**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RHI Entertainment, Inc. <u>et al.</u>, | ) | Case No. 10-_____ |
| | ) | |
| Debtors.[1] | ) | Joint Administration Requested |
| | ) | |
| | ) | |
| | ) | |

### DECLARATION OF ROBERT A. DEL GENIO,
### STRATEGIC PLANNING OFFICER OF RHI ENTERTAINMENT, INC.,
### <u>IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>

Under 28 U.S.C. § 1746, I, Robert A. Del Genio, declare as follows under penalty of perjury:

1.    I am the Strategic Planning Officer of RHI Entertainment, Inc., a Delaware corporation and the ultimate parent corporation of each of the debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (each, a "**Debtor**" and collectively, the "**Debtors**").  I have been associated with the Debtors since May, 2010, and I am familiar with the day-to-day operations, financial conditions, business affairs, and books and records of the Debtors.

2.    Prior to my tenure as Strategic Planning Officer, I served and continue to serve as a principal at Conway, Del Genio, Gries & Co., LLC ("**CDG**"), a financial advisory firm providing restructuring, crisis and turnaround management services.  Over the past six

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are:  RHI Entertainment, Inc. (4616); RHIE Holdings Inc. (5429); RHI Entertainment Holdings II, LLC (0004); RHI Entertainment, LLC (7887); RHI Entertainment Productions, LLC (6014); RHI Entertainment Distribution, LLC (6017); RHI International Distribution Inc. (7653); NGP Holding, Inc. (6138); HEGOA INC. (4608); Independent Projects, Inc. (2430); Don Quixote, Inc. (1238); HE Pro Tunes, Inc. (2268); HEP Music, Inc. (2267); Metropolitan Productions, Inc. (9375); Library Storage, Inc. (8155); HEP SS Music Inc. (7969);  and SLB Productions, Inc. (8171).

months, I have communicated frequently with the Debtors' lenders, management and other representatives regarding the Debtors' activities, cash flows, cost controls and restructuring efforts. I have also assisted the Debtors in preparations for filing these Chapter 11 Cases.

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 100-1532 (as amended, the "**Bankruptcy Code**"). The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been sought and no statutory committee has yet been appointed in these cases (the "**Chapter 11 Cases**"). To enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (collectively, the "**First Day Pleadings**") filed with the Court, including a motion seeking to have the Chapter 11 Cases consolidated for procedural purposes and jointly administered.

4.      Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), I submit this First Day Declaration to (a) provide background information concerning the Debtors and explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under Chapter 11, (b) support the relief requested in the various First Day Pleadings, and (c) provide the information required by Local Rule 1007-2. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the relevant First Day Pleading, as applicable. I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

NY\1628937.21

5.     This First Day Declaration is divided into three parts.  Part I contains an overview of the Debtors' business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the events leading up to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the Debtors' First Day Pleadings. Part III contains the schedules providing additional information about the Debtors, as required by Local Rule 1007-2(a)(3)-(12), (b)(1)-(3).

## I.     BACKGROUND

### THE NATURE OF THE DEBTORS' BUSINESS OPERATIONS AND THE CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     Overview of the Debtors' Business

9.     The Debtors are a leading provider of original long-form television content, including domestic made-for-television movies and mini-series (the "**Content**"), and the Debtors also selectively produce new episodic series programming for television.  The Debtors develop, produce and distribute new Content and maintain and license an extensive library of existing Content.

10.     With respect to new Content, the Debtors acquire the rights to and commission new scripts for long-form content and mini-series.  Once a script is approved by management and before any production processes begin, the Debtors seek licensing agreements with various broadcast entities (the "**Initial Agreements**").  Under these Initial Agreements, a network acquires the right to air the Debtors' Content for a defined period of time.  Generally, production of new Content will not start until an Initial Agreement is executed.  By organizing their business in this way, the Debtors have historically covered a significant percentage of production costs solely through the revenue earned through these Initial Agreements.  Once the

NY\1628937.21

Initial Agreements are in place, the Debtors contract with third-party production companies and other third parties to produce the Content.

11.     In addition to producing the Content, the Debtors also maintain a library of more than 1,000 titles, comprising over 3,500 broadcast hours, of made-for-television movies, mini-series and other programming (the "**Library**").  The Debtors license titles from the Library to networks and broadcast companies from around the world once the Initial Agreements expire. At times, titles may be licensed at the same time in different countries, depending on the terms of the licenses.  The Library serves as a significant source of cash flow and revenue growth for the Debtors.

12.     The Debtors are headquartered in New York, New York, and, together with their non-filing foreign subsidiaries, have offices and rental space in Los Angeles, California, Edison, New Jersey, Kansas City, Missouri, and London, United Kingdom.  The Debtors serve a customer base from around the world that includes a variety of domestic broadcast and cable networks, such as ABC, CBS, the Hallmark Channel, Lifetime, NBC and USA Network ION, the Syfy Channel, Starz/Encore, Spike TV, as well as large international broadcasters, including Antena-3 in Spain, M6 and TF1 in France, PROSIEBEN-SAT1 in Germany, Seven Network in Australia and Sky in the United Kingdom and Ireland.

13.     As of the Petition Date, the Debtors employed approximately 57 salaried employees, one part-time employee and one temporary full-time employee.[2]  In addition to their internal and temporary employees, the Debtors contract with independent contractors and consultants in creative, marketing and production areas.  The Debtors do not have any union-

---

[2] The Debtors' non-filing foreign subsidiaries employ 3 individuals in the United Kingdom.

NY\1628937.21

represented employees, but the Debtors do rely, to varying degrees, on members of the Screen Actors Guild, the Writers Guild of America, the Directors Guild of America and other guilds.

**B.** **Corporate and Debt Structure**

14.     RHI Entertainment, Inc. is a publicly-traded company and operates solely as a holding company that owns all of the equity interests of RHI Entertainment Holdings II, LLC ("**Holdings**") and RHIE Holdings Inc. ("**RHIE**").  Holdings and RHIE each operate solely as holding companies, with Holdings owning 99% and RHIE holding 1% of the equity interests of RHI Entertainment, LLC ("**RHI LLC**").  RHI LLC is the main operating company of the Debtors, and has eight direct subsidiaries.  The three main operating subsidiaries of RHI LLC are RHI Entertainment Productions, LLC ("**Productions**"), RHI Entertainment Distribution, LLC ("**Distribution**") and RHI International Distribution, Inc. ("**RID**").  A corporate organizational chart is attached as **Exhibit L** hereto.

15.     RHI LLC is the borrower under (a) a first-lien term loan in the original principal amount of $175.0 million (the "**First Lien Term Loan**"), (b) a first-lien revolving credit facility in the original principal amount of $350.0 million (the "**First Lien Revolver**") and (c) a second-lien term loan in the original principal amount of $75.0 million (the "**Second Lien Term Loan**," and, together with the First Lien Term Loan and the First Lien Revolver, the "**Secured Facilities**").  As of the Petition Date, the Debtors have approximately $175.0 million principal outstanding under the First Lien Term Loan, and approximately $340.0 million principal outstanding under the First Lien Revolver, as well as approximately $19.6 million of obligations outstanding with respect to terminated swap agreements which had been provided by lenders under the First Lien Credit Agreement (the "**First Lien Swap Obligations**").  They also have approximately $75.0 million principal outstanding under the Second Lien Term Loan.

NY\1628937.21

16.     The First Lien Term Loan and the First Lien Revolver are governed by that certain Amended and Restated Credit, Security, Guaranty and Pledge Agreement dated as of January 12, 2006, as amended and restated as of April 13, 2007 (as amended, supplemented or otherwise modified, renewed or replaced from time to time, the "**First Lien Credit Agreement**") by and among RHI LLC as borrower, Holdings as pledgor, the guarantors referred to therein, the lenders party thereto from time to time, JPMorgan Chase Bank, N.A. ("**JPM**" or "**First Lien Agent**") as a lender, administrative agent for the lenders and as issuing bank, The Royal Bank of Scotland PLC as syndication agent, and Bank of America, N.A. as documentation agent.  The First Lien Credit Agreement is guaranteed by Productions, Distributions, RID, Library Storage, Inc. and RHI Entertainment Ltd., and it is secured by first priority liens and security interests in substantially all of the assets of RHI and of each guarantor.[3]  Pursuant to the First Lien Credit Agreement, the lenders under the First Lien Term Loan and the First Lien Revolver share equal rights in all collateral securing such loans, and such collateral also secures repayment of the First Lien Swap Obligations.

17.     The Second Lien Term Loan is governed by that certain Credit, Security, Guaranty and Pledge Agreement dated as of June 23, 2008 (as amended, supplemented or otherwise modified, renewed or replaced from time to time, the "**Second Lien Credit Agreement**") by and among RHI LLC as borrower, Holdings as pledgor, the guarantors referred to therein, JPM Mezzanine Capital, LLC as lender and the other lenders party thereto from time to time, and Wilmington Trust FSB (as successor agent to JPM) as administrative agent for the lenders.  The Second Lien Term Loan is guaranteed by Distribution, Productions, RID, Library

---

[3] Guarantor RHI Entertainment Ltd. is one of the non-filing foreign subsidiaries.  In exchange for receiving the adequate protection provided in the Interim DIP Order, each of the Pre-Petition First Priority Agent, the Pre-Petition Second Priority Agent, the Guilds, and the other Pre-Petition Secured Parties agreed to forbear from exercising any and all rights and remedies under the Existing Agreements and applicable law against the non-filing foreign subsidiaries.

Storage, Inc. and RHI Entertainment Ltd., and is secured by second priority liens and security interests in substantially all of the assets of RHI and of each guarantor.

### C. Events Leading to the Debtors' Bankruptcy Filing

18. The problems with the U.S. economy that began in the third quarter of 2008 deeply affected the Debtors' industry, business and business model for the production and distribution of made for television films and mini-series.

19. While the Debtors experienced success in preceding years, continuing weak market conditions, sales volume, pricing and other factors present during the fourth quarter of 2009 and into 2010, as well as the significant decline in the annual independent valuation of the unsold rights to the Debtors' film library, caused a significant reduction of the ultimate revenues for the majority of films in their library. At the same time, the Debtors were unable to license new movies and mini-series at prices that would cover the production and debt costs associated with the making of such films. Thus, both the Debtors' Library and new production businesses suffered. Factors that directly precipitated these outcomes included the reduction in television advertising and the reduction in rates that the advertising was capable of generating.

20. With fewer Library films in circulation and with increased costs of producing films, the Debtors experienced a significant reduction in revenues. Over time, the reduction in revenues directly and indirectly reduced the borrowing base governing the First Lien Credit Agreement, which resulted in the Debtors defaulting under the First Lien Credit Agreement and rendered both the First Lien Credit Agreement and the Second Lien Credit Agreement undersecured. With decreased liquidity, the Debtors became unable to finance new films based on these Secured Facilities. Instead, the Debtors were forced to turn to third-party financiers – often times the movie producers, themselves – to finance new productions. Thus, in

addition to being unable to cover the costs of new productions, the Debtors were forced to take on new debt obligations to grow their business.

21.     As the global economy continued to sag, the Debtors' financial position continued to weaken.  In the weeks and months leading up to the Petition Date, the Debtors worked with several of their creditors and stakeholders to restructure the agreements that the Debtors had made with these parties, in an attempt to avoid filing for bankruptcy.  While these negotiations bore fruit in the form of a number of consensual agreements with these third parties, the Debtors were unable to restructure all of their debts on an out-of-court basis and could no longer maintain such a high level of debt, which led to the filing of the Chapter 11 Cases on the Petition Date.

### D.     Overview of the Prepackaged Plan

22.     The Debtors determined, however, that prolonged chapter 11 cases would be unnecessarily expensive and distracting and, as a consequence, would impair their ongoing business operations and threaten their viability as going concerns.  Accordingly, the Debtors, in consultation with certain of their key creditor constituencies, determined to seek their restructuring through the commencement of prepackaged chapter 11 cases.  To this end, the Debtors worked with representatives of such constituencies to formulate a framework for a restructuring that is embodied in the Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors, dated November 1, 2010 (including amendments dated November 19 and 29, 2010, and as it may be further amended, the "**Plan**").[4]

23.     The Plan proposes, and its terms embody, a prepackaged restructuring of the Debtors' obligations under their prepetition credit facilities – referred to under the Plan as the

---

[4] With reference to the description of the Plan, capitalized terms used herein with definition have the meanings provided in the Plan.

NY\1628937.21

Existing First Lien Claims in Class 2 and the Existing Second Lien Claims in Class 3 (the "**Voting Classes**"). The existing public equity will be cancelled. New Term Loan Obligations, New Common Stock and New Warrants will be created. With respect to the Existing First Lien Claims and Existing Second Lien Claims, the Plan provides that on the Effective Date, (a) the First Lien Lenders will receive (i) $300 million of New Term Loan Obligations (ii) approximately 99% of the New Common Stock (subject to dilution), and (b) the Second Lien Lenders will receive (i) approximately 1% of the New Common Stock (subject to dilution), (ii) New Warrants representing 15% ownership of the New Common Stock on a fully diluted basis, and (iii) a limited fee and expense reimbursement of up to $250,000.

24. The Plan provides for the classification of certain classes of claims and interests as Impaired or Unimpaired, each as defined in the Plan and dependent upon the application of the Consensual Plan Alternative or the Non-Consensual Plan Alternative as described below. The Voting Classes are Impaired under the Plan and the holders of Claims in such Classes had their votes solicited prior to the Petition Date and such Classes accepted the Plan by overwhelming requisite majorities. Class 1 Other Priority Claims, Class 4 Other Secured Claims (under the Consensual Plan Alternative), and Class 5 General Unsecured Claims (under the Consensual Plan Alternative if the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount) (collectively, the "**Unimpaired Classes**") are Unimpaired under the Plan. The holders of Claims in such Classes are conclusively presumed to have accepted the Plan and, therefore, did not have their votes solicited prior to the Petition Date. Class 4 Other Secured Claims (under the Non Consensual Plan Alternative), Class 5 General Unsecured Claims (under (a) the Non Consensual Plan Alternative or, (b) the Consensual Plan Alternative if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount), Class 6

NY\1628937.21

Subordinated Claims and Class 7 RHI Inc Interests (collectively, the "**Impaired Rejecting Classes**") are Impaired under the Plan. The holders of Claims and Interests in all but one of such Classes (i.e., Class 4 Other Secured Claims (under the Non Consensual Plan Alternative)), are not entitled to a distribution under the Plan, are deemed to have rejected the Plan and did not have their votes solicited prior to the Petition Date. With respect to Class 4 Other Secured Claims, although the holders of such Claims are entitled to receive or retain property under the Plan under the Non-Consensual Plan Alternative, they are deemed to reject the Plan and they similarly did not have their votes solicited prior to the Petition Date.

        25.     As indicated above, the Plan provides alternatives for the treatment of Other Secured Claims in Class 4 and Allowed General Unsecured Claims in Class 5. It is the Debtors' goal to achieve a fully consensual plan prior to the Combined Hearing. The achievement of that goal is dependent, however, on the Debtors' ability to achieve settlements with certain creditors which are acceptable to the Debtors and to the First Lien Agent by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. If the Debtors are successful, the treatment option that is applicable to Other Secured Claims in Class 4 and to General Unsecured Claims in Class 5 is referred to in the Plan as the Consensual Plan Alternative. Under the Consensual Plan Alternative, the Plan provides that (a) all Allowed Other Secured Claims in Class 4 will be Reinstated and thus Unimpaired, and (b) so long as the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, all Allowed General Unsecured Claims in Class 5 will also be Reinstated and thus Unimpaired. If the prerequisites to the Consensual Plan Alternative are satisfied, then the class of Allowed Other Secured Claims will be deemed to have accepted the Plan. If the prerequisites to the Consensual Plan Alternative are met and the Estimated Class 5 Allowed Claims do not

NY\1628937.21

exceed the Maximum Class 5 Amount, then the class of Allowed General Unsecured Claims will be deemed to have accepted the Plan as well, such that all creditors (other than holders of Subordinated Claims, if any) will have accepted the Plan. The Debtors spent many months prior to the Petition Date working with their creditor constituents in an effort to achieve a fully consensual plan and believe that, if the above-described settlements are reached, the Maximum Class 5 Amount will not be exceeded. If, however, Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, then the holders of General Unsecured Claims in Class 5 will not receive or retain any property under the Plan on account of such Claims and all General Unsecured Claims in Class 5 will be discharged as of the Effective Date. In that case, however, as further described below, a Trade Account made available by the First Lien Lenders will provide payments to those holders of Claims that are eligible to be treated as Allowed Trade Unsecured Claims.

26. The treatment option that is applicable to Other Secured Claims in Class 4 and General Unsecured Claims in Class 5 if the Debtors have not reached the above-described settlements is referred to in the Plan as the Non-Consensual Plan Alternative. Under the Non-Consensual Plan Alternative, the Plan provides with respect to Allowed Other Secured Claims in Class 4 that, at the option of the Debtors, with the agreement of the First Lien Agent, (a) the claim will be Reinstated; (b) the holder of such claim will (i) retain the Liens securing such claim and (ii) receive regular quarterly installment payments in Cash having a total value as of the Effective Date, equal to such claim, over a period not later than five (5) years after the Petition Date; (c) the collateral securing such claim will be surrendered to the holder thereof; or (d) the holder will be paid in full. Under the Non-Consensual Plan Alternative, the holders of General Unsecured Claims in Class 5 will not receive or retain any property under the Plan on account of

11

such Claims and all General Unsecured Claims will be discharged as of the Effective Date. In that case, however, as further described below, a Trade Account made available by the First Lien Lenders will provide payments to those holders of Claims that are eligible to be treated as Allowed Trade Unsecured Claims.

27.     Under either the Consensual Plan Alternative if the Maximum Class 5 Amount is exceeded or the Non-Consensual Plan Alternative, the Plan provides that a Trade Account will be established by the First Lien Lenders for the benefit of the holders of eligible Allowed Trade Unsecured Claims (which essentially consist of General Unsecured Claims held by claimants who have a continuing business relationship with the Debtors including certain vendors, customers, production partners and employees). Under the terms of the Plan, such Trade Account will be funded with a fixed amount of Cash transferred by the Debtors that would otherwise constitute the collateral of the First Lien Lenders; which funds the First Lien Lenders have agreed to make available to preserve and foster the Reorganized Debtors' trade relationships through payment in whole or part of eligible Allowed Trade Unsecured Claims.

28.     To effectuate the foregoing Plan structure, particularly with respect to the determination of whether Estimated Class 5 Allowed Claims will exceed the Maximum Class 5 Amount (a) the Debtors intend to file their Statements of Financial Affairs and Schedules of Assets and Liabilities and Schedule of Executory Contracts (collectively, the "**Statements and Schedules**") approximately fourteen (14) days after the Petition Date, and (b) contemporaneous with the filing of this Declaration, the Debtors have filed a motion (the "**Bar Date Motion**") which seeks (i) to establish a deadline by which claims must be asserted against the Debtors, and (ii) to obtain approval of  a form of notice of such deadline (once approved by the Court, the "**Bar Date Notice**"). The Debtors anticipate mailing the Bar Date Notice within two (2)

NY\1628937.21

business days after the date upon which the Debtors file their Statements and Schedules (such mailing date, the "**Creditor Notification Date**").  The Bar Date Motion further proposes that the deadline by which claims (other than those of governmental units) may be asserted against the Debtors be the date that is twenty-five (25) days after the Creditor Notification Date (such date, the "**Bar Date**").  In accordance with the proposed form of order accompanying the Bar Date Motion, claims not asserted by the Bar Date will be forever discharged.  With the foregoing procedures in place, the Debtors believe that the First Lien Agent will be able to make the determination required by the Plan.

29.     With respect to the solicitation of the votes from the holders of Claims in the two Voting Classes, on November 1, 2010, the Debtors, through their voting agent, caused copies of the Plan, the corresponding Disclosure Statement With Respect to Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors, dated November 1, 2010 (including any supplements and annexes thereto, the "**Disclosure Statement**"), and the appropriate ballot to be transmitted to the holders of Claims in such classes.  The Debtors established 5:00 p.m. (Eastern Time) on November 15, 2010 as the initial deadline for the holders of claims entitled to vote to accept or reject the Plan (as later extended, the "**Voting Deadline**").

30.     On November 12, 2010, the Debtors directed Logan (as defined below) to transmit to the First Lien Lenders and the Second Lien Lenders a Notice of Extended Voting Deadline, which extended the Voting Deadline to 5:00 p.m. (Eastern Time) on November 22, 2010.  Thereafter, the Debtors negotiated and reached an agreement with the First Lien Agent and the steering committee for the First Lien Lenders to modify certain affirmative and negative covenants contained in two exhibits to the Plan.  The modifications were set forth in the

Amendments to Exhibit A (Exit Revolving Credit Facility Term Sheet) and Exhibit E (New Second Lien Term Loan Facility Term Sheet) of Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors, dated November 19, 2010 (the "**November 19 Amendments**"). The First Lien Lenders and the Second Lien Lenders were advised of the Amendments on November 19, 2010, through postings on Intralinks by the First Lien Agent and the Second Lien Agent. In addition, on that date, Logan transmitted to the First Lien Lenders and Second Lien Lenders by e-mail a notice of (i) Amendments to Exhibit A (Exit Revolving Credit Facility Term Sheet) and Exhibit E (New Second Lien Term Loan Facility Term Sheet) of Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors and (ii) Further Extended Voting Deadline (the "**November 19 Extension Notice**"), together with a copy of the November 19 Amendments (the November 19 Extension Notice and the November 19 Amendments together, the "**November 19 Amendment Package**"). Logan also dispatched by hard copy overnight delivery, to be received on November 22, 2010, the November 19 Amendment Package and Amended Ballots (as defined herein) for voting on the Plan as modified by the November 19 Amendments. As announced in the November 19 Extension Notice, the Voting Deadline was set at 5:00 p.m. (Eastern Time) on November 30, 2010.

31. On November 29, 2010, after discussions with certain parties and with the consent of the First Lien Agent, the Debtors made additional immaterial modifications to a section of the Plan and to the corresponding provision in an exhibit to the Plan. Although the modifications were considered to be immaterial, the Debtors elected to provide notice to the First Lien Lenders and the Second Lien Lenders before the Voting Deadline. They also agreed to the request of certain parties to provide a brief extension of the Voting Deadline, to 5:00 p.m. (Eastern Time) on December 6, 2010. Accordingly, on November 29, 2010, the Amendments to

Section 6.7(a) and Exhibit C (New Common Stock Term Sheet) of Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors, as Previously Amended by Amendments to Exhibit A (Exit Revolving Credit Facility Term Sheet) and Exhibit E (New Second Lien Term Loan Facility Term Sheet) of Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors (the "**November 29 Amendments**") and the corresponding Notice of (i) Amendments to Section 6.7(a) and Exhibit C (New Common Stock Term Sheet) of Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors and (ii) Further Extended Voting Deadline (the "**November 29 Extension Notice**") (the November 29 Extension Notice and the November 29 Amendments together, the "**November 29 Amendment Package**") were posted to Intralinks by the First Lien Agent and the Second Lien Agent and were transmitted by Logan to the First Lien Lenders and the Second Lien Lenders by e-mail and hard copy overnight delivery.

32.     As set forth in greater detail in the Declaration of Kathleen M. Logan Certifying Voting On, and Tabulation of Ballots Accepting and Rejecting, Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors, as Amended, the voting results indicate that the two Voting Classes voted to accept the Plan by overwhelming majorities.

33.     The Debtors also have filed a motion (the "**Prepack Procedures Motion**") that seeks (a) entry of an order (the "**Scheduling Order**") (i) scheduling the hearing to consider the adequacy of the Disclosure Statement, the approval of the prepetition solicitation procedures (the "**Solicitation Procedures**"), and the confirmation of the Plan (the "**Combined Hearing**"), (ii) approving the procedures for objecting to the adequacy of the Disclosure Statement, approving the Solicitation Procedures and confirmation of the Plan, (iii) approving

15

the form and manner of notice of the Combined Hearing and commencement of the chapter 11 cases (including authorization to send a send a combined notice of the commencement of the Chapter 11 Cases, the meeting of creditors and of the Combined Hearing (the "**Combined Notice**")), and (iv) approving a procedure to implement the provisions set forth in the Plan for assuming executory contracts and unexpired leases[5]; and (b) entry of an order (i) approving the adequacy of the Disclosure Statement, (ii) approving the Solicitation Procedures, and (iii) confirming the Plan.

34.     Assuming the Court enters the Scheduling Order in the form proposed, and unforeseen circumstances do not arise, the following table sets forth an anticipated timetable for these Chapter 11 Cases to proceed up to the Combined Hearing:

| Proposed Timetable[6] | |
| --- | --- |
| Petition Date | December 10, 2010 |
| Filing of Statements and Schedules/Combined Notice Record Date | Within fourteen (14) days after Petition Date<br><br>(The Debtors are endeavoring to file their Statements and Schedules within ten (10) days after the Petition Date, which would be December 20, 2010) |
| Creditor Notification Date (Mailing of Combined Notice and Mailing of Bar Date Notice) | Within two (2) days after the filing of the Statements and Schedules<br><br>(Proposed date:  December 22, 2010 if Schedules and Statements are filed on |

---

[5] Specifically, the Plan provides a mechanism for the Debtors to assume executory contracts and unexpired leases by filing a schedule that identifies the executory contracts and unexpired leases to be assumed under the Plan (the "**Contract/Lease Assumption Schedule**") on or before the day that is fourteen (14) days before the deadline established to object to the adequacy of the Disclosure Statement, approval of the Solicitation Procedures or confirmation of the Plan (the "**Objection Deadline**").  As set forth in the Plan, any Contract/Lease Assumption Schedule would (a) identify the executory contracts and unexpired leases to be assumed under the Plan, (b) set forth any cure obligation associated with the assumption of such contracts and leases, and (c) be served on the counterparties to the affected contracts and leases.

[6] The following dates are illustrative only. They are subject to, among other things, the Court's schedule and the terms of the Scheduling Order, as entered.

| | December 20, 2010) |
|---|---|
| Deadline for Filing Contract/Lease Assumption Schedule | Fourteen (14) days before Objection Deadline<br><br>(Proposed date:  January 24, 2011 if Objection Deadline is set at February 7, 2011) |
| Bar Date | Twenty-five (25) days after Creditor Notification Date<br><br>(Proposed date:  January 17, 2011, if Creditor Notification Date is December 22, 2010) |
| Deadline for Filing Plan Supplement | Five (5) business days before Objection Deadline<br><br>(Proposed date:  January 31, 2011, if Objection Deadline is set at February 7, 2011) |
| Objection Deadline for Disclosure Statement, Solicitation Procedures and Plan; Objection Deadline for Contract/Lease Assumption Schedule | Ten (10) days before Combined Hearing<br><br>(Proposed date:  February 7, 2011, if Combined Hearing is set on February 17, 2011) |
| Confirmation Brief and Reply Deadline (if any) | Three (3) days before Combined Hearing<br><br>(Proposed date:  February 14, 2011, if Combined Hearing is set on February 17, 2011) |
| Combined Hearing | Approximately seventy (70) days after Petition Date<br><br>(Proposed date:  February 17, 2011) |

## II.    THE CHAPTER 11 CASES

35.    It is critically important for the Debtors to improve their balance sheet and strengthen their business for the benefit of their creditors, customers, suppliers and employees. Achieving these goals is likely to be particularly challenging while operating in chapter 11.  To that end, the Debtors have filed First Day Pleadings seeking relief intended to allow the Debtors

17

to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant consequences because customers, suppliers and employers may refuse to continue to do business with the Debtors and because the administrative burdens otherwise resulting from the process will unnecessarily tax the time of the Debtors' key employees and consume estate resources.

36.     I am generally familiar with the content of each First Day Pleading (including the exhibits thereto) described in further detail herein, and based upon that familiarity and information provided to me by other members of the Debtors' management team and my colleagues who provide information to me in the ordinary course of Debtors' business, I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests, and the failure to grant the motions described herein would have an immediate and irreparable effect on the Debtors' businesses taken as a whole.

A.     **Joint Administration**

37.     The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases. The Debtors also request that the Court maintain one file and one docket for all of the jointly administered cases under the case of RHI Entertainment, Inc. Finally, the Debtors seek authority to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis; provided, however, that all disbursements will be listed on a debtor-by-debtor basis.

38.     I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest. The Debtors

have complex and interlinked commercial relationships.  I believe that joint administration will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  First, joint administration will allow parties-in-interest to monitor these cases with greater ease.  Moreover, many of the motions, hearings and orders that will arise in these Chapter 11 Cases will affect each and every Debtor; therefore, joint administration of these cases will reduce fees and costs by, for example, avoiding duplicative filings and objections and by simplifying the administrative supervision of these cases by the Office of the United States Trustee.

B.    **Waiver of List of Creditors**

39.    The Debtors have requested that this Court enter an order (a) waiving the requirement to file a list of creditors on the Petition Date, and (b) ratifying the Debtors' filing of a single, consolidated list of their 30 largest general unsecured creditors with the petition of each of the Debtors.

40.    The Debtors intend to retain and employ Logan & Company, Inc. ("**Logan**") as their claims and noticing agent (the "**Claims and Noticing Agent**") in these Chapter 11 Cases. Because the Claims and Noticing Agent will receive the consolidated list of creditors and mail the required notices to the parties identified thereon, the Debtors believe that filing the list of creditors will serve no useful, independent purpose.  Additionally, the Debtors have conferred with the Clerk of the Court and the Clerk has been informed that the Debtors will provide the list of creditors to the Claims and Noticing Agent.

41.    Because the majority of creditors in these Chapter 11 Cases have claims against RHI Entertainment, LLC, and the Debtors operating as a single business enterprise, the Debtors request ratification of their decision to attach a single, consolidated list of their 30 largest general unsecured creditors to the petition of each of the Debtors (rather than identifying

19

the 30 largest general unsecured creditors of <u>each</u> Debtor).  This consolidation serves the primary purpose of the list, which is to aid the Office of the United States Trustee in identifying representative creditors who might be willing to serve on an official committee of unsecured creditors, if one is to be appointed in these Chapter 11 Cases.[7]  Moreover, I believe that consolidation will preserve the scare time and resources of the Debtors and their estates.

42.     For the foregoing reasons I believe that waiving the requirement to file a list of creditors on the Petition Date and ratifying the Debtors' filing of a single consolidated list of the Debtors' 30 largest unsecured creditors with each Debtors' petition is necessary and in the best interest of the Debtors' estates and their creditors.

### C.     Case Management

43.     The Debtors seek an order establishing certain notice, case management and administrative procedures, all subject to further order of the Court, including without limitation: (a) directing that all matters be heard at periodic monthly omnibus hearings to be scheduled in advance by the Court; (b) establishing certain filing procedures and deadlines for motions, applications, objections, responses, and permitting service of pleadings by the Debtors by electronic mail as set forth herein; (c) establishing certain notice procedures and designating those entities to receive notice of certain matters; and (d) authorizing the Debtors to establish a website where entities can view the papers, pleadings and notices filed in these Chapter 11 Cases.  The Debtors further request that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to these Chapter 11 Cases except to the extent that they conflict with the relief granted in the order pertaining to case management.  In addition, the Debtors seek

---

[7] It is my belief that a committee is unnecessary in these cases unless and until it is determined that the unimpaired treatment alternative provided to unsecured creditors under the prepackaged plan is not available.

NY\1628937.21

to schedule an initial case management conference in accordance with Local Bankruptcy Rule 1007-2(e).

44.     I believe the establishment of the proposed notice, case management and administrative procedures will be integral to the efficient and effective management of these Chapter 11 Cases because monthly omnibus hearings will assist all parties in planning for attendance, thus reducing the need for emergency hearings and the proposed notice and filing procedures will be assure all parties-in-interest of prompt and appropriate notice of matters affecting their interests.

### D.     Retention of Claims and Noticing Agent

45.     The Debtors seek entry of an order authorizing them to retain and employ Logan in connection with these Chapter 11 Cases as the Claims and Noticing Agent to, among other tasks, (a) distribute required notices to parties-in-interest, (b) receive, maintain, docket, and otherwise administer the proofs of claims and proofs of interest filed in these Chapter 11 Cases, (c) tabulate, if necessary, acceptances and rejections for all claims, and (d) provide such other administrative services that the Debtors may require.

46.     It is my opinion that the retention of Logan is necessary for the administration of the Chapter 11 Cases.  First, Logan is well-suited and qualified for this retention.  Logan is a data processing firm that specializes in chapter 11 administration, consulting and analysis, including noticing, claims processing, voting and other administrative tasks in chapter 11 cases.  The Debtors wish to engage Logan to send out certain designated notices and to maintain claims files and a claims and voting register.  I believe that such assistance will expedite service of notices, streamline the claims administration process and permit the Debtors to focus on their reorganization efforts.  Furthermore, by appointing Logan as

the Claims and Noticing Agent in these Chapter 11 Cases, the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

### E.  Cash Management

#### i.  Request for Authority to Continue Using the Debtors' Existing Cash Management System

47.     The Debtors request authority to continue to use their existing cash management system (the "**Cash Management System**"), to maintain their existing prepetition bank accounts and business forms, and to waive of the requirements of Section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit practices.

48.     I believe that the Debtors' continued utilization of the Cash Management System is necessary for their business and financial affairs.  The Cash Management System allows the Debtors to collect, transfer and disburse funds as needed throughout their business operations and provides significant benefits to the Debtors, including the ability to: (a) closely track all corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of up-to-date status reports and account balance information.  It is my opinion that any disruption in the Cash Management System could delay the collection and disbursement of funds and threaten the orderly operation of the Debtors' business.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Cash Management System will facilitate the Debtors' reorganization efforts.

#### ii.  Request for Authority to Maintain Existing Bank Accounts and Business Forms

49.     The Debtors seek a waiver of the U.S. Trustee's requirement that their bank accounts be closed and that new postpetition bank accounts be opened.  The Debtors further request that the bank accounts be deemed debtor-in-possession accounts and that the Debtors be

22

authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period. Additionally, the Debtors request that they be authorized to continue to use their business forms existing immediately before the Petition Date without reference to the Debtors' status as debtors in possession.

50.     I believe that the Debtors should be authorized to maintain their prepetition bank accounts and business forms because such authority will allow the Debtors to avoid delays in paying debts as they come due and ensure a smooth transition into and out of bankruptcy.  It is my belief that if the relief is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.

### iii.     Request for a Waiver of the Deposit Requirements of 11 U.S.C. § 345(b) on an Interim Basis

51.     Prior to the Petition Date, the Debtors were permitted to invest excess funds in accordance with the terms of the Secured Facilities, which required that any such excess funds be invested only in cash or cash equivalents.  As of the Petition Date, the Debtors had no deposits or investments of money other than the cash on hand in their Operating Accounts. Nevertheless, out of an abundance of caution, the Debtors request that the Court waive the requirements of Section 345(b) on an interim basis and permit the Debtors to maintain their deposits in their accounts in accordance with their existing deposit practices.  The Debtors would request that such interim waiver continue until and be made automatically final upon confirmation of the Plan and that they not be required to seek a further waiver until and unless that Plan is withdrawn or is denied confirmation.

NY\1628937.21

52. Given the relative security of the Debtors' Cash Management System, the Debtors submit that cause exists to grant an interim sixty-day waiver of the requirements of Section 345(b) of the Bankruptcy Code.

**F.     Taxes**

53. In the ordinary course of business, the Debtors (a) incur sales, use, franchise and other taxes, as well as payroll taxes and related obligations, and (b) incur fees, assessments and charges from various taxing and licensing authorities[8] for licenses, permits and other assessments required to conduct the Debtors' business.  As of the Petition Date, the Debtors have timely filed all requisite returns in respect of the taxes and fees and have no outstanding tax obligations that are presently due and payable.[9]  While no taxes and fees are presently outstanding, the Debtors request, out of an abundance of caution, that they be authorized, in their sole discretion and as they may deem necessary or appropriate, to remit and pay any taxes and fees that become due and payable during these Chapter 11 Cases.

54. I believe that the relief requested is necessary for the Debtors.  By allowing the Debtors to pay their taxes and fees, the Court will facilitate the avoidance of unnecessary audits that threaten to divert the Debtors' attention and funds away from the reorganization process.  It is my opinion that the Debtors' failure to promptly pay the taxes and fees could cause unforeseen expenses, including various taxing authorities seeking to lift the automatic stay or pursuing claims against the Debtors' officers and directors, thus distracting the Debtors from completing their reorganization in a timely manner and materially impacting the

---

[8] The Debtors pay Taxes and Fees to the relevant Authorities in several jurisdictions, including, but not limited to, the federal government of the United States, the state governments of California, Delaware, Colorado, Missouri, New York and New Jersey, New York City and several foreign jurisdictions.  The Debtors conduct business in New York, California and Missouri.

[9] This does not include any potential prepetition tax liability that may later come due as the result of an audit.  The Debtors request that the relief sought herein apply likewise to any liability resulting from audits of prepetition taxes, in the event such liability arises (for which the Debtors reserve all rights and defenses).

Debtors' ability to operate in the ordinary course of business. Moreover, by allowing the Debtors to continue to pay taxes and fees on a timely basis, the Court can help to ensure that governmental authorities do not take unwarranted action, such as audits or penalty fees, against the Debtors while in bankruptcy. For these reasons, I submit that the relief requested is in the best interests of the Debtors, their estates and their creditors and respectfully request that it be granted by this Court.

### G. Utilities

55. In the operation of their business, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, natural gas, and telephone and internet service in the ordinary course of business. These utilities are provided by approximately 17 providers.[10] On average, the Debtors spend approximately $21,300 each month on utility costs. Of this amount, the Debtors pay approximately $9,300 per month directly to certain utility providers and $12,000 per month directly to their landlords for certain utility services. The Debtors have historically paid the utility providers promptly and in full. As of the Petition Date, the Debtors do not owe any past due amounts to the utility providers. Given the fact that the Debtors do not owe any past due amounts, the Debtors believe that the Adequate Assurance Deposit is more than sufficient to provide the utility providers with adequate assurance of payment.

56. It is my belief that uninterrupted utility services are essential to the Debtors' ongoing business operations and, therefore, to the success of their reorganization. Should the utility providers refuse or discontinue service, the Debtors' business operations would be severely disrupted, and such disruption would negatively affect the Debtors' business

---

[10] The Debtors reserve the right, without further order of the Court, to supplement the list and number of utility providers if any has been omitted.

NY\1628937.21

relationships, revenues and profits. It is also my belief that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.

**H.    Insurance**

57.    The Debtors purchase and maintain numerous insurance policies providing coverage for, among other things, commercial general liability, commercial property liability, automobile liability, foreign liability, damage to the Debtors' property, producers error and omissions, director and officer liability, workers' compensation liability and employer's liability claims. The Debtors propose to continue the Policies on an uninterrupted basis consistent with pre-petition practices and pay any premiums that arise in the ordinary course of business.

58.    The annual premiums for the various policies (including the insurance broker fees associated therewith) total approximately $1.5 million, and the Debtors do not finance any of the premiums associated with the policies. As of the Petition Date, the Debtors do not believe that there are any prepetition premiums, deductibles or self-insured retention amounts outstanding. However, out of an abundance of caution, the Debtors are seeking the Court's authorization to pay any such undisputed premiums, self insured retention amounts or deductibles in their discretion, as they come due.

59.    I believe that the various insurance policies are essential to the preservation of the Debtors' business, property and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' commercial activity. If the Debtors are unable to continue making payments on the policies, the insurance providers thereunder may be permitted to terminate the policies and recoup their losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and pay a lump-sum premium for the replacement insurance policy or policies in advance. This payment

26

would likely be greater than the premiums currently paid by the Debtors under the current policies. Accordingly, the detrimental effect impact of failing to continue to make premium payments would greatly outweigh the costs associated with honoring the Debtors' prepetition obligations under the insurance policies.

### I. Ordinary Course Professionals

60. The Debtors retain the services of various attorneys in the ordinary course of their business operations. These professionals provide services to the Debtors in a variety of discrete matters unrelated to these Chapter 11 Cases. The Debtors request that they be permitted to employ and retain ordinary course professionals on terms substantially similar to those in effect prior to the Petition Date. In order to maintain these retentions, the Debtors have proposed certain procedures for the retention and compensation of the ordinary course professionals, including the setting of a cap of $50,000 per month and $500,000 for the duration of these Chapter 11 Cases on the fees of each OCP. Although some of the OCPs may have an unsecured claim against the Debtors in respect of prepetition services rendered, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors or other parties-in-interest.

61. I believe it is in the Debtors' best interests to employ the ordinary course professionals as necessary for the day-to-day operations of the Debtors' business. It would be unwieldy, burdensome and expensive to the Debtors and to this Court to request that each ordinary course professional apply separately for approval of its employment and compensation.

### J. Critical, Priority and Foreign Vendors

62. In the ordinary course of business, the Debtors purchase or acquire the necessary goods and services, on open credit, from numerous vendors in order to procure their films. These essential goods and services are provided by certain critical trade vendors (the

27

"**Critical Vendors**"), without which the Debtors would be unable to maintain an uninterrupted supply of quality products and services to their customers. The Debtors also may have received goods from certain vendors in the ordinary course of business during the 20-day period prior to the Petition Date, and therefore, such vendors may be entitled to administrative claim status pursuant to Section 503(b)(9) of the Bankruptcy Code (collectively, the "**Priority Vendors**"). The Debtors also depend on certain foreign vendors (the "**Foreign Vendors**" and, together with the Critical Vendors and the Priority Vendors, the "**Essential Vendors**") to help them produce, develop and modify their movies and mini-series for foreign distribution.

63. The Debtors estimate that the aggregate amount of prepetition Essential Vendor Claims is approximately $500,000, of which $200,000 is attributable to Critical Vendors, $150,000 is attributable to Foreign Vendors and $150,000 is attributable to Priority Vendors. The Debtors seek an Interim Order authorizing, but not obligating, the Debtors to pay, in their sole discretion, the amounts needed to satisfy the Essential Vendor Claims that become due and payable prior to the Final Hearing. The Debtors propose to pay only the Critical Vendor Claims of each Critical Vendor that agrees to continue to supply goods or services to the Debtors on customary trade terms acceptable to the Debtors. In order to ensure that the Critical Vendors continue to supply goods or services to the Debtors in the future, the Debtors also propose to enter into Vendor Agreements with the Critical Vendors, pursuant to which the Critical Vendors agree, among other things, to continue doing business with the Debtors.

64. I believe that the Essential Vendors are critical to maintaining and maximizing the value of the Debtors' operations. The Debtors and their advisors have completed a thorough analysis of the Debtors' vendors to identify those critical to the Debtors' ongoing operations. I believe that the Essential Vendors may refuse to continue providing

services to the Debtors if their prepetition claims were not paid.  I also believe that it would be extremely difficult to find replacement vendors to provide the materials and services of the same quality as provided by the Essential Vendors.  Therefore, if the Debtors are not granted the authority to pay the prepetition claims of the Essential Vendors, their access to quality materials and services may be limited.  Without such quality materials and services, the Debtors' own products will suffer and the resulting loss of  customers and erosion of goodwill would decrease the value of the Debtors' estates.

### K.    Employees

65.    As of the Petition Date, the Debtors employ approximately 62 employees. The Debtors are obligated to pay certain compensation, benefits and other expenses in order to maintain their workforces.  The Debtors' aggregate gross monthly compensation for employees, including both wages and salaries, is approximately $853,226.

66.    Additionally, no accrued wages, salaries, overtime pay, commissions and other compensation (excluding reimbursable expenses, vacation pay, severance pay, deferred compensation and incentive bonus pay) earned prior to the Petition Date remains unpaid as of the Petition Date.  The Debtors owe approximately $600 to a temporary employment agency as of the Petition Date.

67.    In order to address their several responsibilities to their work force, the Debtors seek the entry of an order granting the Debtors authority:

a)  To honor and pay prepetition claims relating to the Employee Wages and Benefits, including, but not limited to, the Unpaid Compensation, obligations to the Temporary Employee, the Deductions, the Withheld Amounts, the Employer Payroll Taxes, the Reimbursable Expenses, the Bonus and Incentive Plans, Severance, the Vacation Time, the Unused and Accrued Vacation Pay, Personal Days, Sick Days, Holidays, the Paid Leave, the

Health Benefits, the Employee Welfare Benefits, the Retirement Plans, the Workers' Compensation Program, the Flexible Spending Plan, the Transportation Plan, the D&O Policies, the COBRA Benefits, the Miscellaneous Benefits Programs and any other policy or program described and defined in the Motion;

b) To continue the Employee Wages and Benefits programs and policies on a postpetition basis and to alter, modify or discontinue such programs and policies as they deem necessary or appropriate in the ordinary course of business, without further notice to or order of the Court;

c) To continue to allocate and distribute the Deductions and the Employer Payroll Taxes in accordance with the Debtors' stated policies and prepetition practices or as required by applicable federal, state and local law, without regard to whether such amounts arose before or after the Petition Date;

d) To pay all processing fees, costs and expenses associated with the payment and administration of the Employee Wages and Benefits, including payment to third-party administrators and service providers, without regard to whether such amounts arose before or after the Petition Date; and

e) To honor and make payments to the Temporary Employee and employment agencies in accordance with their prepetition practices, without regard to whether such amounts arose before or after the Petition Date.

68.    The Debtors also seek relief as it pertains to certain financial institutions and banks. Specifically, the Debtors seek entry of an order authorizing and, in some cases, directing:

a) Certain banks to honor checks, upon presentation, that are drawn in payment to Employees or other entities in connection with the Employee Wages and Benefits programs and policies;

b) Applicable banks and financial institutions to (i) receive, process, honor, and pay any and all checks and transfers drawn on the Debtors' accounts evidencing amounts paid by the Debtors under the proposed order whether presented prior to or after the Petition Date and (ii) rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to the proposed order; and

c) The Debtors to reissue any check, electronic payment or other transfer that was drawn in payment of any claims arising from or related to the Employee Wages and Benefits programs and policies that are not cleared by a depository.

69.     I believe that the relief sought in the Motion is essential to the Debtors' successful reorganization and emergence from these Chapter 11 Cases. It is my opinion that the Employee Wages and Benefits programs are reasonable and appropriate under the circumstances and for the Debtors' industry. Thus, the Debtors should be allowed to keep such programs in place during the pendency of the cases.

70.     The Debtors' employees are integral to their businesses. The Debtors' businesses depend, in large part, on the expertise, effort, attitude, and efficiency of their employees. The employees' knowledge and dedication are vital to the successful reorganization and emergence of the Debtors from bankruptcy. Maintaining the Employee Wages and Benefits will ensure that the Debtors' employees are adequately motivated to facilitate a successful reorganization. I also believe that maintenance of these programs will maintain good morale in the rank and file will alleviate employee concerns regarding their job security. Without this

NY\1628937.21

reassurance, morale and loyalty among employees may decline, and employees may perform their duties at less-than optimal levels, or seek other employment. Such an outcome would be detrimental to the reorganization process, and therefore to the Debtors, its creditors and all parties-in-interest. For all of these reasons, it is my opinion that the relief sought in the Motion should be granted.

**L.      Post-Petition Financing and Cash Collateral**

71.      The Debtors seek entry of an order (a) authorizing the Debtors to obtain post-petition financing on a senior secured, priming, superpriority basis, to grant liens and claims in support of such financing, and to execute necessary documentation attendant to the obtaining of such financing; (b) authorizing the Debtors, subject to certain limitations, to use certain pre-petition collateral, including cash collateral, in which certain pre-petition secured parties have an interest; (c) granting adequate protection to such secured parties for (i) the priming of their existing liens on the pre-petition collateral and (ii) the use of the pre-petition collateral, including the cash collateral; (d) vacating and modifying the automatic stay afforded by Section 362 of the Bankruptcy Code to permit actions necessary to implement, effectuate and enforce the post-petition financing; and (e) scheduling a final hearing to consider entry of the Final Order.

72.      The Debtors seek authority to incur post-petition superpriority secured financing from JPMCB on an interim basis. The Debtors, in the exercise of their business judgment, have concluded that post-petition financing is essential to the success of their operations and reorganization efforts. The Proposed DIP Facility will allow for immediate access to liquidity at this critical, early stage of the Debtors' reorganization efforts, which will give the Debtors an opportunity to operate their business as they had been before the Petition Date, with less of the uncertainty that frequently accompanies chapter 11 filings. The Debtors

will be irreparably harmed if they are not authorized immediately to obtain post-petition financing on the terms and conditions described in the Motion.

73.     The Debtors submit that ample justification exists for the approval of the proposed Post-Petition Financing under Sections 363 and 364 of the Bankruptcy Code and that the entering into of the DIP Credit Agreement with the DIP Lenders is appropriate and is necessary under the circumstances to, among other things, permit the orderly continuation of the Debtors' businesses, maintain business relationships with production partners, vendors, suppliers and customers, make payroll, make capital expenditures and satisfy other working capital and operational needs.  I believe that the access of the Debtors to sufficient working capital and liquidity through the use of Pre-Petition Collateral (including the Cash Collateral) and the incurrence of new indebtedness are vital to the preservation and maintenance of the going concern value of the Debtors and to a successful reorganization of the Debtors.  The Debtors will suffer immediate and irreparable harm if the interim relief requested in the Motion is not granted.

74.     The Debtors also believe that the granting of various forms of adequate protection to the Pre-Petition Secured Parties is warranted and necessary under the circumstances.  It is my belief that the replacement liens, adequate protection superpriority claims, payment of certain expenses and other protections offered to the Pre-Petition Secured Parties are fair and reasonable and will sufficiently protect their respective interests in any Collateral taken under the DIP Facility.

75.     The Debtors believe it would be impossible under the circumstances of these cases to obtain financing on an unsecured basis or merely by granting liens on unencumbered assets.  In the Debtors' considered business judgment based on the Debtors'

significant efforts to obtain post-petition financing from numerous potential lenders, the DIP Financing is the best financing option available in the circumstances of these cases.

### M.    Direction to Pay Agreements

76.    Prior to the Petition Date, the Debtors entered into two types of Direction to Pay Agreements.   First, in the Debtors ordinary course of business, they entered into agreements with certain producers and exhibitors whereby those exhibitors agreed to pay certain amounts due in connection with their agreements with the Debtors directly to certain producers in order to satisfy the Debtors' payment obligations to such producers.   Second, in connection with the Debtors' prepetition restructuring efforts, the Debtors entered into agreements with certain producers or production loan financiers and exhibitors whereby those exhibitors agreed to remit certain or all licensing fees owed in connection with a particular film directly to the pertinent producer or production loan financier rather than to the Debtors.

77.    Out of an abundance of caution and to address the uncertainty with which third parties frequently view the chapter 11 process, the Debtors seek entry of an order that provides the Debtors, producers, production loan financiers, exhibitors, and other entities party to the Direction to Pay Agreements with the authority to continue to perform their obligations under those agreements without further order of the Court.   The Debtors also seek authority to remit any payments exhibitors or other third parties inadvertently deliver to the Debtors to the proper producer or production loan financier as appropriate under any relevant Direction to Pay Agreement.   Finally, the Debtors seek entry of the Order authorizing the Debtors to enter into additional Direction to Pay Agreements to the full extent necessary.

78.    I believe that the Direction to Pay Agreements are essential to the Debtors' successful reorganization and emergence from these Chapter 11 Cases.   These agreements are standard in the Debtors' industry, ensure that the Debtors' business and business relationships

34

are not harmed for the duration of the Chapter 11 Cases and ensure that the integral agreements struck during Debtors' prepetition restructuring efforts will be secure. Moreover, as the Debtors move through the chapter 11 processes, they will continue to conduct business. To that end, the Debtors may need to enter into additional Direction to Pay Agreements in order to sustain their business operations. It is my belief that if the relief is granted, the producers, production loan financiers and exhibitors will be provided with necessary comfort to continue performance under the Direction to Pay Agreements. For these reasons, I submit that the relief requested is in the best interests of the Debtors, their estates and their creditors and respectfully request that it be granted by this Court.

### N. Film Financing Agreements

79. The Debtors request entry of an order allowing them to (i) continue performing under their film financing agreements (the "**Film Financing Agreements**"), (ii) provide credit support in connection with the Film Financing Agreements, and (iii) enter into additional Film Financing Agreements. In the ordinary course of business, the Debtors commission certain production companies (the "**Production Companies**") to produce new films (the "**New Content**") pursuant to the Film Financing Agreements, under which the Debtors pay a fee (the "**Producer Fee**") to the Production Companies in return for exclusive distribution licenses in respect of the New Content. A Production Company typically establishes a special purpose entity for the development of each item of New Content, which retains all of the rights with respect to the literary, musical, dramatic and other written materials created for the New Content and receives a security interest in certain Distribution Payments (as defined below) or in the Distribution License (collectively, the "**Producer Fee Collateral**") to secure full payment of the Producer Fee.

35

80.     Before production begins on an item of New Content, the Debtors sell sublicenses (the "**Sublicenses**") for certain territorial or temporal distribution rights in respect of the New Content to third parties (the "**Sublicensees**") and receive certain payments (the "**Distribution Payments**") in return for granting the Sublicenses.  Many of these Distribution Payments are received before production begins and are available to the Production Companies to help defray the cost of producing the item of New Content.  The balance of the Distribution Payments are received by the Debtors only after the item of New Content has actually been produced and actually been received by the Sublicensees.

81.     Business arrangements like those memorialized in the Film Financing Agreements are standard in the Debtors' industry and I believe they are vitally important to the Debtors' ability to produce and distribute new films, a cornerstone of their business.  Given the uncertainty with which third parties frequently view the chapter 11 process, however, Production Companies and the financial institutions that provide Production Loans may be hesitant to continue to perform under existing Film Financing Agreements or enter into new Film Financing Agreements with the Debtors during these Chapter 11 Cases.  Accordingly, I believe that entry of the order requested in the Motion will help to provide comfort to Film Financing Agreement counterparties and help ensure that the Debtors' business relationships remain unharmed and that the Debtors are able to continue operating their business for the duration of the Chapter 11 Cases.

82.     Given the ordinary-course nature of the Film Financing Agreements and the importance of New Content to the Debtors' business, I believe that it is necessary and appropriate for this Court to grant the relief requested in the Motion.  Were the Order not entered, the Debtors may lose their ability to add New Content to their library, as Production

Companies refuse to produce items of New Content for the Debtors and financial institutions refuse to make Production Loans in respect of items of New Content without the Debtors' credit support. This would threaten the Debtors' prospects both for a successful resolution of these Chapter 11 Cases and for the sound future of their business.

### III. INFORMATION REQUIRED BY LOCAL RULE 1007-2

83. Local Rule 1007-2(a)(3) is not applicable as no committee was formed prior to the commencement of these Chapter 11 Cases.

84. Pursuant to Local Rule 1007-2(a)(4), **Exhibit A** hereto provides the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); telephone number; the name(s) of person(s) familiar with the Debtors' account; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

85. Pursuant to Local Rule 1007-2(a)(5), **Exhibit B** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address); the approximate amount of the claim, a brief description and an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

86. Pursuant to Local Rule 1007-2(a)(6), **Exhibit C** hereto provides a summary of the Debtors' assets and liabilities.

87. Pursuant to Local Rule 1007-2(a)(7), **Exhibit D** hereto provides the following information: the number and classes of shares of stock, debentures or other securities of the Debtors that are publicly held and the number of holders thereof; the number of classes of

shares of stock, debentures and other securities of the Debtors that are held by the Debtors' officer and directors and the amounts so held.

88.　　Pursuant to Local Rule 1007-2(a)(8), **Exhibit E** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditors, or agent for such entity: the name, address, and telephone number of such entity and the court in which any proceeding relating thereto is pending.

89.　　Pursuant to Local Rule 1007-2(a)(9), **Exhibit F** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.  The Debtors' corporate headquarters are located at 1325 Avenue of the Americas, New York, New York, 10019.

90.　　Pursuant to Local Rule 1007-2(a)(10), **Exhibit G** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

91.　　Pursuant to Local Rule 1007-2(a)(11), **Exhibit H** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

92.　　Pursuant to Local Rule 1007-2(a)(12), **Exhibit I** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

93.　　Pursuant to Local Rule 1007-2(b)(1) and (2), **Exhibit J** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and

stockholders) and the estimated amounts paid or to be paid to officers, stockholders, directors, and financial and business consultants retained by Debtors, for the 30 day period following the filing of the Debtors' chapter 11 petitions.

94.     Pursuant to Local Rule 1007-2(b)(3), **Exhibit K** hereto provides a schedule for the 30-day period following the filing of these Chapter 11 Cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

## IV.     CONCLUSION

Accordingly, for the reasons states herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the First Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: December 10, 2010
New York, New York

RHI ENTERAINMENT, INC., et al.
Debtors and Debtors-in-Possession

/s/ Robert A. Del Genio
Robert A. Del Genio
Strategic Planning Officer
RHI Entertainment, Inc.

NY\1628937.21