**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RHI Entertainment, Inc., <u>et al.</u>, | ) | Case Number:  10-16536 (MG) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DISCLOSURE STATEMENT WITH RESPECT TO
### JOINT PREPACKAGED PLAN OF REORGANIZATION OF
### <u>RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS</u>

D. J. Baker
Rosalie Walker Gray
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:(212) 906-1200
Facsimile: (212) 751-4864
Email:    dj.baker@lw.com
          rosalie.gray@lw.com
          keith.simon@lw.com

Proposed Counsel for Debtors and Debtors in Possession

**APPROVAL OF THIS DISCLOSURE STATEMENT, AND CONFIRMATION OF THE CORRESPONDING JOINT PREPACKAGED PLAN OF REORGANIZATION, AS AMENDED,  IS PENDING PURSUANT TO PREPACKAGED GUIDELINES ADOPTED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.**

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 REORGANIZATION PLAN _PRIOR_ TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT THAT, AMONG OTHER THINGS, APPROVES THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, APPROVES THE SOLICITATION OF VOTES AND CONFIRMS THE JOINT PREPACKAGED REORGANIZATION PLAN DESCRIBED HEREIN.  CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

# <u>DISCLOSURE STATEMENT</u>

**Dated November 1, 2010**

**Prepetition Solicitation of Votes with Respect to
Joint Prepackaged Plan of Reorganization**

**for**

**RHI Entertainment, Inc.
RHIE Holdings Inc.
RHI Entertainment Holdings II, LLC
RHI Entertainment, LLC
RHI Entertainment Productions, LLC
RHI Entertainment Distribution, LLC
RHI International Distribution Inc.
NGP Holding, Inc.
HEGOA Inc.
Independent Projects, Inc.
Don Quixote, Inc.
HE Pro Tunes, Inc.
HEP Music, Inc.
Metropolitan Productions, Inc.
Library Storage, Inc.
HEP SS Music Inc.
SLB Productions, Inc.**

**THIS DISCLOSURE STATEMENT SOLICITS ACCEPTANCES OF THE PLAN AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.**

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 REORGANIZATION PLAN _PRIOR_ TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE. BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT THAT, AMONG OTHER THINGS, APPROVES THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, APPROVES THE SOLICITATION OF VOTES AND CONFIRMS THE JOINT PREPACKAGED REORGANIZATION PLAN DESCRIBED HEREIN. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RHI Entertainment, Inc., <u>et al.</u>, | ) | Case Number:  Pending Filing |
| | ) | |
| Debtors. | ) | Joint Administration to be Requested |
| _____ | ) | |

### DISCLOSURE STATEMENT WITH RESPECT TO
### JOINT PREPACKAGED PLAN OF REORGANIZATION OF
### <u>RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS</u>

D. J. Baker
Rosalie Walker Gray
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:   (212) 906-1200
Facsimile:   (212) 751-4864
Email:        dj.baker@lw.com
              rosalie.gray@lw.com
              keith.simon@lw.com

Proposed Counsel for Debtors and Debtors in Possession

Dated:  November 1, 2010

**IMPORTANT INFORMATION FOR YOU TO READ**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THE DEBTORS HAVE <u>NOT</u> COMMENCED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF THE DATE OF THIS DISCLOSURE STATEMENT. WHEN THE DEBTORS RECEIVE PROPERLY COMPLETED BALLOTS INDICATING ACCEPTANCE OF THE PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS ESTABLISHED BY SECTION 1126 OF THE BANKRUPTCY CODE, THEY INTEND TO PROCEED ON A PREPACKAGED BASIS TO FILE WITH THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND TO SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PLAN. UNDER CERTAIN CIRCUMSTANCES, THE DEBTORS MAY FILE, PRIOR TO THE VOTING DEADLINE, VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND SEEK, AS PROMPTLY THEREAFTER AS PRACTICABLE, CONFIRMATION OF THE PLAN. IN EITHER EVENT, CONSUMMATION OF THE PLAN IS EXPECTED TO OCCUR SHORTLY FOLLOWING THE BANKRUPTCY COURT'S ENTRY OF AN ORDER CONFIRMING THE PLAN. IF BALLOTS ACCEPTING THE PLAN IN SUFFICIENT NUMBER AND AMOUNT TO MEET THE VOTING REQUIREMENTS ARE NOT RECEIVED, THE DEBTORS NEVERTHELESS INTEND TO PROCEED, EITHER ON A PREARRANGED OR TRADITIONAL BASIS, TO FILE VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "BELIEVE," "PREDICTS," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY. THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO AND RECOVERIES BY HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. FACTORS THAT COULD CAUSE ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED IN PART VIII HEREIN TITLED "RISK FACTORS". THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTIONS PROVIDED BY SECTION 4(2) AND REGULATION D OF THE SECURITIES ACT, OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF THE NEW SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF BANKRUPTCY

CODE SECTION 1145(a)(1) AND (a)(2) AND SECURITIES ACT SECTION 4(2), REGULATION D OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION RIGHT OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR INTEREST IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN A FINAL ORDER OF THE BANKRUPTCY COURT. THE DEBTORS OR THE REORGANIZED DEBTORS, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE ANY LITIGATION RIGHTS OR OBJECTIONS TO CLAIMS AND INTERESTS, AND MAY DO SO AFTER THE CONFIRMATION DATE OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES SUCH LITIGATION RIGHTS OR OBJECTIONS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO REVIEW THE DISCLOSURE STATEMENT AND PLAN, INCLUDING ALL EXHIBITS ATTACHED HERETO AND THERETO, IN THEIR ENTIRETY BEFORE CASTING THEIR VOTES TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE GOOD FAITH EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE OF THE DISCLOSURE STATEMENT OR SUCH EARLIER DATE AS MAY BE SPECIFICALLY NOTED. THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON OR ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE

**NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS, THE PLAN OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN PART VIII HEREIN TITLED "RISK FACTORS."**

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

**THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESS IN CHAPTER 11 IN THE ORDINARY COURSE AND TO PROMPTLY SEEK THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY THE CLAIMS OF CERTAIN CRITICAL, PRIORITY AND FOREIGN VENDORS AND THE VAST MAJORITY OF THE CLAIMS OF THEIR EMPLOYEES IN FULL AND ON TIME IN ACCORDANCE WITH EXISTING BUSINESS TERMS.**

---

**THE VOTING DEADLINE IS 5:00 EASTERN TIME ON MONDAY, NOVEMBER 15, 2010, UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE.**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

### TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. INTRODUCTION | | 1 |
| A. | PREPACKAGED PROCESS | 1 |
| B. | PURPOSE OF DISCLOSURE STATEMENT | 1 |
| C. | OVERVIEW OF THE PLAN | 2 |
| D. | THE VOTING PROCESS | 10 |
| E. | THE CONFIRMATION HEARING | 13 |
| F. | ESTIMATES AND FORWARD LOOKING STATEMENTS | 13 |
| II. GENERAL INFORMATION CONCERNING THE DEBTORS | | 14 |
| A. | INTRODUCTION | 14 |
| B. | THE DEBTORS' CORPORATE HISTORY AND STRUCTURE | 15 |
| C. | OVERVIEW OF THE DEBTORS' BUSINESS | 15 |
| D. | CORPORATE GOVERNANCE AND MANAGEMENT | 19 |
| E. | SUMMARY OF SIGNIFICANT PREPETITION OBLIGATIONS | 25 |
| F. | EQUITY INTERESTS | 35 |
| G. | HISTORICAL FINANCIAL INFORMATION; ADDITIONAL INFORMATION | 36 |
| H. | KEY EVENTS LEADING TO THE FILING OF CHAPTER 11 CASES | 36 |
| III. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES | | 37 |
| A. | FILING AND FIRST DAY ORDERS | 37 |
| B. | REPRESENTATION OF THE DEBTORS | 38 |
| C. | BAR DATE AND PROOF OF CLAIM PROCESS | 38 |
| D. | ANTICIPATED TIMETABLE FOR THE CHAPTER 11 CASES | 38 |
| IV. REASONS FOR THE SOLICITATION; RECOMMENDATION | | 39 |
| V. THE PLAN | | 39 |
| A. | OVERALL STRUCTURE OF PLAN | 39 |
| B. | BASIS FOR PLAN STRUCTURE | 40 |
| C. | SUBSTANTIVE CONSOLIDATION | 40 |
| D. | SECURED LENDER SETTLEMENT | 41 |
| E. | CONSENSUAL OR NON-CONSENSUAL PLAN ALTERNATIVES | 42 |
| F. | ESTIMATED CLASS 5 ALLOWED CLAIMS DETERMINATIONS | 42 |
| G. | ACCOMMODATIONS BY FIRST LIEN LENDERS | 43 |
| H. | REORGANIZED CAPITAL STRUCTURE CREATED | 43 |
| I. | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | 44 |
| J. | IMPLEMENTATION OF PLAN | 54 |
| K. | TREATMENT OF CONTRACTS AND LEASES | 59 |
| L. | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF PLAN | 63 |

i

**TABLE OF CONTENTS**
**(continued)**

Page

|     | M.  | RETENTION OF JURISDICTION | 64 |
|     | N.  | RELEASES, DISCHARGE, INJUNCTIONS; EXCULPATION | 66 |
|     | O.  | MODIFICATION; SEVERABILITY; REVOCATION | 69 |
|     | P.  | ADDITIONAL PLAN PROVISIONS | 70 |

VI. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS ................................................70

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..............................72

    A.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF EXISTING FIRST LIEN CLAIMS AND HOLDERS OF EXISTING SECOND LIEN CLAIMS ..........................73

    B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTORS ...76

VIII. RISK FACTORS........................................................................................................................79

    A.    CERTAIN BANKRUPTCY CONSIDERATIONS ...........................................................79

    B.    RISKS RELATED TO THE DEBTORS' BUSINESS AND FINANCIAL CONDITION ..................82

    C.    DISCLOSURE STATEMENT DISCLAIMER.......................................................................88

IX. CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION................89

    A.    SOLICITATION OF VOTES .........................................................................................89

    B.    PREPACKAGED SCHEDULING ORDER .........................................................................89

    C.    CONFIRMATION PROCEDURES....................................................................................90

    D.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ......................................90

    E.    CONSUMMATION OF THE PLAN...................................................................................96

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......................96

    A.    COMMENCEMENT OF "TRADITIONAL" CHAPTER 11 CASES......................................96

    B.    COMMENCEMENT OF "PREARRANGED" CHAPTER 11 CASES ...................................96

    C.    LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 OF THE BANKRUPTCY CODE ............96

    D.    ALTERNATIVE PLAN(S)..............................................................................................97

## TABLE OF APPENDICES

Appendix A        Plan of Reorganization

Appendix B        Organizational Chart

Appendix C        Liquidation Analysis

Appendix D        Valuation Analysis

Appendix E        Financial Projections

## ADDITIONAL ITEMS

Item 1        Draft Debtor in Possession Credit, Security, Guaranty and Pledge Agreement, available at www.loganandco.com under case RHI Entertainment

Item 2        Draft Interim Order (i) Authorizing Debtors (a) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to Pre Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (iii) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) And 4001(c), available at www.loganandco.com under case RHI Entertainment

THE DRAFT ITEMS AS POSTED REFLECT NEGOTIATIONS AND AGREEMENTS REACHED AS OF THE DATE OF THE DISCLOSURE STATEMENT.  THE DEBTORS AND THE PROSPECTIVE ADMINISTRATIVE AGENT AND LENDERS RESERVE THE RIGHT TO AGREE TO REVISIONS TO SUCH TERMS, AND SUCH TERMS MAY BE MODIFIED IN CONNECTION WITH THE PROCESS OF OBTAINING APPROVAL OF THE DIP FACILITY AND THE PROPOSED ORDER BY THE BANKRUPTCY COURT.  ACCORDINGLY, ALL RIGHTS ARE RESERVED PENDING ENTRY OF AN ORDER BY THE BANKRUPTCY COURT APPROVING THE FINAL DIP FACILITY.

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH APPENDIX ATTACHED TO THIS DISCLOSURE STATEMENT AND EACH ADDITIONAL ITEM BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

**DISCLOSURE STATEMENT WITH RESPECT TO
JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**I.
INTRODUCTION**

## A.   PREPACKAGED PROCESS

RHI Entertainment, Inc., RHIE Holdings Inc., RHI Entertainment Holdings II, LLC, RHI Entertainment, LLC, RHI Entertainment Productions, LLC, RHI Entertainment Distribution, LLC, RHI International Distribution Inc., NGP Holding, Inc., HEGOA Inc., Independent Projects, Inc., Don Quixote, Inc., HE Pro Tunes, Inc., HEP Music, Inc., Metropolitan Productions, Inc., Library Storage, Inc., HEP SS Music Inc., and SLB Productions, Inc. (collectively, the "**Debtors**") have elected to proceed on a "prepackaged" basis to restructure their financial obligations under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101-1532 (as amended, the "**Bankruptcy Code**").  This means that the Debtors have proposed and are soliciting acceptances of the *Joint Prepackaged Plan of Reorganization of RHI Entertainment, Inc. and Affiliated Debtors*, dated as of November 1, 2010 (as it may be amended, supplemented or otherwise modified from time to time, the "**Plan**") *before* they commence chapter 11 cases.  The Debtors believe that a prepackaged process will minimize the disruption to their businesses that could result from a traditional bankruptcy process, which could be contested and protracted.  The Debtors also believe that a prepackaged process will significantly simplify, shorten and reduce the administrative costs of their chapter 11 cases.

## B.   PURPOSE OF DISCLOSURE STATEMENT

The Debtors submit this disclosure statement (as it may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to Section 1126(b) of the Bankruptcy Code in connection with the solicitation of votes to accept the Plan (the "**Solicitation**").  A copy of the Plan is attached to this Disclosure Statement as Appendix A.  **All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan.**  To the extent of any conflict between the terms or conditions of this Disclosure Statement and the Plan, the terms and conditions of the Plan shall control and govern.

The purpose of this Disclosure Statement is to provide sufficient information to enable the creditors of the Debtors entitled to vote on the Plan to make an informed decision on whether to accept or reject the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading to the filing of chapter 11 cases;

- the solicitation and voting procedures for the Plan;

- the process for confirming the Plan;

- a summary of the terms and provisions of the Plan;

- events anticipated to occur during the chapter 11 cases;

- certain risk factors relating to the Debtors and confirmation and consummation of the Plan;

- alternatives to confirmation and consummation of the Plan; and

- certain tax consequences of the consummation of the Plan.

Additional copies of this Disclosure Statement are available, free of charge, upon request made to (i) the office of the Debtors' counsel at Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Annemarie Tackenberg, (212) 751-4864 (facsimile) or Annemarie.Tackenberg@lw.com (email) or (ii) the Voting Agent, Logan & Company, Inc., at 546 Valley

Road, Upper Montclair, New Jersey 07043, (973) 509-3190 (telephone), (973) 509-1131 (facsimile) or RHI@loganandco.com (email).

In addition, a ballot for voting to accept or reject the Plan (the "**Ballot**") is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan.  If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please promptly contact the Debtors' Voting Agent, Logan & Company, Inc., at 546 Valley Road, Upper Montclair, New Jersey 07043, (973) 509-3190 (telephone), (973) 509-1131 (facsimile) or RHI@loganandco.com (email).

**Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other appendices attached hereto, and the instructions accompanying the Ballots in their entirety before voting on the Plan.**  These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes.

THIS INTRODUCTION IS BEING PROVIDED AS AN OVERVIEW OF THE MATERIAL ITEMS ADDRESSED IN THIS DISCLOSURE STATEMENT AND THE PLAN, WHICH IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN.  THIS INTRODUCTION SHOULD NOT BE RELIED UPON FOR A COMPREHENSIVE DISCUSSION OF THE DISCLOSURE STATEMENT AND/OR THE PLAN OR IN LIEU OF REVIEWING THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

## C.      OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.  For a more detailed description of the terms and provisions of the Plan, see Part V of this Disclosure Statement, entitled "The Plan."

The Plan proposes, and its terms embody, a "prepackaged" restructuring of the Debtors' obligations under their prepetition credit agreements – referred to under the Plan as the Existing First Lien Claims and the Existing Second Lien Claims – negotiated with the First Lien Agent and the steering committee of the First Lien Lenders and the Second Lien Agent and one or more Second Lien Lenders.

The Plan is premised upon the following:  (i) all material assets of the Debtors have been pledged to secure the Existing First Lien Claims and the Existing Second Lien Claims; (ii) subject to the settlement described in Section 2.3(a) of the Plan, the amount of the Existing First Lien Claims exceeds the value of the pledged assets, and the First Lien Lenders have first priority Liens in all of the pledged assets; (iii) any dispute as to the value of the pledged assets with respect to the second priority Liens of the Second Lien Lenders would be expensive, time-consuming, and detrimental to the success of the Debtors' reorganization efforts; (iv) there are no unencumbered assets or, alternatively, any unencumbered assets are of de minimis value; (v) any de minimis value associated with any unencumbered assets would be exhausted by Administrative Claims, Priority Tax Claims, and Other Priority Claims; (vi) the treatment of Other Secured Claims and General Unsecured Claims is dependent upon certain settlements and the applicability of either the Consensual Plan Alternative or the Non-Consensual Plan Alternative; (vii) the treatment of General Unsecured Claims under the Consensual Plan Alternative is dependent on the expected amount of such Claims; and (viii) the future success of the Reorganized Debtors is dependent on paying all or a reasonable portion of Trade Unsecured Claims.

If the Plan is confirmed and becomes effective in accordance with its terms, the existing equity of RHI INC will be cancelled; New Term Loan Obligations and New Common Stock will be created for issuance to the holders of the Existing First Lien Claims; and, as a result of a settlement between the First Lien Lenders and the Second Lien Lenders, New Warrants will be created for issuance to the holders of the Existing Second Lien Claims, who will also receive approximately 1% of the New Common Stock and a limited fee and expense reimbursement.

In preparing to implement a prepackaged reorganization, the Debtors, with the consent of the First Lien Agent, commenced a series of negotiations in an effort to settle various Claims that would impair the prepackaged strategy.  Those negotiations resulted in the settlements described in the Plan as the Guild Settlements, the Film Obligation Settlements and the New York Lease Settlement. The Debtors also sought to achieve settlements with (i) MAT Movies & Television Productions GmbH & Co. Project IV KG ("**MAT IV**") and Hallmark Entertainment Holdings, Inc. ("**HED**"), (ii) U.S. Bank National Association, U.S. Bank National Association, Canada Branch (together, "**U.S. Bank**"), and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (iii) Powercorp International Limited and Powercorp International Holdings Limited (together, "**Powercorp**").  Because such settlements were not reached before commencement of the Solicitation, the Debtors structured the Plan

2

to accommodate the possibility that one or more such settlements might be reached after the commencement of the Solicitation but before approval of the Plan – referred to as the Consensual Plan Alternative, as well as the possibility that such settlements might not be reached at all – referred to as the Non-Consensual Plan Alternative. The different impacts of these scenarios are primarily in the treatment of Other Secured Claims in Class 4 and General Unsecured Claims in Class 5.

Under the Consensual Plan Alternative, Other Secured Claims are Reinstated. Under the Non-Consensual Plan Alternative, Other Secured Claims are subject to various treatments that satisfy cramdown requirements of the Bankruptcy Code. Under the Consensual Plan Alternative, General Unsecured Claims will receive Reinstated treatment only if such Claims, referred to in the Plan as the Estimated Class 5 Allowed Claims, do not exceed a set amount, referred to in the Plan as the Maximum Class 5 Amount. If such set amount is exceeded, as will be determined through a pre-confirmation Proof of Claim filing process, then General Unsecured Claims will receive no recovery under the Plan. Under the Non-Consensual Plan Alternative, General Unsecured Claims will receive no recovery under the Plan.

In circumstances where holders of General Unsecured Claims are to receive no recovery, holders of eligible Allowed Trade Secured Claims may be paid in whole or part as a result of a Trade Account made available by the First Lien Lenders to support the Reorganized Debtors' valuable continuing trade and other business relationships with the holders of such Claims.

The Plan designates six Classes of Claims and one Class of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Debtors believe that the Plan provides the best means currently available to restructure their balance sheets and emerge successfully from Chapter 11.

    **1.**    **General Structure Of The Plan**

The following is an overview of certain material terms of the Plan:

- The Debtors will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of Chapter 11 for the benefit of their creditors, stakeholders, customers, distributors, licensees, production partners, suppliers, licensors, and employees.

- The Debtors will have obtained the DIP Facility on the Petition Date, and the resulting DIP Facility Claims will be paid in full pursuant to the terms of the DIP Facility.

- The Estates will be substantively consolidated for purposes of distributions under the Plan.

- Administrative Claims, Priority Tax Claims, and Other Priority Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the holders of such claims.

- Existing First Lien Claims will be satisfied by New Term Loan Obligations and shares of New Common Stock and all obligations and Liens under the Existing First Lien Credit Agreement (other than Liens that continue to secure the New Term Loan Obligations and the Exit Revolving Credit Facility) will be cancelled.

- As a result of a settlement with the First Lien Lenders, Existing Second Lien Claims will be satisfied by approximately 1% of the New Common Stock, New Warrants and a limited fee and expense reimbursement, and all obligations and Liens under the Existing Second Lien Credit Agreement will be cancelled.

- Under the Consensual Plan Alternative, Other Secured Claims will be Reinstated. Under the Non-Consensual Plan Alternative, at the election of the Debtors, with the consent of the First Lien Agent, Other Secured Claims will either be Reinstated or will receive one of the cramdown treatments specified in Section 1129(b)(2)(A).

- Under the Consensual Plan Alternative, if Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, General Unsecured Claims will be Reinstated, but if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, General Unsecured Claims will receive no distributions and will be discharged. Under

3

the Non-Consensual Plan Alternative, General Unsecured Claims will receive no distributions and will be discharged.

- If applicable, eligible Allowed Trade Unsecured Claims may receive payment in whole or part from encumbered funds agreed to be made available for such purpose by the First Lien Lenders.

- Subordinated Claims will not receive any distributions and will be discharged.

- RHI INC Interests will be cancelled and the holders thereof will not receive or retain any property under the Plan.

- Executory contracts and unexpired leases will be assumed by the Debtors under the Plan unless otherwise disposed of by motion or agreement with the counterparties, or unless otherwise dealt with in the Plan.  Settlements with certain counterparties, including the Guild Settlements and the Film Obligation Settlements, will be approved under the Plan and agreements evidencing such settlements will be assumed under the Plan.

- The Reorganized Debtors will obtain the Exit Revolving Credit Facility to satisfy the DIP Facility Claims, to provide a portion of the funds necessary to make payments required to be made on the Effective Date, and subject to the limitations appearing in the Exit Revolving Credit Facility, to provide funds for working capital and other general corporate purposes of the Reorganized Debtors following their emergence.

### 2.    Summary Of Plan Classification, Treatment And Voting Rights

The following table summarizes the classification of Claims and Interests and the treatment of, estimated recovery for and voting rights of each Class under the Plan.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified.

**The recoveries set forth below are estimates that are contingent upon, among other things, approval of the Plan on a prepackaged basis, as proposed.  In addition, with respect to the recoveries for Classes 2 and 3, the estimated recoveries are contingent upon the valuation of the reorganized business and, thus, the New Common Stock and New Warrants to be issued under the Plan.  See Part IX.D.2(b) for valuation information.  Moreover, as described more fully in Part VIII of this Disclosure Statement, the Debtors' business is subject to a number of risks.  The recoveries and estimates described in the following tables represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.**

| **SUMMARY OF EXPECTED RECOVERIES**<br>(All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | | |
|---|---|---|
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| N/A | **Administrative Claims** | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, and (v) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code or deemed assumed under the Plan.<br><br>The Plan provides that with respect to each Allowed Administrative Claim, except as otherwise provided for in Section 11.1 of the Plan, on, or as soon as reasonably practicable after, the Distribution Date, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. |

4

| | | |
|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES**<br>(All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | | |
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| | | Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| N/A | **DIP Facility Claims** | A DIP Facility Claim is a Claim existing under the DIP Facility. The DIP Facility is the $15 million debtor in possession revolving credit facility provided to the Debtors by JPMorgan Chase Bank, N.A. and certain other financial institutions, subject to approval by the Bankruptcy Court, and having terms substantially as set forth in the draft Debtor in Possession Credit, Security, Guaranty and Pledge Agreement posted at www.loganandco.com under case RHI Entertainment.<br><br>The Plan provides that the DIP Facility Claims will be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Case. The holders of the Allowed DIP Facility Claims will receive, on the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claims, (i) such treatment as required under the DIP Facility or (ii) such different treatment as to which such holders and the Debtors or the Reorganized Debtors, as applicable, have agreed upon in writing; provided, however, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless the issuing bank is a lender under the Exit Revolving Credit Facility and in its sole discretion permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Revolving Credit Facility, the Debtors or the Reorganized Debtors will be required to either, with the consent of such issuing bank: (A) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the issuing bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 105% of the then undrawn amount of such letters of credit.<br><br>DIP Facility Claims, as administrative expense Claims, are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| N/A | **Priority Tax Claims** | A Priority Tax Claim is a Claim that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Under the Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors or by the Reorganized Debtors, either (i) on, or as soon as reasonably practicable after, the Distribution Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined, as of the calendar month in which the Confirmation Date occurs, pursuant to Section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period beginning on the first calendar quarter end after the Effective Date and ending on the last calendar quarter end that precedes the date that is five (5) years after the Petition Date.<br><br>Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| 1 | **Other Priority Claims** | An Other Priority Claim is a Claim against any of the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>The Plan provides that on, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, have agreed upon in writing.<br><br>Other Priority Claims are Unimpaired. The holders of such Claims are deemed to have accepted the Plan.<br><br>Estimated Percentage Recovery: 100% |

| **SUMMARY OF EXPECTED RECOVERIES**<br>(All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | | |
| --- | --- | --- |
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| 2 | **Existing First Lien Claims** | Existing First Lien Claims are Claims arising under the Existing First Lien Credit Agreement, including Existing First Lien Secured Claims and Existing First Lien Deficiency Claims. The Existing First Lien Credit Agreement is the Credit, Security, Guaranty and Pledge Agreement dated as of January 12, 2006, as amended and restated as of April 13, 2007, and as further amended, among, inter alia, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, JPMorgan Chase Bank, N.A. as administrative agent and as issuing bank, and the lenders thereunder.<br><br>Each of the First Lien Lenders, in full satisfaction, settlement, release, and discharge of and in exchange for the Existing First Lien Secured Claims, will receive (i) on the Distribution Date, its Pro Rata share of (A) $300 million of New Term Loan Obligations and (B) an amount of shares of New Common Stock representing approximately 99% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) if, and only if, Section 6.9 of the Plan is applicable, with the Trade Account to be established pursuant to Section 2.6 of the Plan for the purpose of implementing Section 6.9 of the Plan, as soon as practicable after all payments to be made on account of Allowed Trade Unsecured Claims have been made, any amount remaining in the Trade Account.<br><br>The New Term Loan Obligations will be governed by and subject to the New Second Lien Term Loan Facility, which New Second Lien Term Loan Facility (including any indemnification and expense reimbursement therein) will be binding on all First Lien Lenders whether or not executed by any or all First Lien Lenders. The New Common Stock will be governed by and subject to the Reorganized Parent Governing Documents. The New Common Stock of the First Lien Lenders will also be subject to the Stockholders Agreement, which will be binding on all First Lien Lenders upon the Effective Date without execution, and to the Registration Rights Agreement for those First Lien Lenders who agree to execute the same.<br><br>The First Lien Lenders will accept the distributions on account of the Existing First Lien Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing First Lien Credit Agreement, including Claims arising thereunder (but not under the New Second Lien Term Loan Facility) against RHI UK. The First Lien Lenders will not receive or retain any property under the Plan on account of any Existing First Lien Deficiency Claims and all Existing First Lien Deficiency Claims will be deemed waived by the First Lien Lenders and discharged as of the Effective Date.<br><br>All Liens granted by the Debtors to secure the Existing First Lien Claims will be continued in effect to secure the New Term Loan Obligations (subject to the rights of the lenders under the Exit Revolving Credit Facility).<br><br>Existing First Lien Claims are Impaired. **The holders of such Claims are entitled to vote to accept or reject the Plan.**<br><br>Estimated Percentage Recovery: Approximately 63.5% (mid-point) on account of Existing First Lien Claims (prior to dilution from New Management Incentive Plan).<br><br>*NOTE: The valuation assumptions upon which the estimated percentage recovery are based are not a prediction or reflection of post-emergence trading prices of the New Common Stock. The trading price of such securities will depend upon a number of factors, including, but not limited to, those discussed in Parts VIII and IX below. **The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.** |
| 3 | **Existing Second Lien Claims** | An Existing Second Lien Claim is a Claim arising under the Existing Second Lien Credit Agreement, which includes an Existing Second Lien Secured Claim, if any, and an Existing Second Lien Deficiency Claim. The Existing Second Lien Credit Agreement is the Credit, Security, Guaranty and Pledge Agreement dated as of June 23, 2008, as amended, among, inter alia, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, Wilmington Trust FSB as successor administrative agent, and the lenders thereunder.<br><br>Under the Plan, each of the Second Lien Lenders, in compromise of their alleged collateral and intercreditor rights in the Debtors' assets, and in full satisfaction, settlement, release, and discharge of and in exchange for their alleged Existing Second Lien Secured Claims, will receive on the Distribution Date, its Pro Rata share of (i) an amount of shares of New Common Stock representing approximately 1% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) New Warrants representing 15% ownership of the New Common Stock on a fully-diluted basis, as of the Effective Date, determined after taking into account the full dilution attributable to the New Management Incentive |

6

| | | |
|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | | |
| _Class_ | _Claim/Interest_ | _Description, Treatment and Projected Recovery for Claim/Interest_ |
| | | Plan and the exercise of the New Warrants. |
| | | In addition, as soon as practicable after the Distribution Date and the submission to the Reorganized Debtors of all summary invoices therefor, the Reorganized Debtors will pay to the Second Lien Agent and the Second Lien Lenders Cash equal to the amount of reasonable fees and out-of-pocket expenses (including fees and costs of professionals and advisors) invoiced by the Second Lien Agent and any such Second Lien Lender between September 28, 2010 and the Distribution Date (and not invoiced prior to September 28, 2010) with respect to the Existing Second Lien Claims and the Chapter 11 Case, but not exceeding for the Second Lien Agent and all Second Lien Lenders the Second Lien Reimbursement Amount. If the aggregate amount of reasonable fees and out-of-pocket expenses as invoiced exceeds the Second Lien Reimbursement Amount, the Debtors will pay to the Second Lien Agent Cash in the amount of the Second Lien Reimbursement Amount, and the Second Lien Agent will be responsible for allocating such amount among itself and each of the Second Lien Lenders. |
| | | The New Common Stock will be governed by and subject to the Reorganized Parent Governing Documents. Those Second Lien Lenders who agree to execute the Registration Rights Agreement and the New Warrants will have the rights afforded under the Registration Rights Agreement and the New Warrants, respectively. |
| | | The Second Lien Lenders will accept the distributions on account of the Existing Second Lien Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Second Lien Credit Agreement, including Claims against RHI UK. The Second Lien Lenders will not receive or retain any property under the Plan on account of the Existing Second Lien Deficiency Claims and all Existing Second Lien Deficiency Claims will be deemed waived by the Second Lien Lenders and discharged as of the Effective Date. |
| | | As of the Effective Date, all Liens granted by the Debtors to secure the Existing Second Lien Claims will be released, will be deemed null and void, and will be unenforceable for all purposes; provided, however, that the Second Lien Agent will be required to execute and deliver on or before the Effective Date, in form and substance reasonably acceptable to the Debtors, formal documents of release and waiver with respect to all such released Liens, and the Debtors may withhold distributions to the Second Lien Lenders until such documents are received.. |
| | | Existing Second Lien Claims are Impaired. **The holders of such Claims are entitled to vote to accept or reject the Plan.** |
| | | Estimated Percentage Recovery: Approximately 1.3% (mid-point) on account of Existing Second Lien Claims (prior to dilution from New Management Incentive Plan). |
| | | *NOTE: The valuation assumptions upon which the estimated percentage recovery are based are not a prediction or reflection of post-emergence trading prices of the New Warrants. The trading price of such securities will depend upon a number of factors, including, but not limited to, those discussed in Parts VIII and IX below. **The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.** |
| 4 | **Other Secured Claims** | An Other Secured Claim is a Secured Claim arising prior to the Petition Date against any of the Debtors, other than (i) the Existing First Lien Secured Claims, (ii) the Existing Second Lien Claims (which in no event will be considered Secured Claims), (iii) any Secured Claims subject to the Guild Settlements (which will be treated in accordance with the terms of the applicable Guild Settlement), (iv) any Secured Claims subject to the Film Obligation Settlements (which will be treated in accordance with the terms of the applicable Film Obligation Settlement), (v) Secured Claim existing under any executory contract or unexpired lease that is assumed under the Plan or by Final Order (which will be treated in accordance with the terms of the assumed contract or lease), and (vi) under the Consensual Plan Alternative, Secured Claim subject to the settlements reached with (A) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (B) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (C) Powercorp International Limited and Powercorp International Holdings Limited (which will be treated in accordance with the terms of such settlements). A Secured Claim is a Claim (i) that is secured by a Lien on property in which an Estate has an interest, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which is agreed upon in writing by the Debtors or the Reorganized |

| | | **SUMMARY OF EXPECTED RECOVERIES** (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) |
|---|---|---|
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| | | Debtors and the holder of such Claim or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction. |
| | | Consensual Plan Alternative: |
| | | The legal, equitable, and contractual rights of each holder of such an Allowed Other Secured Claim will be Reinstated.  On, or as soon as reasonably practicable after, the Distribution Date, each holder of such an Allowed Other Secured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed, consistent with the relevant underlying documents, if any. |
| | | Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens will be released, will be deemed null and void, and will be unenforceable for all purposes.  Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien. |
| | | Under the Consensual Plan Alternative, Other Secured Claims are Unimpaired.  The holders of such Claims are deemed to have accepted the Plan and will not vote. |
| | | Non-Consensual Plan Alternative: |
| | | The Plan provides that, at the option of the Debtors, with the agreement of the First Lien Agent, either (i) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (ii) the holder of an Allowed Other Secured Claim will (A) retain the Liens securing such Allowed Other Secured Claim and (B) receive regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting the interest rate established in the Confirmation Order or, if applicable, determined under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date, with the first payment to be made on the last day of the calendar quarter that is at least ten (10) days after the Distribution Date and subsequent payments to be made on the last day of each calendar quarter thereafter through the five (5)-year period; (iii) the collateral securing such Allowed Other Secured Claim will be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (iv) the holder of the Allowed Other Secured Claim will be paid in full on the Effective Date. |
| | | Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens will be released, will be deemed null and void, and will be unenforceable for all purposes.  Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien. |
| | | The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Case will be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim or underlying Lien in the appropriate forum when and if such Claim or Lien is sought to be enforced by the holder of such Other Secured Claim. |
| | | Under the Non-Consensual Plan Alternative, Other Secured Claims are Impaired.  The holders of such Claims are deemed to have rejected the Plan and will not vote. |
| 5 | **General Unsecured Claims** | A General Unsecured Claim is a Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Existing First Lien Claim, an Existing Second Lien Claim, an Other Secured Claim, an Intercompany Claim, or a Subordinated Claim, which Claim will be limited in amount by any applicable provision of the Bankruptcy Code, including, without limitation, Section 502 of the Bankruptcy Code, subsection 502(b)(6) thereof with respect to a Claim of a lessor for damages resulting from the termination of a lease of real property, subsection 502(b)(7) thereof with respect to a Claim of an employee for damages resulting from the termination of an employment contract, or any other subsection thereof.  The term specifically includes any Rejection Damages Claim. |

| | **SUMMARY OF EXPECTED RECOVERIES**<br>(All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | |
|---|---|---|
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| | | Consensual Plan Alternative:<br><br>If the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, then the legal, equitable and contractual rights of each holder of an Allowed General Unsecured Claim will be Reinstated.  On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed and consistent with the relevant underlying documents, if any.<br><br>But if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, then the holders of General Unsecured Claims will not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims will be discharged as of the Effective Date.<br><br>Under the Consensual Plan Alternative, such Class is either (i) Unimpaired if the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, in which case the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to accept the Plan, or (ii) Impaired if the Estimated Class 5 Claims exceed the Maximum Class 5 Amount, in which case the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.<br><br>Estimated Percentage Recovery:  If the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, 100%; but if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, 0%<br><br>Non-Consensual Plan Alternative:<br><br>The Plan provides that the holders of General Unsecured Claims will not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims will be discharged as of the Effective Date..<br><br>Under the Non-Consensual Plan Alternative, such Class is Impaired, and the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan<br><br>Estimated Percentage Recovery:  0%<br><br>*NOTE:  If the provisions of Section 6.9 of the Plan become applicable, General Unsecured Claims that are eligible Allowed Trade Unsecured Claims may be entitled to be paid in whole or part out of the Trade Account made available by the First Lien Lenders. |
| 6 | **Subordinated Claims** | A Subordinated Claim is (i) any Claim against any of the Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of an Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; or (ii) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, willful intellectual property infringement, fraud, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit.<br><br>The Plan provides that, under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, the holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims will be discharged as of the Effective Date.<br><br>Subordinated Claims are Impaired.  The holders of such Claims are deemed to have rejected the Plan and will not vote.<br><br>Estimated Percentage Recovery:  0% |
| 7 | **RHI INC Interests** | An RHI INC Interest is an equity interest in RHI INC outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, stock options or other right to purchase the stock of RHI INC, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in RHI INC prior to the Effective Date. |

| | | |
|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | |
| (All capitalized terms used but not otherwise defined below will have the meanings set forth in the Plan.) | | |
| *Class* | *Claim/Interest* | *Description, Treatment and Projected Recovery for Claim/Interest* |
| | | The Plan provides that, under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, all RHI INC Interests will be cancelled and all rights and interests therein will be terminated as of the Effective Date. The holders of RHI INC Interests will not receive or retain any property under the Plan on account of such Interests. |
| | | RHI INC Interests are Impaired. The holders of such Interests are deemed to have rejected the Plan and will not vote. |
| | | Estimated Percentage Recovery: 0% |

NOTICE TO PARTIES TO CONTRACTS AND LEASES: The Plan provides that, except as otherwise provided therein, in the Plan Supplement, or in the Confirmation Order, as of the Effective Date, each Debtor will be deemed to have assumed each executory contract or unexpired lease to which it is a party unless any such contract or lease (i) was previously assumed or rejected upon motion by a Final Order, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date, or (iv) is included on the Contract/Lease Assumption Schedule. **Unless otherwise provided in the Plan, the Plan Supplement or the Confirmation Order, any Cure determined to be owed with respect to any assumed contract or lease will be treated as an Administrative Claim.**

## D. THE VOTING PROCESS

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject a proposed plan. Generally, a claim or equity interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of such claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. In addition, classes of claims or equity interests under a chapter 11 plan in which the holders of such claims or equity interests will not receive or retain any property under such plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Under a prepackaged plan, holders of claims who will receive or retain property under a plan may also be deemed to reject the plan, without voting, if the acceptance of the applicable class of claims is not needed to confirm the plan, In connection with the Plan, therefore:

- Claims in Classes 2 and 3 (together, the "**Voting Classes**") are Impaired and the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in Classes 2 and 3 are entitled to vote to accept or reject the Plan.

- Claims in Class 1 are Unimpaired. As a result, holders of Claims in that Class are deemed to have accepted the Plan and are not entitled to vote on the Plan.

- Under the Consensual Plan Alternative, Claims in Class 4 are Unimpaired and their holders are deemed to have accepted the Plan and are not entitled to vote on the Plan. Under the Non-Consensual Plan Alternative, Claims in Class 4 are Impaired, and although receiving or retaining property under the Plan, the holders of such Claims are deemed to have rejected the Plan, and their votes will not be solicited.

- Under the Consensual Plan Alternative, if Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, Claims in Class 5 will not be Impaired and their holders will be deemed to have accepted the Plan without voting; but if Estimated Class 5 Allowed Claims exceed the Maximum Class Amount, Claims in Class 5 will be Impaired and the holders of such Claims will not receive any distribution, will be deemed to have rejected the Plan, and will not be entitled to vote on the Plan. Under the Non-Consensual Plan Alternative, Claims in Class 5 will be Impaired and the holders of such Claims will not receive any distribution, will be deemed to have rejected the Plan, and will not be entitled to vote on the Plan.

- Claims in Class 6 and Interests in Class 7 are Impaired and the holders of such Claims and Interests will not receive any distribution on account of such Claims and Interests. As a result, the holders of Claims and Interests in those Classes are deemed to have rejected the Plan and are not entitled to vote on the Plan.

At this time, the Debtors have not yet commenced cases under Chapter 11 of the Bankruptcy Code, but are soliciting acceptances of the Plan from the holders of Claims in the two Voting Classes because only these Classes of Claims are Impaired by the Plan and not deemed to have rejected the Plan. If sufficient votes for acceptance of the Plan are received, the Debtors expect to file for bankruptcy and seek prompt confirmation of the Plan. Under certain circumstances, the Debtors may file for bankruptcy prior to the Voting Deadline. If the Debtors file for bankruptcy prior to the Voting Deadline, or if the Debtors do not receive sufficient votes to accept the Plan by the Voting Deadline, they will be forced to evaluate other available options, including proceeding to filing one or more chapter 11 cases on a prearranged or traditional, non-prepackaged basis.

The Debtors have retained Logan & Company, Inc. to, among other things, act as their voting agent (the "**Voting Agent**"). Specifically, the Voting Agent will assist the Debtors with: (a) mailing this Disclosure Statement, (b) soliciting votes on the Plan, (c) receiving, tabulating, and reporting on Ballots cast for or against the Plan, (d) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan, (e) if necessary, contacting creditors regarding the Plan and their Ballots, and (f) mailing notices required by the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that actually vote for acceptance or rejection of the plan (the "**Requisite Acceptances**"). **YOUR VOTE ON THE PLAN IS IMPORTANT.**

If one of the Voting Classes rejects the Plan, the Debtors reserve the right to amend the Plan and if necessary resolicit votes, file for bankruptcy on a prearranged or traditional non-prepackaged basis, abandon the Plan and pursue another plan of reorganization, or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept such plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the appendices attached hereto and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete, execute and return your Ballot to the Debtors' Voting Agent at the following address (as applicable):

Logan & Company, Inc.
Attention: RHI Entertainment, Inc.
546 Valley Road
Upper Montclair, New Jersey 07043
-OR-
RHI@loganandco.com
-OR-
Facsimile: (973) 509-1131

Please refer to the instructions accompanying the Ballots for more information regarding voting requirements to ensure that your Ballot is properly and timely submitted such that your vote may be counted.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE (5:00 P.M. EASTERN TIME ON MONDAY, NOVEMBER 15, 2010) BY THE VOTING AGENT.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement.

11

In consultation with the First Lien Agent and the Second Lien Agent, the Debtors established 5:00 p.m. Eastern Time on Friday, October 29, 2010 (the "**Voting Record Date**") as the time and date for determining which holders of Claims are entitled to receive a copy of this Disclosure Statement and to vote to accept or reject the Plan. Accordingly, only holders of record that are otherwise entitled to vote on the Plan – specifically, lenders appearing on the register maintained by the First Lien Agent with respect to Existing First Lien Claims and lenders appearing on the register maintained by the Second Lien Agent with respect to Existing Second Lien Claims – will receive a Ballot and may vote on the Plan.

All properly completed Ballots received by the Voting Agent prior to the Voting Deadline from holders of Allowed Claims in the Voting Classes will be counted for purposes of determining whether each Class has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting by each of Class 2 and Class 3.

If a Ballot is received by the Voting Agent after the Voting Deadline, it will not be counted, unless the Debtors have granted, in their sole discretion, an extension of the Voting Deadline in writing with respect to such Ballot. Additionally, the following Ballots will **NOT** be counted:

- any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

- any Ballot cast by a Person or Entity that does not hold a Claim in the Voting Classes;

- any Ballot that is properly completed, executed and timely submitted, but (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

- any unsigned Ballot; and/or

- any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting Agent), any administrative agent, or the Debtors' financial or legal advisors, instead of to the Voting Agent.

**NOTICE REGARDING SECURITIES-RELATED CERTIFICATIONS ON BALLOT**:

The Debtors have not filed a registration statement under the Securities Act or any other federal or state securities laws with respect to the New Securities that may be deemed to be offered by virtue of the Solicitation. The Debtors are relying on Section 4(2) and/or any other applicable section of the Securities Act and similar state law provisions, and to the extent applicable, on Regulation D and/or any other applicable regulation or similar state law provisions, to exempt from registration under the Securities Act and any applicable state securities laws the offer of any securities that may be deemed to be made pursuant to the Solicitation. Section 4(2) exempts from the registration provisions of the Securities Act any transaction by an issuer not involving any public offering. Regulation D similarly exempts from the registration provisions under the Securities Act offerings of securities to "accredited investors," as such term is defined under Regulation D, and a limited number of other investors.

To insure compliance with the foregoing, by signing and returning the Ballot, each holder of a Claim in the Voting Classes will be certifying to the Debtors that either (a) such holder is an "accredited investor" as defined in Rule 501(a) under the Securities Act or (b) that such holder has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its participating in the Plan and is capable of bearing the economic risks of such investment, including a complete loss of its investment. See the Ballots for a more detailed description of "accredited investors."

In addition, by signing and returning the Ballot, each holder of a Claim in the Voting Classes will be (a) confirming that (i) such holder and/or legal and financial advisors acting on its behalf has had the opportunity to ask questions of, and receive answers from, the Debtors concerning the terms of the Plan, the businesses of the Debtors and other related matters, (ii) to the best of the holder's knowledge, the Debtors have made available to such holder or its agents all documents and information relating to the Plan and related matters reasonably requested by or on behalf of such holder and (iii) except for information provided by the Debtors in the Disclosure Statement and Plan, such holder has not relied on any statements made or other information received from any person with respect to the Plan; and (b) acknowledging that the New Securities being offered pursuant to the Plan are not being offered pursuant to a registration statement filed with the SEC and representing that any such securities will be acquired for its own account and not with a view to any distribution of such securities in violation of the Securities Act.

12

It is expected that when issued pursuant to the Plan, the New Securities will be exempt from the registration requirements of the Securities Act by virtue of Section 1145 of the Bankruptcy Code and may be resold by the holders thereof subject to the provisions of such Section 1145, subject to any applicable transfer restrictions.

**NOTICE REGARDING RELEASES BY FIRST LIEN LENDERS AND SECOND LIEN LENDERS**:

The Plan provides that as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each First Lien Lender and Second Lien Lender, each holder of an eligible Allowed Trade Unsecured Claim who receives payment from the Trade Account, if applicable, and to the extent permitted by applicable law and approved by the Confirmation Order each other holder of a Claim or Interest, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against:

- any of the Debtors' non-Debtor subsidiaries,

- any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case,

- any Professionals and court-retained agents of the Debtors,

- the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such,

- the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such,

- the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and

- any of the successors or assigns of any of the parties identified in the foregoing clauses,

in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## E.    THE CONFIRMATION HEARING

If the Debtors receive sufficient votes to accept the Plan, the Debtors intend to file voluntary petitions to commence chapter 11 cases and request that the Bankruptcy Court schedule a hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "**Confirmation Hearing**") as soon as possible, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York.

## F.    ESTIMATES AND FORWARD LOOKING STATEMENTS

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the appendices annexed hereto is therefore not necessarily

13

indicative of the future financial condition or results of operations of the Debtors, which in each case may vary significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors, or any Person that the projected financial condition or results of operations can or will be achieved. FACTORS THAT COULD CAUSE ACTUAL RESULTS TO BE MATERIALLY DIFFERENT FROM EXPECTATIONS INCLUDE THOSE FACTORS DESCRIBED IN PART VIII HEREIN TITLED "RISK FACTORS".

## II.
## GENERAL INFORMATION CONCERNING THE DEBTORS

### A.    INTRODUCTION

The Debtors include RHI Entertainment, Inc. ("**RHI INC**"), the ultimate parent company of the RHI corporate family, and its sixteen direct and indirect domestic subsidiaries. Basic information about each of the Debtors is set forth below.

| Name of Entity | Formation | Ownership | Business Purpose/Status |
|---|---|---|---|
| | | | |
| RHI Entertainment, Inc. | Delaware 8/24/07 | Publicly owned | Ultimate parent company; formed to hold 99% interest in RHI Entertainment Holdings II, LLC and interests in RHIE Holdings Inc.; public company; active |
| RHIE Holdings Inc. | Delaware 12/21/09 | RHI Entertainment, Inc. | Holding company formed to hold 1% interest in RHI Entertainment Holdings II, LLC; active |
| RHI Entertainment Holdings II, LLC | Delaware 9/6/07 | RHI Entertainment, Inc. (99%) RHIE Holdings Inc. (1%) | Formed as a partnership to hold interest in RHI Entertainment, LLC; active |
| RHI Entertainment, LLC | Delaware 7/12/94 (converted 12/10/01) | RHI Entertainment Holdings II, LLC | Main operating company; limited liability company into which former RHI Entertainment, Inc., formed on 7/12/94, was converted on 12/10/01; also holding company of other operating subsidiaries; active |
| RHI Entertainment Productions, LLC | Delaware 6/7/99 | RHI Entertainment, LLC | Film production subsidiary; guild signatory company; active |
| Metropolitan Productions, Inc. | Delaware 2/8/95 | RHI Entertainment Productions, LLC | Film production company; guild signatory company; dormant |
| Don Quixote, Inc. | Delaware 12/6/99 | RHI Entertainment Productions, LLC | Single purpose holding company; created for Don Quixote production; dormant |
| HE Pro Tunes, Inc. | Delaware 7/24/96 | RHI Entertainment Productions, LLC | Music publishing company and member of BMI; dormant |
| HEP Music, Inc. | Delaware 7/26/96 | RHI Entertainment Productions, LLC | Music publishing company and member of ASCAP; dormant |
| NGP Holding, Inc. | Delaware 2/1/00 | RHI Entertainment, LLC | Entertainment production company; dormant |
| Independent Projects, Inc. | Delaware 11/13/96 | RHI Entertainment, LLC | Guild signatory company; dormant |
| HEGOA Inc. | Delaware 4/23/01 | RHI Entertainment, LLC | Created to hold interests in film productions; dormant |
| RHI International Distribution Inc. | Delaware 6/8/06 | RHI Entertainment, LLC | Distribution of films and videos in foreign territories; active |
| RHI Entertainment Distribution, LLC | Delaware 6/7/99 | RHI Entertainment, LLC | Distribution of films and videos for production subsidiaries, production partners and licensors; active |
| Library Storage, Inc. | Delaware 6/16/08 | RHI Entertainment Distribution, LLC | Owner of back-up tapes stored at warehouse in NJ; active |
| HEP SS Music Inc. | Delaware 2/21/03 | RHI Entertainment Distribution, LLC | Music publishing company and member of SESAC; dormant |

14

| SLB Productions, Inc. | Delaware 3/1/02 | RHI Entertainment Distribution, LLC | Production sale and leaseback transactions; dormant |
|---|---|---|---|

The RHI corporate family also includes six foreign subsidiaries.  They are not included in the Chapter 11 Case.  The foreign subsidiaries are:  Thistle Management Ltd. BVI, HEDAUS Pty Limited, Southern Whale Pty. Ltd., RHI Entertainment Australia Pty. Ltd., Wayzgoose Concert Services BV (NL), and RHI Entertainment Ltd.  RHI Entertainment Distribution, LLC, the parent company of Southern Whale Pty. Ltd. and Wayzgoose Concert Services BV (NL), has commenced the process of dissolving those two entities in accordance with the laws of their respective jurisdictions.

The chart attached as <u>Appendix B</u> depicts the corporate structure of the RHI family of companies.

## B.       THE DEBTORS' CORPORATE HISTORY AND STRUCTURE

In 1994, a New York corporation founded by Robert Halmi, Sr. and known as RHI Entertainment, Inc. was acquired by Hallmark Cards, Inc.  Hallmark Cards, Inc. expanded and broadened the business, and formed Hallmark Entertainment, Inc. in 1994.  Hallmark Entertainment, Inc. converted to a limited liability company in 2001 and was renamed RHI Entertainment, LLC in 2006.  Hallmark Cards developed the Hallmark Entertainment Network internationally, which ultimately led to the development and launching of the Hallmark Channel in the United States.  In September 2001, Hallmark Entertainment, Inc. sold the U.S. rights in the majority of its film library to Crown Media Holdings LLC, its then U.S. distributor.  In January 2006, Robert A. Halmi, Jr. (currently CEO and President of RHI INC), members of management, a fund advised by Kelso & Company LP ("**Kelso**") and other investors acquired the remaining rights to the film library through the purchase from Hallmark Entertainment Holdings, Inc. of its interest in Hallmark Entertainment, Inc. (which was then converted to a Delaware LLC and renamed RHI Entertainment LLC) ("**RHI LLC**").  In December 2006, RHI LLC acquired the domestic rights to the film library from Crown Media.

The Debtors' business historically has been conducted and continues to be conducted through RHI LLC, the primary operating company.  RHI LLC is a wholly owned subsidiary of RHI Entertainment Holdings II, LLC ("**Holdings II**").  RHI INC and Holdings II were formed on August 24, 2007 and September 6, 2007, respectively, in connection with the June 2008 initial public offering of shares in RHI INC (the "**IPO**").  RHI INC became the public company and its primary asset was and continues to be the common membership units in Holdings II.

Upon the completion of the IPO, Holdings II had two members, which were RHI INC and KRH Investments LLC ("**KRH**").  KRH contributed its ownership interests in RHI LLC to Holdings II in return for common membership interests in Holdings II.  Concurrently, RHI INC purchased from Holdings II a number of newly issued common membership units equal to the number of common shares sold in the IPO, at a price per unit equal to the IPO price per share.  RHI INC became a holding company that currently manages Holdings II, but with no business operations or material assets other than common membership units in Holdings II.  Upon completion of the IPO, KRH held approximately 42.3% of common membership units in Holdings II.  On December 22, 2009, RHI INC issued 9,900,000 shares of its common stock to KRH in connection with the exercise of KRH's exchange right pursuant to the Holdings II operating agreement.  As a result of the exchange, RHI INC owns, as its sole material asset, 100% of the outstanding membership units in Holdings II (99% directly and 1% through its wholly owned subsidiary RHIE Holdings Inc.).  KRH no longer owns any membership units in Holdings II and, thus, is no longer a member of Holdings II, but now owns 42.3% of the common stock of RHI INC.

## C.       OVERVIEW OF THE DEBTORS' BUSINESS

The Debtors develop, produce and distribute new made-for-television movies, mini-series and other television programming worldwide. They are the leading provider of original long-form television content, including domestic made-for-television ("**MFT**") movies and mini-series. The Debtors also selectively package new episodic series programming for television.  Going forward, the Debtors' development and production activities will be limited by the terms of the DIP Facility, the New Second Lien Term Loan Facility and the Exit Revolving Credit Facility (the "**New Facilities**").

In addition to their MFT and mini-series development, production and distribution activities, the Debtors continue to own an extensive library of existing long-form television content, which they license primarily to broadcast and cable networks worldwide.

### 1. Operational Locations

The Debtors are headquartered in New York, New York, and, together with their foreign subsidiaries, have offices and rental space in Los Angeles, California, Edison, New Jersey, Kansas City, Missouri, and London, United Kingdom.

| Location | Business Use | Owned/Leased |
|---|---|---|
| New York, NY | Corporate headquarters | Leased |
| Edison, NJ | Vault for film library copies | Leased |
| Los Angeles, CA | Distribution office and main vault for film library | Leased |
| Kansas City, MO | Sales office | Leased |
| London, UK | Sales office | Leased |

### 2. Development And Production

#### (a) Made-for-Television Movies

The Debtors' MFT movie franchise focuses on developing films with dramatic, suspenseful, and more recently, action/thriller storylines which are generally two broadcast hours in length. With production and acquisition costs of $1.0 to $2.0 million per broadcast hour, the Debtors' MFT movies have short production cycles and pre-sales which have typically recouped the majority of the cost of production.

MFT movies are ordered by broadcast and cable television networks as an integral part of their broadcast strategies. Networks license the rights to air films that meet the characteristics of the network's genre and therefore will appeal to their viewers. In 2009, the Debtors delivered multiple MFT movies to the Hallmark Channel, Lifetime, Syfy and Spike TV.

#### (b) Mini-Series

For more than 20 years, the Debtors and their predecessors have shaped the mini-series industry with award winning and highly-rated releases like *Lonesome Dove*, *Gulliver's Travels*, *Human Trafficking*, *Mitch Albom's The Five People You Meet in Heaven*, *Tin Man* and *Alice*. A mini-series is typically four broadcast hours in length and costs approximately $2.0 to $5.0 million per broadcast hour of content to produce or acquire. Typically, mini-series are ordered by broadcast and cable television networks on a picture-by-picture basis.

#### (c) Episodic Series

In addition to MFT movies and mini-series, the Debtors and their predecessors have in the past selectively produced and acquired episodic series programming for broadcast and cable television if pre-ordered by the Debtors' network customers. The initial order for a television series is typically 13 episodes. A customer will generally increase its initial order to 22 episodes if the series is generating sufficiently high ratings. The Debtors do not commission production of a series unless they believe the production costs will be covered by the license fee to be paid by the initial network licensee. The Debtors may selectively engage in series development in the future, subject to the terms of the New Facilities.

#### (d) Long-Form Television Library

With more than 1,000 titles, comprising over 3,500 broadcast hours of long-form television programming, the Debtors' film library is an important source of cash flow and revenue growth. The film library grows each year as new MFT movies, mini-series and other television programming rolling off their initial license terms are added. These new productions add value to the film library and keep it current. The Debtors believe that the talent and recognizability of the actors and actresses starring in their productions, along with the subject matter, give the library a long shelf life. Classic MFT movies and mini-series such as *Cleopatra*, *Alice In Wonderland*, *Call of the Wild*, *Dinotopia*, *Arabian Nights*, *Merlin*, *The Odyssey* and *The Lion in Winter* are examples of the Debtors' library content, which have been repeatedly licensed out for distribution and exhibition over the last several years.

16

### 3.      Production, Marketing And Distribution Of Films

(a)      <u>Project Development</u>

The Debtors' production process begins in project development, which requires relatively low expenditures to acquire the rights and commission new scripts for potential films. Projects are developed in-house or are commissioned by broadcast and cable television networks. A portion of development undertaken each year (typically MFT movies) is commissioned and paid for by broadcast and cable television networks. As part of this process, the Debtors work with both their internal staff and outside parties to develop a script and formulate a budget for the film.

For the development of some mini-series, and those projects not commissioned by networks, the Debtors have a small internal staff that reviews scripts and sources project ideas. Once the management team has targeted projects to further develop, produce and distribute, a pre-distribution process is initiated to determine the interest of potential licensees and the feasibility of bringing the project to fruition. Broadcast and cable networks are approached based on the subject matter and genre of a film, with the intention of maximizing audience appeal.

Prior to arranging for full production, in a process called greenlighting, the Debtors' senior management reviews and approves all projects to estimate economic viability. During greenlighting sessions, all key aspects of a film project are reviewed, including total production budget as compared to the aggregate fees expected from initial license contracts or expected foreign license distribution, production incentives and subsidies, and ancillary distribution opportunities such as home video sales.

(b)      <u>Licensing</u>

The first step in the distribution process generally is negotiating an initial outbound sublicense or license with a broadcast or cable network. RHI Entertainment Distribution LLC ("**RHIED**") handles U.S. distribution and RHI International Distribution Inc. ("**RHIID**") handles most foreign distribution.   A network pays RHIED to license the right to air the Debtors' content for a defined period of time. This period generally ends after a specific number of telecasts, but generally not later than seven years (depending on the type of content) after delivery. The Debtors' general practice is not to begin production of an MFT movie or mini-series without first securing an initial outbound license agreement. The terms of the New Facilities will impose additional requirements on the license fees that are to be obtained before the Debtors commission the production of any film.  Such existing outbound license agreements are not tied to ratings performance when aired, nor is there a penalty if ratings for a particular project do not meet expectations.

The exhibition rights licensed by RHIED to U.S. networks are generally limited to the United States and its territories. RHIED is usually are able to simultaneously license the same films for exhibition abroad. RHIID has long-term relationships with broadcast and cable networks and distributors in many countries including the United Kingdom, Germany, Spain, France, Italy and Australia. Due to the Debtors' long history of delivering content that satisfies international market demand, many international licensees commit to licensing all or part of the Debtors' annual production slate of MFT movies and mini-series prior to production. Fees from these foreign licensing arrangements, together with domestic license fees, generally equal or exceed the Debtors' costs for these productions. Foreign licensees acquire the exclusive right to air the Debtors' content for typically two to six years within their specific country of operation. Generally, the Debtors will not begin production of a MFT movie, mini-series or other television programming unless a significant number of these foreign license agreements are secured or are in negotiation.

The licensing process does not end when the Debtors secure the initial domestic and foreign licenses. If the initial domestic licensee is a broadcast network, the Debtors will also negotiate an exclusive subsequent license with a cable network. Broadcast and cable networks also license from the Debtors the second and third cycles of the film content. Internationally, the Debtors will often license successive second and third cycles as well. Similarly, the Debtors license their content to other distribution platforms such as home video.

(c)      <u>Production</u>

Once the Debtors have lined up an initial licensee for a film, the production process begins. Although the Debtors have key employees who evaluate certain aspects of a project, they mainly rely on third party production companies to do the actual production. Going forward, under the terms of the New Facilities, third party production companies will be utilized for all projects.  In consultation with the Debtors' management, these third parties are responsible for hiring key talent, including actors, directors, writers and film production crews, determine the filming locations and finalize the production budget and schedule.

17

MFT movies are generally filmed in 25 to 30 days, while mini-series typically have a production timeline of 40 to 60 days. All programming is filmed using either 35 millimeter or high definition cameras, enabling easy adaption to various distribution platforms.

Once filming is complete, the core visuals and dialogue are put in place and the post-production process beings. Post-production can include scene editing, addition of special effects and sound effects, and addition of a musical score. A final version of the film is then delivered to the initial licensee or licensees for exhibition in accordance with their license agreements.

(d)     <u>Production Incentives and Subsidies</u>

Film production incentives and subsidies are widely used throughout the television industry and are important in helping to offset production costs. Many foreign countries, the United States and individual states have tax and financial incentives designed to attract production. These take different forms, including direct government rebates, sale and leaseback transactions or transferable tax credits. The Debtors have benefited from these incentives and subsidies in Canada, Germany, the United Kingdom, Ireland, Hungary, South Africa, Australia, New Zealand and the United States. In some cases, co-production treaties between countries entitle the Debtors or their production partners to receive the benefits of production incentives and subsidies from multiple countries for the same production.

(e)     <u>Talent</u>

Over the years, the Debtors have been able to attract a highly talented and diverse group of actors and actresses to star in their MFT movies, mini-series and other television programming. The Debtors' programming has included such actors and actresses as Jon Voight, Robert Duvall, Sigourney Weaver, Glenn Close and Patrick Stewart. Recently, as the Debtors have produced more diversified content, they have been able to attract actors and actresses such as Katherine Heigl, Sean Astin, Mira Sorvino and Zooey Deschanel. The Debtors expect to continue engaging well-known talented actors and actresses to star in their productions without compromising their production costs and operating budget.

(f)     <u>Marketing and Distribution</u>

The Debtors' marketing force continuously makes presentations to broadcast and cable networks worldwide in order to generate orders for both new productions and existing film library content. Films are licensed on either an individual or multi-picture basis, depending on the needs of the distribution platform. Recent distribution deals have included several multi-film agreements for licensing of new content. The majority of the new productions automatically qualify for inclusion in several of the existing international distribution agreements with European broadcast and cable networks, providing foreign market distribution.

Twice a year, the Debtors attend large marketing conferences in Cannes, France. These conferences bring together licensees and licensors from around the world. The Debtors produce various marketing and sales materials for these events and host numerous meetings with prospective licensees.

**4.     Customers**

The Debtors' customers include a variety of domestic broadcast and cable networks, such as ABC, NBC, CBS, the Hallmark Channel, Lifetime, Syfy and Spike TV, as well as large international broadcasters, including Antena-3, M6, PROSIEBEN-SAT1, Seven Network, Sky and TF1. In addition, the Debtors' on-going new production and extensive library enable them to exploit new business opportunities beyond the traditional distribution channels.

**5.     Seasonality**

The Debtors' revenue and operating results are seasonal in nature. A significant portion of the films that they develop, produce and distribute are delivered to the broadcast and cable networks in the second half of each year. Typically, programming for a particular year is ordered either late in the preceding year or in the early portion of the current year. Planning and production generally take place during the spring and summer and completed film projects are generally delivered in the third and fourth quarters of each year. As a result, the first, second and third quarters of the Debtors' fiscal year typically have less revenue than the fourth quarter; however, the results of any given quarter are not necessarily indicative of results for the next or any future quarter.

### 6. Intellectual Property

The Debtors' most valuable assets are their intellectual property and related contractual rights to the films they own or have the right to distribute. The Debtors maintain and protect their U.S. intellectual property rights by generally registering and recording their copyright ownership and distribution rights in completed films with the United States Copyright Office. Copyright laws of the United States and most other countries provide substantial civil and criminal penalties for unauthorized duplication and exhibition of the Debtors' films. Where commercially appropriate, the Debtors take measures to secure, protect and maintain copyright protection for all of their pictures under the laws of the applicable jurisdictions.

While piracy continues to present challenges to the entire filmed entertainment industry, many foreign countries are signatories to the Berne Convention, which offer U.S. copyright holders some protection in those countries. However, certain other foreign countries do not have or do not enforce laws which protect holders of United States intellectual property rights in the same manner as U.S. courts and regulators. Therefore, the Debtors' rights may be difficult to enforce, or may be unenforceable in those countries.

### 7. Employees

The Debtors have 60 employees, of whom 58 are salaried employees, 1 is a part-time employee and 1 is a temporary employee.  The Debtor's foreign subsidiaries employ 3 employees in the United Kingdom.  None of the employees are represented by labor unions or subject to a collective bargaining agreement.

## D. CORPORATE GOVERNANCE AND MANAGEMENT

### 1. Current Board Of Directors

(a)      Members of the Board

The Board of Directors (the "**Board**") of parent company RHI INC currently consists of the following seven members:

- **Thomas M. Hudgins**, age 70, has been a director of RHI INC since June 2008. Mr. Hudgins retired from Ernst & Young in 2002 after a thirty-five year career with the accounting firm. As one of Ernst & Young's partners, Mr. Hudgins served multi-national client companies and held numerous management positions at the firm. From 1993 to 1998, he served as office managing partner of Ernst & Young's New York office. Mr. Hudgins also was a member of Ernst & Young's international executive committee for its global financial services practice. Mr. Hudgins served on the Aurora Foods, Inc.'s board of directors from 2003 to 2004 and on the board of Foamex International Inc., a publicly listed company, from 2004 to 2009. He is currently a member of the board of Harbinger Group Inc., a publicly listed company. Mr. Hudgins qualifies as an audit committee financial expert and also serves on Harbinger's audit committee.  Mr. Hudgins brings more than 35 years of accounting and finance experience to the Board. Along with his years of experience with the accounting firm of Ernst & Young, Mr. Hudgins has also served as a director of three other public companies.

- **J. Daniel Sullivan**, age 59, has been a director of RHI INC since August 2008. Mr. Sullivan has been the Chairman and Chief Executive Officer of Titan Broadcast Management since October, 2008. He is also currently a member of the board of directors of Ellis Communications, a communications and regional sports production company. Additionally, Mr. Sullivan has been a private investor and consultant specializing in advising various equity funds on media investments since 2004. Prior to that, he served as President and Chief Executive Officer of Quorum Broadcasting Company, Inc. from 1998 to 2004. Mr. Sullivan also served as President & Chief Executive Officer of Sullivan Broadcasting Company, Inc. from 1996 to 1998.  Mr. Sullivan has extensive experience in the television broadcasting industry and brings entrepreneurial business knowledge to the Board. Over the past 20 years, Mr. Sullivan has founded three large broadcasting companies: Clear Channel Television, which has 24 stations, Sullivan Broadcasting Company, which has 18 stations, and Quorum Broadcasting Company, which has 16 stations.

- **Robert A. Halmi, Jr.**, age 53, has served as a director of RHI INC since August 2007 and has served as President & Chief Executive Officer of RHI INC and its predecessor companies for over fifteen years. In 1992, Mr. Halmi became President of the New York corporation named RHI Entertainment, Inc., a publicly traded entertainment company founded by his father, Robert Halmi, Sr. When in 1994, RHI Entertainment, Inc. was acquired by

19

Hallmark Cards, Inc., Mr. Halmi became President, Chief Executive Officer and a director of Hallmark Entertainment. During his tenure at Hallmark Entertainment, Mr. Halmi also served as non-executive chairman of Crown Media, from May 2000 until the end of 2004. He continued his role as President & Chief Executive Officer of Hallmark Entertainment until January 2006, when he, along with members of senior management and affiliates of Kelso, acquired the company and re-launched it as RHI LLC. Mr. Halmi received a Bachelor of Arts degree from Syracuse University.  Mr. Halmi has vast experience developing, producing and distributing MFT movies and mini-series. Mr. Halmi provides an insider's perspective on the broadcasting and entertainment industry in Board discussions about the business and the Debtors' strategic direction and has experience in all aspects of the Debtors' business.

- **Michael B. Goldberg**, age 63, has served as director of RHI INC since August 2007. He joined Kelso in 1991 as a Managing Director. Prior to joining Kelso, he spent two years as a Managing Director and co-head of the mergers and acquisitions department at The First Boston Corporation. From 1977 to 1988, Mr. Goldberg practiced corporate law in the mergers and acquisitions group of Skadden, Arps, Slate, Meagher & Flom, becoming Partner in 1980. He was an associate at Cravath, Swaine & Moore from 1972 to 1977. Mr. Goldberg received a Bachelor of Science degree in Business Administration (Finance) with high honors from the University of Florida and a Juris Doctorate from the University of Virginia, where he was a member of the Order of the Coif and the Law Review. Mr. Goldberg is currently a director of Buckeye Partners, L.P.  As a private equity executive and former investment banker, Mr. Goldberg possesses significant expertise in finance and the operation of capital markets. As an attorney, he also brings legal acumen to the Board.

- **Jeff Sagansky**, age 58, has served as non-executive Chairman of the Board of RHI INC since February 2009. He has a career encompassing over 30 years as an investor and executive in the film, television and digital media business. He serves as Chairman of Elmtree Partners, a private casino development company and Chairman of Winchester Film Capital, a private motion picture financing company. From September 2007 to February 2009, he served as Co-Chairman of the board of directors of Peace Arch Entertainment Group, Inc. ("**Peace Arch**") and he served as the interim Chief Executive Officer of Peace Arch from November 2007 to July 2008. From 2002 to 2003, he was Vice Chairman of Paxson Communications. From 1998 to 2002, Mr. Sagansky served as CEO of Paxson Communications. He is currently a director of Scripps Networks Interactive, Inc., a publicly traded company, and serves on its audit committee and corporate governance committee. Mr. Sagansky earned a Bachelor of Arts from Harvard College and a Masters in Business from Harvard Business School.  Mr. Sagansky brings significant production, investor and executive experience in the film, television and digital media businesses. A proven leader, Mr. Sagansky has successfully directed a number of industry-leading companies, including serving as the Co-President of Sony Pictures, President of CBS Entertainment, President and CEO of Paxson Communications (now ION Media Networks) as well as President of Tri-Star Entertainment. He is a founder of Electric Farm Entertainment, a digital production company. Mr. Sagansky has specific and extensive expertise in the development of business strategy and content in the media and entertainment industry.

- **Jeffrey C. Bloomberg**, age 63, has served as director of RHI INC since June 2009. Mr. Bloomberg is a Principal, Managing Director and Office of the Chairman at Gordon Brothers Group L.L.C., a global advisory, restructuring and investment firm specializing in the retail, consumer products, industrial and real estate sectors. Prior to joining Gordon Brothers Group, Mr. Bloomberg worked in investment banking for nearly twenty years beginning at Lehman Brothers and then serving his final fifteen years on Wall Street with Bear Stearns, where he was a General Partner and Senior Managing Director for the Retail and Consumer Products Sectors. In addition, he was a member of Bear Stearns' Valuation Committee. He is a current or former board member of Tweeter Home Entertainment Group, Inc. and Nortek, Inc. He is a graduate of Dartmouth College and has an MBA from Harvard Business School. He has been active in a number of community organizations and currently serves on the boards of The Boys and Girls Clubs of Greater Boston and Facing History and Ourselves.  The Board elected Mr. Bloomberg as a director in June 2009 due to his leadership skills, financial markets acumen and restructuring experience.

- **Russel H. Givens, Jr.**, age 64, has been a director of RHI INC since August 2008. A veteran of the cable telecommunications industry with over twenty years experience in key executive posts including operations, marketing and programming with several major media companies, Mr. Givens retired in 2004. Prior to his retirement, Mr. Givens served in various senior management roles at Crown Media International from 1998-2004; his most recent role was President & Chief Executive Officer from 2000 to 2004. Previously, he served as Executive Vice President & Chief Operating Officer from 1998 to 2000. Before joining Crown Media, Mr. Givens served as

20

Vice President, European Cable/Telephony, for Media One International (based in London, England) from 1994 to 1998. He holds a bachelor's degree in Mathematics from Morehouse College and a Master's degree in Urban Administration from Occidental College.  Mr. Givens' experience as a former chief executive officer in the media industry provides him with an invaluable perspective on RHI's business and operations.

Under the Plan, a New Board will be established as of the Effective Date.  The members of the New Board will be comprised of five (5) directors, consisting of (i) the chief executive officer of RHI INC serving immediately prior to the Effective Date and (ii) four (4) independent and disinterested directors designated by the First Lien Agent.  The designation of directors will be made in the Plan Supplement.  The New Board will serve in accordance with the Reorganized Parent Governing Documents and will be subject to replacement or removal as provided therein.

(b)      Committees of the Board

The Board has had three standing committees: the Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee. The Board maintains charters for each of its standing committees, which are available on the Debtors' website at www.rhitv.com — Investor Relations — Corporate. The current members of the three committees are:

- **Audit Committee**:  Messrs. Hudgins (Chairman), Bloomberg and Givens.

- **Compensation Committee**:  Messrs. Sullivan (Chairman), Givens and Hudgins.

- **Nominating and Corporate Governance Committee**:  Messrs. Hudgins, Givens and Sullivan (Chairman).

The Debtors have determined that all members of the three committees are independent directors and are otherwise qualified to serve on the respective committees under the applicable rules promulgated by the SEC.

The Debtors anticipate that the New Board will have the same three standing committees and such other committees as the New Board determines appropriate, subject to the terms of the Reorganized Parent Governing Documents.

(c)      Director Compensation

Directors who are employees of the Debtors or any of their subsidiaries or affiliates have not received separate compensation for service on the Board or Board committees. Non-employee directors have been paid a retainer of $100,000 per year. Each of the Chairmen of the Compensation Committee and the Corporate Governance and Nominating Committee has been paid an additional annual retainer of $10,000 and the Chairman of the Audit Committee has been paid an additional annual retainer of $20,000. Non-employee directors were eligible for equity awards, including stock option awards and restricted stock unit awards.  All such equity and stock interests, referred to in the Plan as RHI INC Interests, are being cancelled under the Plan.

The compensation of the New Board will be at the discretion of the New Board.

**2.      Current Executive Management**

(a)      Executive Officers

Set forth below is information regarding the Debtors' current executive officers (the "**Senior Management Team**").

- **Robert A. Halmi, Jr.**, age 53, is President and the Chief Executive Officer. Mr. Halmi has served as a director of RHI INC since August 2007 and has served as President & Chief Executive Officer of RHI INC and its predecessor companies for over fifteen years. In 1992, Mr. Halmi became President of the prior RHI Entertainment, Inc., a publicly traded entertainment company founded by his father, Robert Halmi, Sr. In 1994, that RHI Entertainment, Inc. was acquired by Hallmark Cards and Mr. Halmi became President, Chief Executive Officer and a director of Hallmark Entertainment. During his tenure at Hallmark Entertainment, Mr. Halmi also served as non-executive chairman of Crown Media, from May 2000 until the end of 2004. He continued his role as President & Chief Executive Officer of Hallmark Entertainment until January 2006, when he, along with members of senior management and affiliates of Kelso, acquired the company and re-launched it as RHI Entertainment, LLC. Mr. Halmi received a Bachelor of Arts degree from Syracuse University.  Mr. Halmi has led RHI INC and its

21

predecessor companies for over fifteen years. He has vast experience developing, producing and distributing made-for-television movies and miniseries.

- **Peter N. von Gal**, age 53, is the Head of Worldwide Sales. Mr. von Gal joined RHI INC's predecessor company, Hallmark Entertainment, in 1994 and served as Chief Operating Officer from 1996 until being named Head of Worldwide Sales in 2010. Prior to joining Hallmark Entertainment, he was Vice President-Director of Sales & Marketing at the Univision Television Network from 1988 to 1994. Mr. von Gal received a Bachelor of Science degree in Economics and Business Administration from Wagner College.

- **Michael J. Scarpelli,** age 35, is the Executive Vice President, Finance. Mr. Scarpelli has served as Executive Vice President, Finance since August 2010. In this role, Mr. Scarpelli is responsible for overall financial management, including financial and strategic planning, reporting and analysis, and communications to the investment community. Mr. Scarpelli joined RHI INC in May 2006 as Controller. He was promoted in June 2007 to Vice President, Finance and Controller, promoted again in January 2009 to Senior Vice President, Finance and Controller, and in August 2010 to Executive Vice President, Finance and Controller. Prior to joining RHI INC, Mr. Scarpelli was a Senior Manager in the Entertainment and Media practice of PricewaterhouseCoopers. Mr. Scarpelli is a certified public accountant and holds a Bachelor of Science degree in Accountancy from Villanova University.

- **Henry S. Hoberman**, age 50, is Executive Vice President, General Counsel and Secretary. Mr. Hoberman joined RHI INC in February 2008 as Executive Vice President and General Counsel and was appointed Secretary shortly thereafter. In this role, Mr. Hoberman is responsible for overseeing all Business and Legal Affairs and Human Resources of RHI INC. Prior to joining RHI INC, he was Senior Vice President at ABC, Inc./The Walt Disney Company, serving in various positions of increasing responsibility from 1998 to 2008. He was a Partner in the Media and Communications Group of Baker & Hostetler LLP from 1992 to 1998 and an Assistant United States Attorney for the District of Columbia from 1989 to 1992. Mr. Hoberman holds a Juris Doctorate from University of Pennsylvania Law School and a Bachelor of Arts degree in English Literature from the University of Pennsylvania.

The Plan provides that the (i) officers of RHI INC serving immediately prior to the Effective Date will continue to serve in their same respective capacities after the Effective Date for and on behalf of Reorganized RHI INC in accordance with and subject to the replacement or removal provisions of the Reorganized Parent Governing Documents and (ii) the existing directors and officers of the Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiaries, in accordance with and subject to the replacement or removal provisions of the Reorganized Subsidiary Governing Documents.

Under the proposed Exit Revolving Credit Facility and the New Second Lien Term Loan Facility, an event of default may occur if the Debtors cease to employ an acceptable chief executive officer and an acceptable executive vice president, finance (or chief financial officer if the Debtors utilize such position). Mr. Halmi and Mr. Scarpelli have been pre-approved under the proposed facilities.

(b)    CFO Transition

On June 7, 2010, **William J. Aliber**, the then Chief Financial Officer, notified the Debtors that he would be resigning his position to pursue other opportunities closer to his Kansas City home. Mr. Aliber's last day of active employment was August 13, 2010. Upon Mr. Aliber's departure, **Michael J. Scarpelli** assumed most of Mr. Aliber's current responsibilities. Under a Separation Agreement entered into with the Debtors, Mr. Aliber has agreed to make himself available to respond to any inquiries from the Debtors' officers and Board and to provide consulting services and advice, as needed, regarding business matters of the Debtors for a 12-month period following his termination date.

(c)    Strategic Planning Officer

In connection with their ongoing restructuring efforts, as of May 17, 2010, the Debtors engaged **Robert Del Genio of Conway, Del Genio, Gries & Co., LLC** ("**CDG**") as Strategic Planning Officer of the Company. Under the terms of the engagement agreement between the Debtors and CDG, the Debtors are obligated to pay CDG a monthly fee of $175,000 and to reimburse CDG for all reasonable, direct and out-of-pocket expenses. Mr. Del Genio reports to the Board and, among other functions, communicates frequently with the Debtors' lenders and their representatives regarding the Debtors' activities, cash flows, cost controls and restructuring efforts. To the extent necessary, Mr. Del Genio also will assist the Debtors in connection with the preparation for filing

and the administration of the chapter 11 cases. Mr. Del Genio has an extensive background in finance and accounting, including as Corporate Finance Partner and National Director of Ernst & Young LLP. He will assist, advise and support the Debtors, as needed, in the transition of Mr. Aliber's responsibilities.

It is contemplated under the Plan, through the term sheets applicable to the Exit Revolving Credit Facility and the New Second Lien Term Loan Facility, as well as under the DIP Facility, that the Debtors will continue to retain CDG or another strategic planning officer acceptable to the agents and required lenders under those facilities. Specifically, under the DIP Facility, it is a condition precedent to funding that the Debtors have engaged a strategic planning officer that is reasonably satisfactory to the DIP Facility Agent and required lenders. Under the DIP Facility, the Exit Revolving Credit Facility and the New Second Lien Term Loan Facility, an event of default may occur if the Debtors cease to employ an acceptable strategic planning officer. The continued retention of CDG would satisfy those provisions.

(d) Executive Compensation

The Debtors' executive compensation program has consisted of the following key elements: annual base salary, an annual bonus, and long-term equity-based awards, as well as certain perquisites and other benefits, including employer contributions to tax-qualified defined contribution retirement plans.

- **Base Salary**: Base salaries for executive officers have been determined based on each executive's position, taking into account each executive's contributions and the compensation level required to retain the executive. Base salaries are intended to be competitive within the marketplace. The Debtors' philosophy has been that total compensation should be weighted less towards fixed compensation and more towards variable performance-based compensation. The Debtors expect to continue this practice of emphasizing variable compensation opportunities that stress performance over fixed compensation, subject to the concurrence of the New Board.

- **Annual Bonus**: Executive officers have been eligible to receive annual bonuses at the discretion of the Compensation Committee. These bonuses have been awarded pursuant to the Debtors' Senior Executive Bonus Plan, which was approved by the Board on June 17, 2008, prior to the initial public offering. In determining the amount of each bonus, the Compensation Committee reviewed the performance and contributions of the executive and the overall performance of the business. During fiscal year 2009, none of the then members of the senior management team received an annual cash bonus, and it is not contemplated that annual cash bonuses will be given to members of the senior management team for fiscal year 2010.

- **KRH Compensation**: In the past, each of the members of the Senior Management Team (with the exception of Mr. Scarpelli) has been awarded long-term equity incentive compensation awards in the form of profits interests in KRH, referred to as "Value Units," which entitled the executives to share in the future profits of the business. Additional information concerning the Value Units is available on SEC Form 10-K/A filed by RHI INC on April 30, 2010. These profits interests are not impacted by the Plan, as they are interests in KRH, not interests in any of the Debtors.

- **RHI Equity-Based Awards**: The Compensation Committee has granted equity compensation awards to the members of the Senior Management Team and other employees, directors and consultants pursuant to the Amended and Restated RHI Entertainment, Inc. 2008 Incentive Award Plan (the "**Incentive Award Plan**"), which was approved by the Board on April 8, 2009 and approved by the stockholders on May 12, 2009. The Incentive Award Plan has provided for a variety of equity-based compensation awards, including non-qualified stock options, or "NSOs", incentive stock options, or "ISOs" (within the meaning of Section 422 of the Code), stock appreciation rights, restricted stock awards, restricted stock unit awards, deferred stock awards, dividend equivalents, performance share awards, performance-based awards, stock payment awards, or other stock-based awards. Information concerning the grants to members of the Senior Management Team can be found on SEC Form 10-K/A filed by RHI INC on April 30, 2010. Under the Plan, all equity interests in RHI INC currently held by participants in the Incentive Award Plan will be cancelled. The Plan contemplates new equity awards under the terms of the New Management Incentive Plan.

- **Perquisites and Other Benefits**: The members of the Senior Management Team have received company-paid life, disability and business travel insurance coverage and have been entitled to participate in and receive employer contributions to the 401(k) plan. The Debtors currently make matching contributions to the 401(k) plan on behalf of

23

eligible employees equal to 50% of each participant's contributions (subject to applicable legal limits). The Debtors have also paid the full premiums for supplemental life and disability insurance for each member of the Senior Management Team, which has been reported as taxable income. The members of the Senior Management Team have been eligible to participate in the same benefit plans provided to the Debtors' other salaried employees, including health and welfare plans.

(e)    Employment Agreements

The Debtors have entered into employment agreements with each member of the Senior Management Team. These employment agreements, including the salary, bonus and other material terms of each agreement, are briefly described below. In addition to the terms set forth below, each of these employment agreements provides that, to the extent that delayed commencement of severance payments and benefits is required to avoid the application of the penalty tax under Section 409A of the Code, the severance payments and benefits will be delayed until the earlier of six months after termination or the date of the executive's death.

- **Robert Halmi, Jr.**:  RHI INC entered into an employment agreement with Mr. Halmi effective January 12, 2006, which was subsequently amended and restated effective as of November 8, 2007 to make amendments with respect to Section 409A of the Code, and further amended on December 10, 2008, to make amendments with respect to decreasing Mr. Halmi's annual base salary and extending the term of his employment. The amended and restated agreement provides that Mr. Halmi will serve as the Chief Executive Officer for an initial term that ends on January 11, 2011, and is subject to annual automatic one year extensions thereafter unless either party provides prior notice of its intention not to renew. This amended and restated employment agreement sets the terms and conditions of Mr. Halmi's employment. Under this amended and restated agreement, during the period beginning January 12, 2009 and ending January 11, 2010, Mr. Halmi's annual base pay is $2,065,250, and will increase by 5% per year thereafter on each January 12. Since May 1, 2010, Mr. Halmi has consented to a reduced salary of $1,200,000, but has not executed an amendment to formally reduce his salary.  See Exhibit D to the Plan for a summary of the terms proposed for an amended or replacement employment agreement to be entered into as of the Effective Date.

- **Peter von Gal**:  RHI INC entered into an employment agreement with Mr. von Gal effective January 12, 2006, which was subsequently amended and restated effective as of November 8, 2007, to make amendments with respect to Section 409A of the Code, and further amended on December 11, 2008, to make amendments with respect to decreasing Mr. von Gal's annual base salary, modifying the definition of "good reason," and extending the term of his employment. The agreement provides that Mr. von Gal will serve as the Chief Operating Officer (now Head of Worldwide Sales) for an initial term that ends on January 11, 2011, and is subject to annual automatic one year extensions thereafter unless either party provides prior notice of its intention not to renew. This employment agreement sets the terms and conditions of Mr. von Gal's employment. Under this agreement, as amended effective as of May 1, 2010, Mr. von Gal's annual base pay is $875,000.  See Exhibit D to the Plan for a summary of the terms proposed for an amended or replacement employment agreement to be entered into as of the Effective Date.

- **Michael J. Scarpelli**:  RHI INC entered into an employment agreement with Mr. Scarpelli effective January 1, 2009. The agreement provides that Mr. Scarpelli will serve as the Senior Vice President, Finance and Controller (now Executive Vice President, Finance) for an initial term that began January 1, 2009 and ends on January 1, 2011, and is subject to annual automatic one year extensions thereafter unless either party provides prior notice of its intention not to renew. This employment agreement sets the terms and conditions of Mr. Scarpelli's employment. Under this agreement, as amended effective as of January 1, 2010, Mr. Scarpelli's annual base pay is $350,000.  See Exhibit D to the Plan for a summary of the terms proposed for an amended or replacement employment agreement to be entered into as of the Effective Date.

- **Henry Hoberman**:  RHI INC entered into an employment agreement with Mr. Hoberman effective February 25, 2008. The agreement provides that Mr. Hoberman will serve as the Executive Vice President and General Counsel for an initial term that began February 25, 2008 and ends on February 25, 2011, and is subject to annual automatic one year extensions thereafter unless either party provides prior notice of its intention not to renew. This employment agreement sets the terms and conditions of Mr. Hoberman's employment. Under this agreement, as amended effective as of May 1, 2010, Mr. Hoberman's annual base pay is $700,000.  See Exhibit D to the Plan for a summary of the terms proposed for an amended or replacement employment agreement to be entered into as of the Effective Date.

24

The Debtors also have employment agreements with several other key employees. Each of the Debtors' employment agreements will be amended or replaced in a manner satisfactory to the First Lien Agent as a condition to the Effective Date of the Plan.  All employment agreements in effect as so modified will be treated as executory contracts and will be assumed under the Plan.

### 3.        Potential Conflicts Of Interest

KRH, which owns 42.3% of the common stock interests in RHI INC, is owned 92% by Kelso and affiliates, 3% by members of the Debtors' management via the Value Units described above, and 5% by outside investors.  The directors of KRH include Robert A. Halmi Jr., Frank Loverro of Kelso, and Michael Goldberg of Kelso.  The senior officers of KRH are substantially the same as the senior officers of RHI INC. The primary purpose of KRH is to hold common stock interests in RHI INC.  It has no business operations.

Certain affiliates of Kelso own an aggregate of $15.0 million of the $75.0 million principal amount of the Existing Second Lien Claims.

## E.        SUMMARY OF SIGNIFICANT PREPETITION OBLIGATIONS

### 1.        Credit Facilities

The Debtors currently have two credit agreements that provide financing for the operations of RHI LLC and its subsidiaries (for convenience purposes, these are referred to as the Debtors' credit agreements and related facilities, although certain of the Debtors are not obligated thereunder). The Debtors' first lien credit agreement, as amended (the "**Existing First Lien Credit Agreement**"), is comprised of two facilities: (i) a $175.0 million term loan (the "**First Lien Term Loan**") and (ii) a $350.0 million revolving credit facility, including a letter of credit sub-facility (the "**Revolver**"). The Debtors' second lien credit agreement, as amended (the "**Existing Second Lien Credit Agreement**"), is comprised of a $75.0 million term loan (the "**Second Lien Term Loan**").

Under the terms of the Existing First Lien Credit Agreement, (i) the First Lien Term Loan amortizes in three installments of 10%, 20% and 70% on April 13, 2011, 2012 and 2013, respectively and bears interest at the Alternate Base Rate (ABR) or LIBOR plus an applicable margin of 1.00% or 2.00% per annum, respectively and (ii) the scheduled maturity date of the Revolver is April 13, 2013, and the Revolver bears interest at either ABR or LIBOR plus an applicable margin of 1.00% or 2.00% per annum, respectively. Under the terms of the Existing Second Lien Credit Agreement, the Second Lien Term Loan is scheduled to mature on June 23, 2015 and bears interest at ABR or LIBOR plus an applicable margin of 6.50% or 7.50% per annum, respectively.

Interest payments for all LIBOR loans are due, at the Debtors' election, according to interest periods of one, two or three months, and interest payments for all ABR loans are due quarterly. The Revolver also requires an annual commitment fee of 0.375% on the unused portion of the commitment. At December 31, 2009, the interest rates associated with the First Lien Term Loan, the Revolver and the Second Lien Term Loan were 6.25%, 6.25%, and 7.77%, respectively. Pursuant to the Debtors' defaults under the Existing First Lien Credit Agreement (see discussion below), all of the outstanding First Lien Term Loan and Revolver balances were converted to ABR as of December 29, 2009 and are subject to 2.00% per annum default interest in addition to the applicable margin noted above. The interest rates for the First Lien Term Loan and Revolver noted are inclusive of this default interest; however, the interest rate for the Second Lien Term Loan noted above do not include this default interest because the Second Lien Term Loan was not then in default, although the default interest currently does apply.  Due to the over-advance position of the Debtors' borrowing base and the Debtors' defaults under the Existing First Lien Credit Agreement (see discussions below), they are currently unable to request additional borrowings under the Revolver.  The principal amount outstanding on the Revolver is approximately $340 million.

The Existing First Lien Credit Agreement and Existing Second Lien Credit Agreement include customary affirmative and negative covenants, including among others: (i) limitations on indebtedness, (ii) limitations on liens, (iii) limitations on investments, (iv) limitations on guarantees and other contingent obligations, (v) limitations on restricted junior payments and certain other payment restrictions, (vi) limitations on consolidation, merger, recapitalization or sale of assets, (vii) limitations on transactions with affiliates, (viii) limitations on the sale or discount of receivables, (ix) limitations on lines of business, (x) limitations on production and acquisition of product and (xi) certain reporting requirements. Additionally, the Existing First Lien Credit Agreement includes a Minimum Consolidated Tangible Net Worth covenant (as defined therein) and both the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement contain a Coverage Ratio covenant (as defined therein). The Existing First Lien Credit Agreement and Existing Second Lien Credit Agreement also include customary events of default, including among others, a change of control (including the disposition of capital stock of subsidiaries that guarantee the credit agreement).  The Debtors' obligations under the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement are secured by a perfected security interest

in the capital stock of RHI LLC, granted by Holdings II as pledgor, and substantially all of the assets of RHI LLC and each of its subsidiaries that guaranteed the obligations thereunder, which subsidiaries include RHI Entertainment Productions, LLC, RHI Entertainment Distribution, LLC, RHI International Distribution, Inc. Library Storage, Inc., and RHI Entertainment Ltd.  RHI Entertainment Ltd. is a foreign subsidiary who is not one of the Debtors.  The First Lien Lenders and Second Lien Lenders are expected to forbear from exercising any rights or remedies against RHI Entertainment Ltd. as part of the order approving the DIP Facility, provided there is no default under the DIP Facility, and the Plan will provide for the extinguishment of all liability of RHI Entertainment Ltd. under the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement.

The Debtors defaulted under both the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement. On December 23, 2009, the Debtors acknowledged defaults on the Existing First Lien Credit Agreement resulting from (x) an over-advance on the Revolver due to a reduction in the borrowing base and consequent failure to make mandatory prepayment to cure, and (y) a failure to pay settlement amounts payable and due upon the termination of the interest rate swaps on December 22, 2009 (see further discussion below). On February 12, 2010, the Debtors acknowledged a default on the Existing Second Lien Credit Agreement resulting from the failure to make a scheduled interest payment.

On December 23, 2009, the Debtors entered into a forbearance agreement with the First Lien Agent and lenders holding a majority in principal amount of the loans under the Existing First Lien Credit Agreement and swap counterparties. That forbearance agreement was subsequently amended on January 22, 2010 and again on March 5, 2010. On February 12, 2010, the Debtors entered into a separate forbearance agreement with the Second Lien Agent and lenders holding a majority in principal amount of the loans under the Existing Second Lien Credit Agreement, which was subsequently amended on March 5, 2010. Under each of these forbearance agreements, the agents and lenders (and in the case of the first lien forbearance, the swap counterparties) had agreed to forbear from exercising certain of their rights and agreed to waive some of the existing or prospective defaults until March 31, 2010.

The Debtors and their lenders did not extend the forbearance agreements upon their expiration on March 31, 2010. Therefore, the agents and lenders under the respective credit facilities and swap counterparties have been free to exercise all of their rights and remedies, including the acceleration of the loans and foreclosure on collateral. The Debtors continued to engage in productive discussions with their lenders regarding a restructuring, and the Plan is the result of those discussions.

On December 23, 2009, the Debtors terminated their interest rate swap agreements. As of the date of termination, the interest rate swaps had a value of approximately $19.6 million in favor of the swap counterparties, including approximately $1.1 million related to the net interest settlement of the interest rate swaps. Although this $19.6 million was contractually due immediately upon termination of the interest rate swap agreements, such obligation was deferred in connection with the forbearance agreement entered into between the Debtors and the lenders under the Existing First Lien Credit Agreement.

The obligations outstanding under the Existing First Lien Credit Agreement, including the interest rate swap termination amounts, are referred to in the Plan as the Existing First Lien Claims and are treated in Class 2.  The obligations outstanding under the Existing Second Lien Credit Agreement are referred to in the Plan as the Existing Second Lien Claims and are treated in Class 3. Both Class 2 and Class 3 are Voting Classes.

### 2.      Guild Obligations

The Debtors are parties to, or otherwise bound by, certain collective bargaining agreements and related assumption agreements (collectively, the "**CBAs**") with various entertainment guilds, principally including the Screen Actors Guild, Inc. ("**SAG**"), the Writer's Guild of America West, Inc. for itself and on behalf of Writers Guild of America East, Inc. ("**WGA**"), and the Directors Guild of America, Inc. ("**DGA**"); but also including the American Federation of Television and Radio Artists ("**AFTRA**"); the American Federation of Musicians ("**AFM**"), the Alliance of Canadian Cinema, Television and Radio Artists ("**ACTRA**"); Media Entertainment and Arts Alliance ("**MEAA**"); Equity (formerly known as the British Actors' Equity Association); the Union of British Columbia Performers ("**UBCP**"); and the Writers Guild of Canada ("**WGC**").  Certain of the Debtors are also parties to settlement agreements entered into in February 2003 with SAG and DGA (the "**2003 Settlement Agreements**").  The CBAs and the 2003 Settlement Agreements are executory contracts in bankruptcy, subject to the provisions of Section 1113 of the Bankruptcy Code.

Under the CBAs with each of the SAG, the WGA, the DGA, and AFTRA, when the Debtors are the copyright holder (i.e., the producer) of a film, they are initially responsible for paying to the guilds: (i) residual payments owed to guild members for certain exploitations of a film in which their services are used and credited, and (ii) certain fringe payments such as social security withholdings, unemployment insurance, disability insurance payments and contributions to health and retirement plans created pursuant to the CBAs  (collectively, the "**Guild Obligations**").  Obligations payable to the foreign guilds generally entail similar

26

residual and fringe payments, although there is some variety in that not all include fringe payments for pension and health contributions, some include administrative expenses or a percentage charge for administrative expenses, and at least one includes a value added tax.  In general, the calculation of residuals owed, as specified in the applicable CBAs, for each exploitation of a film depends on several factors such as the type of film being exploited (i.e., whether the film is an MFT film, mini-series, etc.), how the film is exploited (i.e., broadcast on network television, broadcast on cable television, and sale of the home video versions of the film), and the number of times that the film has been previously exhibited (in the case of free television rebroadcasts, the amount per rebroadcast decreases as the number of rebroadcasts increases).

The responsibility to pay these guild obligations can be assumed by other parties besides the initial title holder of the film.  Under Section 406 of the Digital Millennium Copyright Act (the "**DMCA**"), when the copyright ownership in a film that is produced after 1998 and under the CBAs is transferred (such as by sale), the transferee becomes responsible as a matter of law for making residual and fringe payments accruing after the date of the transfer.  Additionally, under both Section 406 of the DMCA and the CBAs, if another party receives a license in a portion of the distribution rights in a film, that distributor must assume the obligation to pay any residuals and fringe obligations that arise from its distribution of that film by entering into a "Distributor's Assumption Agreement."  The distributor's obligation is limited to the specific territories, term and media to which the license to distribute applies.  With respect to certain films, the Debtors as transferee, licensee or distributor have assumed Guild Obligations.

There are some qualifications to the Debtors' responsibility for Guild Obligations.  First, under a Purchase and Sale Agreement entered into with Crown Media Holdings, LLC ("**Crown Media**"), Crown Media agreed to pay to the Debtors residuals and participations related to more than 600 library titles that the Debtors purchased from Crown Media in December 2006 up to a maximum of $22.5 million, of which $21.0 million remains available as of the date hereof (although approximately $9.25 million of the remaining $21.0 million is contemplated to be paid in connection with the undertakings by Crown Media made in connection with the Guild Settlements).  Second, in various states and under the terms of the CBAs, the statute of limitations may limit the guilds' legal right to file a claim on certain unpaid Guild Obligations.  Additionally, under the CBAs, compensation claims submitted by the guilds must be submitted to grievance and thereafter to arbitration.  The time limit under which guilds can file such a claim is limited to various specified time periods, depending on the type of claim and the applicable CBA, after knowledge of or occurrence of the facts upon which the claim is based.  If grievance or arbitration proceedings are not commenced within the applicable limitations period, the claim is deemed to be waived.

Where the Debtors have produced a film, the Debtors have sometimes granted copyright mortgages to some or all of the guilds involved in the production of the title in order to secure the Debtors' obligations under the CBAs.  The collateral covered under these liens includes all rights, title and interest of the grantor of the lien in such film, including, typically, the copyright, all ancillary and subsidiary rights therein and receivables therefrom.  The law is unsettled on some aspects of how such security interests are perfected, and the Debtors believe that some guild liens may not be perfected.  The status of perfection is significant for purposes of determining, in the event of rejection of a CBA, if the resulting rejection damage claim is secured or unsecured.

Where the Debtors only distributed but did not produce a film, the third party producers often granted liens to the guilds to secure payment by the third party producers of the Guild Obligations.  On such films, where the Debtors' distribution rights were granted after such security interests were granted, the Debtors' rights were generally subject to such prior liens as a matter of law.  Moreover, as a matter of contract under the Distributor's Assumption Agreement that the Debtors signed for some of these titles, the Debtors agreed that their license to distribute such film was (i) subject and conditioned upon the prompt payment by the Debtors to the guild of residuals, and (ii) subject and subordinate to any liens granted to the guilds by the producer.  If the Debtors (or, for that matter, the producers) default on their obligation to pay applicable Guild Obligations on films where the guilds have a senior prior perfected security interest, then the guilds would be entitled to exercise remedies, including foreclosing on their security interest, in the copyright in that film and conceivably prevent the Debtors from granting any new sublicenses to or further exploiting those films.

There are believed to be only two titles under which the Debtors' license was recorded before any perfected guild lien, and under which the Debtors did not sign a guild assumption agreement or otherwise consent to the guild lien grants.  In the event the Debtors default in the payment of their guild obligations on these titles, the guilds could step into the copyright owner's shoes, but the Debtors contend that the guilds would do so "subject to" the Debtors' distribution license and any distribution sublicenses theretofore or thereafter granted by the Debtors.  That is, the Debtors would be able to continue to collect revenue under existing sublicenses and possibly also continue to enter into new sublicense agreements.

In considering their restructuring options with respect to the Guild Obligations, the Debtors considered their rights under the Bankruptcy Code to assume, reject or modify the CBAs, the higher scrutiny applied to modification or rejection under Section 1113 of

27

the Bankruptcy Code, and the impact of nonconsensual modification or rejection on their relationships with the guilds. They also considered the impact of the 2003 Settlement Agreements.

Given the importance of their guild relationships to the future viability of their business, and considering their desire to utilize a less costly and less commercially disruptive prepackaged chapter 11 process, the Debtors elected to seek pre-filing settlements with most of the guilds that would permit them to assume the CBAs on modified terms. Over the last several months, after intensive negotiations with the DGA, SAG and WGA and with each of ACTRA, AFTRA, MEAA and Equity, the Guilds and Debtors reached settlements that are referred to in the Plan as the Guild Settlements, which are to be assumed under the Plan.

For purposes of the respective Guild Settlements, the Debtors agreed that the total amount of Guild Obligations owed to the DGA, SAG and WGA was $19,939,374 ($15,337,980 in total residual amounts due and $4,601,394 in total fringe payments due); to ACTRA was $656,012; to AFTRA was $148,356, to MEAA was $550,321; and to Equity was $351,618. Each of the settling guilds agreed to forego additional contractual interest and late payment liquidated damages. The agreed amounts will change between the settlement dates and the Petition Date based on additional film exploitation and any payments or adjustments. The Debtors do not anticipate that there will be significant, if any, amounts owed to the other guilds (AFM, UBCP and WGC) as of the Petition Date.

Accordingly, the Plan provides that the CBAs, assumption agreements, settlement agreements, and other agreements and obligations between the Debtors and the DGA, SAG and WGA and between the Debtors and each of ACTRA, AFTRA, MEAA and Equity will modified with respect to prepetition obligations in accordance with the terms of the respective Guild Settlements, with any prepetition obligations (other than residuals and fringes thereon) not subject to the respective Guild Settlements to remain in effect in accordance with the terms of the applicable underlying agreements, which are set forth in Exhibit B to the Plan. As so modified, all such agreements will be assumed or deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. Cure will be paid by the Debtors in such amount and at such times as the parties have agreed under the terms of the Guild Settlement. The Debtors also expect to assume the CBAs with the other guilds.

### 3. Production Loan Film Obligations

(a) General Overview

Historically, the Debtors have acquired rights to distribute films produced by independent production companies under distribution, license or other forms of agreements that obligated the Debtors to make certain payments to the production company. In some cases, the payment obligations also included a portion of receipts collected by the Debtors and thus were dependent on the success of the particular film. In other cases, the payment obligation consisted of a minimum guaranteed advance or buy-out of distribution rights (the "**Guaranteed Payment**"), which was owed by the Debtors without regard to receipts collected or earned. The production companies often financed the production of a film by obtaining loans that were sometimes based on the Guaranteed Payments. In most cases, the producer relied on receipt of the Guaranteed Payments to enable the producer to repay its production loans. Thus, the Debtors' failure to make the Guaranteed Payments could cause (and in some cases has caused) the producers to default on their production loans.

Some loans to the production companies were secured by the production company's grant of a security interest in its assets related to the film, including the copyrights and receivables. In some instances, to facilitate the production company's borrowing, the Debtors granted the production company a security interest in the Debtors' distribution rights in that film and the associated receivables. In other instances, the Debtors granted the production company a security interest in specifically enumerated sublicenses and revenues thereunder. The Debtors' grants of security interests were nearly always made to secure the Debtors' obligation to make Guaranteed Payments. On occasion, these grants of security interests from the Debtors were to the production companies' lenders directly. On other occasions, the production companies assigned the security interest to their lenders.

There are approximately 40 recent films distributed by the Debtors under agreements containing Guaranteed Payment obligations that were financed with third party bank loans to the production companies (the "**Production Loan Films**"). As of January 1, 2010, the aggregate amount of the Guaranteed Payments owed by the Debtors on Production Loan Films was $76,377,750. Due to increased liquidity constraints, the Debtors were unable to make all Guaranteed Payments as and when owed and were beginning contingency planning for a possible chapter 11 filing. As part of such planning, the Debtors considered the rights that would be afforded to them in Chapter 11 to either assume or reject those agreements that are executory contracts, and also considered which films were possibly not covered by an executory contract. In that context, as to each of the Production Loan Films, the Debtors could (i) assume the applicable agreement and thereby reaffirm its commitment to make the associated Guaranteed Payment, (ii) reject the applicable agreement and thereby convert the Guaranteed Payment to a prepetition claim, which could be a secured claim or an

unsecured claim, depending on any security interest grants by the Debtors and whether such security interests were perfected, or (iii) modify the agreement to reduce or restructure the Guaranteed Payments otherwise owed thereunder and settle all claims arising from unperformed Guaranteed Payment obligations.

In assessing the available options for each Production Loan Film, the Debtors reviewed the status of any security interests, the nature of the collateral and, given the impact of the issue on the economics of a rejection decision, whether the resulting prepetition claim would be wholly secured, partially secured or unsecured.  As a result of that review, the Debtors categorized the Production Loan Films into the following three categories:

- No security interest granted:  There are 19 Production Loan Films in which the Debtors did not grant any security interests to the production companies or their lenders.  As of January 1, 2010, the total unsecured amount of Guaranteed Payments owed by the Debtors under this category of films was $22,925,079.

- Partial security interest granted:  There are 12 Production Loan Films in which the Debtors granted security interests to the production companies or their lenders to secure Guaranteed Payments, but where the pledged collateral is limited to a specific stream of receivables, and the amount of receivables pledged is less than the amount of the Guaranteed Payment on that film.  In these films, the total unsecured amount owed by the Debtors as of January 1, 2010 was $13,916,541, while the total secured and, the Debtors believe, perfected amount owed was $3,594,562.  Additionally, as of January 1, 2010, another $2,250,000 was owed under security interests that the Debtors do not believe were necessarily properly perfected.

- Full security interest granted:  There are nine Production Loan Films in which the Debtors granted security interests to the production companies to secure the Guaranteed Payment obligations and where the collateral consists of all the Debtors' distribution rights or receivables in the relevant Production Loan Film.  In these films, the total secured amount owed by the Debtors as of January 1, 2010 was $33,691,567.  Of this total secured amount owed, $26,266,030 was owed under security interests that the Debtors believe may not have been entirely perfected or in which the perfected security interests were junior to other lien holders who hold security interests granted by the Debtors in the applicable film.

Outside of Chapter 11, if the Debtors do not make the Guaranteed Payments, the production companies (or their assignees) who hold security interests in the Debtors' distribution rights or receivables can foreclose on these assets in relation to the applicable films.  Additionally, under some of the agreements entered into by the Debtors, if the Debtors do not make the Guaranteed Payments when due, then in addition to any other remedies the production companies (or their assignees) may have, the production companies (or their assignees) may be entitled to terminate the license agreement.  If the production company held and exercised a right to terminate the license agreements, all licenses granted to the Debtors in the applicable film would cease and the Debtors would be required to return all applicable delivery materials to the production company.  The Debtors would be unable to grant any new sublicenses to generate revenue, and future receipts from existing sublicenses might have to be turned over to the production company (or its assignee).  In most licenses, the production company is expressly prohibited from terminating the agreement if the Debtors do not make the Guaranteed Payments.  Instead, the remedies of the production companies under these agreements are limited to the right to recover damages in an action at law.

(b)    Settlement Structures

Against this backdrop, the Debtors commenced an effort to work with the production companies and their third party lenders to restructure or otherwise settle the Debtors' payment obligations with respect to certain of the Production Loan Films.  The Debtors believed that such settlements would benefit them because they would allow the Debtors to retain some rights to certain of the films, reduce or eliminate the Guaranteed Payments and, in turn, the pressures on their liquidity, while preserving existing producer and customer relationships that are important to the functioning of the Debtors as a going concern.  These settlements have generally taken one of the following forms:

- Restructuring the timing of the Guaranteed Payments with the Debtors' retaining all of their distribution rights.  In the case of some of the Production Loan Films, the Debtors negotiated to postpone the Guaranteed Payments or to spread them out over a period of time.  In some cases, the Debtors arranged for a portion of the Guaranteed Payments on each such Production Loan Film to be paid via an assignment of receivables from the Debtors' customers on the associated Production Loan Films.  By doing so, the Debtors deferred $875,000 that would

29

otherwise have been payable by April 2010 and minimized the impact of these payments on their cash flow and short-term liquidity.

- An assignment to the production company of the Debtors' accounts receivable from existing sublicenses of the film, combined with returning the distribution rights for unsold territories to the production company or its designee. For some films, the Debtors settled their outstanding Guaranteed Payment obligations by assigning to the production company or its third party lender outstanding and future receivables for such film that arose after an agreed upon date, and surrendering their unexploited distribution rights on a territory-by-territory basis. These restructurings have reduced the Debtors' accounts receivable over the next two years by approximately $2,936,466 and resulted in the Debtors giving up potential sales in such unexploited territories, but also relieved the Debtors of liabilities approximating $11,234,147. On some of these films, the Debtors and the production companies agreed that the Debtors would continue to help distribute such films, in exchange for a modest distribution fee**.**

Where the Debtors have assigned to a third party or returned to the production company unexploited distribution rights, the settlement also provided for such third party or the production company, as the case may be, to assume the obligations to pay the Guild Obligations that arise from the production company's exhibitions or relate to receivables assigned to the production company (or its third party lenders). All settlements include releases of the Debtors from any claims that the production companies or their lenders would otherwise have for non-payment of the Guaranteed Payments.

With respect to settlements completed before the Petition Date, or in some cases before the filing of the Plan Supplement, which settlements are considered to be among the Film Obligation Settlements described in the Plan, the Debtors intend to ratify such settlements, and the Plan specifically provides for such ratification. In addition, the Plan provides that, to the extent the Film Obligation Settlements constitute executory contracts, they will be assumed or deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date, and that the distribution, license, and related agreements that are subject to the Film Obligation Settlements will have been, or as of the Effective Date will be, modified in accordance with, and superseded to the extent inconsistent with, the terms of the Film Obligation Settlements, as applicable. To the extent that the terms of the Film Obligation Settlements, as applicable, require the continuation of any of such subject agreements, as thereby modified, such continuing agreements as so modified will be deemed assumed under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. To the extent that the terms of the Film Obligation Settlements, as applicable, do not require the continuation of any of such subject agreements, such discontinuing agreements will be deemed terminated or amended, as applicable, to give effect to the Film Obligation Settlements. Moreover, unless otherwise provided under the terms of each respective Film Obligation Settlement, any Liens held by a party to each such Film Obligation Settlement will continue in full force and effect, subject to the priorities existing as of the Petition Date. The Production Loan Films that are currently identified as being subject to the Film Obligation Settlements are listed on Exhibit G to the Plan. If additional Production Loan Films are subject to a future Film Obligation Settlement, they will be identified in the Plan Supplement. The Debtors reserve the right to seek approval of any settlement with any producer, licensor, customer, or lender to any such party pursuant to a motion filed with the Bankruptcy Court.

On one Production Loan Film, *Phantom Racer*, the Debtors have negotiated a settlement with the production company and its lender (National Bank of Canada ("**NBC**")), subject to the Bankruptcy Court's approval. Under this settlement, the production company or its lender's designee will (i) assume all of the Debtors' rights and obligations under their customer sublicenses for the film, (ii) receive outstanding and future receivables on this film from the date when the settlement offer was first made, and (iii) be assigned all rights to these films that the Debtors have not yet sublicensed. The production company or its lender's designee will also be liable for payment of all residuals due to the guilds from their future exploitation and those triggered by the exhibitions for which the producer (or its lender) keeps the receivables. In return, the production company and its lender will release the Debtors of all claims that may be brought in relation to these films, including claims for any amount of the Guaranteed Payments. The Debtors currently owe $650,000 in Guaranteed Payments for *Phantom Racer*. In addition, the Debtors had granted a security interest in one or more of the Debtors' sublicenses of *Phantom Racer* (and the receivables arising out of such sublicenses) to the production company, which in turn assigned it to NBC, to secure the Guaranteed Payments on this film. The value of the accounts receivable on this film that will be assigned to the production company or its lender as part of the proposed settlement is approximately $143,295. In the absence of this settlement, the production company and its lender would have a claim against the Debtors for $650,000. Depending on the perfection and priority of the *Phantom Racer* security interest granted by the Debtors, some portion of this claim could be secured, with the amount of the recovery on such secured claim being the lesser of the value of the collateral or the unpaid balance of the Guaranteed Payments on this film. The amount of Guaranteed Payments owed on *Phantom Racer* and the value of the accounts receivable have not been included in the aggregated amounts provided in the preceding general description of the forms of settlements, as this settlement remains subject to Bankruptcy Court approval. The NBC settlement is included within the Film Obligation Settlements under the Plan and thus will be approved in conjunction with confirmation of the Plan.

(c)    U.S. Bank and Powercorp

The Debtors have been negotiating a possible settlement with U.S. Bank in its capacity as the production lender for *Shark Swarm*, *Megastorm*, and up to 13 other films that the Debtors do not wish to keep.  On certain of these films, U.S. Bank has no security interest or no properly perfected security interest securing the Debtors' Guaranteed Payments.   Pursuant to the Debtors' current settlement proposal, U.S. Bank's designee would (i) assume all of the Debtors' under their customer sublicenses for these films, (ii) receive an assignment of all of the Debtors' accounts receivable and proceeds on these films from the date when the settlement offer was first made, and (iii) receive an assignment of all unsold territories and other rights to these films that the Debtors have not yet sublicensed.  The production company or U.S. Bank's designee would also generally be liable for payment of all residuals due to the guilds from their exhibitions and those related to the receivables they receive.  In return, the producers and U.S. Bank would release the Debtors of all claims for the Guaranteed Payments.   As of the date hereof, the Debtors owed approximately $37.83 million in Guaranteed Payments for these 15 films.  In addition, the Debtors have generally granted the production companies security interests in their U.S. sublicenses or distribution rights for these films in order to secure the Guaranteed Payments.  The production companies in turn generally assigned these security interests to U.S. Bank.  The value of the accounts receivable on these films that would be assigned to the production companies and U.S. Bank as part of the proposed settlement is approximately $3.23 million.  In the absence of this settlement, and depending on the perfection and priority of the security interests, the production companies and/or U.S. Bank might have a claim for approximately $39.3 million, a portion of which may be secured but, the Debtors believe, not perfected.  The amount of Guaranteed Payments owed on these U.S. Bank films and the value of the accounts receivable have not been included in the aggregated amounts provided in the preceding general description of the forms of settlements.

The Debtors have also been negotiating a possible settlement with Powercorp, which itself is the subject of an administration proceeding in the U.K.  Powercorp is both a licensee of many of the Debtors' films, and a direct or indirect licensor of two films to the Debtors (*Ice* and *Day of the Triffids*), both of which were financed with loans to Powercorp from U.S. Bank.  A third film (*Dragonsteel*) was licensed by RHIED from a production company named Dragonsteel Films Inc. ("**DFI**").  DFI financed production with a loan from U.S. Bank and separately licensed other distribution geographies to Powercorp.  Under the Debtor's current settlement proposal with Powercorp, the Debtors will be relieved of their obligation to make certain Guaranteed Payments to Powercorp, Powercorp's subsidiaries and DFI. The aggregate amount of these Guaranteed Payments that would be released is $1,500,000 to Powercorp and $4,031,045 to U.S. Bank (these Guaranteed Payments were assigned by Powercorp to U.S. Bank, and are included in the amount of Guaranteed Payments owed to U.S. Bank. described in the preceding paragraph).  Also, in order to help facilitate the Debtors' settlement with U.S. Bank, Powercorp would consent to the assignment by the Debtors to U.S. Bank of the Debtors' interest in film distribution rights licensed by the Debtors from Powercorp and pledged by the Debtors to U.S. Bank as collateral to secure the Debtors promised to pay directly to U.S. Bank Guaranteed Payments originally owed to Powercorp.  Finally, Powercorp would agree not to assign to any person or entity any rights to distribute the Debtors' films without the Debtors' prior written consent.   In return, Powercorp will be relieved of its obligation to pay amounts that Powercorp currently owes to the Debtors, waive certain defaults by Powercorp under the three licenses, and forbear on the Debtors' right to terminate Powercorp's licenses to distribute the Debtors' films on the basis of Powercorp's insolvency and status in administration. The Debtors would also secure a commitment from U.S. Bank to reduce amounts owed by Powercorp and its related borrowers on *Ice* and *Day of the Triffids* and by DFI on *Dragonsteel*.  The amount of the reduction would be the value of the collateral assigned by the Debtors to U.S. Bank.  In the absence of an accounting from Powercorp of its receipts from the subdistribution of the Debtors' films, the Debtors believe that the amount they are currently owed by and that is due from Powercorp (and which the Debtors will be foregoing) is approximately $500,000.  As this amount is unsecured, the Debtors do not believe that this amount will be paid by Powercorp in the course of its administration proceeding in the U.K.

As of the date hereof, there is no certainty that the possible settlements described above will be finalized or that any ultimate settlements will conform to the descriptions above.  If the Debtors are not able to reach settlements within the timeframe required by the Plan, the Debtors would anticipate that all underlying executory contracts would be rejected.  The Claims of U.S. Bank would be treated, to the extent applicable, as Other Secured Claims and General Unsecured Claims, and the Claims of Powercorp as General Unsecured Claims, under the Non-Consensual Plan Alternative.  U.S. Bank would likely receive a return of collateral on account of any Allowed Other Secured Claim.  There would be no recovery on the General Unsecured Claims of either U.S. Bank or Powercorp.

Under the Plan, the Debtors have until the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims to finalize settlements with U.S. Bank and Powercorp.  If the settlements are closed prior to the Petition Date, such settlements may constitute Film Obligation Settlements under the Plan, in which case they may be evidenced in a supplement to Exhibit G to be included in the Plan Supplement or, at the election of the Debtors with the consent of the First Lien Agent, they may be subject of motions for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. If the settlements are closed after the Petition Date, they

will be the subject of motions for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims.  There is no certainty that the possible settlements described above, or any alternative settlements, will be documented, executed or closed within the necessary time period.

### 4.        Participation Obligations

In connection with certain films in the Debtors' film library, the Debtors or their predecessors in interest agreed to pay the production companies or other third parties "participations" based on revenues from the exploitation of their films.  A few of the agreements under which the participations are owed are executory contracts, which are subject to assumption or rejection in bankruptcy.

Although the Debtors have accrued their participation obligations as they recognize revenue on each applicable film, the amounts owed by the Debtors are generally due only after sufficient revenue has been achieved for the Debtors to first recoup any advances, distribution fees and distribution expenses incurred.  If the Debtors do not recoup these amounts, the participation payment may never become due.  For the films where such participation amounts are presently due, the Debtors do not appear to have granted any liens to the participant to secure the payment of such amounts; consequently, all of the Debtors' present obligations to pay participations are unsecured.

Agreements for which participation obligations are still due fall into three categories:

- Home Video Sales:  In these agreements, the Debtors promised to pay participations equal to 50% of gross receipts from home video sales of the film.  The permitted deductions from gross receipts vary by agreement, but often include a 35% distribution fee payable to the Debtors, residuals, recoupment of any advance, actual out-of-pocket expenses, third party fees, royalties and/or other participation obligations.  A few agreements do not permit any deductions.

- All Media:  There is one agreement that falls into this category.  In this agreement, the Debtors promised to pay participations equal to 50% to 100% of gross receipts from the exploitation of the film across all media. The permitted deductions from gross receipts include a distribution fee payable to the Debtors, residuals, recoupment against an advance, actual out-of-pocket expenses and third party fees, royalties and/or other participation obligations.  Certain types of media such as merchandizing and other ancillary rights are excluded.

- Musical Synchronization:  Under two license agreements applicable to the miniseries production *The Temptations*, the Debtors received a license to record certain musical compositions in synchronism with *The Temptations* production, and to reproduce these compositions as recorded in the production.  Under these agreements, the Debtors promised to pay participations calculated based on the number of DVDs, CDs or similar devices sold for home use.

Due to its increased liquidity constraints, the Debtors have over the last several months engaged in negotiations with certain holders of rights to receive participations in an effort to modify the Debtor's participation obligations.  In connection with VZS, the producers of a number of library titles, the Debtors negotiated a settlement whereby VZS would release the Debtors for all past participations owed on a number of films in the Debtors' library produced by VZS and grant the Debtors distribution rights in three recent VZS films, *Acceptance*, *Circuit,* and *Sorority Wars*, in exchange for cash payments totaling $2,321,000 (which payments have been made) and an assignment of receivables in the amount of $883,776.  (the "**VZS Settlement**").  The value of the settlement for the Debtors, particularly with the grant of distribution rights, exceeded their cash outlay to VZS.

In addition to the VZS Settlement, the Debtors have also entered into an amendment with one of their customers, American Broadcasting Companies, Inc. ("**ABC**"), to satisfy the Debtors' payment obligations to ABC with respect to participations of $1,349,706 owed on *Arabian Nights*, *Dreamkeeper* and *Mitch Albom's Five People You Meet in Heaven* and approximately $1,400,000 of "buyback obligation" payments owed on *The Ten Commandments* and *Mitch Albom's Five People You Meet in Heaven* (the "**ABC Settlement**").  Under the terms of the ABC Settlement, in full satisfaction of the Debtors' payment obligations to ABC described above, the Debtors have granted to ABC $2,750,000 in credits to be applied against future exhibitions of certain of the Debtors' library films on ABC-affiliated networks over the next five years, with additional credits contingent upon the occurrence of certain events.

Both the VZS Settlement and the ABC Settlement are considered to be Film Obligation Settlements under the Plan. The Debtors intend to ratify such settlements, and the Plan specifically provides for such ratification. In addition, the Plan provides that, to the extent the Film Obligation Settlements constitute executory contracts, they will be deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date, and that the distribution, license, and related agreements that are subject to the Film Obligation Settlements will have been, or as of the Effective Date will be, modified in accordance with, and superseded to the extent inconsistent with, the terms of the Film Obligation Settlements, as applicable. To the extent that the terms of the Film Obligation Settlements, as applicable, require the continuation of any of such subject agreements, as thereby modified, such continuing agreements as so modified will be deemed assumed under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. To the extent that the terms of the Film Obligation Settlements, as applicable, do not require the continuation of any of such subject agreements, such discontinuing agreements will be deemed terminated or amended, as applicable, to give effect to the Film Obligation Settlements. Moreover, unless otherwise provided under the terms of each respective Film Obligation Settlement, any Liens held by a party to each such Film Obligation Settlement will continue in full force and effect, subject to the priorities existing as of the Petition Date.

As of August 31, 2010, after giving effect to the VZS Settlement and the ABC Settlement, there are nine remaining films for which participation amounts may be due and owing. Under a Purchase and Sale Agreement entered into with Crown Media, Crown Media has agreed to pay the participation amounts related to eight of these remaining nine films. The Debtors believe that the obligation owed by Crown Media on the eight films is in the approximate amount of $2.64 million. However, because the Debtors are parties to the participation agreements under which these amounts are owed, the Debtors can be legally compelled to pay the participation amounts if Crown Media does not make such payments. On the ninth film, which is not payable by Crown Media, the Debtors estimate that a participation amount of approximately $91,863 may be due and owing. The parties owed the participation amounts may assert claims for  higher amounts, although the Debtors would dispute such claims for several reasons including, but not limited to, limitations on amounts that can be claimed under the statute of limitations, insufficient evidence of amounts owed, and inaccurate accounting methodologies.

**5.       MAT IV Litigation**

MAT IV is one of the parties with which the Debtors have sought a settlement with respect to their contractual rights and obligations and certain issues in dispute with respect to such rights and obligations. Whether or not such a settlement, among others, is reached will determine whether the Consensual Plan Alternative or the Non-Consensual Plan Alternative applies under the Plan.

By way of background, On February 22, 2010, RHI Entertainment Distribution, LLC ("**RHI Distribution**") was served with a complaint filed in the United States District Court for the Southern District of New York alleging that RHI Distribution had breached contracts with MAT IV, a German investment fund, by failing to pay amounts due under a settlement agreement dated September 25, 2009, relating to issues under a distribution agreement dated June 24, 2002. The distribution agreement allows RHI Distribution to distribute approximately 36 films throughout the world and to match any offer to purchase the films outright at the end of the distribution term (the "**MAT Film Rights**"). The complaint seeks approximately $7.0 million in damages, plus interest and attorneys' fees. On April 15, 2010, RHI Distribution moved to dismiss the complaint and compel arbitration. MAT IV filed an opposition to the motion on April 29, 2010. The motion is pending. Upon the Petition Date, the litigation will be stayed.

Under the settlement agreement at issue in the complaint, RHI Distribution agreed to pay, subject to audit, $6,036,983, plus interest, in exchange for, among other things, a release from MAT IV that included all amounts due under the distribution agreement through December 31, 2008. In the absence of a settlement, and thus under the Non-Consensual Plan Alternative, the Claim of MAT IV under the settlement agreement, once fixed subject to the audit, would be a General Unsecured Claim under the Plan, which would be entitled to no recovery. MAT IV may assert that the Claim is an Other Secured Claim, but the Debtors would dispute that position.

The June 24, 2002 distribution agreement was entered into between MAT IV and RHI Distribution when RHI Distribution was named Hallmark Entertainment Distribution LLC. It is an executory contract, which RHI Distribution may assume or reject in the Chapter 11 Case. In the absence of a settlement, and thus under the Non-Consensual Plan Alternative, if the distribution agreement is assumed, any amounts determined to be in default under the agreement would need to be paid as Cure. The Debtors may seek to assume the distribution agreement conditioned on a determination of the amount of Cure, reserving the right to reject if the determined Cure amount is excessive. MAT IV has asserted that approximately $14.3 million is due under the distribution agreement. The Debtors believe that such assertion is based on an incorrect interpretation of the accounting provisions in the distribution agreement and that in fact no amounts are owed to MAT IV. If the Debtors prevail, they would be in a position to assume the distribution agreement. If not, they will move to reject the distribution agreement. If the distribution agreement is rejected, MAT IV would have a prepetition Claim for the amount determined to be in default as of the Petition Date and could assert a Rejection

33

Damages Claim, although the Debtors believe they would have defenses to any Rejection Damages Claim. Except to the extent MAT IV may be able to establish that any portion of the Claim or Rejection Damages Claim constitutes a Secured Claim, MAT IV would hold a General Unsecured Claim under the Plan and thus would be entitled to no recovery under the Plan. To the extent MAT IV is able to establish a Secured Claim, that Secured Claim would be an Other Secured Claim under the Plan, which may be treated in one of the methods prescribed by the Plan, at the election of the Debtors (with the consent of the First Lien Agent). The Debtors anticipate that they would elect to return collateral to MAT IV in full satisfaction of any Other Secured Claim.

MAT IV also asserts that it holds a guaranty from Hallmark Entertainment Holdings, Inc. ("**HEH**"), as predecessor by merger to Crown Media Holdings, Inc. ("**CMHI**"), of RHI LLC's obligations under the distribution and settlement agreements in question. In the absence of a settlement, and thus under the Non-Consensual Plan Alternative, any Claim under the guaranty by MAT IV against RHI LLC directly or by HEH against RHI LLC for indemnification for amounts paid by CMHI under the guaranty would be a General Unsecured Claim subject to the treatment provided in Class 5 of the Plan. Nevertheless, HEH may assert setoff or recoupment rights with respect amounts it owes to the Debtors.

The Debtors, MAT IV and HEH engaged in extensive negotiations prior to the date hereof in an attempt to resolve all issues in dispute and claims that MAT IV might bring against HEH under the guaranty. They reached a settlement in principal under which, among other things, (i) RHI Distribution would turn over to MAT IV rights to distribute the movies covered by the distribution agreement; (ii) HEH would pay MAT IV a settlement amount; (iii) HEH and MAT IV would share all future revenues from the MAT Film Rights; (iv) the Debtors would remain liable for pre-settlement residuals and participations, and (v) the Debtors, MAT IV and HEH would exchange mutual general releases. As of the date hereof, the settlement has not been fully documented, executed or closed.

Under the Plan, the Debtors have until the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims to finalize a settlement with MAT IV and HEH. If the settlement is closed prior to the Petition Date, such settlement may constitute a Film Obligation Settlement under the Plan, in which case it may be evidenced in a supplement to Exhibit G to be included in the Plan Supplement or, at the election of the Debtors with the consent of the First Lien Agent, it may be subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. If the settlement is closed after the Petition Date, it will be the subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. There is no certainty that the settlement in principal will be documented, executed or closed within the necessary time period.

**6.    New York Lease Settlement**

RHI LLC is a party to a Lease dated May 22, 2008 (the "**NY Lease**"), with Paramount Group, Inc., as Agent for 1325 Avenue of the Americas, L.P. (the "**NY Landlord**"). Under the NY Lease, RHI LLC leased the entire 21st floor, a portion of the 22nd floor, and certain storage space at the office building known at 1325 Avenue of the Americas in New York, New York for a term continuing through July 1, 2019. RHI LLC's obligations under the NY Lease are backed by a letter of credit in the approximate amount of $3.4 million, which the NY Landlord could draw upon in the event of a default. In March 2010, RHI LLC defaulted in its obligations under the NY Lease and commenced negotiations with the NY Landlord in an effort to restructure its obligations under the NY Lease, including the amount of leased space and the term of the lease. Negotiations continued until October 1, 2010, when RHI LLC and the NY Landlord entered into a Surrender Agreement and Amendment of Lease (the "**Amendment**"). At the time of the Amendment, RHI LLC had amassed an arrearage of $2,098,505.70 (plus certain unbilled submeter electric billings) and owed an additional $27.9 million for the remaining term of the lease. Under the Amendment, and a contemporaneous Settlement Agreement:

- On or about October 1, 2010, RHI LLC paid rent and other charges for the months of August, September and October 2010, plus $40,000 for counsel fees incurred by the NY Landlord. Rent for November and December is to be paid when due as required by the Lease.

- RHI LLC agreed to either file for Chapter 11 or commence a prepackaged plan solicitation by November 1, 2010 and after filing to seek approval of the Amendment and assumption of the Lease as modified by the Amendment from the Bankruptcy Court by an order required to be entered before December 15, 2010.

- Once the required Bankruptcy Court approval is obtained (which would be the "Effective Date" of the Amendment) RHI LLC will surrender the 22nd floor. Full rent for the month of December 2010 will be due notwithstanding such surrender.

34

- Once the Effective Date occurs, the NY Landlord has the right to present the letter of credit for payment, and retain all of the proceeds, as consideration for the NY Landlord's agreement to accept the early surrender of the premises.

- Fixed rent for the months of January, February and March 2011 will be reduced to $145,360.33 per month for the 21st floor. Fixed rent for the storage space will remain unchanged.

- An additional payment of $112,660.72 will be paid for each of the months of January, February and March 2011 to satisfy arrearages under the Lease as of the date of the Amendment.

- On March 31, 2011, RHI LLC will surrender all leased space and vacate the premises, and the Lease as amended by the Amendment will terminate.

- In a summary non-payment proceeding against RHI LLC in the Civil Court of the City of New York, County of New York, RHI LLC entered into a Stipulation of Settlement, under which it consented to entry of a judgment of possession in favor of the NY Landlord and a money judgment for the arrearage. The Civil Court entered a decision and judgment in favor of the NY Landlord, which will be stayed so long as RHI LLC complies with the terms of the Amendment.

- As of the lease surrender date, except with respect to obligations that are expressly stated to survive the surrender, each of RHI LLC and the NY Landlord agree to release the other from and against any and all actions, causes of action, suits, controversies, damages, judgments, claims and demands whatsoever, at law or in equity, of every kind and nature, arising out of or in connection with the Lease or otherwise, including, but not limited to, causes of action arising out of Chapter 5 of the Bankruptcy Code.

As soon as possible after the Petition Date, the Debtors intend to file a motion with the Bankruptcy Court seeking the required approval of the Amendment and assumption of the Lease as modified by the Amendment. If approval is obtained, the NY Landlord will receive payments when due under the Lease and will not have a General Unsecured Claim in the Chapter 11 Case.

The Debtors are currently looking for new office space in the New York area.

### 7.       Shareholder Class Action Lawsuit

On October 9, 2009, RHI INC and two of its officers were named as defendants in a putative shareholder class action filed in the United States District Court for the Southern District of New York, alleging violations of federal securities laws by issuing a registration statement in connection with the June 2008 IPO that purportedly contained untrue statements of material facts and omitted other facts necessary to make certain statements not misleading. The central allegation of the lawsuit is that the registration statement and prospectus overstated the projected number of MFT movies and mini-series expected to be developed, produced and distributed in 2008, while it failed to disclose that the company would not be able to complete the expected number of MFT movies and miniseries in 2008 due to the declining state of the credit markets and other negative factors then impacting the business. The lawsuit seeks unspecified damages and interest. On May 3, 2010, RHI INC filed a motion to dismiss the complaint, which motion remains pending as of the date hereof. The Debtors believe that the lawsuit has no merit.

The claims against RHI INC are subject to Section 510(b) of the Bankruptcy Code and are treated as Subordinated Claims under the Plan. As such, the plaintiffs will receive no recovery from RHI INC under the Plan or otherwise. If the lawsuit is not dismissed, the plaintiffs may proceed against the officers. To the extent of any recovery against the officers that is not covered by insurance, the officers may have the benefit of indemnification from RHI INC. Under the Plan, all Indemnification Obligations in favor of officers serving prior to, on, and after the Petition Date will be deemed to be, and will be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) will survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with a pre-Petition Date or post-Petition Date occurrence.

## F.       EQUITY INTERESTS

At the close of business on October 28, 2010, RHI INC had 23,421,595 shares of common stock outstanding. Of the shares outstanding, approximately 57.7% are owned of record by public stockholders and approximately 42.3% are owned by KRH. In the

aggregate, there are approximately 62 common stockholders of record, but because a number of stockholders hold their shares in street names, RHI INC believes that there are substantially more beneficial owners of common stock.

Until June 21, 2010, the common stock was traded on The Nasdaq Stock Market ("**NASDAQ**") under the symbol "RHIE". On December 24, 2009, RHI INC received a notice from NASDAQ stating that the common stock no longer met the minimum $1.00 per share requirement for continued listing on NASDAQ in accordance with Listing Rule 5450(a)(1). This notice did not result in an immediate delisting of the common stock from NASDAQ, as a grace period of 180 calendar days (June 22, 2010) was provided under Listing Rule 5810(c)(3)(A). In addition, on December 24, 2009, RHI INC also received a notice from NASDAQ stating that the common stock failed to maintain a minimum market value of publicly held shares of $5 million for the previous 30 consecutive trading days, as required for continued inclusion on NASDAQ in accordance with Listing Rule 5450(b)(1)(C). This notice did not result in an immediate delisting of the common stock from NASDAQ, as an original grace period of 90 calendar days was provided under Listing Rule 5810(c)(3)(D). On May 20, 2010, RHI INC received a notice from NASDAQ stating that the Company no longer met the minimum $10 million stockholders' equity requirement for continued listing on NASDAQ in accordance with Listing Rule 5450(b)(1)(A). In addition, RHI INC had failed to meet the minimum bid price of $1.00 for 30 consecutive business days pursuant to Listing Rules 5450(a)(1) and the minimum market value of publicly held shares of $5 million pursuant to 5450(b)(1)(B). RHI INC could not meet the continued listing requirements under the alternative standards under Listing Rule 5450(b). Accordingly, on June 9, 2010, NASDAQ announced its determination to remove from listing the common stock of RHI INC, effective at the opening of the trading session on June 21, 2010. The common stock of RHI INC is currently trading on the pink sheets.

No dividends have been paid on the common stock of RHI INC since its issuance.

Under the Plan, the common stock is referred to as the RHI INC Interests. The Plan provides that the RHI INC Interests will be cancelled as of the Effective Date and that no holder of any RHI INC Interest will receive or retain any property under the Plan on account of such Interest.

**G.    HISTORICAL FINANCIAL INFORMATION; ADDITIONAL INFORMATION**

The Debtors' fiscal year ends on December 31. Consolidated financial information regarding the Debtors for the fiscal year ended December 31, 2009 is available in the Annual Report on Form 10-K of RHI INC filed with the SEC for such period. Financial information for subsequent quarters ended March 31, 2010 and June 30, 2010 is available on the Quarterly Report on Form 10-Q filed for each of such periods. Such reports may be accessed on the SEC's website at www.sec.gov or on the Debtors' website at www.rhitv.com.

The Debtors' website (www.rhitv.com) provides additional information about the Debtors, including, without limitation, all periodic filings made with the SEC, recent press releases, corporate governance practices and guidelines, the code of business conduct and ethics, and charters for the committees of the Board.

**H.    KEY EVENTS LEADING TO THE FILING OF CHAPTER 11 CASES**

As one of the largest producers of television films and mini-series, the Debtors had developed and followed a successful business model for a number of years. Basically, that model required the Debtors to make a new slate of pictures every year, to be marketed throughout the world to their customer base. The new films produced each year, which included both movies and mini-series, helped to drive sales from the library of existing pictures.

The economics of the Debtors' business model had generally worked very well, until the global financial downturn that began in 2008. Each year, the Debtors financed, through their own operating cash flows and credit facilities, production of the new slate of movies and mini-series for that year. New films were priced at a level during the first period for which they were licensed that was designed to recoup the Debtors' out-of-pocket costs to make the film, but not necessarily generate a significant, if any, profit. By following this model, the Debtors were able to steadily add new films to their existing library, and, at the conclusion of the initial licensing of such films, own them outright as fully-paid for library additions. Subsequent licensing of the films generated profits for the Debtors.

As a result of the continued weak market conditions, sales data, pricing and other factors present during the fourth quarter of 2009 and into 2010, as well as the significant decline in the annual independent valuation of the unsold rights to the Debtors' film library, the Debtors experienced a significant reduction of the ultimate revenues for the majority of films in their library. The reduction in ultimate revenues resulted in a decrease in the fair value of films to an amount below their net book value. The decrease

36

in the value of the Debtors' film library directly and materially reduced the borrowing base governing the Existing First Lien Credit Agreement, which caused defaults under the Existing First Lien Credit Agreement, and rendered the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement undersecured.

In addition, as the global market for television films and mini-series continued to change and evolve, it became increasingly clear that the level of their debt – approximately $620 million – was simply too large an amount for the Debtors to service.  In fact, as indicated previously, the Debtors are currently in default under their credit facilities.  As a result, the Debtors' management and Board, in consultation with their outside advisors, determined that survival of the company would require a comprehensive restructuring of the debt, including, in particular, conversion of a very significant portion of such debt into equity.  The Debtors ultimately determined that such restructuring and conversion of debt into equity could best be effectuated through a chapter 11 filing.

**III.**
**ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES**

If, in response to the solicitation occurring pursuant to this Disclosure Statement, the Debtors receive the Requisite Acceptances, the Debtors intend to commence their chapter 11 cases promptly.  From and after the Petition Date, the Debtors will continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

To expedite their emergence from Chapter 11, the Debtors intend to seek, among other things, the relief detailed below from the Bankruptcy Court on the Petition Date.  If granted, this relief will facilitate the administration of the Chapter 11 Case.  There can be no assurance, however, that the Bankruptcy Court will grant the requested relief.  Bankruptcy courts customarily provide various other forms of administrative and other relief in the early stages of chapter 11 cases.  The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals, including the matters described below.

ALL VOTES TO ACCEPT THE PLAN WILL BE DEEMED TO CONSTITUTE CONSENTS TO THE RELIEF TO BE SOUGHT BY THE DEBTORS UPON THE COMMENCEMENT OF THE CHAPTER 11 CASES AS IDENTIFIED BELOW.

## A.    FILING AND FIRST DAY ORDERS

If the Requisite Acceptances are received by the Debtors in advance of the Voting Deadline, all of the Debtors expect to thereafter promptly commence the chapter 11 cases by filing petitions under Chapter 11 of the Bankruptcy Code.  Contemporaneously therewith, the Debtors expect to file certain motions and applications seeking the entry of orders designed to minimize the disruption of the Debtors' business operations and to facilitate the reorganization of the Debtors.  If granted, these orders would provide the following types of relief:

- Joint administration of the Debtors' chapter 11 cases for procedural purposes only;

- Approval of certain case management procedures;

- Authorization for the Debtors to maintain their centralized cash management system, to maintain their existing bank accounts, to continue their intercompany account practices, and to continue their investment practices;

- Authorization for the Debtors to obtain debtor in possession financing in the form of the DIP Facility, and to use the cash collateral of the First Lien Lenders, Second Lien Lenders and the Guilds subject to adequate protection in the form of additional liens, super-priority Administrative Claims, and certain fee and expense reimbursements (a draft Debtor in Possession Credit, Security, Guaranty and Pledge Agreement, as well as a draft interim order pursuant to which the requested authorization is proposed to be granted, may be viewed at www.loganandco.com under case RHI Entertainment);

- Authorization for the Debtors to pay compensation, benefits and expense reimbursements to their employees and to third parties who are involved in the process of providing such compensation, benefits and expense reimbursements;

- Authorization for the Debtors to pay the prepetition claims of critical, priority and foreign vendors;

- Authorization for the Debtors to pay prepetition taxes and governmental fees, if any;

37

- Authorization for the Debtors to pay prepetition obligations owing under their insurance policies, if any;

- Approval of the Debtors' proposal to provide adequate assurance of future payment to utility companies and establish procedures under which utilities may challenge or seek additional adequate assurance;

- Authorization for the Debtors to retain and pay ordinary course professionals without separate retention and fee applications;

- Authorization for the Debtors to retain chapter 11 professionals, including counsel, financial advisors and restructuring managers; and

- Approval of the procedures by which court-approved chapter 11 professionals may obtain interim compensation and reimbursement pending the filing of interim and final fee applications.

The Debtors reserve the right to file additional motions for first day relief, as they determine necessary between the date hereof and the Petition Date.

In addition, to facilitate the prepackaged process contemplated by the Plan, the Debtors will file a motion seeking, *inter alia*, (i) an order scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan, approving the form and manner of notice of the combined hearing, and establishing procedures to implement the Contract/Lease Assumption Schedule provisions of the Plan and (ii) an order approving the Solicitation, approving the adequacy of the disclosure statement, and confirming the Plan. The Debtors also intend to file a motion seeking the establishment of a Bar Date, as discussed below.

## B.    REPRESENTATION OF THE DEBTORS

The Debtors intend to seek Bankruptcy Court authority to retain and employ certain Professionals to represent them and assist them in connection with the Chapter 11 Case. Some of these Professionals have been intimately involved with the negotiation and development of the Plan and include, among others: (i) Latham & Watkins LLP, as counsel for the Debtors, (ii) Rothschild Inc., as financial advisor and investment banker to the Debtors; and (iii) Conway, Del Genio, Gries & Co., LLC, as strategic planning officer and restructuring consultants.

## C.    BAR DATE AND PROOF OF CLAIM PROCESS

Under the Consensual Plan Alternative, as a condition to allowing the Reinstated treatment option for General Unsecured Claims, the First Lien Lenders have required that the Debtors implement a Proof of Claim process during the initial 60 days of the Chapter 11 Case. The Proof of Claim process will enable the Debtors and the First Lien Agent to determine whether or not the Estimated Class 5 Allowed Claims will exceed the Maximum Class 5 Amount. If the Maximum Class 5 Amount is not exceeded then the Reinstated treatment option will be allowed and, as a result, General Unsecured Claims will not be Impaired by the Plan.

Accordingly, the Debtors intend to seek an order from the Bankruptcy Court establishing a Bar Date for filing Proofs of Claim, which Bar Date will run from the date of mailing of notice, following the filing of the Schedules. It is the Debtors' intention to file the Schedules during the first two weeks of the Chapter 11 Case. The Debtors will request a Bar Date of 25 days after the date of mailing of notice, based on the facts and circumstances, but it is possible that the Bankruptcy Court will require a slightly longer Bar Date, which consistent with local guidelines would likely be 35 days after the date of mailing. Any Claim that is required to be, but is not, asserted by the Bar Date will be barred, and the holder of such Claim will not be permitted to receive any distribution under the Plan or otherwise from the Debtors or the Estates on account of such Claim.

## D.    ANTICIPATED TIMETABLE FOR THE CHAPTER 11 CASES

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Confirmation Hearing could occur as early as 60 to 75 days after the Petition Date. There can be no assurance, however, that the Bankruptcy Court will authorize the relief requested by the Debtors or that the orders entered by the Bankruptcy Court will permit the Chapter 11 Case to proceed as expeditiously as anticipated. Although the Debtors intend to request that the United States Trustee defer the appointment of a statutory committee of unsecured creditors, there can be no assurance that there will not be a committee, if a sufficient number of unsecured creditors are willing to serve. If a committee is appointed, the length, complexity and cost of the Chapter 11 Case may be substantially greater than might be expected in a more traditional pre-packaged process.

38

The Debtors reserve the right to seek to shorten the projected length of the Chapter 11 Case as facts and circumstances warrant.

**IV.**
**REASONS FOR THE SOLICITATION; RECOMMENDATION**

Chapter 11 of the Bankruptcy Code provides that, in order for the Bankruptcy Court to confirm the Plan, at least one Class of Impaired Claims must accept the Plan, provided that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code as to any rejecting Classes of Impaired Claims. An Impaired Class of Claims will have accepted the Plan if Requisite Acceptances are obtained, meaning: (i) the holders of at least two-thirds in dollar amount of the Allowed Claims in such Impaired Class of Claims actually voting have voted to accept the Plan and (ii) the holders of more than one-half in number of the Allowed Claims in such Impaired Class actually voting on the Plan have voted to accept the Plan, not counting the vote of any holder designated under Section 1126(e) of the Bankruptcy Code. Thus, the Debtors are seeking the Requisite Acceptances from Class 2 and/or Class 3. The Debtors believe that the requirements of Section 1129(b) are satisfied as to Class 4 and Class 5 under the Non-Consensual Plan Alternative, as to Class 5 under the Consensual Plan Alternative if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, and as to deemed rejecting Classes 6 and 7.

The Solicitation is being conducted at this time in order to obtain the Requisite Acceptances **prior** to the filing of voluntary petitions for reorganization of the Debtors under Chapter 11 of the Bankruptcy Code. The Debtors anticipate that by conducting the Solicitation in advance of commencing the Chapter 11 Case, the duration of the Chapter 11 Case will be significantly shortened and the administration of the cases, which otherwise can be lengthy, complex, and expensive, will be greatly simplified and much less costly.

In light of the benefits to be attained by the Debtors and the Debtors' creditors pursuant to the transactions contemplated by the Plan, the Debtors' boards of directors recommend that all holders of Claims in the Voting Classes vote to accept the Plan. The Debtors' boards of directors (or other governing bodies) have reached this decision after considering the available alternatives to the Plan and their likely effect on the Debtors' business operations, creditors and stakeholders. These alternatives include liquidation of the Debtors under Chapter 7 of the Bankruptcy Code or a reorganization under Chapter 11 of the Bankruptcy Code without prepetition solicitation and on terms other than those included in the Plan. The Debtors' boards of directors (or other governing bodies) determined, after consulting with financial and legal advisors, that the Plan would result in a distribution of greater values to creditors than would a liquidation under Chapter 7 or any other chapter 11 reorganization. For a comparison of estimated distributions under Chapter 7 of the Bankruptcy Code and under the Plan, please see Part IX.D.2(a) of this Disclosure Statement. The Debtors' boards of directors (or other governing bodies) also concluded that initiating the Chapter 11 Case without a prepetition solicitation would result in (i) a significant delay in confirmation of a plan, (ii) higher fees and expenses and (iii) an increased possibility that the reorganization cases would damage the Debtors' businesses, resulting in a lower recovery for all creditors.

FOR ALL OF THESE REASONS, THE DEBTORS' BOARDS OF DIRECTORS (OR OTHER GOVERNING BODIES) SUPPORT THE PLAN AND URGE ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES TO VOTE ON THE PLAN TO ACCEPT AND SUPPORT THE PLAN.

**V.**
**THE PLAN**

> **THIS PART V IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS PART V AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN WILL CONTROL AND GOVERN.**

**A.    OVERALL STRUCTURE OF PLAN**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and, if there is any value in the equity, its shareholders. Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will receive a negotiated, partial recovery, (ii) the Claims in certain Classes will be reinstated or receive treatment required by the Bankruptcy Code, and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Reorganized Debtors, through the Plan Disbursing Agent, will distribute Cash, New Common Stock, New Term Loan Obligations, and New Warrants in respect of certain Classes of Claims as provided in the Plan. If applicable, the Trade Account Disbursing Agent, selected by the First Lien Agent, will distribute Cash to certain holders of eligible Allowed Trade Unsecured Claims. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## B.      BASIS FOR PLAN STRUCTURE

The Plan is premised upon the following: (i) all material assets of the Debtors have been pledged to secure the Existing First Lien Claims and the Existing Second Lien Claims; (ii) subject to the settlement described in Section 2.3(a) of the Plan, the amount of the Existing First Lien Claims exceeds the value of the pledged assets, and the First Lien Lenders have first priority Liens in all of the pledged assets; (iii) any dispute as to the value of the pledged assets with respect to the second priority Liens of the Second Lien Lenders would be expensive, time-consuming, and detrimental to the success of the Debtors' reorganization efforts; (iv) there are no unencumbered assets or, alternatively, any unencumbered assets are of de minimis value; (v) any de minimis value associated with any unencumbered assets would be exhausted by Administrative Claims, Priority Tax Claims, and Other Priority Claims; (vi) the treatment of Other Secured Claims and General Unsecured Claims is dependent upon certain settlements and the applicability of either the Consensual Plan Alternative or the Non-Consensual Plan Alternative; (vii) the treatment of General Unsecured Claims under the Consensual Plan Alternative is dependent on the expected amount of such Claims; and (viii) the future success of the Reorganized Debtors is dependent on paying all or a reasonable portion of Trade Unsecured Claims.

## C.      SUBSTANTIVE CONSOLIDATION

The Plan provides for substantive consolidation of the liabilities and properties of all the Debtors for purposes of distribution. Substantive consolidation is an equitable remedy that must be approved by the Bankruptcy Court. The Plan constitutes a motion for substantive consolidation of the liabilities and properties of all the Debtors, the confirmation of the Plan will constitute approval of the motion by the Bankruptcy Court, and the Confirmation Order will contain findings supporting and conclusions providing for substantive consolidation on the terms set forth in the Plan.

In the Debtors' view, the following facts clearly warrant substantive consolidation:

- The Subsidiary Debtors are directly or indirectly owned by the lead debtor, RHI INC.

- The officers and directors of the Subsidiary Debtors, and the officers of all Debtors, are substantially the same.

- The Board of RHI INC oversees the Debtors' management, reviews their long-term strategic plans and exercises decision making authority in key areas for all of the Debtors.

- Corporate policy is created and executed for all the Debtors at the direction of RHI INC's management.

- The Debtors utilize a fully integrated centralized cash management system that permits them to fund their ongoing operations in the most streamlined and cost-efficient manner possible.

- The Debtors either (i) are obligors, guarantors or pledgors under the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement or (ii) if not obligors, guarantors or pledgors thereunder, have no assets or have assets with no value that could benefit their creditors or stockholders.

- The financial covenants contained in the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement are based on the consolidated financials of the entire RHI family.

- Consolidated books and records are maintained. The Debtors file consolidated reports with the SEC, prepare consolidated tax returns, and provide information on a consolidated basis to third parties for the purpose of determining creditworthiness.

- The Debtors' businesses are managed on an enterprise basis rather than an entity basis.

- The value of the Debtors' enterprise is substantially less than the amount of Secured Claims and unencumbered assets, if any, are diminutive in amount and will be exhausted in payment of Administrative Claims, Priority Tax Claims and Priority Claims.

As a result of the substantive consolidation of the liabilities and properties of all the Debtors, except as otherwise provided in the Plan, (i) the chapter 11 cases of the Subsidiary Debtors will be consolidated into the case of RHI INC as a single consolidated case; (ii) the Estate of each of the Debtors will be deemed to be one consolidated Estate; (iii) all property of the Estate of each Debtor will be deemed to be property of the consolidated Estates; (iv) all Claims against each Estate will be deemed to be Claims against the consolidated Estates; (v) no distributions under this Plan will be made on account of any Intercompany Claims, but at the election of the Debtors or the Reorganized Debtors, as applicable, such Claim may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date, and no such disposition will require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests; (vi) all Claims based upon prepetition unsecured guarantees by one Debtor in favor of any other of the Debtors (other than guarantees existing under any assumed executory contracts or unexpired leases) will be eliminated, and no distributions under this Plan will be made on account of Claims based upon such guarantees; (vii) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors will be treated as one consolidated entity so that, subject to the other provisions of Section 553, prepetition debts due to any of the Debtors may be set off against the prepetition debts of any other of the Debtors; (viii) no distributions under this Plan will be made on account of any Subsidiary Interests, but such Interests will be retained by their respective holders for the benefit of the holders of the New Common Stock, subject to any applicable restrictions arising under the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility; and (ix) the RHI INC Interests will be subject and subordinate to the Claims against the consolidated Estate.

Substantive consolidation will not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under this Plan; substantive consolidation will have no effect on valid, enforceable and unavoidable Liens, except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation will not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of substantive consolidation. Substantive consolidation will not affect the obligation of each of the Debtors, pursuant to Section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as a particular Chapter 11 case is closed, dismissed or converted.

**D.    SECURED LENDER SETTLEMENT**

With respect to the treatment of the Existing Second Lien Claims, the terms of the Plan settle issues in dispute among the Debtors, the First Lien Lenders, and the Second Lien Lenders relating to the value of the assets pledged to secure the Existing First Lien Claims and the Existing Second Lien Claims and the intercreditor rights of the First Lien Lenders and the Second Lien Lenders to the pledged asset value. The treatment of the Existing First Lien Claims under Section 4.2(b) of the Plan and the treatment of the Existing Second Lien Claims under Section 4.2(c) of the Plan reflect the results of such settlement, in that the First Lien Lenders have agreed to allow the Second Lien Lenders to receive approximately 1% of the New Common Stock, the New Warrants, and a limited

fee and expense reimbursement. The Plan is deemed to be a motion for approval of such settlement. The confirmation of the Plan will constitute approval of the motion by the Bankruptcy Court and the Confirmation Order will contain findings supporting and conclusions approving the settlement as fair and equitable and within the bounds of reasonableness.

## E.    CONSENSUAL OR NON-CONSENSUAL PLAN ALTERNATIVES

The Plan defines the Consensual Plan Alternative as the treatment option that will be applicable to Other Secured Claims in Class 4 and to General Unsecured Claims in Class 5 if the Debtors have reached settlements acceptable to the First Lien Agent with (i) MAT IV and HEH, (ii) U.S. Bank and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (iii) Powercorp; in each case by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, as provided in Section 2.4 of the Plan.

The Non-Consensual Plan Alternative is defined as the treatment option that will be applicable to Other Secured Claims in Class 4 and to General Unsecured Claims in Class 5 if the Debtors have not reached settlements acceptable to the First Lien Agent with (i) MAT IV and HEH, (ii) U.S. Bank and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (iii) Powercorp; in each case by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, as provided in Section 2.4 of the Plan.

Until the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, the Debtors will be permitted to seek to reach the required settlements. If any required settlement is reached and closed prior to the Petition Date, such settlement will constitute a Film Obligation Settlement under Section 7.3(b) of the Plan, will be evidenced in a supplement to Exhibit G to be included in the Plan Supplement or, at the election of the Debtors with the consent of the First Lien Agent, will be the subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. If any such settlement is reached or closed after the Petition Date, it will be the subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims.

If the required settlements are reached, and thus the Consensual Plan Alternative is determined to apply, the Debtors will file with the Bankruptcy Court a notice of such determination contemporaneously with the filing of the Plan Supplement. In that event, Other Secured Claims in Class 4 will be entitled to the treatment provided in Section 4.2(d)(i) of the Plan and General Unsecured Claims in Class 5 will be entitled to the treatment provided in Section 4.2(e)(i) of the Plan. If the required settlements are not reached, and thus the Non-Consensual Plan Alternative is determined to apply, the Debtors will file with the Bankruptcy Court a notice of such determination contemporaneously with the filing of the Plan Supplement. In that event, Other Secured Claims in Class 4 will receive the treatment provided in Section 4.2(d)(ii) of the Plan and General Unsecured Claims in Class 5 will receive the treatment provided in Section 4.2(e)(ii) of the Plan.

## F.    ESTIMATED CLASS 5 ALLOWED CLAIMS DETERMINATIONS

The Plan defines the Estimated Class 5 Allowed Claims to mean, under the Consensual Plan Alternative, those General Unsecured Claims that the First Lien Agent determines in its reasonable discretion, based upon Claims listed in the Schedules, Claims asserted in Proofs of Claim by the applicable Bar Date, information provided as to any such Claims by the Debtors, agreements reached as to any such Claims between the holders thereof and the Debtors, or orders entered as to any such Claims by the Bankruptcy Court, are likely to be treated under the Plan as Allowed General Unsecured Claims; *provided, however*, that in no event will Claims be considered to be Estimated Class 5 Allowed Claims if they are (i) Claims paid or to be paid under First Day Orders, (ii) Claims paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed or to be assumed by Final Order or pursuant to the Plan, (iii) Claims subject to the Guild Settlements, the Film Obligation Settlements, and the New York Lease Settlement, (iv) Claims subject to settlements acceptable to the First Lien Agent reached with (A) MAT IV and HEH, (B) U.S. Bank and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (C) Powercorp, and (v) Claims that are paid or certain to be paid by third parties, including, without limitation, Claims paid or contractually bound and certain to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006.

The Plan defines the Maximum Class 5 Amount to mean an amount that equals (i) $2.9 million or such greater amount as will be permitted by the First Lien Agent in its absolute discretion, less (A) the amount paid or to be paid under First Day Orders, other than amounts paid or payable to employees and governmental units under such orders, and (B) the amount paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed or to be assumed by Final Order or pursuant to the Plan,

other than amounts that may be owed as Cure under any of the Guild Settlements, the Film Obligation Settlements (including any settlement that constitutes a Film Obligation Settlement pursuant to Section 2.4(b) of the Plan), and the New York Lease Settlement; plus (ii) the amount asserted in Proofs of Claim (or the amount otherwise agreed to by the Debtors and the respective participants) for participations that are contractually bound to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006, but not exceeding $4.66 million under this clause (ii).

No later than ten (10) days after the applicable Bar Date and following consultation with the Debtors, the First Lien Agent will determine if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount. If the First Lien Agent determines that Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, the Debtors will file a notice with the Bankruptcy Court advising that General Unsecured Claims will receive the treatment provided in Section 4.2(e)(i)(A) of the Plan. If the First Lien Agent determines that Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, the Debtors will file a notice with the Bankruptcy Court advising that General Unsecured Claims will receive the treatment provided in Section 4.2(e)(i)(B) of the Plan.

## G. ACCOMMODATIONS BY FIRST LIEN LENDERS

In view of the premises underlying the Plan, the Plan would not be possible without the cooperation and support of the First Lien Lenders. The First Lien Lenders will have agreed, by their votes in favor of the Plan, (i) to allow distributions to be made to the Second Lien Lenders pursuant to Sections 2.3 and 4.2(c) of the Plan, (ii) if the Consensual Plan Alternative applies and the Estimated Class 5 Allowed Amount is determined not to exceed the Maximum Class 5 Amount, to permit Allowed General Unsecured Claims to be Reinstated pursuant to Section 4.2(e)(i)(A) of the Plan, and (iii) if the Consensual Plan Alternative applies but the Estimated Class 5 Allowed Amount is determined to exceed the Maximum Class 5 Amount or if the Non-Consensual Plan Alternative applies, to allow the establishment of the Trade Account and payments to be made to the holders of eligible Allowed Trade Unsecured Claims pursuant to Section 6.9 of the Plan. With the exception of the First Lien Lenders, no other holder of a Claim or Interest is entitled to the value that the First Lien Lenders will have agreed to forego under the Plan.

## H. REORGANIZED CAPITAL STRUCTURE CREATED

The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from Chapter 11, which is summarized as follows:

- *Exit Revolving Credit Facility.* On the Effective Date, the Reorganized Debtors will obtain new financing in the form of a $25 million first lien revolving credit facility from JPMorgan Chase Bank, N.A. and certain other of the First Lien Lenders, to provide a portion of the funds necessary to make payments required to be made on the Effective Date, as well as funds for working capital and other general corporate purposes after the Effective Date. The facility will contain certain material terms substantially in accordance with those described on Exhibit A to the Plan. The Plan Supplement will include the commitment letter for the Exit Revolving Credit Facility and, if then available, the form of the Exit Revolving Credit Facility.

- *New Second Lien Term Loan Facility.* On the Effective Date, the Reorganized Debtors will enter into a new second lien term loan credit facility in the aggregate principal amount of $300 million, under which New Term Loan Obligations will be distributed on account of the Existing First Lien Secured Claims. The facility will contain certain material terms as described on Exhibit E to the Plan and will be substantially in the form to be included in the Plan Supplement. The Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement will be terminated. The New Second Lien Term Loan Facility will take the form of an amendment and restatement of the Existing First Lien Credit Agreement, and any Liens with respect to the Existing First Lien Credit Agreement, as well as the priority of such Liens, will be continued for the benefit of the parties secured under the New Second Lien Term Loan Facility.

- *New Common Stock.* RHI INC will issue New Common Stock on the Effective Date to be allocated among the holders of the Existing First Lien Secured Claims (approximately 99%, subject to dilution by the New Management Incentive Plan and the New Warrants) pursuant to Section 4.2(b) of the Plan and the holders of Existing Second Lien Secured Claims (approximately 1%, subject to dilution by the New Management Incentive Plan and the New Warrants) pursuant to Sections 2.3 and 4.2(c) of the Plan. The New Common Stock will have rights, preferences and privileges as described on Exhibit C to the Plan and to be included in the Reorganized Parent Governing Documents, and certain holders thereof, to the extent applicable, will be entitled to additional rights under the

Stockholders Agreement and the Registration Rights Agreement.  The existing RHI INC Interests will be terminated.

- *New Warrants*.  RHI INC will issue New Warrants on the Effective Date to be allocated among the holders of the Existing Second Lien Secured Claims pursuant to Sections 2.3 and 4.2(c) of the Plan.  The New Warrants will have certain material terms as described on Exhibit F to the Plan and will be substantially in the form included in the Plan Supplement.

## I.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to Section 1123(a)(1), need not be classified).  The Debtors also are required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  In view of the deemed rejection by Classes 7 and 9, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  Specifically, Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.  Although the Debtors believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

### 1.    Treatment Of Unclassified Claims Under The Plan

(a)    Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, and (v) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code or deemed assumed under the Plan.

Under the Plan, except as otherwise provided for in Section 11.1 of the Plan, on, or as soon as reasonably practicable after, the Distribution Date, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, will have agreed upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Plan provides that all final applications for allowance and payment of Professional Fee Claims and Substantial Contribution Claims must be filed and served on the Reorganized Debtors and their counsel, the First Lien Agent and its counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

In addition, the Plan provides that all Requests for Payment of an Administrative Claim (except as otherwise set forth in the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or Reorganized Debtors no later than forty-five (45) days after the Effective Date. Unless the Debtors or Reorganized Debtors object to an Administrative Claim by the applicable Claim Objection Deadline, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an Administrative Claim that is paid or payable by the Debtors in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan (including pursuant to the Contract/Lease Assumption Schedule) or pursuant to a motion to assume and fix the amount of Cure filed by the Debtors and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

ADMINISTRATIVE CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE. THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

(b)      DIP Facility Claims

Pursuant to the Plan, DIP Facility Claims are Claims existing under the $15 million debtor in possession revolving credit facility provided to the Debtors by JPMorgan Chase Bank, N.A. and certain financial institutions from time to time party thereto, subject to approval by the Bankruptcy Court, and having terms substantially as set forth in the draft Debtor in Possession Credit, Security, Guaranty and Pledge Agreement posted at www.loganandco.com under case RHI Entertainment.

The DIP Facility Claims will be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Case. The holders of the Allowed DIP Facility Claims will receive, on the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claims, (i) such treatment as required under the DIP Facility or (ii) such different treatment as to which such holders and the Debtors or the Reorganized Debtors, as applicable, will have agreed upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless the issuing bank is a lender under the Exit Revolving Credit Facility and in its sole discretion permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Revolving Credit Facility, the Debtors or the Reorganized Debtors will be required to either, with the consent of such issuing bank: (A) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the issuing bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 105% of the then undrawn amount of such letters of credit.

DIP FACILITY CLAIMS, AS ADMINISTRATIVE EXPENSE CLAIMS, ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE. THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

(c)      Priority Tax Claims

The Plan defines Priority Tax Claims as Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in Section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of Section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of Section 507(a)(8)(D) of the Bankruptcy Code, (v) excise taxes of the kind specified in Section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F) of the Bankruptcy Code, and (vii) pre-petition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtors or by the Reorganized Debtors, either (i) on, or as soon as reasonably practicable after, the Distribution Date, Cash equal to the unpaid portion

45

of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder will have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined, as of the calendar month in which the Confirmation Date occurs, pursuant to Section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period beginning on the first calendar quarter end after the Effective Date and ending on the last calendar quarter end that precedes the date that is five (5) years after the Petition Date.

PRIORITY TAX CLAIMS ARE NOT CLASSIFIED AND ARE TREATED AS REQUIRED BY THE BANKRUPTCY CODE.  THE HOLDERS OF SUCH CLAIMS ARE NOT ENTITLED TO VOTE ON THE PLAN.

### 2.   Treatment Of Classified Claims And Interests Under Plan

(a)   Class 1:  Other Priority Claims

The Plan defines Other Priority Claims as Claims against any of the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

The Plan provides that on, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, will have agreed upon in writing.

OTHER PRIORITY CLAIMS ARE UNIMPAIRED.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE ACCEPTED THE PLAN.

(b)   Class 2:  Existing First Lien Claims

Existing First Lien Claims are Claims arising under the Existing First Lien Credit Agreement, including Existing First Lien Secured Claims – which are Secured Claims, and Existing First Lien Deficiency Claims – which are not Secured Claims.  The Existing First Lien Credit Agreement is the Credit, Security, Guaranty and Pledge Agreement dated as of January 12, 2006, as amended and restated as of April 13, 2007, and as further amended, among, inter alia, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, JPMorgan Chase Bank, N.A. as administrative agent, and the lenders thereunder.

The Existing First Lien Claims will be allowed in full, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount outstanding as of the Petition Date plus the amount attributable to letters of credit issued and outstanding under the Existing First Lien Credit Agreement as of the Petition Date, the amount of terminated swap agreements as of the Petition Date, and the amount attributable to accrued and unpaid interest, fees, and costs as of the Petition Date.

Each of the First Lien Lenders, in full satisfaction, settlement, release, and discharge of and in exchange for the Existing First Lien Secured Claims, will receive (i) on the Distribution Date, its Pro Rata share of (A) $300 million of New Term Loan Obligations and (B) an amount of shares of New Common Stock representing approximately 99% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) if, and only if, Section 6.9 of the Plan is applicable, with the Trade Account to be established pursuant to Section 2.6 of the Plan for the purpose of implementing Section 6.9 of the Plan, as soon as practicable after all payments to be made on account of Allowed Trade Unsecured Claims have been made, any amount remaining in the Trade Account.

The New Term Loan Obligations are the obligations of the Reorganized Debtors under the New Second Lien Term Loan Facility, which is a new second lien term loan credit facility in the aggregate principal amount of $300 million, to be entered into by the Reorganized Debtors on the Effective Date.  The facility will contain certain material terms as described on Exhibit E to the Plan and will be substantially in the form to be included in the Plan Supplement.  The New Second Lien Term Loan Facility (including any indemnification and expense reimbursement therein) will be binding on all First Lien Lenders whether or not executed by any or all First Lien Lenders.

The New Common Stock consists of new common shares of Reorganized RHI INC.  The shares will have rights, preferences and privileges as described on Exhibit C to the Plan and to be included in the Reorganized Parent Governing

46

Documents.  The New Common Stock will also be subject to the Stockholders Agreement, which will be binding on all First Lien Lenders upon the Effective Date without execution.  The benefits of the Registration Rights Agreement will be available only for those First Lien Lenders who agree to execute the same.

The provisions of Section 6.9 of the Plan will be applicable only (i) under the Consensual Plan Alternative if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount or (ii) under the Non-Consensual Plan Alternative.  Under those provisions, if applicable, the Trade Account will be an account made available by the First Lien Lenders, from funds provided by the Debtors that are subject to the First Lien Lenders' Liens, to support payments to holders of Allowed Trade Unsecured Claims, in the interest of preserving the Reorganized Debtors' important trade relationships and, thus, the value of their business.  The Trade Account is expected to be in an amount as of the Effective Date that will not exceed $7.56 million in the aggregate, less certain deductions, but will be sufficient to pay all or a substantial part of eligible Allowed Trade Unsecured Claims.  Although little, if any, of the amount in the Trade Account is expected to remain after such payments are made, the Plan provides that if any remaining amount will be distributed to the First Lien Lenders.

The Plan further provides that the First Lien Lenders will accept the distributions on account of the Existing First Lien Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing First Lien Credit Agreement Documents, including Claims arising thereunder (but not under the New Second Lien Term Loan Facility) against RHI UK.  RHI UK is a non-Debtor but is a guarantor under the Existing First Lien Credit Agreement.  The First Lien Lenders will not receive or retain any property under the Plan on account of any Existing First Lien Deficiency Claims and all Existing First Lien Deficiency Claims will be deemed waived by the First Lien Lenders and discharged as of the Effective Date

All Liens granted by the Debtors to secure the Existing First Lien Claims will be continued in effect to secure the New Term Loan Obligations (subject to the rights of the lenders under the Exit Revolving Credit Facility).

EXISTING FIRST LIEN CLAIMS ARE IMPAIRED.  **THE HOLDERS OF SUCH CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The Debtors estimate a percentage recovery of approximately 63.5% (mid-point) on account of the Existing First Lien Claims (prior to dilution from the New Management Incentive Plan).  NOTE:  The valuation assumptions upon which the estimated percentage recovery is based are not a prediction or reflection of post-emergence trading prices of the New Common Stock.  The trading price of such securities will depend upon a number of factors, including, but not limited to, those discussed in Parts VIII and IX below.  **The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

> (c)  Class 3:  Existing Second Lien Claims

Under the Plan, an Existing Second Lien Claim is a Claim arising under the Existing Second Lien Credit Agreement, which includes an Existing Second Lien Secured Claim, if any, and an Existing Second Lien Deficiency Claim.  The Existing Second Lien Credit Agreement is the Credit, Security, Guaranty and Pledge Agreement dated as of June 23, 2008, as amended, among, inter alia, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, Wilmington Trust FSB as successor administrative agent, and the lenders thereunder.

The Existing Second Lien Claims will be allowed in full, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount as of the Petition Date, plus the amount attributable to accrued and unpaid interest, fees and costs as of the Petition Date.

Under the Plan, as the holders of Existing Second Lien Claims, each of the Second Lien Lenders, in compromise of their alleged collateral and intercreditor rights in the Debtors' assets, and in full satisfaction, settlement, release, and discharge of and in exchange for their alleged Existing Second Lien Secured Claims, will receive on the Distribution Date, (i) its Pro Rata share of (A) an amount of shares of New Common Stock representing approximately 1% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) New Warrants representing 15% ownership of the New Common Stock on a fully-diluted basis, as of the Effective Date, determined after taking into account the full dilution attributable to the New Management Incentive Plan and the exercise of the New Warrants.

The New Common Stock consists of new common shares of Reorganized RHI INC.  The shares will have rights, preferences and privileges as described on Exhibit C to the Plan and to be included in the Reorganized Parent Governing

47

Documents. The New Warrants will have certain material terms as described on Exhibit F to the Plan and will be substantially in the form included in the Plan Supplement. Those Second Lien Lenders who agree to execute the Registration Rights Agreement and the New Warrants will have the rights afforded by the Registration Rights Agreement and the New Warrants, respectively.

In addition, as soon as practicable after the Distribution Date and the submission to the Reorganized Debtors of all summary invoices therefor, the Reorganized Debtors will pay to the Second Lien Agent and the Second Lien Lenders Cash equal to the amount of reasonable fees and out-of-pocket expenses (including fees and costs of professionals and advisors) invoiced by the Second Lien Agent and each such Second Lien Lender between September 28, 2010 and the Distribution Date (and not invoiced prior to September 28, 2010) with respect to the Existing Second Lien Claims and the Chapter 11 Case, but not exceeding for the Second Lien Agent and all Second Lien Lenders the Second Lien Reimbursement Amount. The Second Lien Reimbursement Amount is defined to mean the aggregate amount of $250,000, less any amounts paid to the Second Lien Agent or the Second Lien Lenders on account of their fees and expenses as adequate protection or otherwise pursuant to Final Order between the Petition Date and the Distribution Date. If the aggregate amount of reasonable fees and out-of-pocket expenses as invoiced exceeds the Second Lien Reimbursement Amount, the Debtors will pay to the Second Lien Agent Cash in the amount of the Second Lien Reimbursement Amount, and the Second Lien Agent will be responsible for allocating such amount among itself and each of the Second Lien Lenders.

The Second Lien Lenders will accept the distributions on account of the Existing Second Lien Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Second Lien Credit Agreement, including Claims against RHI UK. RHI UK is a non-debtor but is a guarantor under the Existing Second Lien Credit Agreement. The Second Lien Lenders will not receive or retain any property under the Plan on account of the Existing Second Lien Deficiency Claims and all Existing Second Lien Deficiency Claims will be deemed waived by the Second Lien Lenders and discharged as of the Effective Date.

As of the Effective Date, all Liens granted by the Debtors to secure the Existing Second Lien Claims will be released, will be deemed null and void, and will be unenforceable for all purposes; provided, however, that the Second Lien Agent will be required to execute and deliver on or before the Effective Date, in form and substance reasonably acceptable to the Debtors, formal documents of release and waiver with respect to all such released Liens, and the Debtors may withhold distributions to the Second Lien Lenders until such documents are received.

EXISTING SECOND LIEN CLAIMS ARE IMPAIRED. **THE HOLDERS OF SUCH CLAIMS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The Debtors estimate a percentage recovery of approximately 1.3% (mid-point) on account of Existing Second Lien Claims (prior to dilution from the New Management Incentive Plan). NOTE: The valuation assumptions upon which the estimated percentage recovery are based are not a prediction or reflection of post-emergence trading prices of the New Warrants. The trading price of such securities will depend upon a number of factors, including, but not limited to, those discussed in Parts VIII and IX below. **The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

        (d)       <u>Class 4: Other Secured Claims</u>

Under the Plan, an Other Secured Claim is a Secured Claim arising prior to the Petition Date against any of the Debtors, *other than* (i) the Existing First Lien Secured Claims, (ii) the Existing Second Lien Claims (which in no event will be considered Secured Claims), (iii) any Secured Claims subject to the Guild Settlements (which will be treated in accordance with the terms of the applicable Guild Settlement), (iv) any Secured Claims subject to the Film Obligation Settlements (which will be treated in accordance with the terms of the applicable Film Obligation Settlement), (v) Secured Claim existing under any executory contract or unexpired lease that is assumed under the Plan or by Final Order (which will be treated in accordance with the terms of the assumed contract or lease), and (vi) under the Consensual Plan Alternative, Secured Claim subject to the settlements reached with (A) MAT IV and HEH, (B) U.S. Bank National and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (C) Powercorp (which will be treated in accordance with the terms of such settlements). A Secured Claim is a Claim (i) that is secured by a Lien on property in which an Estate has an interest, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which is agreed upon in writing by the Debtors or the Reorganized Debtors and

the holder of such Claim or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction.

Class 4 is deemed to consist of separate sub-Classes, one for each Other Secured Claim. Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.

(i)      Consensual Plan Alternative

Under the Consensual Plan Alternative, the Plan provides that the legal, equitable, and contractual rights of each holder of such an Allowed Other Secured Claim will be Reinstated. On, or as soon as reasonably practicable after, the Distribution Date, each holder of such an Allowed Other Secured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed, consistent with the relevant underlying documents, if any.

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens will be released, will be deemed null and void, and will be unenforceable for all purposes. Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien.

UNDER THE CONSENSUAL PLAN ALTERNATIVE, OTHER SECURED CLAIMS ARE IMPAIRED. THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

(ii)      Non-Consensual Plan Alternative

Under the Non-Consensual Plan Alternative, the Plan provides that, at the option of the Debtors, with the agreement of the First Lien Agent, either (A) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim will be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (B) the holder of an Allowed Other Secured Claim will (x) retain the Liens securing such Allowed Other Secured Claim and (y) receive regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting the interest rate established in the Confirmation Order or, if applicable, determined under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date, with the first payment to be made on the last day of the calendar quarter that is at least ten (10) days after the Distribution Date and subsequent payments to be made on the last day of each calendar quarter thereafter through the five (5)-year period; (C) the collateral securing such Allowed Other Secured Claim will be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (D) the holder of the Allowed Other Secured Claim will be paid in full on the Effective Date.

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens will be released, will be deemed null and void, and will be unenforceable for all purposes. Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien.

The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Case will be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim or underlying Lien in the appropriate forum when and if such Claim or Lien is sought to be enforced by the holder of such Other Secured Claim.

UNDER THE NON-CONSENSUAL PLAN ALTERNATIVE, OTHER SECURED CLAIMS ARE IMPAIRED. THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

(e)      Class 5:  General Unsecured Claims

Under the Plan, a General Unsecured Claim is a Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Existing First Lien Claim, an Existing Second Lien Claim, an Other Secured Claim, an Intercompany Claim, or a Subordinated Claim, which Claim will be limited in amount by any applicable provision of the Bankruptcy Code, including, without

limitation, Section 502 of the Bankruptcy Code, subsection 502(b)(6) thereof with respect to a Claim of a lessor for damages resulting from the termination of a lease of real property, subsection 502(b)(7) thereof with respect to a Claim of an employee for damages resulting from the termination of an employment contract, or any other subsection thereof.  The term specifically includes any Rejection Damages Claim.

(i)  Consensual Plan Alternative

If the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, then the legal, equitable and contractual rights of each holder of an Allowed General Unsecured Claim will be Reinstated.  On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed and consistent with the relevant underlying documents, if any.

But if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, then the holders of General Unsecured Claims will not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims will be discharged as of the Effective Date.

UNDER THE CONSENSUAL PLAN ALTERNATIVE, GENERAL UNSECURED CLAIMS ARE EITHER (I) UNIMPAIRED IF THE ESTIMATED CLASS 5 ALLOWED CLAIMS DO NOT EXCEED THE MAXIMUM CLASS 5 AMOUNT, IN WHICH CASE THE HOLDERS OF CLAIMS WITHIN SUCH CLASS ARE NOT ENTITLED TO VOTE ON THE PLAN AND ARE DEEMED TO ACCEPT THE PLAN, OR (II) IMPAIRED IF THE ESTIMATED CLASS 5 CLAIMS EXCEED THE MAXIMUM CLASS 5 AMOUNT, IN WHICH CASE THE HOLDERS OF CLAIMS WITHIN SUCH CLASS ARE NOT ENTITLED TO VOTE ON THE PLAN AND ARE DEEMED TO REJECT THE PLAN.

(ii)  Non-Consensual Plan Alternative

Under the Non-Consensual Plan Alternative, the Plan provides that the holders of General Unsecured Claims will not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims will be discharged as of the Effective Date.

GENERAL UNSECURED CLAIMS ARE IMPAIRED UNDER THE NON-CONSENSUAL PLAN ALTERNATIVE.  THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

NOTICE TO HOLDERS OF TRADE UNSECURED CLAIMS:  Under the Consensual Plan Alternative if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount or under the Non-Consensual Plan Alternative, the provisions of Section 6.9 of the Plan will become applicable.  In the event of such applicability, the First Lien Lenders have agreed to fund the Trade Account to support payments to holders of eligible Allowed Trade Unsecured Claims.  A Trade Unsecured Claim is a General Unsecured Claim that is held by a claimant who has a continuing business relationship with the Debtors and is expected to have a continuing business relationship with the Reorganized Debtors, as determined by the Reorganized Debtors in their discretion, with the consent of the First Lien Agent, including, without limitation, if so determined, any claimant who is a continuing provider of goods or services to the Debtors, any claimant who is a continuing customer of the Debtors, any claimant who is a continuing production partner, continuing distributor, or party to a continuing license or sub-license to or from the Debtors, and any claimant who is a continuing employee of the Debtors; provided, however, that in no event will (i) a Rejection Damages Claim be considered a Trade Unsecured Claim, (ii) a Claim be considered a Trade Unsecured Claim if the Debtors determine, in their discretion, that any continuing relationship is of a nature that does not warrant the use of the Trade Account to pay such Claim; (iii) an otherwise eligible Claim be considered a Trade Unsecured Claim if such Claim is transferred by the original holder to a third party transferee who does not have a continuing business relationship with the Debtors and who is not expected to have a continuing business relationship with the Reorganized Debtors, or (iv) an otherwise eligible Claim be considered a Trade Unsecured Claim if the holder of such Claim files an objection to confirmation of the Plan or an objection to the release contained in Section 11.8 of the Plan.  See Part V.J.6 below for a discussion of the Trade Account provisions.

(f)  Class 6:  Subordinated Claims

The Plan defines a Subordinated Claim as (i) any Claim against any of the Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of an Interest, or any Claim for reimbursement, contribution, or

indemnification on account of any such Claim; or (ii) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, willful intellectual property infringement, fraud, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit.

The Plan provides that, under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, the holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.

SUBORDINATED CLAIMS ARE IMPAIRED. THE HOLDERS OF SUCH CLAIMS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

   (g)  Class 7: RHI INC Interests

The Plan defines RHI INC Interests as equity interests in RHI INC outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, stock options or other right to purchase the stock of RHI INC, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in RHI INC prior to the Effective Date.

The Plan provides that, under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, all RHI INC Interests will be cancelled and all rights and interests therein will be terminated as of the Effective Date. The holders of RHI INC Interests will not receive or retain any property under the Plan on account of such Interests.

RHI INC INTERESTS ARE IMPAIRED. THE HOLDERS OF SUCH INTERESTS ARE DEEMED TO HAVE REJECTED THE PLAN AND WILL NOT VOTE.

   **3.**  **Requirement For Allowance Of Claims**

A Claim otherwise entitled to be paid or to receive a distribution under the Plan must be an Allowed Claim. As defined by the Plan, an Allowed Claim is:

- with respect to an Administrative Claim, all or any portion of an Administrative Claim (a) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, (b) for which a Request for Payment in a liquidated amount has been filed by the applicable Bar Date and as to which either (i) no objection to the allowance thereof has been filed by the applicable Claim Objection Deadline, or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (c) that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability; or

- with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (a) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, or is expressly allowed in a liquidated amount in the Plan, (b) as to which (i) no Proof of Claim has been filed and (ii) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as disputed, or (c) for which a Proof of Claim in a liquidated amount has been filed by the Bar Date and as to which either (i) no objection to the allowance thereof has been filed by the applicable Claim Objection Deadline, or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order; or (c) when used with respect to any Claim, a Claim that is not otherwise a Disputed Claim; *provided*, *however*, that all Allowed Claims will remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

The Existing First Lien Claims and Existing Second Lien Claims are deemed to be Allowed Claims under the Plan. No other Claims are deemed to be Allowed under the Plan and, therefore, must satisfy one of the criteria for allowance described above.

Where a Claim is required to be asserted by the Bar Date, the Bar Date is either (i) with respect to an Administrative Claim (other than a Claim arising under Section 503(b)(9) of the Bankruptcy Code), the deadline established in Section 11.2 of the Plan for filing Requests for Payment, to the extent applicable or (ii) with respect to a Claim other than an Administrative Claim and a Claim arising under Section 503(b)(9) of the Bankruptcy Code, the deadline to be established by the Bankruptcy Court for the filing of any and all Proofs of Claim against the Debtors.  Any Claim that is required to be, but is not, asserted by the Bar Date will be barred, and the holder of such Claim will not be permitted to receive any distribution under the Plan or otherwise from the Debtors or the Estates on account of such Claim.

The Debtors may object to any Claim at any time before the Claim Objection Deadline established by the Plan.  The Claim Objection Deadline is the last day for filing objections to Claims, including Administrative Claims, which will be the latest of (i) sixty (60) days after the Effective Date, (ii) sixty (60) days after the applicable Proof of Claim or Request for Payment is filed, and (iii) such other later date as is established by order of the Bankruptcy Court upon motion of the Reorganized Debtors, without notice to any party.

The Plan authorizes the Reorganized Debtors to compromise and settle Claims without any further approval by the Bankruptcy Court.

The Plan makes clear that neither the Debtors nor the Reorganized Debtors will be required to file an objection to (i) under the Non-Consensual Plan Alternative or under the Consensual Plan Alternative if the Estimated Class 5 Allowed Claims are determined to exceed the Maximum Class 5 Amount, a General Unsecured Claim (unless such Claim is an eligible Trade Unsecured Claim), (ii) a Subordinated Claim, or (iii) any other Claim that is not entitled to receive or retain any property under the Plan.  The holder of any such Claim will acquire no rights under the Plan or otherwise against the Reorganized Debtors or their assets as a consequence of the non-filing of an objection.

### 4.    Distributions Via Disbursing Agent

As used in the Plan, the term Disbursing Agent means the Plan Disbursing Agent and/or, if applicable, the Trade Account Disbursing Agent, as the context requires.  The Plan Disbursing Agent is the Reorganized Debtors or any other Person or Persons designated by the Debtors in their sole discretion on or before the Effective Date to serve as disbursing agent, stock transfer agent, and/or warrant agent under the Plan with respect to all distributions under the Plan other than distributions from the Trade Account.  If applicable, the Trade Account Disbursing Agent is the Person designated by the First Lien Agent in its sole discretion to serve as disbursing agent with respect to all distributions from the Trade Account,

On or before the Effective Date, the Debtors will designate the Person or Persons (whether Reorganized RHI INC, any of the other Reorganized Debtors, or one or more independent third parties) to serve as the Plan Disbursing Agent on mutually agreeable terms and conditions.  If the Plan Disbursing Agent is an independent third party designated to serve in such capacity, such Plan Disbursing Agent will receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized RHI INC.  If the Trade Account provisions of the Plan are applicable, on or before the Effective Date, the First Lien Agent will designate the Person to serve as the Trade Account Disbursing Agent on mutually agreeable terms and conditions.  The Trade Account Disbursing Agent will receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized RHI INC.  No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 5.    Requirement For Distribution Record Date Holdings

Only those holders of Claims who are holders as of the applicable Distribution Record Date established under the Plan will be entitled to receive payment or other distributions if and when their Claims are Allowed Claims.  The Plan provides that:

- In respect of the Existing First Lien Claims and Existing Second Lien Claims, the Distribution Record Date is the Business Day immediately preceding the Effective Date, at 5:00 p.m. Eastern Time on such Business Day.  At the close of business on such Distribution Record Date, the registers maintained by the First Lien Agent and the Second Lien Agent will be closed and there will be no further changes in the listed holders of the Existing First Lien Claims and Existing Second Lien Claims for purposes of distributions under the Plan. The Reorganized Debtors, the Disbursing Agent, the First Lien Agent, the Second Lien Agent, and each of their respective agents, successors, and

52

assigns will have no obligation to recognize any transfer of Existing First Lien Claims or Existing Second Lien Claims occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes under the Plan with only those record holders stated on the register as of the close of business on the Distribution Record Date (or, in the case of the issuance of New Common Stock or New Warrants, an affiliated designee of such record holder which is reflected as such on the register or as to which the Debtors, the Disbursing Agent, and, as applicable, the First Lien Agent or the Second Lien Agent have received written notice from the record holder by the close of business on the Distribution Record Date).

- In respect of all other Claims, the Distribution Record Date is the Business Day immediately following the Confirmation Date, at 5:00 p.m. Eastern Time on such Business Day.  At the close of business on such Distribution Record Date, the claims register maintained by the claims agent will be closed and there will be no further changes in the listed holders of the Claims.  The Reorganized Debtors, the Disbursing Agent, claims agent, and each of their respective agents, successors, and assigns will have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**6.      Expected Delivery Date For Payments And Distributions**

For Claims within Classes that are entitled to receive payments or other distributions, the Plan provides that such payments or other distributions will be made on the applicable Distribution Date.  The Distribution Date varies by type of Claim and Allowed status:

- For the Existing First Lien Secured Claims and the Existing Second Lien Secured Claims, the Distribution Date is the Effective Date.

- For any other Claim that is an Allowed Claim on the Effective Date, the Distribution Date is on or as soon as practicable after the Effective Date, but not later than the first (1st) Business Day that is twenty (20) days after the Effective Date.

- For any other Claim that is not an Allowed Claim on the Effective Date, the Distribution Date is on or as soon as practicable after the date on which the Claim becomes an Allowed Claim, but not later than the first (1st) Business Day that is twenty (20) days after such date.

In all cases, a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors, or any other party.

**7.      Payments And Distributions Subject To Tax Withholding And Reporting**

In connection with the Plan and all payments and distributions thereunder, the Disbursing Agent will, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions thereunder will be subject to any such withholding and reporting requirements.  The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution will be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations.  Any property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Disbursing Agent until such time as the Disbursing Agent is satisfied with the holder's arrangements for any withholding tax obligations.

**8.      No Distributions On De Minimis Claims**

Neither the Reorganized Debtors nor the Disbursing Agent will have any obligation to make a Cash distribution with respect to any Claim if the amount of the distribution is less than $20.00.  The Claim of any holder whose distribution is in an amount less than $20.00 will be discharged, and such holder will be forever barred from asserting such Claim against the Reorganized Debtors or their respective property.  Any Cash not distributed as a result of this provision will be the property of the Reorganized Debtors, free of any restrictions, and any such Cash held by the Disbursing Agent will be returned to the Reorganized Debtors following the Distribution Date that would have applied to any such distribution.

**9.      Reservation Of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights, defenses, and counterclaims, both legal and equitable, with respect to any Claims other than the Existing First Lien Claims and the Existing Second Lien Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**J.      IMPLEMENTATION OF PLAN**

**1.      Continued Corporate Existence; Restructuring Transactions; Revesting Of Assets**

The Plan generally contemplates that the Reorganized Debtors will continue to exist after the Effective Date as separate legal entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated as of the Effective Date.

However, under the Plan, the Reorganized Debtors may elect to implement certain Restructuring Transactions as may be necessary or appropriate to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify their overall corporate or operational structure, to achieve corporate or operational efficiencies, or to otherwise improve financial results, provided that such actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, the New Second Lien Term Loan Facility, or the Exit Revolving Credit Facility.  The Restructuring Transactions (i) may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate, and (ii) will be in accordance with any applicable state law, except to the extent the Bankruptcy Code, the Plan, or any document in the Plan Supplement exempts such transactions from applicable state law.  Upon entry of the Confirmation Order, the Debtors will be authorized to take such steps as may be necessary prior to the Effective Date to prepare to implement any or all of such actions on or after the Effective Date.

Subject to the Restructuring Transactions, and except as otherwise provided in the Plan, the property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, will revest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, each Reorganized Debtor may operate its business and may use, license, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Claims, Interests, Liens, charges, or other encumbrances.

Unless the Plan provides otherwise, all Liens securing the obligations of any Debtor will be released and the holders of Claims or Interests or other Persons claiming the benefit of any such Liens will be directed to release the collateral or other property subject thereto and to take such actions as may be required by the Reorganized Debtors to evidence such release, including, without limitation, the execution, delivery, and filing or recording of such release.  The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.

**2.      Corporate Governance; New Certificates Of Incorporation And By-laws; Directors And Officers**

As of the Effective Date, Reorganized RHI INC will be governed by the Reorganized Parent Governing Documents, which will contain provisions that satisfy the Plan and the Bankruptcy Code and will include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code.  The Reorganized Parent Governing Documents will be in substantially the forms of such documents included in the Plan Supplement.

54

In addition, the certificate or articles of incorporation, by-laws, articles of organization, or operating agreement, as applicable, of each Subsidiary Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and, as amended, will constitute the Reorganized Subsidiary Governing Documents.

On the Effective Date, a New Board will be installed for RHI INC.  The New Board will be comprised of five (5) directors, consisting of (i) the chief executive officer of RHI INC serving immediately prior to the Effective Date and (ii) four (4) independent and disinterested directors designated by the First Lien Agent.  The designation of directors pursuant to the foregoing clause will be made in the Plan Supplement.  The New Board will serve in accordance with the Reorganized Parent Governing Documents and will be subject to replacement or removal as provided therein.

The officers of RHI INC serving immediately prior to the Effective Date will continue to serve in their same respective capacities after the Effective Date for and on behalf of Reorganized RHI INC in accordance with and subject to the replacement or removal provisions of the Reorganized Parent Governing Documents.

Subject to the Restructuring Transactions, the existing directors and officers of the Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiaries, in accordance with and subject to the replacement or removal provisions of the Reorganized Subsidiary Governing Documents.

### 3.       Management Incentive Plan; Indemnification

To retain and incentivize the management of the Reorganized Debtors, the Plan provides for a New Management Incentive Plan to be implemented on the Effective Date.  As defined by the Plan, the New Management Incentive Plan consists of a founders equity plan, a management equity incentive plan, an annual incentive plan, and employment agreements, each containing material terms substantially in accordance with those described on Exhibit D to the Plan.

Specifically, the Plan provides that (i) on the Effective Date, (A) Reorganized RHI INC will be authorized and directed to establish and implement the founders equity plan and the management equity incentive plan, under which, inter alia, an aggregate of 15% of the total amount of New Common Stock (without giving effect to the shares reserved for issuance pursuant to the New Warrants) will be issued or reserved for issuance, as described on Exhibit D; and (B) the Reorganized Debtors will enter into new employment agreements, as described on Exhibit D; and (ii) after the Effective Date, the Reorganized Debtors will establish and implement the annual incentive plan, as described on Exhibit D. The New Management Incentive Plan (and in particular the founders equity plan and the management equity incentive plan) will be deemed adopted by the unanimous action of the New Board and approved by the unanimous action of the stockholders of Reorganized RHI INC (including, without limitation, for purposes of Section 422 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder).  The New Management Incentive Plan may be amended or modified from time to time by the New Board in accordance with the terms of the particular plan document or agreement, and any such amendment or modification will not require an amendment of the Plan.

The Reorganized Parent Governing Documents and the Reorganized Subsidiary Governing Documents will contain provisions which, to the fullest extent permitted by applicable law, (i) eliminate the personal liability of the Debtors' directors, officers, and key employees serving before, on, and after the Petition Date and the Reorganized Debtors' directors, officers, and key employees serving on and after the Effective Date for monetary damages; and (ii) require such Reorganized Debtors, subject to appropriate procedures, to indemnify those of the Debtors' and the Reorganized Debtors' directors, officers, and key employees serving prior to, on, or after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

### 4.       Exit Funding

The Plan authorizes the Reorganized Debtors to (i) enter into the Exit Revolving Credit Facility, (ii) incur or guaranty the indebtedness and grant any Lien as required under the Exit Revolving Credit Facility, and (iii) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Revolving Credit Facility and to take all other actions necessary to implement and effectuate borrowings under the Exit Revolving Credit Facility.  On the Effective Date, the Exit Revolving Credit Facility, together with new promissory notes and guarantees, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, will become effective.  The new loans extended pursuant to the Exit

Revolving Credit Facility and all obligations under the Exit Revolving Credit Facility and related documents will be paid as set forth in the Exit Revolving Credit Facility and related documents.

In addition, the Plan authorizes the Debtors and the Reorganized Debtors, as applicable, to (i) engage in intercompany transactions to transfer Cash for distribution pursuant to the Plan and (ii) continue to engage in intercompany transactions (subject to any applicable contractual limitations, including any in the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility), including, without limitation, transactions relating to the incurrence of intercompany indebtedness.

The New Second Lien Term Loan Facility will take the form of an amendment and restatement of the Existing First Lien Credit Agreement, and any Liens with respect to the Existing First Lien Credit Agreement, as well as the priority of such Liens, will be continued for the benefit of the parties secured under the New Second Lien Term Loan Facility.

### 5. New Securities

Under the Plan, on the Effective Date, Reorganized RHI INC (i) will (A) provide for authorized capital equal to 1 million shares of New Common Stock; (B) issue such number of shares of New Common Stock as will be mutually acceptable to the First Lien Agent and Reorganized RHI INC for ultimate distribution to the First Lien Lenders on account of their Existing First Lien Secured Claims and the Second Lien Lenders on account of their Existing Second Lien Claims, which shares will initially be transferred 99% to RHI Entertainment Holdings II, LLC and 1% to RHIE Holdings Inc. (which immediately transfers such 1% to RHI Entertainment Holdings II, LLC), then from RHI Entertainment Holdings II, LLC to RHI LLC, and finally from RHI LLC to the First Lien Lenders and Second Lien Lenders; and (C) reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of (x) the New Warrants and (y) the stock, options, and other awards granted under the New Management Incentive Plan; and (ii) will authorize and issue the New Warrants for ultimate distribution to the Second Lien Lenders on account of their Existing Second Lien Claims, which warrants will initially be transferred 99% to RHI Entertainment Holdings II, LLC and 1% to RHIE Holdings Inc. (which immediately transfers such 1% to RHI Entertainment Holdings II, LLC), then from RHI Entertainment Holdings II, LLC to RHI LLC, and finally from RHI LLC to the Second Lien Lenders.

The New Common Stock issued under the Plan will be subject to dilution based upon (i) such shares of the New Common Stock as may be issued pursuant to the New Management Incentive Plan as set forth in the Plan, (ii) the exercise of the New Warrants, and (iii) any other shares of New Common Stock issued post-emergence. The chart below shows the anticipated holdings of the New Common Stock after giving effect to the New Management Incentive Plan and the New Warrants (but subject to any post-emergence issuances):

| | *Prior to New Management Incentive Plan and New Warrants* | *After New Management Incentive Plan and Prior to New Warrants* | *After New Management Incentive Plan and New Warrants* |
|---|---|---|---|
| Existing First Lien Secured Claims | 98.82% | 84.00% | 71.40% |
| Existing Second Lien Secured Claims | 1.18% | 1.00% | 0.85% |
| Sub-Total | 100.00% | 85.00% | 72.25% |
| New Management Incentive Plan | 0.00% | 15.00% | 12.75% |
| New Warrants | 0.00% | 0.00% | 15.00% |
| TOTAL | 100.00% | 100.00% | 100.00% |

The issuance and distribution of the New Securities pursuant to the Plan will be authorized under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by the Reorganized Parent Governing Documents or applicable law, regulation, order or rule.

The rights of the holders of New Common Stock will be as provided for in the Reorganized Parent Governing Documents and, as to certain holders, the Stockholders Agreement and the Registration Rights Agreement. The rights of the holders of the New Warrants will be as provided for in the New Warrants and, as to certain holders, the Registration Rights Agreement. Forms for all of such documents will be included in the Plan Supplement.

Each First Lien Lender will be deemed to have consented to the terms of, and to have executed and become a party to, the Stockholders Agreement. Each First Lien Lender and Second Lien Lender receiving New Common Stock under the Plan will, if desiring to obtain the benefits of the Registration Rights Agreement as to the New Common Stock, be required to execute and become a party to the Registration Rights Agreement. Each Second Lien Lender receiving New Warrants under the Plan will, if desiring to

obtain the benefits of the Registration Rights Agreement as to the New Warrants, be required to execute and become a party to the Registration Rights Agreement, if applicable.

As the New Common Stock and New Warrants are expected to each be held by fewer than 300 holders, RHI INC anticipates it will be able, and it intends immediately upon the Effective Date, to suspend its reporting obligations under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). As a result, RHI INC will no longer be obligated to file periodic or other reports with the SEC. The Reorganized Parent Governing Documents will include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require Reorganized RHI INC to continue or resume filing periodic or other reports pursuant to the Exchange Act.

### 6.    Trade Account Distributions

The provisions in Section 6.9 of the Plan for Trade Account distributions will be applicable only (i) under the Consensual Plan Alternative if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount or (ii) under the Non-Consensual Plan Alternative.

In recognition of the importance of the Debtors' business relationships to the success of the Reorganized Debtors, the First Lien Lenders have agreed to make a portion of the funds subject to their Liens available to satisfy, in whole or part, the Claims of certain holders who are expected to have valuable continuing business relationships with the Debtors.

The Claims that are potentially eligible for this accommodation from the First Lien Lenders are Trade Unsecured Claims. A Trade Unsecured Claim is a General Unsecured Claim that is held by a claimant who has a continuing business relationship with the Debtors and is expected to have a continuing business relationship with the Reorganized Debtors, as determined by the Reorganized Debtors in their discretion, with the consent of the First Lien Agent, including, without limitation, if so determined, any claimant who is a continuing provider of goods or services to the Debtors, any claimant who is a continuing customer of the Debtors, any claimant who is a continuing production partner, continuing distributor, or party to a continuing license or sub-license to or from the Debtors, and any claimant who is a continuing employee of the Debtors; *provided, however*, that in no event will (i) a Rejection Damages Claim be considered a Trade Unsecured Claim, (ii) a Claim be considered a Trade Unsecured Claim if the Debtors determine, in their discretion, that any continuing relationship is of a nature that does not warrant the use of the Trade Account to pay such Claim; (iii) an otherwise eligible Claim be considered a Trade Unsecured Claim if such Claim is transferred by the original holder to a third party transferee who does not have a continuing business relationship with the Debtors and who is not expected to have a continuing business relationship with the Reorganized Debtors, or (iv) an otherwise eligible Claim be considered a Trade Unsecured Claim if the holder of such Claim files an objection to confirmation of the Plan or an objection to the release contained in Section 11.8 of the Plan.

AS THE FOREGOING MAKES CLEAR, THE DETERMINATION AS TO WHETHER A CLAIM WILL BE TREATED AS A TRADE UNSECURED CLAIM WILL BE MADE BY THE DEBTORS, IN THEIR DISCRETION. THUS, NO HOLDER SHOULD ASSUME THAT IT WILL RECEIVE THE BENEFIT OF ANY PAYMENT FROM THE TRADE ACCOUNT.

Moreover, to be entitled to receive any payment, a Claim determined to be an eligible Trade Unsecured Claim must also be an Allowed Claim. As set forth above, an Allowed Claim is Claim or any portion thereof (a) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, or is expressly allowed in a liquidated amount in the Plan, (b) as to which (i) no Proof of Claim has been filed and (ii) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as disputed, or (c) for which a Proof of Claim in a liquidated amount has been filed by the Bar Date and as to which either (i) no objection to the allowance thereof has been filed by the applicable Claim Objection Deadline, or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order; or (c) when used with respect to any Claim, a Claim that is not otherwise a Disputed Claim; *provided, however*, that all Allowed Claims will remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510

The amount to be made available by the First Lien Lenders to pay eligible Allowed Trade Unsecured Claims will be determined as of the Effective Date. The amount, referred to in the Plan as the Trade Account Cap, will be equal to (i) $2.9 million less (A) the amount paid or to be paid under First Day Orders, other than amounts paid or payable to employees and governmental units under such orders, (B) the amount paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed by Final Order or pursuant to the Plan, other than amounts that may be owed as Cure under any of the Guild Settlements, the Film Obligation Settlements (including any settlement that constitutes a Film Obligation Settlement pursuant to Section 2.4(b) of the Plan), and the New York Lease Settlement, and (C) the amount, if any, that the Debtors determine, with the consent of the First Lien

Agent, will exceed the amount needed to satisfy all eligible Allowed Trade Unsecured Claims; plus (ii) the amount asserted in Proofs of Claim (or the amount otherwise agreed to by the Debtors and the respective participants) for participations that are contractually bound to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006, but not exceeding $4.66 million, less any portion of such participations that are paid or certain to be paid by Crown Media Holdings, Inc. and affiliates.

Before the Effective Date, the First Lien Agent will select a Person to serve as of the Trade Account Disbursing Agent. The Trade Account Disbursing Agent will establish a Trade Account, and the amount determined to be Trade Account Cap will be placed by the Debtors in the Trade Account. The Debtors or the Reorganized Debtors, with the consent of the First Lien Agent, will identify the Claims that are eligible to be treated as Trade Unsecured Claims and will provide such information to the Trade Account Disbursing Agent. As indicated above, eligible Trade Unsecured Claims will not be entitled to a distribution from the Trade Account until and unless such Claims are determined to be Allowed Claims.

On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed Trade Unsecured Claim will receive from the Trade Account Disbursing Agent, in full satisfaction, settlement, release, and discharge of and in exchange for, such Allowed Trade Unsecured Claim, either (i) if the aggregate amount of all eligible Allowed Trade Unsecured Claims is less than the Trade Account Cap, Cash in the amount of such holder's Allowed Claim or (ii) if the aggregate amount of all eligible Allowed Trade Unsecured Claims is more than the Trade Account Cap, then such holder's Pro Rata share of the Trade Account Cap.

In the event that distributions are made on a Pro Rata basis, the Trade Account Disbursing Agent will set aside from the initial allocation an amount of Cash sufficient to ensure the same Pro Rata allocation for any eligible Disputed Trade Unsecured Claims until such Claims are Allowed. If the amount of the allocation set aside for such Disputed Claims exceeds the Pro Rata distribution to which such Claims are entitled when and if Allowed, such excess amount will be held in the Trade Account until all Disputed Claims are resolved, and will then distributed on a Pro Rata basis among all eligible Allowed Trade Unsecured Claims.

For the avoidance of doubt, as of the Effective Date, the funds in the Trade Account will not constitute property of the Debtors or the Reorganized Debtors. All payments from the Trade Account will be made by the Trade Account Disbursing Agent to the holders of eligible Allowed Trade Unsecured Claims, free and clear of all Liens, claims and encumbrances. After all payments from the Trade Account have been made, the undistributed portion of the Trade Account, if any, will be distributed to the First Lien Lenders in accordance with Section 4.2(b) of the Plan.

### 7.    Preservation Of Rights Of Action; Compromises And Settlements

Except as otherwise provided in the Plan, the Confirmation Order, a Final Order, or the Plan Supplement, and in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtors and the Reorganized Debtors will retain all of their respective Litigation Rights against any Person. Each of the Debtors or Reorganized Debtors will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights.

**Except as otherwise provided in the Plan or by Final Order, no Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any claims, rights of action, suits, or proceedings against such Person as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Litigation Rights against such Person. Unless any Litigation Rights are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by Final Order, the Debtors and the Reorganized Debtors expressly reserve all Litigation Rights for later adjudication and, therefore, no preclusion doctrine (including, without limitation, res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, or laches) will apply to any of the Litigation Rights upon, after, or as a consequence of the Confirmation Date or the Effective Date.**

Under the Plan, each of the Debtors will release, with certain exceptions noted therein, (a) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals and court-retained agents of the Debtors, (d) the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (e) the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (f) the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and (g) any of the successors or assigns of any of the parties identified in the foregoing clauses.

58

The Plan authorizes the Reorganized Debtors to compromise and settle the Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court.

### 8.      Corporate Action; Effectuating Documents; Plan Supplement

On the Effective Date, the adoption and filing of the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or Boards of Directors (or other governing bodies) of the Debtors or Reorganized Debtors.

Any chief executive officer, president, chief or principal financial officer, general counsel or any other appropriate officer of any Debtor or Reorganized Debtor, as the case may be, will be authorized, without the need for any required approvals, authorizations, or consents except for any express consents required under the Plan, to issue, execute, deliver, file, or record such contracts, instruments, securities, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Any secretary or assistant secretary of any Debtor or Reorganized Debtor, as the case may be, will be authorized to certify or attest to any of the foregoing actions.

The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than five (5) Business Days prior to the Plan Objection Deadline, and may be amended, modified, or supplemented prior to the Confirmation Hearing.  The Plan Supplement will include (i) notice of the members of the New Board, (ii) a supplement to Exhibit G to the Plan identifying any additional films that may be subject to Film Obligation Settlements, (iii) the commitment letter for the Exit Revolving Credit Facility and if then available the form of the credit agreement for the Exit Revolving Credit Facility, (iv) the forms of the credit agreement for the New Term Loan Facility, the Reorganized Parent Governing Documents, the Stockholders Agreement, the Registration Rights Agreement, the New Warrants, and the New Management Incentive Plan (including forms for the founders equity plan, the management equity incentive plan, the annual incentive plan, and the employment agreement). Upon filing, all documents included in the Plan Supplement may be inspected via the Bankruptcy Court's electronic filing system or at http://www.loganandco.com.  Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' counsel.

### 9.      Exemption From Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by a Debtor or a Reorganized Debtor to secure the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility and any New Securities, will not be taxed under any law imposing a document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording fee, sales or use tax, or other similar tax or governmental assessment.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement and all documents necessary to evidence and implement any of the transactions and actions described in the Plan or the Plan Supplement including, without limitation, the Restructuring Transactions.

## K.      TREATMENT OF CONTRACTS AND LEASES

### 1.      Assumption Of Contracts And Leases; Cure

The Plan provides that, except as otherwise provided therein, the Plan Supplement, or the Confirmation Order, as of the Effective Date, each Debtor will be deemed to have assumed each executory contract or unexpired lease to which it is a party unless any such contract or lease (i) was previously assumed or rejected upon motion by a Final Order, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date, or (iv) is included on the Contract/Lease Assumption Schedule.  The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the assumptions described above, as of the Effective Date.

For the avoidance of doubt, in no event will any purchase and sale agreement or other transaction agreement that was closed and substantially consummated prior to the Petition Date be considered to be an executory contract and, thus, in no event will any such agreement be subject to deemed assumption under Section 7.1(a) of the Plan.  Outstanding obligations owed to the Debtors under any

59

such agreements will continue in full force and will be enforceable by the Debtors or the Estates. Outstanding obligations owed by the Debtors under any such agreements will constitute Claims to be treated under the Plan in the Class applicable to each of such Claims.

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default, plus any resulting actual pecuniary loss, will be satisfied, under Section 365(b)(1)(A) and, if applicable, Section 365(b)(1)(B) of the Bankruptcy Code, by Cure. Cure is defined to mean, with respect to the assumption of an executory contract or unexpired lease, compliance as of the time of assumption with the provisions of Section 365(b)(1)(A) and, if applicable, Section 365(b)(1)(B) of the Bankruptcy Code, which may include, to the extent applicable, (i) the payment of Cash in the amount, if any, set forth in the Contract/Lease Assumption Schedule if such contract or lease is included therein, (ii) the payment of Cash, or the distribution of such other property as may be agreed upon by the parties to the contract or lease or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties to such contract or lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (iii) the taking of such other actions as may be agreed upon by the parties to the contract or lease or ordered by the Bankruptcy Court. (As used in the Plan, the term does not include future performance under the assumed contract or lease.) The Plan provides that in the event of a Final Order resolving a dispute as to the nature or amount of any Cure owed with respect to a contract or lease to be assumed, the Reorganized Debtors will be authorized to reject the contract or lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order renders assumption of such contract or lease unfavorable to the Reorganized Debtors. The Debtors will be authorized to effect such rejection by filing written a notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Except as otherwise provided in the Plan or by Final Order of the Bankruptcy Court, all Cure obligations with respect to assumed contracts and assumed leases will be treated as Administrative Claims.

## 2.    Assumption Pursuant To Contract/Lease Assumption Schedule

As an alternative to the deemed assumption that will result from the Plan, the Plan establishes a procedure under which the Debtors may seek to affirmatively assume executory contracts and unexpired leases and to fix the Cure amounts owed in connection with such assumptions. Specifically, the Plan provides that the Debtors may seek to assume executory contracts or unexpired leases by including them on a Contract/Lease Assumption Schedule, which is a schedule that identifies the executory contracts and unexpired leases to be assumed under the Plan and sets forth any Cure obligation associated with the assumption of such contracts and leases. On or before the day that is fourteen (14) days before the Plan Objection Deadline, the Debtors will file the Contract/Lease Assumption Schedule and provide notice thereof to the counterparties to the contracts and leases listed thereon; provided, however, that the Debtors reserve the right to amend the Contract/Lease Assumption Schedule at any time prior to the Confirmation Date on notice to the counterparties affected thereby. The deadline for objecting to the Contract/Lease Assumption Schedule will be the Plan Objection Deadline, or in the event of an amendment to the Contract/Lease Assumption Schedule such deadline as is prescribed in the notice of amendment. The failure of any counterparty to an executory contract or unexpired lease to timely file and serve an objection, including, without limitation, an objection to the proposed assumption, the provision of adequate assurance of future performance, or the designated Cure amount, will be deemed to be a waiver of all objections and a consent for all purposes to the assumption as set forth on the Contract/Lease Assumption Schedule. In particular, and without limiting the foregoing, in the absence of an objection to the designated Cure amount, such Cure amount will be binding on the counterparty, and such counterparty will be deemed to have waived any and all rights to seek payment from the Debtors in an amount that exceeds the designated Cure amount. In the event of a timely objection to the designated Cure amount, the Plan provides that if a Final Order is entered resolving a dispute as to the nature or amount of Cure, the Reorganized Debtors will be authorized to reject the contract or lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order renders assumption of such contract or lease unfavorable to the Reorganized Debtors. The Debtors will be authorized to effect such rejection by filing written a notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

All executory contracts and unexpired leases of the Debtors listed on the Contract/Lease Assumption Schedule will be assumed under Section 365 of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court pursuant to an objection or unless the Debtors elect rejection pursuant to the provisions of the Plan. The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving all assumptions that as of the Confirmation Date are not subject to an amendment as to which the objection period has not expired or are not subject to a pending objection. The Debtors may seek additional orders from the Bankruptcy Court to approve any assumptions that as of the Confirmation Date are subject to an amendment as to which the objection period has not expired or are subject to a pending objection.

**3.**       **Assumption Of Certain Modified Contracts; Approval And Ratification Of Certain Contract Settlements**

(a)       Guild Settlements

The Plan provides that the collective bargaining agreements, assumption agreements, settlement agreements, and other agreements and obligations between the Debtors and the DGA, SAG and WGA and between the Debtors and each of ACTRA, AFTRA, MEAA, and Equity will be modified with respect to prepetition obligations in accordance with the terms of the respective Guild Settlements, with any prepetition obligations (other than residuals and fringes thereon) not subject to the respective Guild Settlements to remain in effect in accordance with the terms of the applicable underlying agreements. As so modified, all such agreements will be assumed or deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. Cure will be paid by the Debtors in monthly payments for such amounts and at such times as the parties have agreed under the terms of the respective Guild Settlements. Unless otherwise provided under the terms of the respective Guild Settlements, any Liens held by the Guilds as of the Petition Date will continue, subject to the priorities existing as of the Petition Date.

The Guild Settlements will be deemed approved in their entireties by the Confirmation Order. See Part II.E.2 above for additional information about guild issues. The Guild Settlements are attached to the Plan as Exhibit B. In general, they provide that the Debtors will make monthly payments over negotiated time periods in order to pay off the agreed upon amount of prepetition residuals and fringes payments owed to the guilds. With respect to new motion pictures produced after reorganization, the Debtors will continue to be signatories to the CBAs with the guilds in the same manner and to the same extent as prior to reorganization, and have agreed to pay and remain current on any new Guild Obligations as and when they come due. As part of the Guild Settlements, the Debtors will also obtain Crown Media's agreement to pay any Guild Obligations that Crown Media may owe as a result of the agreement between Crown Media and the Debtors for Crown Media to pay to the Debtors residuals and participations related to more than 600 titles that the Debtors purchased from Crown Media in December 2006.

(b)       Film Obligation Settlements

The Film Obligation Settlements are (i) the settlements entered into by the Debtors with certain producers, licensors, customers, and, in some instances, certain lenders to certain such parties with respect to the distribution, license, and related agreements that govern the rights and obligations of the Debtors with respect to the films listed on Exhibit G to the Plan and (ii) any additional settlements entered into by the Debtors with certain producers, licensors, customers, and, in some instances, certain lenders to certain such parties with respect to the distribution, license, and related agreements that govern the rights and obligations of the Debtors with respect to the films listed any supplement to Exhibit G that may be included in the Plan Supplement. Additional information about the settlements is included in Part II.E.3 above.

Under the Plan, the Film Obligation Settlements will be ratified by the Debtors and, to the extent required by their respective terms, will be deemed approved in their entireties by the Confirmation Order. To the extent that the Film Obligation Settlements constitute executory contracts, they will be deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. The distribution, license, and related agreements that are subject to the respective Film Obligation Settlements will have been, or as of the Effective Date will be, modified in accordance with, and superseded to the extent inconsistent with, the terms of the Film Obligation Settlements, as applicable. To the extent that the terms of the respective Film Obligation Settlements require the continuation of any of such subject agreements, as thereby modified, such continuing agreements as so modified will be assumed or deemed to have been assumed under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date. To the extent that the terms of the respective Film Obligation Settlements do not require the continuation of any of such subject agreements, such discontinuing agreements will be deemed terminated or amended, as applicable, to give effect to the Film Obligation Settlements. Unless otherwise provided under the terms of each respective Film Obligation Settlement, any Liens held by a party to each such Film Obligation Settlement will continue, subject to the priorities existing as of the Petition Date.

The Debtors reserve the right to seek approval of any settlement with any producer, licensor, customer, or lender to any such party pursuant to a motion filed with the Bankruptcy Court.

If settlements are reached with any of (i) MAT IV Movies and HEH, (ii) U.S. Bank and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank made loans, and (iii) Powercorp before the Petition Date, such settlement may be treated as a Film Obligation Settlement depending on the date of closing of the settlement.

(c)    New York Lease Settlement

The New York Lease Settlement is the settlement entered between RHI LLC and Paramount Group, Inc., with respect to the lease of premises at 1325 Avenue of the Americas, New York, New York, and evidenced by that certain Surrender Agreement and Amendment of Lease dated as of October 1, 2010, as more particularly described in Part II.E.6 above.  The New York Lease Settlement is not subject to approval under the Plan.  It is the intention of the Plan, consistent with the terms of the Surrender Agreement and Amendment of Lease, that the settlement will be subject to approval, and the underlying lease as modified thereby will be subject to assumption, by a Final Order entered pursuant a motion filed with the Bankruptcy Court.

### 4.    Compensation And Benefit Programs

The Plan defines Employee Programs to consist of all of the Debtors' employee-related programs, plans, policies, and agreements, including, without limitation, (i) all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and retiree programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, (ii) all employment, retention, incentive, severance, compensation, and other similar agreements, and (iii) all other employee compensation, benefit, and reimbursement programs, plans, policies, and agreements, but excluding any equity incentive plans, equity ownership plans, or any equity-based plans of any kind of the Debtors.

Under the Plan, except to the extent (i) otherwise provided therein, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all Employee Programs in effect before the Effective Date, will be deemed to be, and will be treated as though they are, contracts that are assumed under the Plan, unless otherwise provided in or subject to any modifications included in the New Management Incentive Plan.  Nothing contained herein will be deemed to modify the existing terms of Employee Programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

To the extent any change of control provision contained in any Employee Program would be triggered solely as a result of the transactions contemplated by the Plan, such Employee Program will not be assumed to the extent a waiver of the change of control provision is not executed by the employee having the benefit of such change of control provision, but otherwise will remain in full force and effect and may be triggered as a result of any transactions occurring outside of the Plan after the Effective Date.

As of the Effective Date, any and all equity incentive plans, equity ownership plans, or any other equity-based plans entered into before the Effective Date, including Claims arising from any change of control provision therein, will be deemed to be, and will be treated as though they are, contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order.  Any Claims resulting from such rejection will constitute Subordinated Claims and will be treated in accordance with the Plan.

### 5.    Certain Indemnification Obligations

Indemnification Obligations are defined to include any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to by-laws, articles or certificates of incorporation, operating agreements, contracts, or otherwise.  Under the Plan, Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving prior to, on, and after the Petition Date will be deemed to be, and will be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) will survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with a pre-Petition Date or post-Petition Date occurrence.  Indemnification Obligations owed to any of the Debtors' Professionals pursuant to Sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, whether such Indemnification Obligations relate to the period before or after the Petition Date, will be deemed to be, and will be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

Except as provided above, Indemnification Obligations owed under any agreement that is not executory, or that is not otherwise expressly assumed, will not constitute executory obligations and will not be subject to assumption under the Plan.  Instead, such Indemnification Obligations will constitute Claims to be treated under the Plan in the Class applicable to each of such Claims.

**6.      Rejection Of Contracts And Leases; Rejection Damages Claims**

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease.  Any contracts or leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors.

If the rejection by a Debtor, pursuant to the Plan or otherwise, of a contract or lease results in a Rejection Damages Claim, then such Rejection Damages Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtors within thirty (30) days after entry of the order authorizing the rejection of such contract or lease.  The Debtors reserve their rights to object to any Rejection Damages Claim.

Rejection Damages Claims will be treated as General Unsecured Claims pursuant to and in accordance with the terms of the Plan.

**7.      Extension Of Time To Assume Or Reject**

The Plan provides that, notwithstanding anything to the contrary set forth therein, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

## L.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF PLAN

**1.      Conditions To Confirmation**

The Plan specifies certain conditions precedent that must be satisfied, or if permitted waived, before the Confirmation Date can occur.  Such conditions precedent are as follows:

- the Debtors will have obtained a written commitment for the Exit Revolving Credit Facility on terms and conditions that (i) are reasonably acceptable to the Debtors and the First Lien Agent and (ii) support the Debtors' demonstration that the Plan is feasible;

- the Confirmation Order will be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, the Second Lien Agent, and the Exit Revolving Agent, and will, among other things: (i) provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created under or in connection with the Plan; (ii) approve the Exit Revolving Credit Facility and the New Second Lien Term Loan Facility; (iii) authorize the issuance of the New Securities; and (iv) provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; and

- the Confirmation Order will have been entered by the Bankruptcy Court.

**2.      Conditions To Effective Date**

The Plan specifies certain conditions precedent that must be satisfied, or if permitted waived, before the Effective Date can occur.  Such conditions precedent are as follows:

- the Confirmation Order will not then be stayed, vacated, or reversed;

- (i) the New Second Lien Term Loan Facility, the Stockholders Agreement, and the New Management Incentive Plan (including the founders equity plan, the management equity incentive plan, the annual incentive plan, and the employment agreements) shall be in form and substance reasonably satisfactory to the Debtors and the First Lien

Agent and (ii) the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, the Registration Rights Agreement, and the New Warrants shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, and the Second Lien Agent, provided that the rights of the Second Lien Agent as to the Reorganized Parent Governing Documents and the Reorganized Subsidiary Governing Documents shall be limited to confirming that the final documents are not inconsistent with the parameters described in the Plan and any applicable exhibits to the Plan; and, to the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived in accordance with the respective provisions thereof, as applicable; provided, however, that in no event shall the effectiveness of any document that implements the treatment of the Existing First Lien Secured Claims or the Existing Second Lien Claims, including, without limitation, the New Second Lien Term Loan Facility, the Reorganized Parent Governing Documents, the Stockholders Agreement, the Registration Rights Agreement (except as required by the Plan to obtain the benefits thereof), or the New Warrants (except as required by the Plan to obtain the benefits thereof), be conditioned upon the execution of such document by any First Lien Lender or Second Lien Lender, as applicable, other than by JPMorgan Chase Bank, N.A. to the extent that it is party to such document in its capacity as First Lien Agent or New Term Loan Agent;

- (i) the Exit Revolving Credit Facility will be on terms and conditions reasonably acceptable to the Debtors, the First Lien Agent, and the Exit Revolving Agent, (ii) the Exit Revolving Credit Facility will be in full force and effect upon closing and will provide for the extension of credit thereunder to be available upon closing; (iii) the credit agreement and other documents evidencing the Exit Revolving Credit Facility will have been executed and delivered by the respective parties thereto, and (iv) all conditions precedent to the closing of the Exit Revolving Credit Facility will have been satisfied or waived in accordance with the provisions thereof, as applicable;

- all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan will have been obtained;

- all employment agreements entered into by the Debtors before the Petition Date will have been terminated or modified to the satisfaction of the First Lien Agent, consistent with the employment agreement provisions of the New Management Incentive Plan to the extent applicable; and

- all material actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

### 3.    Waiver Of Conditions

Each of the conditions precedent to the occurrence of the Confirmation Date and the Effective Date, with the express exception of the conditions that the Confirmation Order be entered and not stayed, vacated, or reversed, may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided*, *however*, that such waiver will not be effective without the consent of the First Lien Agent and the Exit Revolving Agent, and with respect to the conditions requiring the consent of the Second Lien Agent, the Second Lien Agent as well, which consents will not be unreasonably withheld.

## M.    RETENTION OF JURISDICTION

The Plan provides for continuing jurisdiction by the Bankruptcy Court after the Effective Date.  Specifically, as set forth in the Plan, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan or by a Final Order (other than personal injury or wrongful death Claims, unless agreed by the holder), including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

64

- hear and determine all applications for Professional Fees and Substantial Contribution Claims; *provided*, *however*, that from and after the Effective Date, in respect to services rendered on and after the Effective Date, the payment of the fees and expenses of any professionals retained by the Reorganized Debtors will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Rejection Damages Claims or Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Litigation Rights;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents contained in the Plan Supplement or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the New Securities, the Exit Revolving Credit Facility, the New Second Lien Term Loan Facility, the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, the New Management Incentive Plan, the Registration Rights Agreement, or the Stockholders Agreement will be dealt with in accordance with the provisions of the applicable document;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

- except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth above, the provisions of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## N.   RELEASES, DISCHARGE, INJUNCTIONS; EXCULPATION

### 1.   Releases By Debtors

The Plan provides for certain releases to be granted by the Debtors in favor of the Debtors' non-Debtor subsidiaries, the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, and the Professionals and court-retained agents of the Debtors; the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; and any of the successors or assigns of any of such identified parties.

**Specifically, the Plan provides that, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, willful misconduct, or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (a) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals and court-retained agents of the Debtors, (d) the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (e) the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (f) the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and (g) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (f); *provided*, *however*, that nothing in this Section 11.7(a) will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any of their employees (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; and *provided, further, however*, that nothing in this Section 11.7(a) will operate as a release of intercompany obligations between any of the Debtors or between any of the Debtors and their non-Debtor subsidiaries unless otherwise provided for in the Plan.**

The releases being provided by the Debtors relate to claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities held by the Debtors or that may be asserted on behalf of the Debtors (the "**Debtor Claims**"). The Debtor Claims are part of the Debtors' estates created pursuant to Section 541 of the Bankruptcy Code and, absent extraordinary circumstances, the Debtors have the exclusive authority to pursue or settle such claims. See, e.g., In re Educators Group Health Trust, 25 F.3d 1281, 1284-1285 (5th Cir. Tex. 1994) (holding that to the extent that creditors' claims derived from a direct injury to the bankruptcy estate, those claims belonged solely to the estate); Mitchell v. Mitchell, 734 F.2d 129, 131 (2d Cir. 1984) (holding that derivative actions are property of the bankruptcy estate and enforceable by the trustee). The releases of the Debtor Claims are in the best interests of the Debtors' estates and arise from an appropriate exercise of the Debtors' authority under Section 1123(b)(3) to include in the Plan "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3). See also In re Heritage Org., L.L.C., 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) (a trustee's plan may "unquestionably" resolve potential claims against third parties through settlement under the express authority of § 1123(b)(3)); In re Best Products Co., Inc., 168 B.R. 35, 61, 63-64 (Bankr. S.D.N.Y. 1994) (court

66

approved release and settlement of debtor's claims pursuant to Section 1123(b)(3)); In re General Homes Corp., FGMC, Inc., 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action against the Bank Group which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be proposed in good faith.").

The Debtors do not believe that there are any valid Debtor Claims against any of the released parties. Any action brought to enforce a potential Debtor Claim would involve significant costs to the Debtors, including legal expenses and the distraction of the Debtors' key personnel from the demands of the Debtors' ongoing businesses. In light of these considerations, and given the contributions made by the recipients of the releases to the Debtors' businesses and/or reorganization efforts, the releases of the Debtor Claims are appropriate and in the best interests of the Debtors' estates.

**2.      Releases By Holders Of Claims And Interests**

The Plan also provides for the release of claims held by holders of Claims and Interests against the Debtors' non-Debtor subsidiaries, the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, any Professionals and court-retained agents of the Debtors; the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such; and the successors or assigns of any of the identified parties.

**Specifically, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each First Lien Lender and Second Lien Lender, each holder of an eligible Allowed Trade Unsecured Claim who receives payment from the Trade Account, if applicable, and to the extent permitted by applicable law and approved by the Confirmation Order each other holder of a Claim or Interest, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against (a) any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals and court-retained agents of the Debtors, (d) the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (e) the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (f) the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and (g) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (f), in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.**

**3.      Discharge Of The Debtors**

The Plan provides that, except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, (i) the Debtors, and each of them, will be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, (D) the holder of a Claim based upon such debt is entitled to receive or retain any property under the Plan, or (E) the holder of a Claim based upon such debt accepted the Plan, and (ii) all RHI INC Interests will be terminated.

The Plan further provides that, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all RHI INC Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

### 4. Injunction

**The Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any suit or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in any manner, in any place, or against any Person, that does not comply with or is inconsistent with the provisions of the Plan.**

**The Plan further provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, demand, damages, debt, right, cause of action, or liability against a Person that is released or exculpated pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such claim, obligation, suit, judgment, damages, demand, debt, right, cause of action, or liability: (i) commencing or continuing, in any manner or in any place, any suit or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment against any debt, liability, or obligation due to any released or exculpated Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person, that does not comply with or is inconsistent with the provisions of the Plan.**

**Without limiting the effect of the foregoing provisions upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in the Plan.**

### 5. Exculpation And Limitation Of Liability

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case.

**Specifically, the Plan provides that, to the extent permitted by applicable law and approved in the Confirmation Order, none of (i) the Debtors or any of the Debtors' non-Debtor subsidiaries, (ii) the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (iii) the Professionals or court-retained agents of the Debtors, (iv) the DIP Facility Agent, the DIP Facility Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (v) the First Lien Agent, the First Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vi) the Second Lien Agent, the Second Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vii) the members or Professionals of any statutory committee appointed during the Chapter 11 Case, but only in their capacities as such, or (viii) any of the successors or assigns of any of the parties identified in the foregoing clauses (i) through (vii), will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful**

**misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects all of the parties identified in the foregoing clauses (i) through (viii) will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

**The Plan further provides that, notwithstanding any other provision of the Plan, to the extent permitted by applicable law and approved in the Confirmation Order, no holder of a Claim or an Interest, no other party in interest, and none of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, will have any right of action against any of (i) the Debtors or any of the Debtors' non-Debtor subsidiaries, (ii) the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (iii) the Professionals or court-retained agents of the Debtors, (iv) the DIP Facility Agent, the DIP Facility Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (v) the First Lien Agent, the First Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vi) the Second Lien Agent, the Second Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vii) the members or Professionals of any statutory committee appointed during the Chapter 11 Case, but only in their capacities as such, or (viii) any of the successors or assigns of any of the parties identified in the foregoing clauses (i) through (vii), and none of the parties identified in the foregoing clauses (i) through (viii) will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.**

The exculpations contained in the Plan are appropriate and are standard in large chapter 11 cases such as the Debtors' Chapter 11 Case.  See In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000) (describing exculpation clauses as "commonplace").  The exculpations are appropriately limited in scope and confer only a qualified immunity by excluding acts or omissions which are the result of fraud, gross negligence, willful violation of federal or state securities laws or the Internal Revenue Code, or willful misconduct.  Moreover, these exculpations have, in the Debtors' view, been earned.  The beneficiaries of the exculpations have made significant contributions to the Debtors' reorganization, which contributions have allowed for the formulation of the Plan which resolves many complicated issues between and among the Debtors and other interested parties and which, in the Debtors' view, provides for the best possible recoveries for Claims against the Debtors.  In the Debtors' view, the beneficiaries of the exculpations would not have contributed as they did without the prospect of the limited immunity reflected in the exculpations.  The Debtors are also unaware of any valid causes of action against any of the beneficiaries of the exculpations.  In view of the foregoing, the exculpations are appropriate and in the best interests of the Debtors' estates.  See In re Winn Dixie Stores, Inc., 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006) (finding a similar exculpation provision appropriate due to, among other things, the significant contributions made to the chapter 11 case by the beneficiaries of the exculpations, the expectation of the beneficiaries that the exculpations would be included in the Plan in exchange for their participation in the case, and the fact that the exculpation was the result of negotiation by all parties); In re Enron Corp., 326 B.R. 497, 501-04 (S.D.N.Y. 2005) (upholding bankruptcy court's finding that a similar exculpation provision "was 'reasonable and customary and in the best interests of the estates,' and that 'without such exculpation, negotiation of a Plan in [the] Chapter 11 Cases would not have been possible.') (citing Findings of Fact and Conclusions of Law Confirming Supplemental Modified 5th Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the U.S. Bankruptcy Code, 145-146, In re Enron, Case No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004)).

The exculpation provision in the Plan is expressly limited by applicable law and approval by the Bankruptcy Court in the Confirmation Order.  There can be no guarantee that all parties listed in the exculpation will be found to be entitled to the exculpation.  Although the First Lien Lenders and the Second Lien Lenders are included in the exculpation, such parties should not rely on the availability of exculpation in determining their vote on the Plan.

## O.    MODIFICATION; SEVERABILITY; REVOCATION

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court

to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however*, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

## P.    ADDITIONAL PLAN PROVISIONS

**THE FOREGOING SUMMARY OF THE PLAN IS INTENDED TO HIGHLIGHT ONLY CERTAIN PROVISIONS OF THE PLAN. IT IS NOT INTENDED TO COVER EVERY PROVISION OF THE PLAN AND IT IS NOT A SUBSTITUTE FOR A COMPLETE REVIEW OF THE PLAN ITSELF. THE SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PROVISIONS OF THE PLAN ITSELF, WHICH PROVISIONS CONTROL IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARY.**

## VI.
## APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

The Debtors or Reorganized Debtors, as the case may be, intend to enter into the Registration Rights Agreement, as described on Exhibit C to the Plan. The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and state securities laws exempt from federal and state securities registration requirements (a) the offer and the sale of securities pursuant to the Plan and (b) subsequent transfers of such securities.

## A.    Solicitation Of Votes Prior To Commencement Of Chapter 11 Case

The Debtors have not filed a registration statement under the Securities Act or any other federal or state securities laws with respect to the New Securities that may be deemed to be offered by virtue of the Solicitation. The Debtors are relying on Section 4(2) and/or any other applicable section of the Securities Act and similar state law provisions, and to the extent applicable, on Regulation D and/or any other applicable regulation or similar state law provisions, to exempt from registration under the Securities Act and any applicable state securities laws the offer of any securities that may be deemed to be made pursuant to the Solicitation. Section 4(2) exempts from the registration provisions of the Securities Act any transaction by an issuer not involving any public offering. Regulation D similarly exempts from the registration provisions under the Securities Act offerings of securities to "accredited investors," as such term is defined under Regulation D, and a limited number of other investors. Each holder of a Claim in the Voting Classes will be requested to make representations that are set forth in the Ballot regarding its qualifications to be an offeree in a private offering exempt from registration under the Securities Act by virtue of Section 4(2) or Regulation D or that such holder is an "accredited investor."

## B.    Offer And Sale Of New Securities:  Bankruptcy Code Exemption

Holders of Allowed Existing First Lien Claims will receive shares of New Common Stock and holders of Allowed Existing Second Lien Claims will receive New Warrants pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or

70

sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (2) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (3) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  Section 1145(a)(2) of the Bankruptcy Code exempts the offer of a security through any warrant, option, right to subscribe or conversion privilege that was sold in a manner specified in Section 1145(a)(1), or the sale of a security upon the exercise of such a warrant, option, right or privilege.  In reliance upon these exemptions, the Debtors believe that the offer and sale of the New Securities under the Plan will be exempt from registration under the Securities Act and state securities laws.

## C.        Subsequent Transfers Of New Securities

The New Securities generally may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities.  Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Common Stock or New Warrants pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Such persons would not be permitted to resell such New Common Stock or New Warrants, as the case may be, unless such securities were registered under the Securities Act or an exemption from such registration requirements were available.  Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or New Warrants to be issued pursuant to the Plan, or an "affiliate" of Reorganized RHI INC, would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or "affiliate."  PERSONS WHO RECEIVE NEW COMMON STOCK OR NEW WARRANTS UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

71

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.   THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW COMMON STOCK OR NEW WARRANTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CLAIMANT TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW COMMON STOCK OR NEW WARRANTS.

THE NEW COMMON STOCK AND NEW WARRANTS WILL BE ISSUED SUBJECT TO THE TERMS AND CONDITIONS OF THE NEW PARENT GOVERNING DOCUMENTS AND, AS APPLICABLE, THE STOCKHOLDERS AGREEMENT AND THE REGISTRATION RIGHTS AGREEMENT, EACH TO BE DATED AS OF THE EFFECTIVE DATE.

## D.     Discontinuation Of Reporting Obligations

If the Plan is confirmed and becomes effective in accordance with its terms, all existing RHI Inc. Interests will be cancelled and shares of New Common Stock will (pursuant to the mechanics described in the Plan)  be issued to holders of Existing First Lien Claims and Existing Second Lien Claims and New Warrants will be issued to holders of Existing Second Lien Claims.  As the New Common Stock and New Warrants are expected to each be held by fewer than 300 holders, RHI INC anticipates it will be able, and it intends immediately upon the Effective Date, to suspend its reporting obligations under the Exchange Act.  As a result, RHI INC will no longer be obligated to file periodic or other reports with the SEC.

**VII.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON IT UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to holders of Existing First Lien Claims, holders of Existing Second Lien Claims and the Debtors.  This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "**IRS**") and other applicable authorities, all as publicly available and in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  The tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

This discussion applies only to holders of Claims that are "United States persons" (as such phrase is defined in the IRC) (each, a "**U.S. Holder**") and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such holders in light of their individual circumstances.  This discussion assumes that the New Term Loan Obligations are properly treated as indebtedness for United States federal income tax purposes.  This discussion is limited to holders of Existing First Lien Claims and holders of Existing Second Lien Claims who have held their interests in the Existing First Lien Credit Agreement (as well as swap agreements the outstanding obligations under which are Existing First Lien Claims) and Existing Second Lien Credit Agreement as capital assets, and who will hold interests in the New Term Loan Obligations, New Common Stock and New Warrants as capital assets within the meaning of Section 1221 of the IRC.  This discussion does not address tax issues with respect to holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations,

small business investment companies and regulated investment companies, those reporting on the installment method, those who have previously claimed a bad debt or worthless security deduction in respect of their claim against the Debtors, those holding any portion of an Existing First Lien Claim, the New Common Stock or the New Warrants as part of a hedge, straddle, conversion or constructive sale transaction and those who acquire New Term Loan Obligations, New Common Stock or New Warrants other than pursuant to the Plan).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

**THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

A.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF EXISTING FIRST LIEN CLAIMS AND HOLDERS OF EXISTING SECOND LIEN CLAIMS**

1.      **Characterization Of Payments Made To The Second Lien Lenders And Holders Of Other Secured Claims And General Unsecured Claims**

The Debtors intend to take the position that (i) the New Common Stock, New Warrants and Cash payable to holders of Existing Second Lien Claims (the "**Second Lien Consideration**") and any amounts paid to a holder of an Other Secured Claim or a General Unsecured Claim (the "**Other Claim Consideration**") either as a result of the reinstatement of such holder's Claims, from Cash payments, or from the Trade Account (solely in the case of General Unsecured Claims that are eligible Trade Unsecured Claims) should be treated as paid directly by the Debtors to such holders of Existing Second Lien Claims, Other Secured Claims and General Unsecured Claims in respect of such Claims and (ii) the First Lien Lenders will be deemed to receive, in respect of their Claims, only the First Lien Consideration (as defined below).  However, alternative characterizations are possible.  For example, the First Lien Lenders could be deemed to first receive the Second Lien Consideration and Other Claim Consideration from the Debtors and then to contribute such consideration back to the Debtors, which then distribute such consideration to the Second Lien Lenders and holders of Other Secured Claims and General Unsecured Claims.  If this characterization were sustained, the amount realized by the First Lien Lenders upon the exchange of their Existing First Lien Claims would be greater than as described below, and the First Lien Lenders' basis in the New Common Stock received upon such exchange would also be greater than as described below, in each case, by the amount of Cash and the fair market value of the other Second Lien Consideration deemed distributed to the First Lien Lenders.  **The remainder of this discussion assumes the Debtors' position is respected and that no amount of Cash will remain in the Trade Account for distribution to the First Lien Lenders pursuant to Section 6.9(f) of the Plan.**  We urge holders of Existing First Lien Claims to consult their own tax advisors regarding the characterization of the payments of the Second Lien Consideration to the Second Lien Lenders and the Other Claim Consideration to the holders of Other Secured Claims and General Unsecured Claims.

2.      **Taxable Nature Of The Exchange Of Existing First Lien Claims And Existing Second Lien Claims**

The United States federal income tax consequences to a U.S. Holder of exchanging an Existing First Lien Claim or Existing Second Lien Claim for its pro rata share of the First Lien Consideration or Second Lien Consideration, respectively (in each case, as defined in this discussion), are uncertain and complex and depend upon, among other things, whether such an exchange constitutes a fully taxable exchange for such holder or, alternatively, constitutes in whole or in part a tax-deferred transaction (or series thereof) for United States federal income tax purposes.  Irrespective of whether the exchanges are treated as taxable to the First Lien Lenders and Second Lien Lenders (the "**Lien Lenders**"), the Debtors will be treated as recognizing COD income, but not other gain or loss, as discussed below.  The Plan provides that Reorganized RHI INC will first issue 99% of the New Common Stock payable to the Lien Lenders (together with 99% of the New Warrants payable to the Second Lien Lenders) to Holdings II and 1% of such New Common Stock and New Warrants to RHIE Holdings Inc., which will contribute such New Common Stock and New Warrants to Holdings II immediately thereafter.  Holdings II will then transfer all of such New Common Stock and New Warrants to RHI LLC (an entity disregarded as separate from Holdings II for U.S. federal income tax purposes) and RHI LLC will transfer 99% of the New Common Stock, together with the New Term Loan Obligations, to the First Lien Lenders and 1% of the New Common Stock, together with the Cash and New Warrants, to the Second Lien Lenders in satisfaction of their Claims.  Because RHI LLC is a disregarded entity wholly owned by Holdings II, all actions taken by RHI LLC will be treated as those of Holdings II for U.S. federal income tax purposes.  The Debtors intend to take the position that these transactions should be characterized in accordance with their form for United States federal income tax purposes, in which case the exchange of Existing First Lien Claims for the First Lien Consideration and the exchange of the Existing Second Lien Claims for the Second Lien Consideration would constitute fully taxable transactions for the

73

Lien Lenders under section 1001 of the IRC. However, other characterizations are also possible. For example, it is possible that the exchange could be characterized as if the Lien Lenders contributed a portion of their Claims to the capital of Holdings II in exchange for membership interests in Holdings II and then contributed those membership interests to Reorganized RHI INC in exchange for New Common Stock (and, in the case of the Second Lien Lenders, New Warrants, which would be treated as taxable "boot") in a series of transactions qualifying for nonrecognition treatment for United States federal income tax purposes. Under this recharacterization, the exchange of the remainder of the Existing First Lien Claims and Existing Second Lien Claims for the New Term Loan Obligations and Cash, respectively, would likely be treated as a separate fully taxable exchange in which the Lien Lenders may recognize gain or loss. As another example, the exchange could be characterized as if the Lien Lenders contributed their entire Claims to Reorganized RHI INC in exchange for the First Lien Consideration or Second Lien Consideration, as applicable, in a transaction qualifying for nonrecognition treatment for United States federal income tax purposes. Under this recharacterization, the receipt of the New Term Loan Obligations by the First Lien Lenders and the New Warrants and Cash by the Second Lien Lenders would instead be treated as taxable "boot", which could result in the Lien Lenders recognizing gain, but not loss. Additional recharacterizations are also possible. If a Lien Lender was treated as receiving its pro rata share of the First Lien Consideration or Second Lien Consideration, as applicable, in a tax-deferred exchange, such Lien Lender would have a carry-over basis (adjusted to take into account any "boot" received by such lender and the amount of gain recognized with respect thereto) in a portion of the consideration received and its holding period for such portion would include its holding period for its exchanged claim. **The remainder of this discussion assumes the Debtors' position is respected and that the exchange of Existing First Lien Claims and Existing Second Lien Claims are treated as fully taxable transactions for the Lien Lenders.** U.S. Holders of Existing First Lien Claims or Existing Second Lien Claims are urged to consult their tax advisors with respect to the possibility that any portion of the exchange of such claims may be treated as a tax-deferred transaction and reporting requirements applicable to persons receiving stock or other property in an exchange in connection with a tax-deferred transaction, as well as all other aspects of the Plan.

     **3.**      **Gain Or Loss**

     (a)      Holders of Existing First Lien Claims

Pursuant to the Plan, Existing First Lien Claims will be exchanged for the New Term Loan Obligations and shares of New Common Stock (collectively, the "**First Lien Consideration**"). A portion of the Existing First Lien Claims consists of payments to terminate certain interest rate swap contracts. To the extent a First Lien Lender receives any portion of the First Lien Consideration as a termination payment for such a swap contract, such lender generally should recognize capital gain equal to the issue price (determined as described below under "Tax Treatment of the New Term Loan Obligations—Stated Interest and OID") of any portion of the New Term Loan Obligations and the fair market value of the shares of New Common Stock received therefor. We urge First Lien Lenders who are owed termination payments relating to swap contracts to consult their own tax advisors regarding the recognition of income or loss in connection with the swap contracts, including the portion of First Lien Consideration, if any, that should be allocated to such termination payments for United States federal income tax purposes, as well as all other aspects of the Plan. **The remainder of this discussion pertains only to Existing First Lien Claims that constitute indebtedness for United States federal income tax purposes under the Existing First Lien Credit Agreement.**

Subject to the market discount rules described below and except as described below with respect to accrued interest, an exchanging First Lien Lender should recognize capital gain or loss on the exchange of its Existing First Lien Claims for First Lien Consideration equal to the difference between: (a) the holder's adjusted tax basis in its Existing First Lien Claims (excluding any tax basis attributable to accrued but unpaid interest) and (b) the sum of (i) the issue price of the share of the New Term Loan Obligations received by such holder (as determined below under "Tax Treatment of the New Term Loan Obligations—Stated Interest and OID") and (ii) the fair market value of the shares of New Common Stock received by such holder. Such gain or loss should be long-term capital gain or loss if the holder has a holding period for its Existing First Lien Claims of more than one year. A holder's initial tax basis in its share of the New Term Loan Obligations should equal the issue price of the share of the New Term Loan Obligations received by such holder (as determined below under "Tax Treatment of the New Term Loan Obligations—Stated Interest and OID"). A holder's tax basis in its shares of New Common Stock received by such holder should equal the fair market value of such shares. A holder's holding period for its share of the First Lien Consideration should begin on the day following the Effective Date.

     (b)      Holders of Existing Second Lien Claims

Subject to the market discount rules described below and except as described below with respect to accrued interest, an exchanging Second Lien Lender should recognize capital gain or loss on the exchange of its Existing Second Lien Claims for Second Lien Consideration equal to the difference between: (a) the holder's adjusted tax basis in the Existing Second Lien Claims (excluding any tax basis attributable to accrued but unpaid interest) and (b) the sum of the amount of Cash and the fair market value of the New

Common Stock and New Warrants received by such holder.  Such capital gain or loss should be long-term capital gain or loss if the holder has a holding period for its Existing Second Lien Claims of more than one year.  A holder's initial tax basis in the New Common Stock and New Warrants it receives should equal the fair market value of such stock and warrants, respectively.  A holder's holding period in the New Common Stock and New Warrants it receives should begin on the day following the Effective Date.

### 4.        Distributions In Discharge Of Accrued Interest

In general, to the extent any consideration received pursuant to the Plan by a U.S. Holder is allocable to accrued but unpaid interest or accrued OID (accrued during such holder's holding period), such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income).  Conversely, a holder generally will recognize a deductible loss to the extent any such accrued but unpaid interest or OID was previously included in its gross income and is not paid.

Pursuant to the Plan, all distributions in respect of Claims will be treated as allocated first to the principal amount of such Claims, with any excess allocated to any unpaid accrued interest.  However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.  If the IRS were to determine that such distributions should be allocated first to accrued but unpaid interest, a U.S. Holder would be required to recognize ordinary interest income (if not previously included in the holder's gross income) equal to the lesser of (i) the accrued but unpaid interest and (ii) the fair market value of the consideration received that is allocated to interest accrued but unpaid on the discharged obligation during such holder's holding period with respect to such Claim.  To the extent interests in the New Term Loan Obligations, New Common Stock or New Warrants are treated as being issued for accrued interest, a Holder will have a new holding period with regard to such instrument and will have an initial tax basis equal to the instrument's fair market value (in the case of New Common Stock or New Warrants) or issue price (in the case of New Term Loan Obligations).

### 5.        Market Discount

If a holder acquired its interests in the Existing First Lien Claims or the Existing Second Lien Claims with market discount, any gain recognized by a holder on the taxable exchange of an Existing First Lien Claim or the Existing Second Lien Claim will be treated as ordinary income to the extent of the market discount that accrued thereon during the holder's holding period for such Claim, unless the holder elected to include the market discount in income as it accrued.  In general, a Claim will be treated as having been acquired with market discount if the stated redemption price at maturity (as defined below) of the Claim (or the revised issue price of the Claim, in the event that the Claim is a debt instrument that was issued with OID) exceeded the holder's initial tax basis in such Claim by more than a specified *de minimis* amount.

### 6.        Tax Treatment Of The New Term Loan Obligations

#### (a)        Stated Interest and OID

A U.S. Holder of New Term Loan Obligations will be required to include stated interest on the New Term Loan Obligations in income in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes to the extent such stated interest is "qualified stated interest."  Stated interest is generally "qualified stated interest" if it is unconditionally payable in cash at least annually at a single fixed rate or at certain variable rates.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount.  A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest.  The "issue price" of the New Term Loan Obligations depends on whether such obligations or the Existing First Lien Claims are "publicly traded."  Such obligations will be considered publicly traded if, at any time during the 60-day period ending 30 days after the exchange date, they are traded on an "established market".  Although it is uncertain, the Debtors do not believe that the Existing First Lien Claims currently should be treated as traded on an established market, and do not anticipate that the Existing First Lien Claims or the New Term Loan Obligations will be treated as traded on an established market during the relevant period.  Assuming this is correct, the issue price for the New Term Loan Obligations should be their stated principal amount, and the New Term Loan Obligations should not have OID.  If, however, the New Term Loan Obligations are treated as issued with OID, a U.S. Holder of the New Term Loan Obligations generally would be required to include such OID in income over the term of the debt in accordance with a constant yield-to-maturity method, regardless of its method of accounting, and regardless of whether and when the U.S. Holder receives cash payments of interest on the New Term Loan Obligations.  The determination as to whether the Existing First Lien Claims or the New Term Loan Obligations are publicly traded is highly dependent on facts and circumstances that exist during the 30 days before and after the exchange, some of which may be

unknowable by the Debtors.  As such, there can be no assurances that the Debtors' position will ultimately be respected.  All First Lien Lenders are urged to consult their own tax advisors regarding the determination of the issue price of the New Term Loan Obligations.

(b)        Sale, Redemption or Repurchase

Except as described above with respect to accrued interest, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption (including at maturity) or other taxable disposition of a portion of the New Term Loan Obligations in an amount equal to the difference between the U.S. Holder's adjusted tax basis in such New Term Loan Obligations and the sum of the cash plus the fair market value of any property received from such disposition.  Generally, a U.S. Holder's adjusted tax basis in its New Term Loan Obligations will be equal to its initial tax basis (as determined above), increased by any OID and market discount previously included in income, and (ii) reduced by any cash payments received on the New Term Loan Obligations other than payments of "qualified stated interest."  Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for its New Term Loan Obligations is more than one year at the time of disposition.

### 7.        Tax Treatment Of The New Warrants

A U.S. Holder holding a New Warrant generally will not recognize gain or loss for United States federal income tax purposes upon the exercise of such New Warrant and will have a tax basis in the New Common Stock received equal to its tax basis in the New Warrant exercised, increased by the amount paid to exercise the New Warrant.  A U.S. Holder's holding  period for the New Common Stock received on exercise of a New Warrant generally would commence the day following the exercise.  A U.S. Holder that allows the New Warrant to lapse would generally recognize a loss for United States federal income tax purposes equal to its tax basis in the New Warrant.  In general, such a loss would be a capital loss, and would be a short term or long term capital loss depending on its holding period for the New Warrant.

### 8.        Information Reporting And Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that holder  (a) comes within certain exempt categories and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

The Debtors intend to withhold all amounts required by law to be withheld from distributions pursuant to the Plan.  The Debtors intend to comply with all applicable reporting requirements of the IRS.

## B.        CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO REORGANIZED DEBTORS

The Debtors reported a net operating loss ("**NOL**") carryforward for federal income tax purposes for the taxable year ended December 31, 2009 and expect to incur additional NOLs during the current taxable year.  However, as discussed below, the Debtors believe that such NOLs will be eliminated upon the implementation of the Plan.  To the extent any NOLs of the Debtors are not so eliminated, the Debtors believe that the NOL carryforwards from 2009 generally will be subject to limitations as a result of a prior ownership change pursuant to Section 382 of the IRC.  In addition, the subsequent utilization of any remaining NOLs and NOL carryforwards (and possibly certain other tax attributes) may be restricted upon the implementation of the Plan.  In general, when NOLs are subject to more than one IRC Section 382 annual limitation under Section 382 of the IRC, the lowest annual limitation applies.

### 1.        Cancellation Of Debt And Reduction Of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the adjusted issue price of such indebtedness.  Under Section 108 of the IRC a debtor is treated as satisfying its outstanding indebtedness when such indebtedness is acquired by a related party (within the meaning of the IRC). The amount of COD income, in general, is equal to the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash, (y) the stated principal amount of debt with adequate stated

76

interest that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (other than debt described in clause (y) above), in each case in this clause (b) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a taxpayer may exclude COD income from gross income if the discharge occurs in a case brought under Title 11 of the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a court in such case and the cancellation of indebtedness is granted by the court or is pursuant to a plan approved by the court.  Generally, any COD income excluded from a debtor's gross income under Section 108 of the IRC must be applied against and reduce certain tax attributes of the taxpayer.  Unless the taxpayer elects to have such reduction apply first against the basis of its depreciable property, such reduction is first applied against NOLs (including NOLs for the taxable year of discharge and any NOL carryover to such taxable year), and then to certain tax credits, capital loss and capital loss carryovers, tax basis, passive activity losses and foreign tax credits.

Generally, when a partnership transfers a capital or profits interest in the partnership to a creditor in satisfaction of a partnership debt, the partnership recognizes COD income as if the debt had been satisfied with an amount of cash equal to the fair market value of the partnership interest, and such COD income is allocated to those who were partners of the partnership immediately prior to the satisfaction of the partnership debt.  The income exclusion and attribute reduction rules discussed above are applied at the partner level where partnership debt gives rise to COD income. In such case, the partners' basis in the partnership, together with other attributes of the partners, will be subject to reduction; however, the attributes of the partnership will not be subject to reduction unless the partner and partnership elect to treat the partnership interest as depreciable property.

It is expected that the Debtors will realize a significant amount of COD income as a result of the implementation of the Plan.  Because Holdings II is treated as a partnership for United States federal income tax purposes, COD income realized upon satisfaction of the Existing First Lien Claims and Existing Second Lien Claims will be allocated to the partners holding equity interests in Holdings II, RHI INC and RHIE Holdings Inc. (the "**Holdings II Partners**").   Because the Plan provides that holders of the Existing First Lien Claims will receive New Common Stock and New Term Loan Obligations, and the holders of the Existing Second Lien Claims will receive New Common Stock and New Warrants (together with Cash), the amount of COD income and, accordingly, the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock and New Warrants, and the issue price for tax purposes of the New Term Loan Obligations exchanged therefor.  These values cannot be known with certainty until after the Effective Date.  In addition, the issue price for tax purposes of the New Term Loan Obligations will depend on whether either or both of the Existing First Lien Claim or New Term Loan Obligations are "publicly traded" for U.S. federal income tax purposes (determined as described above).

Because the Debtors will be under the jurisdiction of a court in a title 11 bankruptcy case at the time that they realize the COD income and the debt discharge will be pursuant to a plan approved by the Bankruptcy Court, the Debtors will not include such COD income in gross income.  However, since such excluded COD income must be applied against NOLs (or other attributes) of certain of the Debtors, the Debtors anticipate that their NOLs will be significantly reduced or eliminated and the Holdings II Partners anticipate that their basis in their equity interests in Holdings II will be substantially reduced.

### 2.       Limitations On NOL Carryforwards And Other Tax Attributes

Following the implementation of the Plan, any NOLs (and carryforwards thereof) and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date, remaining after the reduction described above, will be subject to the limitations imposed by Section 382 of the IRC.

Under Section 382, if a corporation with NOLs (a "**loss corporation**") undergoes an "ownership change," the amount of its pre-change NOLs that may be utilized to offset future taxable income is, in general, subject to an annual limitation equal to the product of the applicable long-term-tax-exempt rate (the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the change date occurs) and the value of the loss corporation (the "**Section 382 Limitation**").  In general, subject to the discussion below regarding ownership changes that occur pursuant to a Title 11 bankruptcy case for purposes of calculating the Section 382 Limitation, the value of the loss corporation is the value of the stock of the loss corporation immediately before the ownership change (with certain adjustments).  The Section 382 Limitation does not limit the use of NOLs to offset taxable income allocable to the pre-ownership change portion of the taxable year in which the ownership change occurs.  Except as discussed below, if a loss corporation does not continue its historic business or use a significant portion of its business assets in a new business for two years after the ownership change, the annual limitation would be zero.

The Section 382 Limitation may also apply to certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and all items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the Section 382 Limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the Section 382 Limitation, such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Based on the estimated enterprise value of the Debtors, the Debtors currently anticipate that they will be in a net unrealized built-in loss position on the Effective Date.

It is expected that the issuance of New Common Stock pursuant to the Plan will constitute an ownership change of RHI INC (and consequently, the other corporate Debtors). However, an exception from application of the Section 382 Limitation is available for certain loss corporations undergoing an ownership change pursuant to a Title 11 bankruptcy case (the "**Bankruptcy Exception**"). The Bankruptcy Exception is available when shareholders and creditors of the loss corporation before the ownership change own at least 50% (by voting power and by value) of the loss corporation after the ownership change. In general, for purposes of the 50% ownership test, stock transferred to a creditor is only taken into account if it was transferred to the creditor in satisfaction of indebtedness and such indebtedness either (i) was held by the creditor for at least 18 months prior to the filing of the bankruptcy petition or (ii) arose in the ordinary course of business of the loss corporation and was held by the same creditor since it arose. If the Bankruptcy Exception applies, the loss corporation's NOLs and tax credits that can be carried forward to a post-ownership change year are not subject to the Section 382 Limitation, but instead must be reduced by any deductions allowed for interest paid or accrued, during any taxable year ending during the three years preceding the year of the reorganization and during the pre-ownership change portion of the year of reorganization, on debt converted into stock pursuant to the bankruptcy reorganization. Further, there is no requirement under the Bankruptcy Exception for the taxpayer to continue its historic business. However, any further ownership change of the taxpayer within a two-year period after the ownership change will preclude the utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

RHI INC has determined that the Debtors will not qualify for the Bankruptcy Exception. Even if the Debtors qualify for the Bankruptcy Exception, they may elect out of the Bankruptcy Exception. If so, provided certain requirements are met, a special rule under Section 382 applicable to corporations that are under the jurisdiction of a title 11 bankruptcy court but are not subject to the Bankruptcy Exception will apply. Under this special rule, the value of the loss corporation for purposes of computing the Section 382 Limitation generally is equal to the lesser of (i) the value of the stock of the loss corporation immediately after the ownership change (with certain adjustments) or (ii) the value of the loss corporation's pre-change assets (determined without regard to liabilities). However, regardless of whether either of the foregoing special bankruptcy rules applies, the prior ownership change of the Debtors will limit the utilization of NOL carryforwards from 2009 in all future years (to the extent such NOLs are not completely eliminated as a result of the implementation of the Plan) and built-in losses (to the extent they existed as of the date of the prior ownership change) during the recognition period (generally, the five-year period beginning on the date of the ownership change).

**3.    Alternative Minimum Tax**

A corporation may incur alternative minimum tax ("**AMT**") liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. In addition, if a corporation (or consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. It is possible that the corporate Debtors may be liable for the alternative minimum tax.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN MANY CASES UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

## VIII.
## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

#### 1.    General

While the Debtors believe that the planned prepackaged chapter 11 filing will be of short duration and will not be seriously disruptive to their business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, a chapter 11 proceeding could have an adverse effect on the Debtors' business.  Among other things, it is possible that a bankruptcy proceeding could adversely affect the Debtors' relationships with their production partners and other key suppliers, their customers, and their employees.  A chapter 11 proceeding also will involve additional expenses and could materially divert the attention of the Debtors' management from operation of the business and implementation of the strategic plan.

The extent to which a chapter 11 proceeding disrupts the Debtors' business will likely be directly related to the length of time it takes to complete the proceeding.  If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different reorganization plan that can be confirmed, which would increase both the probability and the magnitude of the adverse effects described above.

#### 2.    The Debtors May Fail To Receive The Requisite Acceptances

If the Requisite Acceptances are received, the Debtors intend to proceed on a prepackaged basis to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and to seek, as promptly thereafter as practicable, confirmation of the Plan.  If the Requisite Acceptances are not received, the Debtors will nevertheless file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, either on a prearranged basis with a plan of reorganization that has been negotiated with their key constituents or on a traditional basis without any agreement as to a plan of reorganization.  There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

#### 3.    The Debtors May Not Be Able To Secure Confirmation Of The Plan

Even if the Requisite Acceptances are received, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan satisfies such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the Solicitation must comply with the requirements of Section 1126(b) of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period, compliance with applicable non-bankruptcy law, if any, and in the absence of applicable non-bankruptcy law, the adequacy of the information contained in this Disclosure Statement.  If the Bankruptcy Court were to find that the Solicitation did not so comply, all acceptances received pursuant to the Solicitation could be deemed invalid and the Debtors could be forced to resolicit acceptances under Section 1125(b) of the Bankruptcy Code, in which case confirmation of the Plan could be delayed and possibly jeopardized.  The Debtors believe that the Solicitation complies with the requirements of Section 1126(b) of the Bankruptcy Code, that duly executed Ballots will be in compliance with applicable provisions of the Bankruptcy Code, and that the Plan, if the Requisite Acceptances are received, should be confirmed by the Bankruptcy Court.

There can be no assurance, however, that the Plan will ever be filed and, if the Plan is filed, there can be no assurance that modifications thereof will not be required for confirmation, or that such modifications would not result in a resolicitation of acceptances.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Non-Consensual Confirmation Of The Plan Will Be Necessary

When any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class of claims has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements with respect to the Impaired Classes that are deemed to reject the Plan. Nevertheless, in the event that a Voting Class does not accept the Plan, although the Debtors may seek nonconsensual confirmation with respect to such Voting Class, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. The Debtors May Amend, And Other Parties In Interest May Object To, The Amount, Classification And Treatment Of A Claim

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount and classification, and to amend or modify the treatment, of any Claim or Interest under the Plan. In certain circumstances before the Effective Date, other parties in interest may also object to the amount, classification and treatment of any Claim or Interest under the Plan. Any holder of a Claim that is or may become subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement or the Plan.

### 6. The Debtors May Fail To Meet All Conditions Precedent To Effectiveness Of The Plan

Although the Debtors believe that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing (or that the Effective Date even occurs). Moreover, if the conditions precedent to the Effective Date, including the entry of a Confirmation Order, execution and delivery of certain documents, and receipt of all necessary authorizations, have not occurred within a reasonable period of time, the Plan may be vacated by the Bankruptcy Court.

### 7. Contingencies Will Not Affect Validity Of Votes Of Impaired Classes To Accept Or Reject The Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 8. Filing Could Adversely Affect The Debtors' Operations And Relationships

It is possible that announcement of the Solicitation or the filing of the Chapter 11 Case could adversely affect the Debtors' operations and relationships with employees, customers, production partners, and suppliers. Due to uncertainties, many risks exist, including the following:

- customers could switch to competitors;

- employees may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with the Debtors' competitors;

- customers may delay making payments;

- although the Debtors anticipate that claims of critical, priority and foreign vendors will be paid in the ordinary course of business, other general unsecured creditors may suspend or terminate their relationship with the Debtors, exercise rights of set-off or similar remedies, further restrict ordinary credit terms or require guarantee of payment;

- production partners and key suppliers could terminate their relationship or require financial assurances or enhanced performance;

- trade creditors could require payment in advance or cash on delivery;

- the ability to renew existing contracts and compete for new business may be adversely affected;

- the ability to pursue acquisitions and obtain financing for such acquisitions may be negatively impacted; and

- competitors may take business away from the Debtors.

The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations and prospects of the Debtors.

### 9.      The Chapter 11 Case May Be Longer Than Expected

The Debtors cannot be certain that the Chapter 11 Case will be of relatively short duration (*e.g.*, 60 to 75 days) and will not unduly disrupt their businesses.  It is impossible to predict with certainty the amount of time needed in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Moreover, time limitations exist for which the Debtors have an exclusive right to file a plan before other proponents can propose and file their own plan.

Lengthy chapter 11 cases would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for employees, customers, production partners and vendors.  The disruption that a chapter 11 case would inflict upon the businesses would increase with the length of time it takes to complete the proceeding and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including essential employees, customers, production partners and vendors.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis, because of a challenge to the Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while trying to develop a different reorganization plan that can be confirmed.  A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.  Such a protracted process would also jeopardize the proposed reorganization and the benefits the Debtors expect to obtain therefrom.

### 10.      The Debtors May Be Unsuccessful In Obtaining First Day Orders To Authorize Payment To Key Creditors In The Ordinary Course Of Business

There can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize payment of obligations in the ordinary course of business to employees and to critical, priority and foreign vendors.  As a result, the Debtors may be unable to make certain prepetition payments to employees, customers, production partners and other key creditors, in which case their businesses may suffer.

### 11.      Tax Implications Of The Plan

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.

**Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.**

## B.    RISKS RELATED TO THE DEBTORS' BUSINESS AND FINANCIAL CONDITION

### 1.    The Debtors Have Incurred Net Losses In The Past And May Experience Net Losses In The Future

The Debtors have incurred net losses in the past largely due to amortization of film production costs, inclusive of impairment charges, and interest expense on their outstanding indebtedness. During the year ended December 31, 2009, impairment charges were recorded for the majority of their films totaling $338.9 million to reduce the net book value for those films to an amount approximating their fair value and film cost amortization was increased $1.1 million related to films for which revenue has been recognized during the period as a result of the reduction in (and elimination of) ultimate revenues from their annual review of ultimate revenues. During the year ended December 31, 2008, a non-cash impairment charge of $59.8 million with respect to goodwill was recorded as the result of the Debtors' stock price declining significantly to a level implying a market capitalization below book value. During the year ended December 31, 2007, a loss on extinguishment of debt was recorded with respect to the refinancing of the Debtors' credit facilities.

### 2.    The Debtors May Be Subjected To Accelerated Film Amortization And Significant Write-Offs Due To Changes In Estimated Film Revenue

The Debtors use the individual film-forecast-computation method to amortize their capitalized film production costs. The Debtors are required to amortize capitalized film production costs over the expected revenue streams as they recognize revenue from each of the associated films. The amount of film production costs that will be amortized depends on the amount of ultimate revenue the Debtors expect to receive from each film. If estimated ultimate revenue declines, amortization of capitalized film costs will be accelerated and future margins may be lower than expected. If estimated ultimate revenue is not sufficient to recover the unamortized film production costs, the unamortized film production costs will be written down to fair value. Furthermore, the Debtors base their estimates of revenue on a variety of information, including recent sales data from domestic and major international licenses and other sources. If the estimates are not correct or are subsequently revisited, and their internal controls over such information do not detect such an error or the revisions are not applied in a timely manner, the amount of film production cost amortization that the Debtors record could be incorrect, which could result in fluctuations in their earnings.

The Debtors review the ultimate revenues associated with their films. This analysis considers various data points, including current market conditions, library sales activity, and pricing, the delivery of their annual film slate and the results of the annual independent valuation of the unsold rights to their film library. This assessment reflecting ultimate revenues as of December 31, 2009, was completed in February of 2010. As a result of the continued weak market conditions, sales data, pricing and other factors present during the fourth quarter of 2009 and into 2010 as well as the significant decline in the annual independent valuation of the unsold rights to the film library, this analysis resulted in a significant reduction of the ultimate revenues for the majority of films in the library. In addition, based upon a qualitative analysis and assessment of recent sales activity, the Debtors now assume that there will be no future revenues for certain films. A reduction in the ultimate revenue associated with a film results in a higher rate of amortization over that film's remaining accounting life and causes a reduction in that film's prospective profit margin. The reduction in ultimate revenues resulted in a decrease in the fair value of films to an amount below their net book value. As a result, impairment charges were recorded totaling $338.9 million during the year ended December 31, 2009 to reduce the net book value of those films to an amount approximating their fair value. In addition, the reduction in ultimate revenues resulted in a $1.1 million increase to film cost amortization for the year ended December 31, 2009 related to films for which revenue has been recognized during the period.

### 3.    The Debtors' Lack Of A Diversified Business Could Adversely Affect Them

The Debtors derive substantially all of their revenue from the development, production and distribution of MFT movies, mini-series and other television programming. Since the Debtors depend on demand for long-form television content, their financial condition would suffer significantly if audience demand for their product declines in the future. This demand is driven by the interests of the viewers and the financial strength of the various networks. Unlike the Debtors' major competitors, which are divisions of major media companies that generate revenue from a variety of other operations, the Debtors depend primarily on the success of their MFT movies and mini-series. In recent years, the major U.S. broadcast networks migrated away from airing long-form television programs in favor of reality and other programming. If a new type of content becomes popular in the television entertainment industry, or the networks or other buyers of the Debtors' content perceive changes in audience demand for that content, the ability to license the

Debtors' MFT movies, mini-series and other television programming either domestically or internationally may be negatively impacted and the Debtors may suffer significant financial losses.

**4.      The Debtors' Ability To Augment Their Film Library And Thus Maintain Contracted Cash Flows May Be Jeopardized By Limited Resources**

The Debtors' business model relies upon their ability to continue to add to the existing titles in their film library.  As audience tastes and demands change over time, some of the Debtors' older content loses a portion of its licensing value.  To meet market demand, the Debtors must continue to deliver new content that will achieve high ratings and increased viewership.  If the Debtors do not augment their film library with new content that will meet market and audience demand, their film library cash flow will decrease and negatively impact their profits.  Given the Debtors' current financial position and liquidity concerns, and the requirements of the New Facilities, the Debtors will likely produce fewer new films and will need their production partners to finance the cost of each new production without short-term financial support from them.  If the Debtors' production partners cannot finance a film's cost through the use of new or existing credit facilities of their own, the Debtors will not develop or solicit the production of that film.  As a result, the number of films in the Debtors' new production slate may be further reduced, which would likely have an adverse impact on their production revenue and the contracted cash flows generated by their film library.

In addition, the size of the Debtors' film library is expected to decrease over time due to the expiration of their distribution rights to certain titles in their film library.  Although the Debtors own the distribution rights in perpetuity for the majority of titles in the library, their rights to approximately 34% of the titles in the library will ultimately expire.  By December 31, 2012, the Debtors' intellectual property rights to 52 of their films, or approximately 5% of their existing titles, will terminate.  Therefore, the Debtors must continue to develop, produce and distribute new content in an effort to replenish the titles available for distribution and to sustain their business model.

**5.      The Debtors' Success Depends On Their Ability To Develop, Produce And Distribute Quality Television Content**

An uncertainty always exists with the production and exploitation of television content whose success is subject to viewer tastes and preferences that can change in unpredictable ways.  Generally, the popularity of the Debtors' programs depends on many factors, including the critical acclaim they receive, the genre, the specific subject matter, the actors and other key talent and the format of their initial release.  To respond to market demand, the Debtors have developed and produced film content outside of their traditional genres, including a number of action/thriller MFT movies targeted at a younger 18-34 year old demographic.  The Debtors cannot provide any assurance that there will continue to be a demand for these action/thriller movies in broadcast television, PPV and/or home video platforms.  In addition, to respond to future market demand, the Debtors may need to produce genres that they lack experience in delivering.  The Debtors cannot provide any assurance that this programming will achieve high ratings.

The delivery of a MFT movie or mini-series that does not achieve high ratings can adversely affect the Debtors' financial condition and results of operations in at least three ways.  First, the Debtors rely heavily on their ability to license their films several times, but the receipt of low ratings for a particular MFT movie or mini-series will hinder their ability to re-license that program to another customer in the future.  Second, the initial customer may decide against licensing the rights to any of the Debtors' future MFT movies or mini-series due to the lack of profitability from the prior production.  Third, one or more MFT movies or mini-series that do not achieve high ratings may cause a negative impact to the Debtors' reputation and could also cause their significant customers to look to one of the Debtors' competitors to fulfill their long-form television programming needs.

Additionally, the New Facilities will require that the Debtors not produce any new films directly and that the Debtors pre-sell to territorial exhibitors 100% of the purchase price to the Debtors of acquiring rights in any new films, and there is inherent uncertainty in the Debtors being able to achieve such levels of pre-sales or to execute on this new model of film acquisitions as contemplated under the New Facilities.

**6.      The Debtors Have A Significant Concentration Of Their Revenue From A Limited Number Of Licensees**

In 2009, approximately 73% of the Debtors' revenue was earned from their top ten customers, with approximately 20% from Lifetime, 16% from broadcast and cable channels affiliated with Universal Television (NBC, Syfy and Universal Television's international channels) and 5% from the Hallmark Channel.  As a percentage of the Debtors' total original MFT movies and mini-series productions licensed to broadcast and cable networks, the Hallmark Channel comprised approximately 28% in 2007, 11% in 2008 and 27% in 2009.  A disruption to, or termination of, the Debtors' relationship with any of their significant licensees could cause

them to suffer significant financial losses.  Additionally, as of June 30, 2010, approximately $45.4 million, or 94%, of the Debtors' accounts receivable was due from their top seven customers.  Because the licensing of their content for network and cable television is highly concentrated, an adverse change in the Debtors' relationship with any of their significant customers or an adverse change in the financial condition of their customers could have a material adverse impact on the Debtors' financial condition.

In 2009, the Debtors replaced Genius Products (Genius) as their domestic video distributor and entered into an agreement with Vivendi Entertainment (Vivendi) for video and digital distribution of their content requiring Vivendi to provide the Debtors with monthly royalty reports reflecting the financial performance of the titles included under the agreement along with monthly royalty payments.  If Vivendi does not report or remit to the Debtors in a timely manner, if Vivendi experiences financial difficulties, or if Vivendi is not successful in distributing the Debtors' content, it could have a material effect on the Debtors' business and results of operations.

### 7.   The Debtors Rely On Third Party Licensees To Promote, Market And Advertise Their Programming

The Debtors have licensed to broadcast and cable networks the right to air their long-form television content.  The Debtors also license their content to other parties in order to take advantage of emerging distribution platforms.  Licensed distributors' decisions regarding the timing of release and promotional support of the Debtors' programming content are important in determining the success of the Debtors' MFT movies, mini-series and other television programming.  The Debtors do not control the timing and manner in which their customers distribute their productions.  Because the Debtors rely on those with initial rights to their content to create a high-level of interest in their programming, any decision by such parties not to distribute or promote one of the Debtors' productions or, instead, to promote the Debtors' competitors' television programs or related products more than they promote the Debtors could have a material adverse effect on the Debtors' business and financial condition.  In addition, upon the completion of a license term, the Debtors have the ability to re-license the same programming to another party.  If during the initial license term, the Debtors' programming does not enjoy high ratings, their ability to re-license these programs in the future will become difficult and their reputation and opportunity to license new programming may be adversely affected.

### 8.   The Debtors Place Significant Reliance On Third Party Production Companies

Although the Debtors have a team of creative personnel who read scripts and evaluate talent, the physical production (filming, editing, etc) of their films is primarily performed by (and under the New Facilities is required to be performed by) third party producers and independent contractors.  The success of the Debtors' programming will depend to a degree on their ability and the ability of these third parties to avoid production problems and delays and to hire, retain and motivate top creative talent.  Making films is an activity that requires the services of individuals, such as actors, directors and producers, each of whom have unique creative talents.  If the Debtors' production partners experience difficulty in hiring, retaining or motivating creative talent, the production of their films could be delayed or the success of their films could be adversely affected.  If any of these partners were unable or unwilling to produce or assist in the production of the Debtors' MFT movies and mini-series, the Debtors would have to expend significant time, money and resources to find another company to produce their content and they may not be able to meet their creative needs and timely completion of their content with a new production company.  In addition, the Debtors' production partners finance a substantial portion of their films through the use of new or existing credit facilities of their own.  Although a majority of the films are in production in the summer months so that they can be delivered late in the third quarter and during the fourth quarter, a portion of the funding for these films has been deferred to future periods to better match the cash inflows related to sales of this product.  If the Debtors' production partners cannot finance a film's cost through the use of new or existing credit facilities of their own, and if the Debtors cannot achieve pre-sales of 100% of the contracted price to the Debtors of acquiring the film rights, management will not be able to produce that film.  As a result, the number of films produced may be further reduced, which could have an adverse impact on the Debtors' production revenue and contracted cash flows generated from their film library.

### 9.   The Debtors' Business Involves Risks Of Liability Claims For Entertainment Content

As an owner and distributor of entertainment content, the Debtors may face potential liability for defamation, invasion of privacy, right of publicity or misappropriation, actions for royalties and accountings, breach of contract, negligence, copyright or trademark infringement (as discussed below); and other claims based on the nature and content of the materials distributed.  These types of claims have been brought, sometimes successfully, against broadcasters, producers and distributors of entertainment content.  Any imposition of liability that is not covered by insurance or is in excess of insurance coverage could have a material adverse effect on the Debtors' business, results of operations and financial condition.

**10.    The Debtors' Success Depends On Certain Key Employees**

The Debtors' success greatly depends on their employees.  In particular, the Debtors are dependent upon the services of their President and Chief Executive Officer, Robert Halmi, Jr., select members of their senior management and certain creative employees such as directors and producers.  The Debtors have entered into employment agreements with Mr. Halmi, Jr. and with all of their top executive officers and production executives, and new or modified agreements are proposed to be entered into as a condition to the Effective Date of the Plan.  However, although it is standard in the television industry to rely on employment agreements as a method of retaining the services of key employees, these agreements cannot assure the Debtors of the continued services of such employees.  These agreements have limited terms.  The proposed new or modified agreements will have initial terms of three years from the Effective Date.  Moreover, although the Debtors carry key employee insurance for Mr. Halmi, Jr., the proceeds from an insurance payout would not compensate for the loss of their President and Chief Executive Officer's creativity and knowledge of the long-form television business.  The loss of Mr. Halmi, Jr.'s services or a substantial group of key employees could have a material adverse effect on the Debtors' business and results of operations.

**11.    Recent Market Conditions Have Negatively Impacted The Debtors' Ability To Sustain Their Production Model**

Historically, the Debtors' production model has enabled them to contract for license fees covering the majority of their production costs for their MFT movies and mini-series before delivery of their content to an initial licensee.  Although the Debtors intend to adhere to their general practice of commencing production when they have contracted license fees for a significant portion of their production costs, the Debtors can provide no assurance that this will always be the case.  Recent market conditions have resulted in a lower pre-sale percentage for the Debtors' films, which has caused a substantial negative impact to their revenues over the past two years than they have historically experienced.  The Debtors may rely on an alternative means of revenue to recoup their production costs.  The Debtors may determine that there are other ways of licensing their content, or their customers may change the way they license productions and such alternative methods may not include an upfront license fee that covers a majority of the Debtors' production costs before they deliver the content.  However, the Debtors can provide no assurance that these alternative means or methods will be available to them in the future, which would negatively impact their financial condition and results of operations.

**12.    The Debtors Face Risks Relating To The International Distribution Of Their Films And Related Products**

Because the Debtors have historically derived a significant portion of their revenue (44%, 37% and 59% in 2009, 2008 and 2007, respectively) from the exploitation of their films in territories outside of the United States, their business is subject to risks inherent in international trade, many of which are beyond their control.  These risks include: laws and policies affecting trade, investment and taxes, including laws and policies relating to the repatriation of funds and withholding taxes and changes in these laws; differing cultural tastes and attitudes, including various censorship laws; differing degrees of protection for intellectual property; financial instability and increased market concentration of buyers in foreign television markets; the instability of foreign economies and governments; fluctuating foreign exchange rates; and war and acts of terrorism.

**13.    The Advancement Of Video Technologies May Cause Advertisers To Shift Their Expenditures Away From Television Advertising, Causing A Reduction In Demand For The Debtors' Programming**

The entertainment industry in general and the television industry in particular continue to undergo significant technological developments.  Advances in technologies or alternative methods of product delivery or storage or certain changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on the Debtors' business.  In particular, broadcast and cable networks place significant reliance on the revenue stream generated from commercial advertising.  Since the introduction of video technology such as Digital Video Recording, or DVR, television audiences now have the ability to circumvent commercials while they view television programming, which could negatively impact advertising demand for the advertisers for the Debtors' content, and could therefore adversely affect the Debtors' revenue.  Similarly, further increases in the use of portable devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect the Debtors' revenue.  If the Debtors cannot successfully exploit these and other emerging technologies, it could have a material adverse effect on their business, results of operations and financial condition.

This technology has impacted the Nielsen ratings, which advertisers utilize to determine the rates for advertising time which they purchase from the television networks.  Lower Nielsen ratings may result in a decrease in the amount of advertising revenue

received by the networks and the networks may not have sufficient cash flow to license the Debtors' programming at favorable rates, or choose not to license their programming at all.

### 14. The Debtors Could Be Adversely Affected By Strikes And Other Union Activity

The Debtors do not have any union-represented employees within their company, but they do rely on members of the Screen Actors Guild, the Writers Guild of America, the Directors Guild of America and other guilds in connection with most of their productions. The Debtors are currently subject to collective bargaining agreements with these unions and, therefore, must comply with all provisions of those agreements in order to hire actors, directors or writers who are members of these guilds. Provisions in each labor contract with each of the Guilds obligate the Debtors to pay residuals to the Guild's members based on various criteria including the airing of films or cash collections. If the Debtors fail to pay such residuals to those entitled to receive them, any of the unions that represent their actors, writers and directors may have the right to foreclose on the film giving rise to such residual in order to compensate union members accordingly. Additionally, the Debtors may be adversely impacted by work stoppages or strikes. A halt or delay in negotiating a new industry-wide union contract, depending on the length of time involved, could lead to a strike by union members and cause delays in the development, production and completion of the Debtors' films. Any new collective bargaining agreements may increase the Debtors' expenses in the future.

### 15. Business Interruptions And Disasters Could Adversely Affect The Debtors' Operations

The Debtors' operations are vulnerable to outages and interruptions due to fire, flood, power loss, telecommunications failures and similar events beyond their control. In addition, the Debtors have a film vault located in California and a backup storage facility located in New Jersey. The Debtors' California film vault has, in the past, and may, in the future, be subject to earthquakes as well as electrical blackouts as a consequence of a shortage of available electrical power. Although the Debtors have developed certain plans to respond in the event of a disaster, there can be no assurance that such plans will be effective in the event of a specific disaster. Films are unique in nature and cannot be easily reproduced. If the Debtors' storage facilities were to suffer damage or destruction such that their films were no longer able to be licensed to third parties, the Debtors' opportunity to generate revenue by re-licensing their content would be limited and would potentially impact their earnings and financial condition.

### 16. The Debtors May Incur Significant Expenses In Order To Protect And Defend Against Intellectual Property Claims

The Debtors currently own the rights to distribute more than 1,000 titles in their film library. As such, the Debtors' success depends, in part, upon sufficient protection of their intellectual property. The Debtors cannot be certain that they have good title to each of the films in their library. Many of these films were produced by production companies that the Debtors hired, but others were acquired. Most notably, the Debtors acquired the domestic rights to approximately 550 titles from Crown Media in December 2006. Although the seller made representations that it had legal title to these films at the time of sale, the Debtors cannot be certain that legal title to these films was acquired when they consummated the acquisition. There can be no assurance that infringement or misappropriation claims (or claims for indemnification resulting from such claims) will not be asserted or prosecuted against the Debtors, or that any assertions or prosecutions will not materially adversely affect their business, financial condition or results of operations. Notwithstanding the validity or the successful assertion of such claims, the Debtors would incur significant costs and diversion of resources with respect to the defense thereof, which could have a material adverse effect on their business, financial condition or results of operations. If any claims or actions are asserted against the Debtors, they may seek to obtain a license of a third party's intellectual property rights. The Debtors cannot provide any assurances, however, that under such circumstances a license would be available on reasonable terms or at all.

### 17. The Debtors Face A Potential Loss In Their Copyrighted Works Due To Recapture Rights Under The U.S. Copyright Act

Under the U.S. Copyright Act, authors and their heirs have a non-waiveable statutory right to terminate their earlier assignments and licenses in many copyrighted works by sending notice within a statutorily-defined window of time. The right of termination does not apply to copyrights in "works made for hire" which encompasses most of the copyrights owned by the Debtors. However, with respect to copyrights licensed by the Debtors, or to the extent that any of the works to which the Debtors have rights are determined not to be "works made for hire," a termination right may exist under the U.S. Copyright Act. These rights can provide authors and their heirs an opportunity to renegotiate new and more commercially advantageous arrangements. If that were to come to pass, the Debtors' net revenue associated with those works could decrease.

**18.      The Debtors' Intellectual Property Rights May Not Be Enforceable In Certain Foreign Jurisdictions**

The Debtors attempt to protect the proprietary and intellectual property rights to their productions through available copyright and trademark laws as well as through licensing and distribution arrangements with reputable international companies in specific territories and for limited durations.  The Debtors rely on copyright laws to protect the works of authorship created by them or transferred to them via assignment or by operation of law as "works made for hire."  The Debtors have generally recorded or registered their copyright and trademark interests in the United States.  Despite these precautions, existing copyright and trademark laws vary from country to country and the laws of some countries in which the Debtors' productions are marketed may not protect their intellectual property to the same extent as do U.S. laws, or at all.  Furthermore, although copyrights and trademarks that arise under United States and United Kingdom law will be recognized in most other countries (as most countries are signatories to the Berne Convention, the Universal Copyright Convention and the Madrid Protocol), the Debtors cannot guarantee that courts in other jurisdictions will afford their copyrights and trademarks the same treatment as do courts in the United States or the United Kingdom.  Although the Debtors believe that their intellectual property is enforceable in most jurisdictions, it cannot guarantee such validity or enforceability.

**19.      Competition Within The Debtors' Industry Could Reduce Licensing Revenue And Profitability**

The Debtors operate in the highly competitive business of developing, producing and distributing long-form television programming.  If the Debtors are unable to compete effectively with large diversified entertainment companies that have substantially greater resources, the Debtors' operating margins and market share could be reduced, and the growth of their business inhibited.  In particular, the Debtors compete with other television production and distribution companies, such as Buena Vista International Television, Paramount Television and Sony Pictures Television.  A continuing trend towards business combinations and alliances in the communications industries may create significant new competitors for the Debtors or intensify existing competition.  Many of these combined entities have resources far greater than the Debtors.  These combined entities may provide programming and other services that compete directly with the Debtors' offered programming.  The Debtors may need to reduce their prices or license additional programming to remain competitive, and they may be unable to sustain future pricing levels as competition increases.  The Debtors' failure to achieve or sustain market acceptance of their programming at desired pricing levels could impair their ability to achieve profitability or positive cash flow, which would negatively impact their results of operations.

Furthermore, third party producers, whom the Debtors heavily rely on to produce their productions, are capable of developing, producing and distributing their own content to cable and broadcast networks.  If this were to occur, these third party producers could subject the Debtors to further competition in the industry.

**20.      Change In Accessibility Or Availability Of Film Production Incentives And Subsidies Could Cause The Debtors' Production Costs To Substantially Increase**

Production incentives and subsidies for film production are widely used throughout the industry and are important in helping to offset production costs.  Many foreign countries, the United States and individual states have programs designed to attract production.  Canada and its provinces are notable examples.  Incentives and subsidies are used to reduce production costs and such incentives and subsidies take different forms, including direct government rebates, sale and leaseback transactions or transferable tax credits.  The Debtors have benefited from these financial incentives and subsidies in Canada as well as in Germany, the United Kingdom, Ireland, Hungary, South Africa, Australia, New Zealand and the United States.  The laws and procedures governing these production incentives are subject to change.  If the Debtors or their production partners are unable to access any of these incentives and subsidies because they are modified or eliminated, the Debtors may be forced to restructure the financing of their film productions, increasing the likelihood that their inability to offset production costs will cause their profits to decrease.  Further, the applications for these incentives and subsidies often are prepared and filed by the Debtors' production partners, rather than by the Debtors, and they are subject to guidelines and criteria mandated by foreign, United States or state governments.  The Debtors do not control the application or approval processes.  If these applications are denied or revoked for any reason, impacting the operations of the Debtors' production partners, the Debtors may be forced to restructure the financing of their film productions.  Failure to achieve the cost savings that the Debtors' historically achieved could have a material adverse effect on their results of operations, financial condition and cash flows.

**21.      Delays And Changed Delivery Dates May Have A Material Impact On Financial Results**

A majority of the Debtors' annual productions or acquisitions have been completed and made available to their licensees during the third and fourth quarter of their fiscal year.  Typically, the Debtors' MFT movies, mini-series and other television

programming are ordered in the beginning of their fiscal year, and produced during the spring and summer, with distribution beginning in the fall. The Debtors do not recognize revenue from the distribution and licensing of their productions until several criteria are met, including such productions being made available for exhibition by a third party distributor or licensee. To the extent that the Debtors or their third party producers have any production delays due to weather, equipment malfunctions, creative differences or labor strikes, the timing can shift from one quarter to the next, which causes the Debtors to recognize such revenue in the next quarter or fiscal year and materially impacts their results of operations. If the Debtors decide to give guidance on their financial condition or results of operation, they may not achieve those projections due to a variety of factors including those discussed in this report. Furthermore, due to unpredictable factors that may occur during production, the Debtors believe that quarterly comparisons of their financial results should not be relied upon as an indication of their future performance.

## C.     DISCLOSURE STATEMENT DISCLAIMER

### 1.     The Information Contained Herein Is For Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

### 2.     This Disclosure Statement Was Not Approved By The SEC

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.     The Financial Information Contained In This Disclosure Statement Is Not Audited

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable good faith efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without material inaccuracies.

### 4.     This Disclosure Statement Contains Forward Looking Statements

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "believe," "predicts," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 5.     No Legal Or Tax Advice Is Provided To You By This Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 6.     No Admissions Are Made By This Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, the holders of Allowed Claims or Interests or any other parties in interest.

**7.**     **No Reliance Should Be Placed On Any Failure To Identify Litigation Rights Or Projected Objections**

No reliance should be placed on the fact that a particular Litigation Right or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  Except as otherwise provided in the Plan, the Confirmation Order or a Final Order, the Debtors or the Reorganized Debtors, as applicable, may seek to investigate, file and prosecute any Litigation Rights or objections to Claims and Interests, and may do so after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Litigation Rights or objections.

**8.**     **Nothing Herein Constitutes A Waiver Of Any Right To Object To Claims Or Recover Transfers And Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Reorganized Debtors or any party in interest, as the case may be, to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Litigation Rights of the Debtors or their Estate are specifically or generally identified herein.

**9.**     **The Information Used Herein Was Provided By The Debtors And Was Relied Upon By The Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

**10.**     **The Potential Exists For Material Inaccuracies, And The Debtors Have No Duty To Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable good faith efforts to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11.**     **No Representations Made Outside The Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Case or the Plan are authorized by the Debtors, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

**IX.**
**<u>CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION</u>**

**A.**     **SOLICITATION OF VOTES**

This Disclosure Statement, including all appendices hereto, together with the related materials included herewith, are being furnished to the holders of Existing First Lien Claims in Class 2 and Existing Second Lien Claims in Class 3, which Classes are the only Classes entitled to vote on the Plan.  The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Part I.D of this Disclosure Statement. **All parties who are entitled to vote should read Part I.D carefully to ensure that votes are properly and timely submitted such that they are counted as votes to accept or reject the Plan.**

**B.**     **PREPACKAGED SCHEDULING ORDER**

Under Section 1126 of the Bankruptcy Code, a holder of claim or equity interest that has accepted the plan before the commencement of the chapter 11 case is deemed to have accepted the plan if either (i) the solicitation of votes was in compliance with

89

any applicable nonbankruptcy law, rule or regulations governing the adequacy of disclosure or (ii) if there is not any such law, rule or regulation, the solicitation of votes was in compliance with Section 1125(a) of the Bankruptcy Code.

Once the Solicitation is completed or Requisite Acceptances have been obtained, the Debtors will proceed to commence their chapter 11 cases. As part of their first-day filings, the Debtors will file this Disclosure Statement and the Plan, along with a "prepack scheduling motion." The prepack scheduling motion will represent that the Solicitation complied with Section 1126(b) of the Bankruptcy Code and will request that the Bankruptcy Court so find. In addition, the motion will request that the Bankruptcy Court schedule the Confirmation Hearing for a date at least 60 days after the filing.

## C.    CONFIRMATION PROCEDURES

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As indicated above, on the first day of the Chapter 11 Case, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' Estates, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (i) the Office of the United States Trustee for the Southern District of New York, (ii) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834, Attn: D. J. Baker, (iii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0600, Attn: Wendy S. Walker, (iv) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036-8704, Attn: Mark R. Somerstein, and (v) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the date and time designated in the notice of the Confirmation Hearing.

Rule 9014 of the Federal Rules of Bankruptcy Procedure governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## D.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### 1.    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of Section 1129(a) of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

90

- The Debtors have disclosed (i) the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting trustee of the Reorganized Debtors, (ii) any affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and (iii) the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors, as applicable, has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.

- With respect to each Impaired Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

- Except to the extent the Plan meets the "nonconsensual confirmation" standards of the Bankruptcy Code, each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Other Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding five (5) years after the Petition Date, of a value, as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date.

- At least one class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under Section 1930 of Title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in Section 1114(a) of the Bankruptcy Code), at the level established pursuant to Section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

**2.     Best Interests Test**

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under Chapter 7 of the Bankruptcy Code as of the effective date of the plan.  To make these findings with respect to the Plan, the Bankruptcy Court must: (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the Debtors' chapter 11 cases were converted to chapter 7 cases on the Effective Date of the Plan and the assets of the Debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a Claim or an Interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such holder's liquidation distribution to the distribution that such holder would receive under the Plan if the Plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured

91

claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms, by order of the bankruptcy court or by law; and (e) holders of equity interests.

Accordingly, the cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered cash held by the debtors at the time of the commencement of the liquidation. Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of Chapter 7 for purposes of a liquidation.

(a)    Liquidation Analysis

As described in more detail in the Liquidation Analysis attached as Appendix C to this Disclosure Statement, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Interest in each Impaired Class with a recovery greater than or equal to the value of any distributions if the chapter 11 cases were converted to cases under Chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be discounted due to the distressed nature of the sale of the Debtors' assets, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Case and the Claims against the Debtors. A table that compares the estimated recoveries under the Plan to a chapter 7 liquidation for each Impaired Class is provided below.

| *Claim/Interest* | *Projected Recovery Under the Plan* | *Projected Recovery from Chapter 7 Liquidation* |
|---|---|---|
| Class 2: Existing First Lien Claims | Approx. 63.5% (mid-point) (prior to dilution from New Management Incentive Plan) | Approx. 24.5% (mid-point) |
| Class 3: Existing Second Lien Claim | Approx. 1.3% (mid-point) (prior to dilution from New Management Incentive Plan) | 0% |
| Class 4: Other Secured Claims | - | Liquidation value of collateral |
| Consensual Plan Alternative | Reinstated | - |
| Non-Consensual Plan Alternative | Cramdown alternatives | - |
| Class 5: General Unsecured Claims | - | 0% |
| Consensual Plan Alternative | | |
| -- If Estimated Class 5 Allowed Claims do not exceed Maximum Class 5 Amount | 100% | - |
| -- If Estimated Class 5 Allowed Claims exceed Maximum Class 5 Amount | 0% * | - |
| Non-Consensual Plan Alternative | 0% * | - |
| Class 6: Subordinated Claims | 0% | 0% |
| Class 7: RHI INC Interests | 0% | 0% |

\* Eligible Allowed Trade Unsecured Claims may receive payment in full or part from the Trade Account made available by the First Lien Lenders.

(b)    Valuation of the Debtors

Rothschild Inc., the Debtors' financial advisor, has determined the estimated range of reorganization value of the Reorganized Debtors, excluding cash on hand, to be approximately $335 million to $395 million (with a mid-point estimate of approximately $365 million) as of an assumed Effective Date of January 31, 2011.

The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the business plan (see the Projections at Appendix E), access to adequate exit financing, continuity of a qualified management team, market conditions through the period covered by the projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein. The valuation is supported

by the analysis (the "**Valuation Analysis**") attached hereto as <u>Appendix D</u> and will be further supported by the Debtors' presentation at the Confirmation Hearing.

**The valuation assumptions are not a prediction or reflection of post-emergence trading prices of the New Common Stock. Such securities may trade at substantially lower or higher prices because of a number of factors, including, but not limited to, those discussed in Part VIII above. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

(c)    <u>Application of the "Best Interests" Test to the Liquidation Analysis and the Valuation Analysis</u>

It is impossible to determine with any specificity the value each holder of an Existing First Lien Claim or Existing Second Lien Claim will receive as a percentage of its Allowed Claim. The difficulty in estimating the value of recoveries for such holders is due to, among other things, the lack of any public market for the New Common Stock.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to holders of Existing First Lien Claims and Existing Second Lien Claims than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

**3.    Feasibility**

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as <u>Appendix E</u>.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, to comply with any covenants in the agreements governing their indebtedness, and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. The Debtors will be required to adopt "fresh start" accounting upon their emergence from Chapter 11. The actual adjustments for "fresh start" accounting that the Debtors may be required to adopt upon emergence, may differ substantially from those "fresh start" adjustments in the Projections. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

The Projections should be read together with the information in Part VIII of this Disclosure Statement entitled "Risk Factors," which sets forth important factors that could cause actual results to differ from those in the Projections.

RHI INC is currently subject to the informational requirements of the Exchange Act, and in accordance therewith files periodic reports and other information with the SEC relating to its businesses, financial statements, and other matters. Such filings do not and will not include projected financial information. The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: Certain statements made in this Disclosure Statement and the Projections contained in this Disclosure Statement, and other written or oral statements made by the Debtors or on the Debtors' behalf, may constitute "forward-looking statements" within the meaning of the federal securities laws. Statements regarding future events and developments and the Debtors' future performance, as well as management's expectations, beliefs, plans, estimates, or projections related to the future, are forward-looking statements within the meaning of these laws. These forward-looking statements include and may be indicated by words or phrases such as "anticipate," "estimate," "plans," "expects," "projects," "should," "believes," or "intends" and similar words and phrases.

All forward-looking statements, as well as the Debtors' business and strategic initiatives, are subject to risks and uncertainties that could cause actual results to differ materially from expected results after the Effective Date. Management believes that these forward-looking statements are reasonable. However, you should not place undue reliance on such statements. These statements are based on current expectations and speak only as of the date of such statements. The Debtors undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of future events, new information or otherwise. Additional information concerning the risks and uncertainties that you may wish to consider are contained in Part VIII of this Disclosure Statement and the section entitled "Risk Factors" in RHI INC's Annual Report on Form 10-K for the fiscal year ended December 31, 2009 filed with the SEC on March 26, 2010. A number of factors could cause the Debtors' actual results to differ materially from the expected results.

### 4.        Acceptance By Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan either (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation and otherwise leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those creditors who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Class 1 are not Impaired under the Plan, and, as a result, the holders of such Claims are deemed to have accepted the Plan. Claims in Classes 2 and 3 are Impaired under the Plan, and the holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to Section 1129 of the Bankruptcy Code, the holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under Section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the Plan.

Claims in Classes 4 and 5 may be Impaired and deemed to reject the Plan or Unimpaired and deemed to accept the Plan, depending on whether the Consensual Plan Alternative or the Non-Consensual Plan Alternative applies. Even if the Consensual Plan Alternative applies, Claims in Class 5 may be Impaired and deemed to reject the Plan if the Estimated Class 5 Allowed Claims exceeds the Maximum Class 5 Amount.

In addition, Claims in Class 6 and Interests in Class 7 are Impaired and are deemed to have rejected the Plan. The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code as more fully described below with respect to such Classes.

**5.       Confirmation Without Acceptance By All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to Section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the Plan, the Plan can be confirmed, at the debtors' request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" (as discussed below) and is "fair and equitable" (as discussed below) with respect to each class of claims or equity interests that is impaired under, and has not accepted, the Plan.

**6.       No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment not be "unfair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors in a materially different manner without unfairly discriminating against either class. This test only applies to classes that reject or that are deemed to have rejected a plan.

**7.       Fair And Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. This test only applies to classes that reject or that are deemed to have rejected the Plan. As to the rejecting class, the test sets different standards depending on the type of claims or equity interests in such class:

- Secured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:

    (a)  (i) the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or

    (b)  for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or

    (c)  for the realization by such holders of the indubitable equivalent of such claims.

- Unsecured Claims.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:

    (a)  the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

    (b)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

- Equity Interests.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

(a) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(b) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

## E.      CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  The Debtors expect consummation of the Plan to occur on or within 75 days of the Petition Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan, see Article IX of the Plan.

**X.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not consummated, the Debtors' capital structure will remain highly leveraged and the Debtors will remain unable to service their debt obligations or to cure the current defaults thereunder.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include the following:

## A.      COMMENCEMENT OF "TRADITIONAL" CHAPTER 11 CASES

If the Requisite Acceptances are not received, the Debtors nevertheless could commence "traditional" chapter 11 cases, in which circumstance they could continue to operate their businesses and manage their properties as debtors in possession, but would become subject to the numerous restrictions imposed on debtors in possession by the Bankruptcy Code.  The Debtors would formulate, negotiate, propose and solicit a plan of reorganization during the course of the chapter 11 proceeding.  That plan could have substantially the same or significantly different terms than the Plan.  It is not clear whether the Debtors could survive as going concerns in a protracted chapter 11 case.  They could have difficulty sustaining operations in the face of the high costs, erosion of customer confidence, loss of key employees and liquidity difficulties that could result if they remained chapter 11 debtors in possession for an extended period of time.  Ultimately, the Debtors could propose another plan or liquidate the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

## B.      COMMENCEMENT OF "PREARRANGED" CHAPTER 11 CASES

As a middle ground between the prepackaged process now proposed and a traditional filing, the Debtors could proceed on a prearranged basis to file chapter 11 cases and at the same time file a plan of reorganization.  The plan filed could be the Plan or an alternative plan.  At this stage, there is no certainty that the Debtors would have the liquidity to support the pre-filing formulation, negotiation and preparation of a substantially different alternative plan.  Although a prearranged process can be expected to be shorter and more focused than a traditional process, there is no certainty that disputes will not arise that could significantly lengthen the process.  In addition, many of the requirements of a traditional process that add cost, time and distraction, that would be avoided in a prepackaged process, are generally present in a prearranged process.

## C.      LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11 OF THE BANKRUPTCY CODE

If no plan is confirmed, the Debtors' cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates.  The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the

Debtors' assets.  More importantly, conversion to Chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most Chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization.  In a liquidation under Chapter 11, the Debtors' assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery.  Conversely, to the extent the Debtors' businesses incur operating losses, the Debtors' efforts to liquidate their assets over a longer period of time theoretically could result in a lower net distribution to creditors than they would receive through chapter 7 liquidation.  Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, chapter 11 liquidation might be less costly than chapter 7 liquidation and thus provide larger net distributions to creditors than in chapter 7 liquidation.  Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return anticipated by the Plan.

**D.      ALTERNATIVE PLAN(S)**

The Debtors believe that failure to accept and confirm the Plan will lead inevitably to expensive and protracted chapter 11 cases.  In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process involving many different parties with widely disparate interests.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims and enable the holders of Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger or equal distribution to the Debtors' creditors than would otherwise result in liquidation under Chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than that which is proposed under the Plan. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan cast their Ballots to accept the Plan and support confirmation of the Plan.

Dated: November 1, 2010

RHI Entertainment, Inc.
RHIE Holdings Inc.
RHI Entertainment Holdings II, LLC
RHI Entertainment, LLC
RHI Entertainment Productions, LLC
RHI Entertainment Distribution, LLC
RHI International Distribution Inc.
NGP Holding, Inc.
HEGOA Inc.
Independent Projects, Inc.
Don Quixote, Inc.
HE Pro Tunes, Inc.
HEP Music, Inc.
Metropolitan Productions, Inc.
Library Storage, Inc.
HEP SS Music Inc.
SLB Productions, Inc.

By: _____
Robert A. Halmi, Jr.
President and Chief Executive Officer
RHI Entertainment, Inc.

D. J. Baker
Rosalie Walker Gray
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:   (212) 906-1200
Facsimile:   (212) 751-4864
Email:       dj.baker@lw.com
             rosalie.gray@lw.com
             keith.simon@lw.com

Proposed Counsel for Debtors and Debtors in Possession