**APPENDIX A**

Plan of Reorganization

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THIS JOINT CHAPTER 11 REORGANIZATION PLAN *PRIOR* TO THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE.  BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THE DISCLOSURE STATEMENT RELATING TO THIS PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK AN ORDER OF THE BANKRUPTCY COURT THAT, AMONG OTHER THINGS, APPROVES THE DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, APPROVES THE SOLICITATION OF VOTES AND CONFIRMS THIS PLAN.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| RHI Entertainment, Inc., <u>et al.</u>, | ) | Case Number:  Pending Filing |
|  | ) |  |
| Debtors. | ) | Joint Administration to be Requested |
| _____ | ) |  |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF**
<u>**RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**</u>

D. J. Baker
Rosalie Walker Gray
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:        dj.baker@lw.com
              rosalie.gray@lw.com
              keith.simon@lw.com

Proposed Counsel for Debtors and Debtors in Possession

Dated:  November 1, 2010

**TABLE OF CONTENTS**

**ARTICLE I** RULES OF CONSTRUCTION AND DEFINITIONS ..................................................................1

1.1       Rules of Construction.............................................................................................................1
1.2       Definitions ...............................................................................................................................2

**ARTICLE II** PLAN STRUCTURE......................................................................................................11

2.1       Basis for Plan Structure.......................................................................................................11
2.2       Substantive Consolidation ...................................................................................................11
2.3       Secured Lender Settlement...................................................................................................12
2.4       Consensual or Non-Consensual Plan Alternatives ...........................................................12
2.5       Estimated Class 5 Allowed Claims Determination ...........................................................13
2.6       Accommodations by First Lien Lenders .............................................................................13

**ARTICLE III** CLASSIFICATION OF CLAIMS AND INTERESTS..........................................................13

3.1       Introduction ..........................................................................................................................13
3.2       Unclassified Claims...............................................................................................................13
3.3       Classified Claims and Interests ...........................................................................................13

**ARTICLE IV** TREATMENT OF CLAIMS AND INTERESTS .................................................................14

4.1       Unclassified Claims...............................................................................................................14
4.2       Classified Claims and Interests ...........................................................................................15
4.3       Continuing Effectiveness of First Day Orders ..................................................................18
4.4       Reservation of Rights Regarding Claims ...........................................................................18

**ARTICLE V** ACCEPTANCE OR REJECTION OF THE PLAN...............................................................18

5.1       Impaired Classes of Claims and Interests Entitled to Vote .............................................18
5.2       Acceptance by an Impaired Voting Class...........................................................................18
5.3       Deemed Acceptances by Classes..........................................................................................19
5.4       Deemed Rejections by Classes .............................................................................................19
5.5       Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code...............................19
5.6       Votes Solicited in Good Faith ..............................................................................................19

**ARTICLE VI** MEANS FOR IMPLEMENTATION OF THE PLAN...........................................................19

6.1       Continued Corporate Existence...........................................................................................19
6.2       Restructuring Transactions..................................................................................................20
6.3       Certificates of Incorporation and By-laws..........................................................................20
6.4       Revesting of Assets; Release of Liens..................................................................................20
6.5       Exit Funding...........................................................................................................................20
6.6       Authorization and Issuance of the New Securities ............................................................21
6.7       Directors and Officers of Reorganized Debtors .................................................................21
6.8       New Management Incentive Plan.........................................................................................22
6.9       Trade Account Distributions ...............................................................................................22
6.10      Indemnification of Debtors' Directors, Officers, and Employees ....................................23
6.11      Preservation of Rights of Action .........................................................................................23
6.12      Exemption from Certain Transfer Taxes ...........................................................................23
6.13      Corporate Action...................................................................................................................23
6.14      Effectuating Documents; Further Transactions.................................................................23
6.15      Plan Supplement...................................................................................................................24
6.16      Compromise of Controversies..............................................................................................24

**ARTICLE VII** TREATMENT OF CONTRACTS AND LEASES ...................................................................24

7.1        Assumption of Contracts and Leases; Cure........................................................................24
7.2        Assumption Pursuant to Contract/Lease Assumption Schedule.........................................25
7.3        Assumption of Certain Modified Contracts; Approval and Ratification of Certain Contract Settlements....25
7.4        Compensation and Benefit Programs ..................................................................................26
7.5        Certain Indemnification Obligations ..................................................................................26
7.6        Rejection of Contracts and Leases; Rejection Damages Claims ........................................27
7.7        Extension of Time to Assume or Reject ..............................................................................27

**ARTICLE VIII** PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND DISTRIBUTIONS ............................27

8.1        Objections to Claims ...........................................................................................................27
8.2        Distributions for Claims Allowed as of Distribution Date .................................................28
8.3        Treatment of Disputed Claims Pending and Following Allowance ....................................28
8.4        No Interest on Claims...........................................................................................................28
8.5        Disbursing Agent..................................................................................................................28
8.6        Application of Distribution Record Date.............................................................................28
8.7        Delivery of Distributions; Undeliverable Distributions .....................................................29
8.8        Means of Cash Payment ......................................................................................................30
8.9        Calculation of Distribution Amounts of New Securities .....................................................30
8.10       Withholding and Reporting Requirements ..........................................................................30
8.11       Setoffs ..................................................................................................................................30
8.12       De Minimis Distributions ....................................................................................................30
8.13       No Distributions in Excess of Allowed Claim Amount .......................................................31
8.14       Allocation of Distributions ..................................................................................................31

**ARTICLE IX** CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .............31

9.1        Conditions to Confirmation..................................................................................................31
9.2        Conditions to Effective Date ...............................................................................................31
9.3        Waiver of Conditions ...........................................................................................................32
9.4        Substantial Consummation ..................................................................................................32

**ARTICLE X** RETENTION OF JURISDICTION ...............................................................................................32

10.1       Scope of Retention of Jurisdiction ......................................................................................32
10.2       Failure of the Bankruptcy Court to Exercise Jurisdiction..................................................33

**ARTICLE XI** MISCELLANEOUS PROVISIONS ..............................................................................................34

11.1       Professional Fee Claims and Substantial Contribution Claims ..........................................34
11.2       Administrative Claims Bar Date ..........................................................................................34
11.3       Dissolution of Statutory Committees ...................................................................................34
11.4       Payment of Statutory Fees...................................................................................................34
11.5       Compromises and Settlements of Claims and Litigation Rights .........................................34
11.6       Satisfaction of Subordination Rights...................................................................................34
11.7       Releases by Debtors .............................................................................................................35
11.8       Releases by Holders of Claims and Interests.......................................................................35
11.9       Discharge of the Debtors......................................................................................................35
11.10      Injunction .............................................................................................................................36
11.11      Exculpation and Limitation of Liability ..............................................................................36
11.12      Term of Injunctions or Stays ...............................................................................................37
11.13      Successors and Assigns and Binding Effect.........................................................................37
11.14      Modifications and Amendments............................................................................................37
11.15      Severability of Plan Provisions ...........................................................................................37
11.16      Revocation, Withdrawal, or Non-Consummation ...............................................................38

11.17    Notices...........................................................................................................................................38
11.18    Governing Law.............................................................................................................................38
11.19    Computation of Time ..................................................................................................................38

## EXHIBITS

Exhibit A          Exit Revolving Credit Facility Term Sheet

Exhibit B          Guild Settlement Term Sheets

Exhibit C          New Common Stock Term Sheet

Exhibit D          New Management Incentive Plan Term Sheet

Exhibit E          New Second Lien Term Loan Facility Term Sheet

Exhibit F          New Warrants Term Sheet

Exhibit G          Films Subject to Film Obligation Settlements

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**INTRODUCTION**

RHI Entertainment, Inc., RHIE Holdings Inc., RHI Entertainment Holdings II, LLC, RHI Entertainment, LLC, RHI Entertainment Productions, LLC, RHI Entertainment Distribution, LLC, RHI International Distribution Inc., NGP Holding, Inc., HEGOA Inc., Independent Projects, Inc., Don Quixote, Inc., HE Pro Tunes, Inc., HEP Music, Inc., Metropolitan Productions, Inc., Library Storage, Inc., HEP SS Music Inc., and SLB Productions, Inc. hereby propose this joint prepackaged plan of reorganization for the resolution of their outstanding Claims (as defined herein) and Interests (as defined herein).

Reference is made to the Disclosure Statement (as defined herein) distributed contemporaneously herewith for a discussion of the Debtors' (as defined herein) history, businesses, properties, results of operations, projections for future operations and risk factors, and a summary and analysis of the Plan (as defined herein) and certain related matters, including distributions to be made under the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code (as defined herein).

All holders of Claims who are entitled to vote on the Plan are encouraged to read each of the Plan and the Disclosure Statement in its entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Rule 3019 of the Bankruptcy Rules (as defined herein), and Article XI of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

**ARTICLE I**

**RULES OF CONSTRUCTION AND DEFINITIONS**

**1.1      Rules of Construction**

(a)      For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms used in the Plan and not otherwise defined in the Plan shall have the meanings ascribed to them in Section 1.2 of the Plan. Any capitalized term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

(b)      Whenever the context requires, terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

(c)      Any reference in the Plan to (i) a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and (ii) an existing document, exhibit, or other agreement means such document, exhibit or other agreement as it may be amended, modified, or supplemented from time to time.

(d)      Unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan.

(e)      The words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan.

(f)      Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

(g)      The rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

(h)      References to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection.

**1.2      Definitions**

(a)      "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, and (v) Cure payments for executory contracts and unexpired leases that are assumed under Section 365 of the Bankruptcy Code or deemed assumed under the Plan.

(b)      "**Allowed**" means (i) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (A) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, (B) for which a Request for Payment in a liquidated amount has been filed by the applicable Bar Date and as to which either (x) no objection to the allowance thereof has been filed by the applicable Claim Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (C) that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability; (ii) when used with respect to a Claim other than an Administrative Claim, such Claim or any portion thereof (A) that has been allowed by a Final Order or adjudicated in favor of the holder by estimation or liquidation by a Final Order, or is expressly allowed in a liquidated amount in the Plan, (B) as to which (x) no Proof of Claim has been filed and (y) the liquidated and noncontingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as disputed, or (C) for which a Proof of Claim in a liquidated amount has been filed by the Bar Date and as to which either (x) no objection to the allowance thereof has been filed by the applicable Claim Objection Deadline, or (y) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order; or (iii) when used with respect to any Claim, a Claim that is not otherwise a Disputed Claim; *provided*, *however*, that all Allowed Claims shall remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

(c)      "**Bankruptcy Code**" means Sections 101 *et seq.*, of Title 11 of the United States Code, as now in effect or hereafter amended.

(d)      "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Case or any aspect thereof.

(e)      "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

(f)      "**Bar Date**" means (i) when used with respect to an Administrative Claim (other than a Claim arising under Section 503(b)(9) of the Bankruptcy Code), the deadline established in Section 11.2 of the Plan for filing Requests for Payment, to the extent applicable or (ii) with used with respect to a Claim other than an Administrative Claim and a Claim arising under Section 503(b)(9) of the Bankruptcy Code, the deadline established by order of the Bankruptcy Court for the filing of Proofs of Claim against the Debtors, to the extent applicable.

(g)      "**Business Day**" means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Rule 9006(a) of the Bankruptcy Rules), on which commercial banks are open for business in New York, New York.

(h)      "**Cash**" means legal tender of the United States or equivalents thereof.

(i)      "**Chapter 11 Case**" means the jointly administered Chapter 11 cases of the Debtors.

(j)      "**Claim**" means (i) the right to payment against any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(k)      "**Claim Objection Deadline**" means the last day for filing objections to Claims, including Administrative Claims, which shall be the latest of (i) sixty (60) days after the Effective Date, (ii) sixty (60) days after the applicable Proof of Claim or Request for Payment is filed, and (iii) such other later date as is established by order of the Bankruptcy Court upon motion of the Reorganized Debtors, without notice to any party.

(l)      "**Class**" means a category of holders of Claims or Interests, as described in Article III of the Plan.

(m)      "**Confirmation**" means confirmation of the Plan by the Bankruptcy Court pursuant to Section 1129 of the Bankruptcy Code.

(n)      "**Confirmation Date**" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

(o)      "**Confirmation Hearing**" means the hearing to consider Confirmation of the Plan under Section 1128 of the Bankruptcy Code.

(p)      "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

(q)      "**Consensual Plan Alternative**" means the treatment option that shall be applicable to Other Secured Claims in Class 4 and to General Unsecured Claims in Class 5 if the Debtors have reached settlements acceptable to the First Lien Agent with (i) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (ii) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (iii) Powercorp International Limited and Powercorp International Holdings Limited; in each case by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, as provided in Section 2.4 of the Plan.

(r)      "**Contract/Lease Assumption Schedule**" means the schedule that identifies the executory contracts and unexpired leases to be assumed under the Plan and sets forth any Cure obligation associated with the assumption of such contracts and leases.

(s)      "**Cure**" means, with respect to the assumption of an executory contract or unexpired lease, compliance as of the time of assumption with the provisions of Section 365(b)(1)(A) and, if applicable, Section 365(b)(1)(B) of the Bankruptcy Code, which may include, to the extent applicable, (i) the payment of Cash in the amount, if any, set forth in the Contract/Lease Assumption Schedule if such contract or lease is included therein, (ii) the payment of Cash, or the distribution of such other property as may be agreed upon by the parties to the contract or lease or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties to such contract or lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law, or (iii) the taking of such other actions as may be agreed upon by the parties to the contract or lease or ordered by the Bankruptcy Court.  As used in the Plan, the term shall not include future performance under the assumed contract or lease.

(t)      "**Debtor(s)**" means, individually or collectively as the context requires, and including in their capacity as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, RHI Entertainment, Inc., RHIE Holdings Inc., RHI Entertainment Holdings II, LLC, RHI Entertainment, LLC, RHI Entertainment Productions, LLC, RHI Entertainment Distribution, LLC, RHI International Distribution Inc., NGP Holding, Inc., HEGOA Inc., Independent Projects, Inc., Don Quixote, Inc., HE Pro Tunes, Inc., HEP Music, Inc., Metropolitan Productions, Inc., Library Storage, Inc., HEP SS Music Inc., and SLB Productions, Inc.

(u)      "**DIP Facility**" means the $15 million debtor in possession revolving credit facility provided to the Debtors by JPMorgan Chase Bank, N.A. and certain other financial institutions from time to time party thereto, subject to approval by the Bankruptcy Court.

(v)      "**DIP Facility Agent**" means JPMorgan Chase Bank, N.A. or any successor administrative agent under the DIP Facility.

(w)      "**DIP Facility Claim(s)**" means the Claim(s) existing under the DIP Facility.

(x)      "**DIP Facility Lenders**" means the lenders under the DIP Facility.

(y)      "**Disbursing Agent**" means the Plan Disbursing Agent or, if applicable, the Trade Account Disbursing Agent, as the context requires.

(z)      "**Disclosure Statement**" means the written disclosure statement that relates to the Plan, as amended, supplemented, or otherwise modified from time to time, and that is prepared, approved and distributed in accordance with Section 1125 of the Bankruptcy Code and Rule 3018 of the Bankruptcy Rules.

(aa)      "**Disputed**" means, with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (i) as to which no Request for Payment or Proof of Claim has been filed by the applicable Bar Date, that is listed in the Schedules as unliquidated, contingent, or disputed; (ii) as to which a Request for Payment or Proof of Claim has been filed by the applicable Bar Date, but as to which an objection or request for estimation has been filed by the applicable Claim Objection Deadline, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (iii) as to which a Request for Payment or Proof of Claim was required to be filed by the Bar Date, but as to which a Request for Payment or Proof of Claim was not timely or properly filed; (iv) that is disputed in accordance with the provisions of the Plan; (v) under the Non-Consensual Plan Alternative or under the Consensual Plan Alternative if the Estimated Class 5 Allowed Claims are determined to exceed the Maximum Class 5 Amount, that is a General Unsecured Claim (unless such Claim is a Trade Unsecured Claim) or a Subordinated Claim, or (vi) if not otherwise Allowed, as to which the applicable Claim Objection Deadline has not expired.

(bb)      "**Distribution Date**" means, (i) for the Existing First Lien Secured Claims and the Existing Second Lien Secured Claims, the Effective Date; (ii) for any other Claim that is an Allowed Claim on the Effective Date, on or as soon as practicable after the Effective Date, but not later than the first (1st) Business Day that is twenty (20) days after the Effective Date; or (iii) for any other Claim that is not an Allowed Claim on the Effective Date, on or as soon as practicable after the date on which such Claim becomes an Allowed Claim, but not later than the first (1st) Business Day that is twenty (20) days after such date; *provided*, *however*, that a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors, or any other party.

(cc)      "**Distribution Record Date**" means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be (i) in respect of the Existing First Lien Claims and Existing Second Lien Claims, the Business Day immediately preceding the Effective Date, at 5:00 p.m. prevailing Eastern time on such Business Day and (ii) in respect of all other Claims, the Business Day immediately following the Confirmation Date, at 5:00 p.m. prevailing Eastern time on such Business Day.

(dd)      "**Effective Date**" means the Business Day upon which all conditions to the consummation of the Plan as set forth in Section 9.2 of the Plan have been satisfied or waived as provided in Section 9.3 of the Plan, and is the date on which the Plan becomes effective and is substantially consummated.

(ee)      "**Employee Programs**" means all of the Debtors' employee-related programs, plans, policies, and agreements, including, without limitation, (i) all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and retiree programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, (ii) all employment, retention, incentive, severance, compensation, and other similar agreements, and (iii) all other employee compensation, benefit, and reimbursement programs, plans, policies, and agreements, but excluding any equity incentive plans, equity ownership plans, or any equity-based plans of any kind of the Debtors.

(ff)      "**Estate(s)**" means, individually, the estate of each Debtor in the Chapter 11 Case and, collectively, the estates of all Debtors in the Chapter 11 Case, created pursuant to Section 541 of the Bankruptcy Code.

(gg)      "**Estimated Class 5 Allowed Claims**" means, under the Consensual Plan Alternative, those General Unsecured Claims that the First Lien Agent determines in its reasonable discretion, based upon Claims listed in the Schedules, Claims asserted in Proofs of Claim by the applicable Bar Date, information provided as to any such Claims by the Debtors, agreements reached as to any such Claims between the holders thereof and the Debtors, or orders entered as to any such Claims by the Bankruptcy Court, are likely to be treated under the Plan as Allowed General Unsecured Claims; *provided, however*, that in no event shall Claims be considered to be Estimated Class 5 Allowed Claims if they are (i) Claims paid or to be paid under First Day Orders, (ii) Claims paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed or to be assumed by Final Order or pursuant to the Plan, (iii) Claims subject to the Guild Settlements, the Film Obligation Settlements, and the New York Lease Settlement, (iv) Claims subject to settlements acceptable to the First Lien Agent reached with (A) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (B) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (C) Powercorp International Limited and Powercorp International Holdings Limited, and (v) Claims that are paid or contractually bound and certain to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006.

(hh)      "**Existing First Lien Claim(s)**" means Claim(s) arising under the Existing First Lien Credit Agreement, which include Existing First Lien Secured Claim(s) and Existing First Lien Deficiency Claim(s).

4

(ii)        "**Existing First Lien Credit Agreement**" means the Credit, Security, Guaranty and Pledge Agreement dated as of January 12, 2006, as amended and restated as of April 13, 2007, and as further amended, among, *inter alia*, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, JPMorgan Chase Bank, N.A. as administrative agent, and the lenders thereunder.

(jj)        "**Existing First Lien Deficiency Claim(s)**" means Claim(s) arising under the Existing First Lien Credit Agreement that are not Secured Claim(s), including principal, interest, fees, and claims under terminated swap agreements.

(kk)        "**Existing First Lien Secured Claim(s)**" means Secured Claim(s) arising under the Existing First Lien Credit Agreement, including principal, interest, fees, and claims under terminated swap agreements.

(ll)        "**Existing Second Lien Claim(s)**" means Claim(s) arising under the Existing Second Lien Credit Agreement, which include Existing Second Lien Secured Claim(s), if any, and Existing Second Lien Deficiency Claim(s).

(mm)        "**Existing Second Lien Credit Agreement**" means the Credit, Security, Guaranty and Pledge Agreement dated as of June 23, 2008, as amended, among, *inter alia*, RHI LLC as borrower, certain of the Subsidiary Debtors as guarantors, Wilmington Trust FSB as successor administrative agent, and the lenders thereunder.

(nn)        "**Existing Second Lien Deficiency Claim(s)**" means Claim(s) arising under the Existing Second Lien Credit Agreement that are not Secured Claim(s), including principal, interest, and fees.

(oo)        "**Existing Second Lien Secured Claim(s)**" means Secured Claim(s), if any, arising under the Existing Second Lien Credit Agreement, including principal, interest, and fees.

(pp)        "**Exit Revolving Agent**" means JPMorgan Chase Bank, N.A. or any successor administrative agent under the Exit Revolving Credit Facility.

(qq)        "**Exit Revolving Credit Facility**" means the revolving credit facility to be provided to the Reorganized Debtors by JPMorgan Chase Bank, N.A. and certain other financial institutions from time to time party thereto, to provide a portion of the funds necessary to make payments required to be made on the Effective Date, as well as funds for working capital and other general corporate purposes after the Effective Date, which facility shall contain certain material terms substantially in accordance with those described on Exhibit A.

(rr)        "**Film Obligation Settlements**" means (i) the settlements entered into by the Debtors with certain producers, licensors, customers, and, in some instances, certain lenders to certain such parties, in connection with the distribution, license, and related agreements that govern the rights and obligations of the Debtors with respect to the films listed on Exhibit G and (ii) any additional settlements that may be entered into by the Debtors, subject to the consent of the First Lien Agent, with certain producers, licensors, customers, and, in some instances, certain lenders to certain such parties with respect to the distribution, license, and related agreements that govern the rights and obligations of the Debtors with respect to the films listed on any supplement to Exhibit G that may be included in the Plan Supplement.

(ss)        "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Case, or the docket of any such other court, the operation or effect of which has not been stayed, reversed, or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to such order shall not cause such order not to be a Final Order.

(tt)        "**First Day Order**" means an order of the Bankruptcy Court entered pursuant to a motion filed by the Debtors on or after the Petition Date that authorizes the payment of prepetition Claims.

(uu)        "**First Lien Agent**" means JPMorgan Chase Bank, N.A. or any successor serving as administrative agent under the Existing First Lien Credit Agreement.

(vv)        "**First Lien Lenders**" means the lenders under the Existing First Lien Credit Agreement and the holders of Existing First Lien Claims (whether held in their capacity as a lender or as a party to terminated swap agreements with the Debtors), determined as of the applicable Distribution Record Date.

(ww)    "**General Unsecured Claim**" means a Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Existing First Lien Claim, an Existing Second Lien Claim, an Other Secured Claim, an Intercompany Claim, or a Subordinated Claim, which Claim shall be limited in amount by any applicable provision of the Bankruptcy Code, including, without limitation, Section 502 of the Bankruptcy Code, subsection 502(b)(6) thereof with respect to a Claim of a lessor for damages resulting from the termination of a lease of real property, subsection 502(b)(7) thereof with respect to a Claim of an employee for damages resulting from the termination of an employment contract, or any other subsection thereof.  The term specifically includes any Rejection Damages Claim.

(xx)    "**Guild Settlements**" means the settlements reached by the Debtors with (i) the Directors Guild of America, Inc., the Screen Actors Guild, Inc., and the Writers Guild of America West, Inc. for itself and its affiliate Writers Guild of America East, Inc., (ii) the Alliance of Canadian Cinema, Television and Radio Artists, (iii) the American Federation of Television and Radio Artists, (iv) the Media Entertainment and Arts Alliance, and (v) Equity, with respect to the rights and obligations of the parties existing as of the Petition Date under various collective bargaining agreements, assumption agreements, and related agreements, the terms of which settlements are included in Exhibit B.

(yy)    "**Impaired**" means, with respect to any Claim or Interest, that such Claim or Interest is impaired within the meaning of Section 1124 of the Bankruptcy Code.

(zz)    "**Indemnification Obligation**" means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to by-laws, articles or certificates of incorporation, operating agreements, contracts, or otherwise.

(aaa)    "**Intercompany Claim**" means any Claim arising prior to the Petition Date against any of the Debtors by another Debtor or by a non-Debtor subsidiary or affiliate of a Debtor.

(bbb)    "**Interest**" means the legal, equitable, contractual, or other rights of any Person (i) with respect to any RHI INC Interests, (ii) with respect to any Subsidiary Interests, or (iii) to acquire or receive either of the foregoing.

(ccc)    "**Lien**" means a charge against or interest in property to secure payment of a debt or performance of an obligation, and includes, without limitation, any lien, security interest, mortgage, pledge, or other encumbrance.

(ddd)    "**Litigation Rights**" means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, which are to be retained by the Reorganized Debtors pursuant to Section 6.11 of the Plan, including, without limitation, claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code.

(eee)    "**Maximum Class 5 Amount**" means an amount that equals (i) $2.9 million or such greater amount as shall be permitted by the First Lien Agent in its absolute discretion, less (A) the amount paid or to be paid under First Day Orders, other than amounts paid or payable to employees and governmental units under such orders, and (B) the amount paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed or to be assumed by Final Order or pursuant to the Plan, other than amounts that may be owed as Cure under any of the Guild Settlements, the Film Obligation Settlements (including any settlement that constitutes a Film Obligation Settlement pursuant to Section 2.4(b) of the Plan), and the New York Lease Settlement; plus (ii) the amount asserted in Proofs of Claim (or the amount otherwise agreed to by the Debtors and the respective participants) for participations that are contractually bound to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006, but not exceeding $4.66 million under this clause (ii).

(fff)    "**New Board**" means the Board of Directors of Reorganized RHI INC.

(ggg)    "**New Common Stock**" means the new common shares of Reorganized RHI INC, to be allocated among the holders of the Existing First Lien Secured Claims pursuant to Section 4.2(b) of the Plan and the holders of Existing Second Lien Secured Claims pursuant to Sections 2.3 and  4.2(c) of the Plan, which shall have certain material terms substantially in accordance with those described on Exhibit C and to be included in the Reorganized Parent Governing Documents and, to the extent applicable, the Stockholders Agreement and the Registration Rights Agreement.

(hhh)    "**New Management Incentive Plan**" means a founders equity plan, a management equity incentive plan, an annual incentive plan, and employment agreements, each containing material terms substantially in accordance with those described on Exhibit D.

(iii)    "**New Securities**" means, collectively, the New Common Stock and the New Warrants.

6

(jjj)    "**New Second Lien Term Loan Facility**" means a new second lien term loan credit facility in the aggregate principal amount of $300 million, to be entered into by the Reorganized Debtors and the New Term Loan Agent on the Effective Date on account of the Existing First Lien Secured Claims as set forth in Section 4.2(b) of the Plan, which facility shall contain certain material terms substantially in accordance with those described on Exhibit E and shall be substantially in the form included in the Plan Supplement.

(kkk)    "**New Term Loan Agent**" means JPMorgan Chase Bank, N.A. or any successor administrative agent under the New Second Lien Term Loan Facility.

(lll)    "**New Term Loan Obligations**" means the obligations of the Reorganized Debtors under the New Second Lien Term Loan Facility, to be distributed among the holders of Allowed Existing First Lien Secured Claims on the Effective Date, as provided for in Section 4.2(b) of the Plan.

(mmm)    "**New Warrants**" means the warrants to purchase shares of New Common Stock, to be allocated among the holders of the Existing Second Lien Claims pursuant to Sections 2.3 and 4.2(c) of the Plan, which shall have certain material terms substantially in accordance with those described on Exhibit F, and which shall be governed by the terms and conditions of the definitive form of New Warrant to be reasonably acceptable to the First Lien Agent, the Second Lien Agent, and the Debtors and to be included in the Plan Supplement.

(nnn)    "**New York Lease Settlement**" means the settlement entered between RHI LLC and Paramount Group, Inc., with respect to the lease of premises at 1325 Avenue of the Americas, New York, New York, and evidenced by that certain Surrender Agreement and Amendment of Lease dated as of October 1, 2010.

(ooo)    "**Non-Consensual Plan Alternative**" means the treatment option that shall be applicable to Other Secured Claims in Class 4 and to General Unsecured Claims in Class 5 if the Debtors have not reached settlements acceptable to the First Lien Agent with (i) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (ii) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (iii) Powercorp International Limited and Powercorp International Holdings Limited; in each case by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, as provided in Section 2.4 of the Plan.

(ppp)    "**Other Priority Claim**" means a Claim against any of the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

(qqq)    "**Other Secured Claim**" means a Secured Claim arising prior to the Petition Date against any of the Debtors, other than any (i) Existing First Lien Secured Claim, (ii) alleged Existing Second Lien Secured Claim, (iii) Secured Claim subject to any of the Guild Settlements (which shall be treated in accordance with the terms of the Guild Settlements), (iv) Secured Claim subject to any of the Film Obligation Settlements (which shall be treated in accordance with the terms of the applicable Film Obligation Settlement), (v) Secured Claim existing under any executory contract or unexpired lease that is assumed under the Plan or by Final Order (which shall be treated in accordance with the terms of the assumed contract or lease), and (vi) under the Consensual Plan Alternative, Secured Claim subject to the settlements reached with (A) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (B) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (C) Powercorp International Limited and Powercorp International Holdings Limited (which shall be treated in accordance with the terms of such settlements).

(rrr)    "**Person**" means any person, individual, firm, partnership, corporation, trust, association, company, limited liability company, joint stock company, joint venture, governmental unit, or other entity or enterprise.

(sss)    "**Petition Date**" means the date on which the Debtors filed their petitions for relief commencing the cases that are being administered as the Chapter 11 Case.

(ttt)    "**Plan**" means this joint prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code and all exhibits annexed hereto or referenced herein, as the same may be amended, modified, or supplemented from time to time.

(uuu)    "**Plan Disbursing Agent**" means, with respect to all distributions under the Plan other than distributions from the Trade Account, the Reorganized Debtors or any other Person or Persons designated by the Debtors in their sole discretion on or before the Effective Date to serve as disbursing agent, stock transfer agent, and/or warrant agent under the Plan.

(vvv)    "**Plan Objection Deadline**" means the deadline established by the Bankruptcy Court for the filing of objections to confirmation of the Plan.

(www)    "**Plan Supplement**" means the supplement to the Plan containing, without limitation, (i) notice of the members of the New Board, (ii) a supplement to Exhibit G identifying any additional films that may be subject to Film Obligation Settlements, (iii) the commitment letter for the Exit Revolving Credit Facility and, if then available, the form of the credit agreement for the Exit Revolving Credit Facility, and (iv) the forms of the credit agreement for the New Term Loan Facility, the Reorganized Parent Governing Documents, the Stockholders Agreement, the Registration Rights Agreement, the New Warrants, and the New Management Incentive Plan (including forms for the founders equity plan, the management equity incentive plan, the annual incentive plan, and the employment agreement).

(xxx)    "**Priority Tax Claim**" means a Claim that is entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

(yyy)    "**Professional**" means any professional employed in the Chapter 11 Case by order of the Bankruptcy Court, excluding any of the Debtors' ordinary course professionals.

(zzz)    "**Professional Fee Claim**" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services rendered after the Petition Date and prior to and including the Effective Date, subject to any limitations imposed by order of the Bankruptcy Court.

(aaaa)    "**Pro Rata**" means the proportion that the amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to the aggregate amount of all Claims (including Disputed Claims) in such Class or Classes, unless the Plan provides otherwise.

(bbbb)    "**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court or any court-approved claims agent in connection with the Chapter 11 Case.

(cccc)    "**Registration Rights Agreement**" means the registration rights agreement to be entered into with certain holders of the New Common Stock and New Warrants in connection with the issuance of the New Common Stock and New Warrants, which shall contain certain material terms substantially in accordance with those described on Exhibit C and shall be substantially in the form included in the Plan Supplement.  No Person shall be entitled to registration rights under the Registration Rights Agreement unless it has countersigned the same.

(dddd)    "**Rejection Damages Claim**" means a Claim arising from the Debtors' rejection of a contract or lease, which Claim shall be limited in amount by any applicable provision of the Bankruptcy Code, including, without limitation, Section 502 of the Bankruptcy Code, subsection 502(b)(6) thereof with respect a Claim of a lessor for damages resulting from the rejection of a lease of real property, subsection 502(b)(7) thereof with respect to a Claim of an employee for damages resulting from the rejection of an employment contract, or any other subsection thereof.

(eeee)    "**Reinstated**" means (i) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim or Interest is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (A) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, or of a kind that Section 365(b)(2) does not require to be cured, (B) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (C) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (D) if such Claim or Interest arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensating the holder of such Claim or Interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (E) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim or Interest is entitled; *provided*, *however*, that any Claim that is Reinstated under the Plan shall be subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

(ffff)    "**Reorganized Debtor(s)**" means, subject to the Restructuring Transactions, individually, any reorganized Debtor or its successor and, collectively, all reorganized Debtors and their successors, on or after the Effective Date.

(gggg)    "**Reorganized Parent By-laws**" means the by-laws of Reorganized RHI INC to be substantially in the form included in the Plan Supplement.

(hhhh)    "**Reorganized Parent Charter**" means the Certificate of Incorporation of Reorganized RHI INC to be substantially in the form included in the Plan Supplement.

(iiii)    "**Reorganized Parent Governing Documents**" means the Reorganized Parent Charter and the Reorganized Parent By-laws.

(jjjj)    "**Reorganized RHI INC**" means RHI INC on or after the Effective Date.

(kkkk)    "**Reorganized Subsidiary**" means, individually, a reorganized Subsidiary Debtor or its successor and, collectively, all reorganized Subsidiary Debtors or their successors, on or after the Effective Date, subject in either case to the Restructuring Transactions.

(llll)    "**Reorganized Subsidiary Governing Documents**" means certificates of incorporation, by-laws, articles of organization, operating agreements, or any other governing corporate document with respect to a Reorganized Subsidiary, as amended pursuant to the Plan or the Plan Supplement.

(mmmm)  "**Request for Payment**" means a request for payment of an Administrative Claim filed with the Bankruptcy Court in connection with the Chapter 11 Case.

(nnnn)    "**Restructuring Transactions**" means the corporate and operational restructuring transactions provided for in Section 6.2 of the Plan.

(oooo)    "**RHI INC**" means RHI Entertainment, Inc., which is among the Debtors the ultimate parent company, and is publicly owned.

(pppp)    "**RHI INC Interests**" means, collectively, all equity interests in RHI INC outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, stock options or other right to purchase the stock of RHI INC, together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in RHI INC prior to the Effective Date.

(qqqq)    "**RHI LLC**" means RHI Entertainment, LLC.

(rrrr)    "**RHI UK**" means RHI Entertainment Ltd., an affiliate of the Debtors, which is organized and existing under the laws of the United Kingdom, and is a guarantor under the Existing First Lien Credit Agreement and the Existing Second Lien Credit Agreement.

(ssss)    "**Schedules**" means the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs required under Rule 1007(b) of the Bankruptcy Rules, as filed in the Bankruptcy Court by the Debtors and as may be amended or supplemented from time to time thereafter in accordance with Rule 1009(a) of the Bankruptcy Rules.

(tttt)    "**Second Lien Agent**" means Wilmington Trust FSB or any successor serving as administrative agent under the Existing Second Lien Credit Agreement.

(uuuu)    "**Second Lien Lenders**" means the lenders under the Existing Second Lien Credit Agreement and the holders of Existing Second Lien Claims, determined as of the applicable Distribution Record Date.

(vvvv)    "**Second Lien Reimbursement Amount**" means the aggregate amount of $250,000 less any amounts paid to the Second Lien Agent or the Second Lien Lenders, on account of fees and expenses of the Second Lien Agent or the Second Lien Lenders, as adequate protection or otherwise pursuant to Final Order between the Petition Date and the Distribution Date.

(wwww)    "**Secured Claim**" means a Claim (i) that is secured by a Lien on property in which an Estate has an interest, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which is agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim or determined, resolved, or adjudicated by final, non-appealable order of a court or other tribunal of competent jurisdiction.

(xxxx)    "**Stockholders Agreement**" means the stockholders agreement to be applicable to the New Common Stock issued to the First Lien Lenders under the Plan, which agreement shall contain certain material terms substantially in accordance with those described on Exhibit C and shall be substantially in the form included in the Plan Supplement.

(yyyy)    "**Subordinated Claim**" means (i) any Claim against any of the Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which shall include any Claim arising from the rescission of a purchase or sale of any Interest, any Claim for damages arising from the purchase or sale of any Interest, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim; or (ii) any Claim for any fine, penalty, or forfeiture, or multiple, exemplary, or punitive damages, to the extent that such fine, penalty, forfeiture, or damage is not compensation for actual pecuniary loss suffered by the holder of such Claim, including, without limitation, any such Claim based upon, arising from, or relating to any cause of action whatsoever (including, without limitation, violation of law, willful intellectual property infringement, fraud, personal injury, or wrongful death, whether secured or unsecured, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise), and any such Claim asserted by a governmental unit in connection with a tax or other obligation owing to such unit.

(zzzz)    "**Subsidiary Debtors**" means, collectively, RHIE Holdings Inc., RHI Entertainment Holdings II, LLC, RHI Entertainment, LLC, RHI Entertainment Productions, LLC, RHI Entertainment Distribution, LLC, RHI International Distribution Inc., NGP Holding, Inc., HEGOA Inc., Independent Projects, Inc., Don Quixote, Inc., HE Pro Tunes, Inc., HEP Music, Inc., Metropolitan Productions, Inc., Library Storage, Inc., HEP SS Music Inc., and SLB Productions, Inc., each of which is a Debtor in the Chapter 11 Case.

(aaaaa)    "**Subsidiary Interests**" means, collectively, all of the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors, existing prior to the Effective Date but subject to the Restructuring Transactions, which stock and interests are owned, directly or indirectly, by RHI INC.

(bbbbb)    "**Substantial Contribution Claim**" means a Claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Case pursuant to Sections 503(b)(3), (4), or (5) of the Bankruptcy Code.

(ccccc)    "**Trade Account**" means an account to be established under Section 6.9 of the Plan, if applicable, which account shall be in the amount that equals the Trade Account Cap.

(ddddd)    "**Trade Account Cap**" means, for purposes of Section 6.9 of the Plan, if applicable, the amount, as of the Effective Date, that equals (i) $2.9 million less (A) the amount paid or to be paid under First Day Orders, other than amounts paid or payable to employees and governmental units under such orders, (B) the amount paid or to be paid as Cure with respect to executory contracts or unexpired leases that are assumed by Final Order or pursuant to the Plan, other than amounts that may be owed as Cure under any of the Guild Settlements, the Film Obligation Settlements (including any settlement that constitutes a Film Obligation Settlement pursuant to Section 2.4(b) of the Plan), and the New York Lease Settlement, and (C) the amount, if any, that the Debtors determine, with the consent of the First Lien Agent, will exceed the amount needed to satisfy all eligible Allowed Trade Unsecured Claims; plus (ii) the amount asserted in Proofs of Claim (or the amount otherwise agreed to by the Debtors and the respective participants) for participations that are contractually bound to be paid by Crown Media Holdings, Inc. and affiliates under the Purchase and Sale Agreement dated as of October 3, 2006, but not exceeding $4.66 million, less any portion of such participations that are paid or certain to be paid by Crown Media Holdings, Inc. and affiliates.

(eeeee)    "**Trade Account Disbursing Agent**" means, with respect to any distributions from the Trade Account, if applicable, the Person designated by the First Lien Agent in its sole discretion to serve as disbursing agent for the Trade Account.

(fffff)    "**Trade Unsecured Claim**" means, for purposes of Section 6.9 of the Plan, if applicable, a General Unsecured Claim that is held by a claimant who has a continuing business relationship with the Debtors and is expected to have a continuing business relationship with the Reorganized Debtors, as determined by the Reorganized Debtors in their discretion, with the consent of

the First Lien Agent, including, without limitation, if so determined, any claimant who is a continuing provider of goods or services to the Debtors, any claimant who is a continuing customer of the Debtors, any claimant who is a continuing production partner, continuing distributor, or party to a continuing license or sub-license to or from the Debtors, and any claimant who is a continuing employee of the Debtors; *provided, however*, that in no event shall (i) a Rejection Damages Claim be considered a Trade Unsecured Claim, (ii) a Claim be considered a Trade Unsecured Claim if the Debtors determine, in their discretion, that any continuing relationship is of a nature that does not warrant the use of the Trade Account to pay such Claim; (iii) an otherwise eligible Claim be considered a Trade Unsecured Claim if such Claim is transferred by the original holder to a third party transferee who does not have a continuing business relationship with the Debtors and who is not expected to have a continuing business relationship with the Reorganized Debtors, or (iv) an otherwise eligible Claim be considered a Trade Unsecured Claim if the holder of such Claim files an objection to confirmation of the Plan or an objection to the release contained in Section 11.8 of the Plan.

(ggggg)    "**Unimpaired**" means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

## ARTICLE II

## PLAN STRUCTURE

### 2.1    Basis for Plan Structure

The Plan is premised upon the following:  (a) all material assets of the Debtors have been pledged to secure the Existing First Lien Claims and the Existing Second Lien Claims; (b) subject to the settlement described in Section 2.3(a) of the Plan, the amount of the Existing First Lien Claims exceeds the value of the pledged assets, and the First Lien Lenders have first priority Liens in all of the pledged assets; (c) any dispute as to the value of the pledged assets with respect to the second priority Liens of the Second Lien Lenders would be expensive, time-consuming, and detrimental to the success of the Debtors' reorganization efforts; (d) there are no unencumbered assets or, alternatively, any unencumbered assets are of de minimis value; (e) any de minimis value associated with any unencumbered assets would be exhausted by Administrative Claims, Priority Tax Claims, and Other Priority Claims; (f) the treatment of Other Secured Claims and General Unsecured Claims is dependent upon certain settlements and the applicability of either the Consensual Plan Alternative or the Non-Consensual Plan Alternative; (g) the treatment of General Unsecured Claims under the Consensual Plan Alternative is dependent on the expected amount of such Claims; and (h) the future success of the Reorganized Debtors is dependent on paying all or a reasonable portion of Trade Unsecured Claims.

### 2.2    Substantive Consolidation

(a)    **Request for Substantive Consolidation**

The Plan constitutes a motion for substantive consolidation of the liabilities and properties of all the Debtors for purposes of distribution, the confirmation of the Plan shall constitute approval of the motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions providing for substantive consolidation on the terms set forth in Section 2.2(b) of this Plan.

(b)    **Effect of Substantive Consolidation**

As a result of the substantive consolidation of the liabilities and properties of all the Debtors, except as otherwise provided in the Plan, (i) the chapter 11 cases of the Subsidiary Debtors shall be consolidated into the case of RHI INC as a single consolidated case; (ii) the Estate of each of the Debtors shall be deemed to be one consolidated Estate; (iii) all property of the Estate of each Debtor shall be deemed to be property of the consolidated Estates; (iv) all Claims against each Estate shall be deemed to be Claims against the consolidated Estates; (v) no distributions under this Plan shall be made on account of any Intercompany Claims, but at the election of the Debtors or the Reorganized Debtors, as applicable, such Claim may be adjusted, continued, or capitalized, either directly or indirectly or in whole or in part as of the Effective Date, and no such disposition shall require the consent of the holders of New Common Stock or the consent of any holder of Subsidiary Interests; (vi) all Claims based upon prepetition unsecured guarantees by one Debtor in favor of any other of the Debtors (other than guarantees existing under any assumed executory contracts or unexpired leases) shall be eliminated, and no distributions under this Plan shall be made on account of Claims based upon such guarantees; (vii) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of Section 553, prepetition debts due to any of the Debtors may be set off against the prepetition debts of any other of the Debtors; (viii) no distributions under this Plan shall be made on account of any Subsidiary Interests, but such Interests shall be retained by their respective holders for the benefit of the holders of the New

11

Common Stock, subject to any applicable restrictions arising under the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility; and (ix) the RHI INC Interests shall be subject and subordinate to the Claims against the consolidated Estate.

Substantive consolidation shall not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under this Plan; substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens, except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation shall not have the effect of creating a Claim in a class different from the class in which a Claim would have been placed in the absence of substantive consolidation.

Substantive consolidation shall not affect the obligation of each of the Debtors, pursuant to Section 1930 of Title 28 of the United States Code, to pay quarterly fees to the Office of the United States Trustee until such time as a particular chapter 11 case is closed, dismissed or converted.

**2.3      Secured Lender Settlement**

**(a)      Issues Subject to Settlement**

The terms of the Plan settle issues in dispute among the Debtors, the First Lien Lenders, and the Second Lien Lenders. Such issues relate to the value of the assets pledged to secure the Existing First Lien Claims and the Existing Second Lien Claims and the intercreditor rights of the First Lien Lenders and the Second Lien Lenders to the pledged asset value. The treatment of the Existing First Lien Claims under Section 4.2(b) of the Plan and the treatment of the Existing Second Lien Claims under Section 4.2(c) of the Plan reflect the results of such settlement.

**(b)      Approval of Settlement**

The Plan is deemed to be a motion for approval of the compromise and settlement of the issues described in Section 2.3(a) of the Plan. The confirmation of the Plan shall constitute approval of the motion by the Bankruptcy Court and the Confirmation Order shall contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

**2.4      Consensual or Non-Consensual Plan Alternatives**

**(a)      Impact of Alternatives on Certain Claim Treatments**

The treatment of Allowed Other Secured Claims in Class 4 and Allowed General Unsecured Claims in Class 5 shall be dependent on whether or not the Debtors reach settlements acceptable to the First Lien Agent with respect to (i) MAT Movies & Television Productions GmbH & Co. Project IV KG and Hallmark Entertainment Holdings, Inc., (ii) U.S. Bank National Association, U.S. Bank National Association, Canada Branch, and certain production entities, borrowers, and guarantors to which, or for the benefit of which, U.S. Bank National Association and U.S. Bank National Association, Canada Branch made loans, and (iii) Powercorp International Limited and Powercorp International Holdings Limited.

**(b)      Deadline for and Implementation of Consensual Plan Settlements**

Until the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims, the Debtors shall be permitted to seek to reach the required settlements. If any required settlement is reached and closed prior to the Petition Date, such settlement shall constitute a Film Obligation Settlement under Section 7.3(b) of the Plan, shall be evidenced in a supplement to Exhibit G to be included in the Plan Supplement or, at the election of the Debtors with the consent of the First Lien Agent, shall be the subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims. If any such settlement is reached or closed after the Petition Date, it shall be the subject of a motion for approval to be filed with the Bankruptcy Court by the earlier of the deadline for filing the Plan Supplement and the Bar Date applicable to General Unsecured Claims.

**(c)      Notice of Applicable Alternative**

If the required settlements are reached, and thus the Consensual Plan Alternative is determined to apply, the Debtors shall file with the Bankruptcy Court a notice of such determination contemporaneously with the filing of the Plan Supplement. In that event, Other Secured Claims in Class 4 shall be entitled to the treatment provided in Section 4.2(d)(i) of the Plan and General Unsecured Claims shall be entitled to the treatment provided in Section 4.2(e)(i) of the Plan. If the required settlements are not reached, and thus

the Non-Consensual Plan Alternative is determined to apply, the Debtors shall file with the Bankruptcy Court a notice of such determination contemporaneously with the filing of the Plan Supplement. In that event, Other Secured Claims in Class 4 shall receive the treatment provided in Section 4.2(d)(ii) of the Plan and General Unsecured Claims shall receive the treatment provided in Section 4.2(e)(ii) of the Plan.

**2.5 Estimated Class 5 Allowed Claims Determination**

**(a) Impact of Determination on Treatment of General Unsecured Claims**

Under the Consensual Plan Alternative, the treatment of General Unsecured Claims under the Plan shall be dependent on whether or not the Estimated Class 5 Allowed Claims are determined to exceed the Maximum Class 5 Amount.

**(b) Deadline for and Implementation of Determination**

No later than ten (10) days after the applicable Bar Date and following consultation with the Debtors, the First Lien Agent shall determine if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount.

**(c) Notice of Determination**

If the First Lien Agent determines that Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, the Debtors shall file a notice with the Bankruptcy Court advising that General Unsecured Claims shall receive the treatment provided in Section 4.2(e)(i)(A) of the Plan. If the First Lien Agent determines that Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, the Debtors shall file a notice with the Bankruptcy Court advising that General Unsecured Claims shall receive the treatment provided in Section 4.2(e)(i)(B) of the Plan.

**2.6 Accommodations by First Lien Lenders**

The First Lien Lenders shall have agreed, by their votes in favor of the Plan, (a) to allow distributions to be made to the Second Lien Lenders pursuant to Sections 2.3 and 4.2(c) of the Plan, (b) if the Consensual Plan Alternative applies and the Estimated Class 5 Allowed Amount is determined not to exceed the Maximum Class 5 Amount, to permit Allowed General Unsecured Claims to be Reinstated pursuant to Section 4.2(e)(i)(A) of the Plan, and (c) if the Consensual Plan Alternative applies but the Estimated Class 5 Allowed Amount is determined to exceed the Maximum Class 5 Amount or if the Non-Consensual Plan Alternative applies, to allow the establishment of the Trade Account and payments to be made to the holders of eligible Allowed Trade Unsecured Claims pursuant to Section 6.9 of the Plan. With the exception of the First Lien Lenders, no other holder of a Claim or Interest is entitled to the value that the First Lien Lenders shall have agreed to forego under the Plan.

**ARTICLE III**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

**3.1 Introduction**

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. A Claim or Interest may be bifurcated and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**3.2 Unclassified Claims**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified.

**3.3 Classified Claims and Interests**

Subject to Section 2.2 of the Plan, the Claims and Interests against the Debtors have been classified into the separate Classes set forth below.

(a)        *Class 1:  Other Priority Claims* -- Class 1 consists of all Other Priority Claims.  Such Class is Unimpaired and the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to accept the Plan.

(b)        *Class 2:  Existing First Lien Claims* -- Class 2 consists of all Existing First Lien Claims.   Such Class is Impaired.  The holders of Claims within such Class are entitled to vote to accept or reject the Plan.

(c)        *Class 3: Existing Second Lien Claims* -- Class 3 consists of all Existing Second Lien Claims.  Such Class is Impaired.  The holders of Claims within such Class are entitled to vote to accept or reject the Plan.

(d)        *Class 4:  Other Secured Claims* -- Class 4 consists of separate sub-Classes, one for each Other Secured Claim.  Each sub-Class is deemed to be a separate Class for all purposes under the Bankruptcy Code.  Under the Consensual Plan Alternative, each of such sub-Classes is Unimpaired, and the holders of Claims within such sub-Classes are not entitled to vote on the Plan and are deemed to accept the Plan.  Under the Non-Consensual Plan Alternative, each of such sub-Classes is Impaired, and the holders of Claims within such sub-Classes are not entitled to vote on the Plan and are deemed to reject the Plan.

(e)        *Class 5:  General Unsecured Claims* -- Class 5 consists of all General Unsecured Claims.  Under the Consensual Plan Alternative, such Class is either (i) Unimpaired if the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, in which case the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to accept the Plan, or (ii) Impaired if the Estimated Class 5 Claims exceed the Maximum Class 5 Amount, in which case the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.  Under the Non-Consensual Plan Alternative, such Class is Impaired, and the holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.

(f)        *Class 6:  Subordinated Claims* -- Class 6 consists of all Subordinated Claims.  Such Class is Impaired.  The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.

(g)        *Class 7:  RHI INC Interests* -- Class 7 consists of all RHI INC Interests.  Such Class is Impaired.  The holders of Interests within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

**4.1    Unclassified Claims**

**(a)    Administrative Claims**

With respect to each Allowed Administrative Claim, except as otherwise provided for in Section 11.1 of the Plan, on, or as soon as reasonably practicable after, the Distribution Date, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, shall have agreed upon in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

**(b)    DIP Facility Claims**

The DIP Facility Claims shall be deemed Allowed in their entirety for all purposes of the Plan and the Chapter 11 Case.  The holders of the Allowed DIP Facility Claims shall receive, on the Effective Date, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed DIP Facility Claims, (i) such treatment as required under the DIP Facility or (ii) such different treatment as to which such holders and the Debtors or the Reorganized Debtors, as applicable, shall have agreed upon in writing; *provided*, *however*, that in respect of any letters of credit issued and undrawn under the DIP Facility, unless the issuing bank is a lender under the Exit Revolving Credit Facility and in its sole discretion permits such letters of credit to be rolled over and treated as letters of credit issued under the Exit Revolving Credit Facility, the Debtors or the Reorganized Debtors shall be required to either, with the consent of such issuing bank: (A) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (B) return any such letters of credit to the issuing bank undrawn and marked "cancelled," or (C) provide a "back-to-back" letter of credit to the issuing bank in a form and issued by an institution reasonably satisfactory to such issuing bank, in an amount equal to 105% of the then undrawn amount of such letters of credit.

(c)        **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtors or by the Reorganized Debtors, either (i) on, or as soon as reasonably practicable after, the Distribution Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing, or (iii) at the Reorganized Debtors' sole discretion, regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined, as of the calendar month in which the Confirmation Date occurs, pursuant to Section 511(a) of the Bankruptcy Code), equal to such Allowed Priority Tax Claim, over a period beginning on the first calendar quarter end after the Effective Date and ending on the last calendar quarter end that precedes the date that is five (5) years after the Petition Date.

**4.2        Classified Claims and Interests**

(a)        **Class 1:  Other Priority Claims**

*Class 1 is Unimpaired.*
*The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to accept the Plan.*

On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed Other Priority Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such different treatment as to which such holder and the Debtors or the Reorganized Debtors, as applicable, shall have agreed upon in writing.

(b)        **Class 2:  Existing First Lien Claims**

*Class 2 is Impaired.*
*The holders of Claims within such Class are entitled to vote to accept or reject the Plan.*

The Existing First Lien Claims shall be allowed in full, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount outstanding as of the Petition Date plus the amount attributable to letters of credit issued and outstanding under the Existing First Lien Credit Agreement as of the Petition Date, the amount of terminated swap agreements as of the Petition Date, and the amount attributable to accrued and unpaid interest, fees, and costs as of the Petition Date.

Each of the First Lien Lenders, in full satisfaction, settlement, release, and discharge of and in exchange for the Existing First Lien Secured Claims, shall receive (i) on the Distribution Date, its Pro Rata share of (A) $300 million of New Term Loan Obligations and (B) an amount of shares of New Common Stock representing approximately 99% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) if, and only if, Section 6.9 of the Plan is applicable, with the Trade Account to be established pursuant to Section 2.6 of the Plan for the purpose of implementing Section 6.9 of the Plan, as soon as practicable after all payments to be made on account of Allowed Trade Unsecured Claims have been made, any amount remaining in the Trade Account.

The New Term Loan Obligations shall be governed by and subject to the New Second Lien Term Loan Facility, which New Second Lien Term Loan Facility (including any indemnification and expense reimbursement therein) shall be binding on all First Lien Lenders whether or not executed by any or all First Lien Lenders.  The New Common Stock shall be governed by and subject to the Reorganized Parent Governing Documents.  The New Common Stock of the First Lien Lenders shall also be subject to the Stockholders Agreement, which shall be binding on all First Lien Lenders upon the Effective Date without execution, and to the Registration Rights Agreement for those First Lien Lenders who agree to execute the same.

The First Lien Lenders shall accept the distributions on account of the Existing First Lien Secured Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing First Lien Credit Agreement, including Claims arising thereunder (but not under the New Second Lien Term Loan Facility) against RHI UK.  The First Lien Lenders shall not receive or retain any property under the Plan on account of any Existing First Lien Deficiency Claims and all Existing First Lien Deficiency Claims shall be deemed waived by the First Lien Lenders and discharged as of the Effective Date.

All Liens granted by the Debtors to secure the Existing First Lien Claims shall be continued in effect to secure the New Term Loan Obligations (subject to the rights of the lenders under the Exit Revolving Credit Facility).

15

**(c)    Class 3:  Existing Second Lien Claims**

*Class 3 is Impaired.*
*The holders of Claims within such Class are entitled to vote to accept or reject the Plan.*

The Existing Second Lien Claims shall be allowed in full, without setoff, subordination, avoidance, reduction, defense, setoff, recharacterization, or counterclaim, in the aggregate principal amount as of the Petition Date, plus the amount attributable to accrued and unpaid interest, fees and costs as of the Petition Date.

Each of the Second Lien Lenders, in compromise of their alleged collateral and intercreditor rights in the Debtors' assets, and in full satisfaction, settlement, release, and discharge of and in exchange for their alleged Existing Second Lien Secured Claims, shall receive on the Distribution Date, its Pro Rata share of (i) an amount of shares of New Common Stock representing approximately 1% of the New Common Stock to be issued on the Effective Date (subject to dilution by the New Management Incentive Plan and the New Warrants), and (ii) New Warrants representing 15% ownership of the New Common Stock on a fully-diluted basis, as of the Effective Date, determined after taking into account the full dilution attributable to the New Management Incentive Plan and the exercise of the New Warrants.

In addition, as soon as practicable after the Distribution Date and the submission to the Reorganized Debtors of all summary invoices therefor, the Reorganized Debtors shall pay to the Second Lien Agent and the Second Lien Lenders Cash equal to the amount of reasonable fees and out-of-pocket expenses (including fees and costs of professionals and advisors) invoiced by the Second Lien Agent and any such Second Lien Lender between September 28, 2010 and the Distribution Date (and not invoiced prior to September 28, 2010) with respect to the Existing Second Lien Claims and the Chapter 11 Case, but not exceeding for the Second Lien Agent and all Second Lien Lenders the Second Lien Reimbursement Amount.  If the aggregate amount of reasonable fees and out-of-pocket expenses as invoiced exceeds the Second Lien Reimbursement Amount, the Debtors shall pay to the Second Lien Agent Cash in the amount of the Second Lien Reimbursement Amount, and the Second Lien Agent shall be responsible for allocating such amount among itself and each of the Second Lien Lenders.

The New Common Stock shall be governed by and subject to the Reorganized Parent Governing Documents.  Those Second Lien Lenders who agree to execute the Registration Rights Agreement and the New Warrants shall have the rights afforded under the Registration Rights Agreement and the New Warrants, respectively.

The Second Lien Lenders shall accept the distributions on account of the Existing Second Lien Claims in full satisfaction, settlement, release, and discharge of and in exchange for all Claims arising under the Existing Second Lien Credit Agreement, including Claims against RHI UK.  The Second Lien Lenders shall not receive or retain any property under the Plan on account of the Existing Second Lien Deficiency Claims and all Existing Second Lien Deficiency Claims shall be deemed waived by the Second Lien Lenders and discharged as of the Effective Date.

As of the Effective Date, all Liens granted by the Debtors to secure the Existing Second Lien Claims shall be released, shall be deemed null and void, and shall be unenforceable for all purposes; *provided, however*, that the Second Lien Agent shall be required to execute and deliver on or before the Effective Date, in form and substance reasonably acceptable to the Debtors, formal documents of release and waiver with respect to all such released Liens, and the Debtors may withhold distributions to the Second Lien Lenders until such documents are received.

**(d)    Class 4:  Other Secured Claims**

(i)    <u>Consensual Plan Alternative</u>

*Each sub-Class within Class 4 is Unimpaired.*
*The holders of Claims within such sub-Classes are not entitled to vote on the Plan and are deemed to accept the Plan.*

The legal, equitable, and contractual rights of each holder of such an Allowed Other Secured Claim shall be Reinstated.  On, or as soon as reasonably practicable after, the Distribution Date, each holder of such an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed, consistent with the relevant underlying documents, if any.

16

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Nothing in the Plan shall preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien.

     (ii)     <u>Non-Consensual Plan Alternative</u>

*Each sub-Class within Class 4 is Impaired.*
*The holders of Claims within such sub-Classes are not entitled to vote on the Plan and are deemed to reject the Plan.*

At the option of the Debtors, with the agreement of the First Lien Agent, either (A) the legal, equitable, and contractual rights of the holder of an Allowed Other Secured Claim shall be Reinstated as of the Effective Date in accordance with the provisions of Section 1124(2) of the Bankruptcy Code; (B) the holder of an Allowed Other Secured Claim shall (x) retain the Liens securing such Allowed Other Secured Claim and (y) receive regular quarterly installment payments in Cash having a total value, as of the Effective Date (reflecting the interest rate established in the Confirmation Order or, if applicable, determined under Section 511 of the Bankruptcy Code), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date, with the first payment to be made on the last day of the calendar quarter that is at least ten (10) days after the Distribution Date and subsequent payments to be made on the last day of each calendar quarter thereafter through the five (5)-year period; (C) the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim on the Distribution Date; or (D) the holder of the Allowed Other Secured Claim shall be paid in full on the Effective Date.

Notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all pre-petition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim shall survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens shall be released, shall be deemed null and void, and shall be unenforceable for all purposes. Nothing in the Plan shall preclude the Debtors or the Reorganized Debtors from challenging the validity, perfection, priority, or enforceability of, or seeking to avoid, any alleged Lien on any asset of a Debtor or the value of the property that allegedly secures any such Lien.

The Debtors' failure to object to any Other Secured Claim in the Chapter 11 Case shall be without prejudice to the Debtors' or the Reorganized Debtors' right to contest or otherwise defend against such Claim or underlying Lien in the appropriate forum when and if such Claim or Lien is sought to be enforced by the holder of such Other Secured Claim.

     **(e)**     **Class 5:  General Unsecured Claims**

     (i)     <u>Consensual Plan Alternative</u>

     (A)     <u>Estimated Class 5 Allowed Claims Do Not Exceed Maximum Class 5 Amount</u>

*Class 5 is Unimpaired.*
*The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to accept the Plan.*

If the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount, then the legal, equitable and contractual rights of each holder of an Allowed General Unsecured Claims shall be Reinstated.  On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for, such Allowed General Unsecured Claim, such payment on such terms as would otherwise apply to such Claim had the Chapter 11 Case not been filed and consistent with the relevant underlying documents, if any.

     (B)     <u>Estimated Class 5 Allowed Claims Exceed Maximum Class 5 Amount</u>

*Class 5 is Impaired.*
*The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.*

17

But if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount, then the holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims shall be discharged as of the Effective Date.

(ii)    <u>Non-Consensual Plan Alternative</u>

*Class 5 is Impaired.*
*The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.*

The holders of General Unsecured Claims shall not receive or retain any property under the Plan on account of such Claims.  All General Unsecured Claims shall be discharged as of the Effective Date.

**(f)    Class 6:  Subordinated Claims**

*Class 6 is Impaired.*
*The holders of Claims within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.*

Under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, the holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.  All Subordinated Claims shall be discharged as of the Effective Date.

**(g)    Class 7:  RHI INC Interests**

*Class 7 is Impaired.*
*The holders of Interests within such Class are not entitled to vote on the Plan and are deemed to reject the Plan.*

Under both the Consensual Plan Alternative and the Non-Consensual Plan Alternative, all RHI INC Interests shall be cancelled and all rights and interests therein shall be terminated as of the Effective Date.  The holders of RHI INC Interests shall not receive or retain any property under the Plan on account of such Interests.

**4.3    Continuing Effectiveness of First Day Orders**

Payment authorization granted to the Debtors under any First Day Order shall continue in effect after the Effective Date. Accordingly, the Debtors may, in their discretion, pay or otherwise satisfy any Claim as permitted by the applicable First Day Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

**4.4    Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights, defenses, and counterclaims, both legal and equitable, with respect to any Claims other than the Existing First Lien Claims and the Existing Second Lien Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**ARTICLE V**

**ACCEPTANCE OR REJECTION OF THE PLAN**

**5.1    Impaired Classes of Claims and Interests Entitled to Vote**

Holders of Claims in each Impaired Class of Claims that will receive or retain any property under the Plan are entitled to vote to accept or reject the Plan, unless any such Class has been deemed to reject the Plan.  Classes 2 and 3 are Impaired and will receive or retain property under the Plan, as set forth in Section 4.2(b) and 4.2(c) of the Plan, and have not been deemed to reject the Plan. Accordingly, the votes of holders of Claims in Classes 2 and 3 shall be solicited with respect to the Plan.

**5.2    Acceptance by an Impaired Voting Class**

In accordance with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims that votes on the Plan shall have accepted the Plan if the Plan is accepted by the holders of at least

18

two-thirds (2/3) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**5.3    Deemed Acceptances by Classes**

(a)    Under the Consensual Plan Alternative, Claims in Classes 1 and 4, and if the Estimated Class 5 Allowed Claims do not exceed the Maximum Class 5 Amount also Class 5, are Unimpaired under the Plan.  Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim and Interest holders shall not be solicited.

(b)    Under the Non-Consensual Plan Alternative, only Claims in Class 1 are Unimpaired under the Plan.  Under Section 1126(f) of the Bankruptcy Code, holders of such Unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such Unimpaired Claim and Interest holders shall not be solicited.

**5.4    Deemed Rejections by Classes**

(a)    Under the Consensual Plan Alternative, Claims in Class 6 and Interests in Class 7, and if the Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount also Class 5, are Impaired, and the holders of such Claims and Interests are not entitled to receive or retain any property under the Plan.  Under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan, and the votes of such holders shall not be solicited.

(b)    Under the Non-Consensual Plan Alternative, Claims in Classes 4, 5, and 6 and Interests in Class 7 are Impaired.  With respect to Class 4, although the holders of such Claims are entitled to receive or retain property under the Plan, they are deemed to reject the Plan and their votes shall not be solicited.  With respect to Classes 5, 6, and 7, the holders of such Claims and Interests are not entitled to receive or retain any property under the Plan, and under Section 1126(g) of the Bankruptcy Code, such holders are deemed to have rejected the Plan and their votes shall not be solicited.

**5.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

In view of the deemed rejection of the Plan by Classes 6 and 7 under the Consensual Plan Alternative, or by Classes 4, 5, 6, and 7 under the Non-Consensual Plan Alternative, the Debtors request Confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, or modify the Plan, the Plan Supplement, or any exhibit, in accordance with the provisions of the Plan, including, without limitation, Section 11.14, as necessary to satisfy the requirements of Section 1129(b) of the Bankruptcy Code.

**5.6    Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on the Plan from Classes 2 and 3 in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, Section 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  The Debtors, the Reorganized Debtors, and each of their respective principals, members, partners, directors, officers, employees, agents, managers, representatives, advisors, attorneys, accountants, and professionals shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of any securities offered or sold under the Plan, and, therefore, are not, and on account of such offer, issuance, sale, solicitation, or purchase shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of any security offered or sold under the Plan.

**ARTICLE VI**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**6.1    Continued Corporate Existence**

Subject to the Restructuring Transactions, the Reorganized Debtors shall continue to exist after the Effective Date as separate legal entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated as of the Effective Date.

19

**6.2      Restructuring Transactions**

On, as of, or after the Effective Date, with the consent of its Board of Directors (or other governing body), each of the Reorganized Debtors may take such actions as may be necessary or appropriate to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; *provided, however*, that such actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, the New Second Lien Term Loan Facility, or the Exit Revolving Credit Facility.  Such actions (a) may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate, and (b) shall be in accordance with any applicable state law, except to the extent the Bankruptcy Code, the Plan, or any document in the Plan Supplement exempts such transactions from applicable state law, including, without limitation, as specified in Section 6.12 of the Plan.  Upon entry of the Confirmation Order, the Debtors shall be authorized to take such steps as may be necessary prior to the Effective Date to prepare to implement any or all of such actions on or after the Effective Date.

**6.3      Certificates of Incorporation and By-laws**

(a)      Reorganized RHI INC shall be governed by the Reorganized Parent Governing Documents, which shall contain provisions that satisfy the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code.  The Reorganized Parent Governing Documents shall be in substantially the forms of such documents included in the Plan Supplement.

(b)      The certificate or articles of incorporation, by-laws, articles of organization, or operating agreement, as applicable, of each Subsidiary Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and, as amended, shall constitute the Reorganized Subsidiary Governing Documents.

**6.4      Revesting of Assets; Release of Liens**

(a)      Subject to the Restructuring Transactions, and except as otherwise provided herein, the property of each Debtor's Estate, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, each Reorganized Debtor may operate its business and may use, license, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances.

(b)      Unless the Plan provides otherwise, all Liens securing the obligations of any Debtor shall be released and the holders of Claims or Interests or other Persons claiming the benefit of any such Liens shall be directed to release the collateral or other property subject thereto and to take such actions as may be required by the Reorganized Debtors to evidence such release, including, without limitation, the execution, delivery, and filing or recording of such release.  The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

**6.5      Exit Funding**

(a)      The Reorganized Debtors shall be authorized to (i) enter into the Exit Revolving Credit Facility, (ii) incur or guaranty the indebtedness and grant any Lien as required under the Exit Revolving Credit Facility, and (iii) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Revolving Credit Facility and to take all other actions necessary to implement and effectuate borrowings under the Exit Revolving Credit Facility.

(b)      On the Effective Date, the Exit Revolving Credit Facility, together with new promissory notes and guarantees, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective.  The new promissory notes issued pursuant to the Exit Revolving Credit Facility and all obligations under the Exit Revolving Credit Facility and related documents shall be paid as set forth in the Exit Revolving Credit Facility and related documents.

(c)      The Debtors and the Reorganized Debtors, as applicable, shall be authorized to (i) engage in intercompany transactions to transfer Cash for distribution pursuant to the Plan and (ii) continue to engage in intercompany transactions (subject to any applicable contractual limitations, including any in the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility), including, without limitation, transactions relating to the incurrence of intercompany indebtedness.

(d)      The New Second Lien Term Loan Facility shall take the form of an amendment and restatement of the Existing First Lien Credit Agreement, and any Liens with respect to the Existing First Lien Credit Agreement, as well as the priority of such Liens, shall be continued for the benefit of the parties secured under the New Second Lien Term Loan Facility.

**6.6      Authorization and Issuance of the New Securities**

(a)      On the Effective Date, Reorganized RHI INC (i) shall (A) provide for authorized capital equal to 1 million shares of New Common Stock; (B) issue such number of shares of New Common Stock as shall be mutually acceptable to the First Lien Agent and Reorganized RHI INC for ultimate distribution to the First Lien Lenders on account of their Existing First Lien Secured Claims and the Second Lien Lenders on account of their Existing Second Lien Claims, which shares shall initially be transferred 99% to RHI Entertainment Holdings II, LLC and 1% to RHIE Holdings Inc. (which immediately transfers such 1% to RHI Entertainment Holdings II, LLC), then from RHI Entertainment Holdings II, LLC to RHI LLC, and finally from RHI LLC to the First Lien Lenders and Second Lien Lenders; and (C) reserve for issuance in accordance with the terms of the Plan a number of shares of New Common Stock necessary (excluding shares that may be issuable as a result of the antidilution provisions thereof) to satisfy the required distributions of (x) the New Warrants and (y) the stock, options, and other awards granted under the New Management Incentive Plan; and (ii) shall authorize and issue the New Warrants for ultimate distribution to the Second Lien Lenders on account of their Existing Second Lien Claims, which warrants shall initially be transferred 99% to RHI Entertainment Holdings II, LLC and 1% to RHIE Holdings Inc. (which immediately transfers such 1% to RHI Entertainment Holdings II, LLC), then from RHI Entertainment Holdings II, LLC to RHI LLC, and finally from RHI LLC to the Second Lien Lenders.

(b)      The New Common Stock issued under the Plan shall be subject to dilution based upon (i) such shares of the New Common Stock as may be issued pursuant to the New Management Incentive Plan as set forth in Section 6.8(a)(i) of the Plan, (ii) the exercise of the New Warrants, and (iii) any other shares of New Common Stock issued post-emergence.

(c)      The issuance and distribution of the New Securities pursuant to the Plan shall be authorized under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by the Reorganized Parent Governing Documents or applicable law, regulation, order or rule.

(d)      The rights of the holders of New Common Stock shall be as provided for in the Reorganized Parent Governing Documents and, as to certain holders, the Stockholders Agreement and the Registration Rights Agreement.  The rights of the holders of the New Warrants shall be as provided for in the New Warrants and, as to certain holders, the Registration Rights Agreement.

(e)      Each First Lien Lender shall be deemed to have consented to the terms of, and to have executed and become a party to, the Stockholders Agreement.

(f)      Each First Lien Lender and Second Lien Lender receiving New Common Stock under the Plan shall, if desiring to obtain the benefits of the Registration Rights Agreement as to the New Common Stock, be required to execute and become a party to the Registration Rights Agreement.  Each Second Lien Lender receiving New Warrants under the Plan shall, if desiring to obtain the benefits of the Registration Rights Agreement as to the New Warrants, be required to execute and become a party to the Registration Rights Agreement, if applicable.

(g)      From and after the Effective Date, or as soon as practicable thereafter, upon the filing of the necessary certifications with the Securities and Exchange Commission, it is intended that Reorganized RHI INC shall no longer be a "public" company and shall no longer be subject to periodic filing or other requirements pursuant to the Securities Exchange Act of 1934. The rights of the holders of New Common Stock shall be as provided for in the Reorganized Parent Governing Documents, which shall include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require Reorganized RHI INC to continue or resume filing periodic or other reports pursuant to the Securities Exchange Act of 1934.

**6.7      Directors and Officers of Reorganized Debtors**

(a)      The New Board shall be comprised of five (5) directors, consisting of (i) the chief executive officer of RHI INC serving immediately prior to the Effective Date and (ii) four (4) independent and disinterested directors designated by the First Lien

Agent.  The designation of directors pursuant to the foregoing clause shall be made in the Plan Supplement.  The New Board shall serve in accordance with the Reorganized Parent Governing Documents and shall be subject to replacement or removal as provided therein.

(b)        The officers of RHI INC serving immediately prior to the Effective Date shall continue to serve in their same respective capacities after the Effective Date for and on behalf of Reorganized RHI INC in accordance with and subject to the replacement or removal provisions of the Reorganized Parent Governing Documents.

(c)        Subject to the Restructuring Transactions, the existing directors and officers of the Subsidiary Debtors shall continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiaries, in accordance with and subject to the replacement or removal provisions of the Reorganized Subsidiary Governing Documents.

**6.8        New Management Incentive Plan**

(a)        In accordance with the New Management Incentive Plan, (i) on the Effective Date, (A) Reorganized RHI INC shall be authorized and directed to establish and implement the founders equity plan and the management equity incentive plan, under which, *inter alia*, an aggregate of 15% of the total amount of New Common Stock (without giving effect to the shares reserved for issuance pursuant to the New Warrants) shall be issued or reserved for issuance, as described on Exhibit D; and (B) the Reorganized Debtors shall enter into new employment agreements, as described on Exhibit D; and (ii) after the Effective Date, the Reorganized Debtors shall establish and implement the annual incentive plan, as described on Exhibit D.

(b)        As of the Effective Date, pursuant to the Confirmation Order and Section 303 of the Delaware General Corporation Law, the New Management Incentive Plan (and in particular the founders equity plan and the management equity incentive plan) shall be deemed adopted by the unanimous action of the New Board and approved by the unanimous action of the stockholders of Reorganized RHI INC (including, without limitation, for purposes of Section 422 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder).  The foregoing sentence shall not be deemed to limit the application of Section 303 of the Delaware General Corporation Law to any other corporate action taken pursuant to the Plan.

(c)        The New Management Incentive Plan may be amended or modified from time to time by the New Board in accordance with the terms of the particular plan document or agreement, and any such amendment or modification shall not require an amendment of the Plan.

**6.9        Trade Account Distributions**

(a)        This Section 6.9 of the Plan shall be applicable only (i) under the Consensual Plan Alternative if Estimated Class 5 Allowed Claims exceed the Maximum Class 5 Amount or (ii) under the Non-Consensual Plan Alternative.

(b)        On or before the Effective Date, the Trade Account Disbursing Agent shall establish, for the benefit of the holders of Allowed Trade Unsecured Claims, the Trade Account, which shall be funded, on the Effective Date, with Cash transferred by the Debtors or the Reorganized Debtors from funds that would otherwise constitute the collateral of the First Lien Lenders, which funds the First Lien Lenders have agreed to make available to preserve and foster the Reorganized Debtors' valuable trade and other continuing business relationships.

(c)        On or before the Effective Date, the Debtors or the Reorganized Debtors, with the consent of the First Lien Agent, shall have identified the Claims that are eligible to be treated as Trade Unsecured Claims and shall provide such information to the Trade Account Disbursing Agent.  Such eligible Trade Unsecured Claims shall not be entitled to a distribution from the Trade Account until such Claims are determined to be Allowed Claims.

(d)        On, or as soon as reasonably practicable after, the Distribution Date, each holder of an Allowed Trade Unsecured Claim shall receive from the Trade Account Disbursing Agent, in full satisfaction, settlement, release, and discharge of and in exchange for, such Allowed Trade Unsecured Claim, either (i) if the aggregate amount of all eligible Allowed Trade Unsecured Claims is less than the Trade Account Cap, Cash in the amount of such holder's Allowed Claim or (ii) if the aggregate amount of all eligible Allowed Trade Unsecured Claims is more than the Trade Account Cap, then such holder's Pro Rata share of the Trade Account Cap.

(e)        In the event that distributions are made on a Pro Rata basis, the Trade Account Disbursing Agent shall set aside from the initial allocation an amount of Cash sufficient to ensure the same Pro Rata allocation for any eligible Disputed Trade Unsecured Claims until such Claims are Allowed.  If the amount of the allocation set aside for such Disputed Claims exceeds the Pro

Rata distribution to which such Claims are entitled when and if Allowed, such excess amount shall be held in the Trade Account until all Disputed Claims are resolved, and shall then be distributed on a Pro Rata basis among all eligible Allowed Trade Unsecured Claims.

(f)         For the avoidance of doubt, as of the Effective Date, the funds in the Trade Account shall not constitute property of the Debtors or the Reorganized Debtors. All payments from the Trade Account shall be made by the Trade Account Disbursing Agent to the holders of eligible Allowed Trade Unsecured Claims, free and clear of all Liens, claims and encumbrances. After all payments from the Trade Account have been made, the undistributed portion of the Trade Account, if any, shall be distributed to the First Lien Lenders in accordance with Section 4.2(b) of the Plan.

**6.10    Indemnification of Debtors' Directors, Officers, and Employees**

The Reorganized Parent Governing Documents and the Reorganized Subsidiary Governing Documents shall contain provisions which, to the fullest extent permitted by applicable law, (i) eliminate the personal liability of the Debtors' directors, officers, and key employees serving before, on, and after the Petition Date and the Reorganized Debtors' directors, officers, and key employees serving on and after the Effective Date for monetary damages; and (ii) require such Reorganized Debtors, subject to appropriate procedures, to indemnify those of the Debtors' and the Reorganized Debtors' directors, officers, and key employees serving prior to, on, or after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

**6.11    Preservation of Rights of Action**

Except as otherwise provided in the Plan, the Confirmation Order, a Final Order, or the Plan Supplement, and in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtors and the Reorganized Debtors shall retain all of their respective Litigation Rights against any Person.  Each of the Debtors or Reorganized Debtors shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any claims, rights of action, suits, or proceedings against such Person as any indication that any of the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Litigation Rights against such Person.  Unless any Litigation Rights are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by Final Order, the Debtors and the Reorganized Debtors expressly reserve all Litigation Rights for later adjudication and, therefore, no preclusion doctrine (including, without limitation, res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, or laches) shall apply to any of the Litigation Rights upon, after, or as a consequence of the Confirmation Date or the Effective Date.**

**6.12    Exemption from Certain Transfer Taxes**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Lien granted by a Debtor or a Reorganized Debtor to secure the Exit Revolving Credit Facility or the New Second Lien Term Loan Facility, shall not be taxed under any law imposing a document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording fee, sales or use tax, or other similar tax or governmental assessment.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement and all documents necessary to evidence and implement any of the transactions and actions described in the Plan or the Plan Supplement including, without limitation, the Restructuring Transactions.

**6.13    Corporate Action**

On the Effective Date, the adoption and filing of the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, and all actions contemplated by the Plan shall be authorized and approved in all respects pursuant to the Plan. All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or Boards of Directors (or other governing bodies) of the Debtors or Reorganized Debtors.

**6.14    Effectuating Documents; Further Transactions**

Any chief executive officer, president, chief or principal financial officer, general counsel, or any other appropriate officer of any Debtor or Reorganized Debtor, as the case may be, shall be authorized, without the need for any required approvals,

23

authorizations, or consents except for any express consents required under the Plan, to issue, execute, deliver, file, or record such contracts, instruments, securities, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Any secretary or assistant secretary of any Debtor or Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**6.15    Plan Supplement**

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court no later than five (5) Business Days prior to the Plan Objection Deadline, and may be amended, modified, or supplemented prior to the Confirmation Hearing. Upon filing, all documents included in the Plan Supplement may be inspected via the Bankruptcy Court's electronic filing system or at http://www.loganandco.com. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request in accordance with Section 11.17 of the Plan.

**6.16    Compromise of Controversies**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Rule 9019 of the Bankruptcy Rules.

**ARTICLE VII**

**TREATMENT OF CONTRACTS AND LEASES**

**7.1    Assumption of Contracts and Leases; Cure**

(a)    Except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, as of the Effective Date, each Debtor shall be deemed to have assumed each executory contract or unexpired lease to which it is a party unless any such contract or lease (i) was previously assumed or rejected upon motion by a Final Order, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date, or (iv) is included on the Contract/Lease Assumption Schedule. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the assumptions described above, as of the Effective Date.

(b)    For the avoidance of doubt, in no event shall any purchase and sale agreement or other transaction agreement that was closed and substantially consummated prior to the Petition Date be considered to be an executory contract and, thus, in no event shall any such agreement be subject to deemed assumption under Section 7.1(a) of the Plan. Outstanding obligations owed to the Debtors under any such agreements shall continue in full force and shall be enforceable by the Debtors or the Estates. Outstanding obligations owed by the Debtors under any such agreements shall constitute Claims to be treated under the Plan in the Class applicable to each of such Claims.

(c)    Each executory contract and unexpired lease that is assumed pursuant to the Plan shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease and (ii) all contracts or leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

(d)    To the extent applicable, each executory contract or unexpired lease that is assumed pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant contract or lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(e)    Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default, plus any resulting actual pecuniary loss, shall be satisfied, under Section 365(b)(1)(A) and, if applicable, Section 365(b)(1)(B) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor to provide adequate assurance of future performance (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption, except as provided in Section 7.6(b) of the Plan.

24

(f)     Except as otherwise provided in the Plan or by Final Order of the Bankruptcy Court, all Cure obligations with respect to assumed contracts and assumed leases shall be treated as Administrative Claims pursuant to Section 4.1(a) of the Plan.

**7.2     Assumption Pursuant to Contract/Lease Assumption Schedule**

(a)     The Debtors may seek to assume executory contracts or unexpired leases by including them on the Contract/Lease Assumption Schedule.  On or before the day that is fourteen (14) days before the Plan Objection Deadline, the Debtors shall file the Contract/Lease Assumption Schedule and provide notice thereof to the counterparties to the contracts and leases listed thereon; *provided, however*, that the Debtors reserve the right to amend the Contract/Lease Assumption Schedule at any time prior to the Confirmation Date on notice to the counterparties affected thereby.

(b)     The deadline for objecting to the Contract/Lease Assumption Schedule shall be the Plan Objection Deadline, or in the event of an amendment to the Contract/Lease Assumption Schedule such deadline as is prescribed in the notice of amendment. The failure of any counterparty to an executory contract or unexpired lease to timely file and serve an objection, including, without limitation, an objection to the proposed assumption, the provision of adequate assurance of future performance, or the designated Cure amount, shall be deemed to be a waiver of all objections and a consent for all purposes to the assumption as set forth on the Contract/Lease Assumption Schedule.  In particular, and without limiting the foregoing, in the absence of an objection to the designated Cure amount, such Cure amount shall be binding on the counterparty, and such counterparty shall be deemed to have waived any and all rights to seek payment from the Debtors in an amount that exceeds the designated Cure amount.  In the event of a timely objection to the designated Cure amount, the provisions of Section 7.6(b) of the Plan shall be applicable.

(c)     Each contract and lease that is assumed pursuant to the Contract/Lease Assumption Schedule shall include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease and (ii) all contracts or leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.  Any Liens held by a party as of the Petition Date to secure the Debtors' obligations under any assumed contract or lease shall continue in full force and effect, subject to the priorities existing as of the Petition Date.

(d)     To the extent applicable, each contract or lease that is assumed pursuant to the Contract/Lease Assumption Schedule shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant contract or lease, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

(e)     All executory contracts and unexpired leases of the Debtors listed on the Contract/Lease Assumption Schedule shall be assumed under Section 365 of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court pursuant to an objection or unless the Debtors elect rejection pursuant to the provisions of Section 7.6(b) of the Plan.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving all assumptions that as of the Confirmation Date are not subject to an amendment as to which the objection period has not expired or are not subject to a pending objection. The Debtors may seek additional orders from the Bankruptcy Court to approve any assumptions that as of the Confirmation Date are subject to an amendment as to which the objection period has not expired or are subject to a pending objection.

**7.3     Assumption of Certain Modified Contracts; Approval and Ratification of Certain Contract Settlements**

(a)     The collective bargaining agreements, assumption agreements, settlement agreements, and other agreements and obligations between the Debtors and (i) the Directors Guild of America, Inc., the Screen Actors Guild, Inc., the Writers Guild of America West, Inc. for itself and its affiliate Writers Guild of America East, Inc., (ii) the Alliance of Canadian Cinema, Television and Radio Artists, (iii) the American Federation of Television and Radio Artists (iv) the Media Entertainment and Arts Alliance, and (v) Equity shall be modified with respect to prepetition obligations in accordance with the terms of the respective Guild Settlements (with any prepetition obligations (other than residuals and fringes thereon) not subject to the respective Guild Settlements to remain in effect in accordance with the terms of the applicable underlying agreements).  As so modified, all such agreements shall be assumed or deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date.  Cure shall be paid by the Debtors in such amount and at such times as the parties have agreed under the terms of the respective Guild Settlements.  Unless otherwise provided under the terms of the respective Guild Settlements, any Liens held by the Guilds as of the Petition Date shall continue, subject to the priorities existing as of the Petition Date. The Guild Settlements shall be deemed approved in their entireties by the Confirmation Order.

(b)      The Film Obligation Settlements are ratified by the Debtors and, to the extent required by their respective terms, shall be deemed approved in their entireties by the Confirmation Order.  To the extent that the Film Obligation Settlements constitute executory contracts, they shall be deemed to have been assumed by the applicable Debtors under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date.  The distribution, license, and related agreements that are subject to the respective Film Obligation Settlements shall have been, or as of the Effective Date shall be, modified in accordance with, and superseded to the extent inconsistent with, the terms of the respective Film Obligation Settlements.  To the extent that the terms of the respective Film Obligation Settlements require the continuation of any of such subject agreements, as thereby modified, such continuing agreements as so modified shall be assumed or deemed to have been assumed under Section 365(a) of the Bankruptcy Code, effective as of the Effective Date.  To the extent that the terms of the respective Film Obligation Settlements do not require the continuation of any of such subject agreements, such discontinuing agreements shall be deemed terminated or amended, as applicable, to give effect to the Film Obligation Settlements.  Unless otherwise provided under the terms of each respective Film Obligation Settlement, any Liens held by a party to each such Film Obligation Settlement shall continue, subject to the priorities existing as of the Petition Date. Nothing herein shall limit or restrict the right of the Debtors to seek approval of any settlement with any producer, licensor, customer, or lender to any such party pursuant to a motion filed with the Bankruptcy Court.

(c)      The New York Lease Settlement shall be subject to approval, and the underlying lease as modified by the New York Lease Settlement shall be subject to assumption, by a Final Order entered pursuant a motion filed with the Bankruptcy Court.

**7.4      Compensation and Benefit Programs**

(a)      Except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all Employee Programs in effect before the Effective Date, shall be deemed to be, and shall be treated as though they are, contracts that are assumed under the Plan, unless otherwise provided in or subject to any modifications included in the New Management Incentive Plan.  Nothing contained herein shall be deemed to modify the existing terms of Employee Programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

(b)      To the extent any change of control provision contained in any Employee Program would be triggered solely as a result of the transactions contemplated by the Plan, such Employee Program shall not be assumed to the extent a waiver of the change of control provision is not executed by the employee having the benefit of such change of control provision, but otherwise shall remain in full force and effect and may be triggered as a result of any transactions occurring outside of the Plan after the Effective Date.

(c)      As of the Effective Date, any and all equity incentive plans, equity ownership plans, or any other equity-based plans entered into before the Effective Date, including Claims arising from any change of control provision therein, shall be deemed to be, and shall be treated as though they are, contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order.  Any Claims resulting from such rejection shall constitute Subordinated Claims and shall be treated in accordance with Section 4.2(f) of the Plan.

**7.5      Certain Indemnification Obligations**

(a)      Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving prior to, on, and after the Petition Date shall be deemed to be, and shall be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) shall survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with a pre-Petition Date or post-Petition Date occurrence.

(b)      Indemnification Obligations owed to any of the Debtors' Professionals pursuant to Sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, whether such Indemnification Obligations relate to the period before or after the Petition Date, shall be deemed to be, and shall be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan.

(c)      Except as provided in Sections 7.5(a) and 7.5(b) of the Plan, Indemnification Obligations owed under any agreement that is not executory, or that is not otherwise expressly assumed, shall not constitute executory obligations and shall not be subject to assumption under the Plan.  Instead, such Indemnification Obligations shall constitute Claims to be treated under the Plan in the Class applicable to each of such Claims.

**7.6     Rejection of Contracts and Leases; Rejection Damages Claims**

(a)        The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease.  Any contracts or leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors.

(b)        In the event of a Final Order resolving a dispute as to the nature or amount of any Cure owed with respect to a contract or lease to be assumed, the Reorganized Debtors shall be authorized to reject the contract or lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order renders assumption of such contract or lease unfavorable to the Reorganized Debtors.  The Debtors shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

(c)        If the rejection by a Debtor, pursuant to the Plan or otherwise, of a contract or lease results in a Rejection Damages Claim, then such Rejection Damages Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtors within thirty (30) days after entry of the order authorizing the rejection of such contract or lease.  The Debtors reserve their rights to object to any Rejection Damages Claim.

(d)        Rejection Damages Claims shall be treated as General Unsecured Claims pursuant to and in accordance with the terms of Section 4.2(e) of the Plan.

**7.7     Extension of Time to Assume or Reject**

Notwithstanding anything set forth in Article VII of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Section 7.1(a) of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

**ARTICLE VIII**

**PROVISIONS GOVERNING ALLOWANCE OF CLAIMS AND DISTRIBUTIONS**

**8.1     Objections to Claims**

(a)        All objections to Claims must be filed and served on the holders of such Claims by the applicable Claim Objection Deadline.  If an objection has not been filed to a Proof of Claim or Request for Payment by the Claim Objection Deadline, the Claim to which the Proof of Claim or Request for Payment relates shall be treated as an Allowed Claim if not otherwise an Allowed Claim. The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanisms.

(b)        After the Effective Date, only the Reorganized Debtors shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims. The Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

(c)        In no event shall the Debtors or the Reorganized Debtors be required to file an objection to (i) under the Non-Consensual Plan Alternative or under the Consensual Plan Alternative if the Estimated Class 5 Allowed Claims are determined to

exceed the Maximum Class 5 Amount, a General Unsecured Claim (unless such Claim is an eligible Trade Unsecured Claim), (ii) a Subordinated Claim, or (iii) any other Claim that is not entitled to receive or retain any property under the Plan. The holder of any such Claim shall acquire no rights under the Plan or otherwise against the Reorganized Debtors or their assets as a consequence of the non-filing of an objection.

**8.2      Distributions for Claims Allowed as of Distribution Date**

A Claim shall be entitled to receive distributions under the Plan only if such Claim is classified in a Class that is entitled to receive distributions under the Plan and only if the Claim is an Allowed Claim. Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to Section 8.3 of the Plan. The Reorganized Debtors shall have the right, in their discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

**8.3      Treatment of Disputed Claims Pending and Following Allowance**

(a)      Notwithstanding any other provisions of the Plan, no payments or distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim; *provided, however*, that the Reorganized Debtors may elect to withhold distributions on the portion of a Claim that is not Disputed until the portion of the Claim that is Disputed is resolved by Final Order.

(b)      The Disbursing Agent shall, on the applicable Distribution Date, make distributions on account of any Disputed Claim that has become an Allowed Claim. Such distributions shall be made pursuant to the provisions of the Plan governing the Class applicable to each respective Allowed Claim. Such distributions shall be equivalent to the distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**8.4      No Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim that may become an Allowed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon.

**8.5      Disbursing Agent**

(a)      On or before the Effective Date, the Debtors shall designate the Person or Persons (whether Reorganized RHI INC, any of the other Reorganized Debtors, or one or more independent third parties) to serve as the Plan Disbursing Agent on mutually agreeable terms and conditions. If the Plan Disbursing Agent is an independent third party designated to serve in such capacity, such Plan Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized RHI INC.

(b)      If Section 6.9 of the Plan is applicable, on or before the Effective Date, the First Lien Agent shall designate the Person to serve as the Trade Account Disbursing Agent on mutually agreeable terms and conditions. The Trade Account Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized RHI INC.

(c)      No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**8.6      Application of Distribution Record Date**

(a)      At the close of business on the Distribution Record Date, the registers maintained by the First Lien Agent and the Second Lien Agent shall be closed and there shall be no further changes in the listed holders of the Existing First Lien Claims and Existing Second Lien Claims for purposes of distributions under the Plan. The Reorganized Debtors, the Disbursing Agent, the First Lien Agent, the Second Lien Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize

any transfer of Existing First Lien Claims or Existing Second Lien Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the register as of the close of business on the Distribution Record Date (or, in the case of the issuance of New Common Stock or New Warrants, an affiliated designee of such record holder which is reflected as such on the register or as to which the Debtors, the Disbursing Agent, and, as applicable, the First Lien Agent or the Second Lien Agent have received written notice from the record holder by the close of business on the Distribution Record Date).

(b)        At the close of business on the Distribution Record Date, the claims register maintained by the claims agent shall be closed and there shall be no further changes in the listed holders of the Claims.  The Reorganized Debtors, the Disbursing Agent, claims agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims register as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

**8.7        Delivery of Distributions; Undeliverable Distributions**

(a)        Distributions to holders of Allowed Claims shall be made by the Disbursing Agent (i) at the addresses set forth on the Proofs of Claim filed by such holders, (ii) at the addresses set forth in any written notices of address changes delivered to the Debtors, the claims agent, or the Disbursing Agent after the date of any related Proof of Claim, (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and a written notice of a change of address has not been received by the Debtors, the claims agent, or the Disbursing Agent, or (iv) in the case of the First Lien Lenders and the Second Lien Lenders, at the addresses provided by the First Lien Agent and the Second Lien Agent, respectively.

(b)        If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Disbursing Agent is notified by the Debtors, the claims agent, or such holder of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  If any distribution is made by check and such check is not returned but remains uncashed for six (6) months after the date of such check, the Disbursing Agent may cancel and void such check, and the distribution with respect thereto shall be deemed undeliverable.  If any holder is requested to provide a taxpayer identification number or to otherwise satisfy any tax withholding requirements with respect to a distribution and such holder fails to do so within six (6) months of the date of such request, such holder's distribution shall be deemed undeliverable.

(c)        Unless otherwise agreed between the Reorganized Debtors and the Plan Disbursing Agent, amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Plan Disbursing Agent on behalf of the Reorganized Debtors shall be returned to the Reorganized Debtors until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (i) on or before the first (1st) anniversary of the Effective Date or (ii) with respect to any distribution made later than such date, on or before six (6) months after the date of such later distribution; after which date all undeliverable property shall revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Reorganized Debtors shall deliver the applicable distribution amount or property to the Plan Disbursing Agent for distribution pursuant to the Plan.

(d)        If Section 6.9 of the Plan is applicable, amounts in respect of returned or otherwise undeliverable or unclaimed distributions made by the Trade Account Disbursing Agent shall be retained by the Trade Account Disbursing Agent in the Trade Account until such distributions are claimed. All claims for returned or otherwise undeliverable or unclaimed distributions must be made (i) on or before three (3) months after the Effective Date or (ii) with respect to any distribution made later than such date, on or before three (3) months after the date of such later distribution; after which date all undeliverable property shall revert to the Trade Account free of any restrictions thereon and the claims of any holder with respect to such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. In the event of a timely claim for any returned or otherwise undeliverable or unclaimed distribution, the Trade Account Disbursing Agent shall deliver the applicable distribution amount to the holder entitled thereto.

(e)        Nothing contained in the Plan shall require any Debtor, any Reorganized Debtor, or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

**8.8        Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. funds, by check or wire transfer or by such other commercially reasonable means as may be agreed to by the Disbursing Agent and the payee.

**8.9        Calculation of Distribution Amounts of New Securities**

No fractional shares of New Common Stock or fractional New Warrants shall be issued or distributed under the Plan and no Cash shall be distributed in lieu of such fractional shares or warrants.  Whenever any distribution of New Common Stock or New Warrants to a particular Person would otherwise call for distribution of a fraction, the actual distribution of such shares or warrants shall be rounded to the next higher or lower whole number as follows:  (a) fractions one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number. Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving zero shares or zero warrants, as applicable, such Person shall receive one (1) share of New Common Stock or one (1) New Warrant, as applicable. If two or more Persons are entitled to equal fractional entitlements and the aggregate amount of New Common Stock or New Warrants that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole shares of New Common or whole New Warrants which remain to be allocated, the Disbursing Agent shall allocate the remaining whole shares or warrants by random lot or such other impartial method as the Disbursing Agent deems fair.  Upon the allocation of all of the whole New Securities authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.

**8.10       Withholding and Reporting Requirements**

In connection with the Plan and all distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Disbursing Agent until such time as the Disbursing Agent is satisfied with the holder's arrangements for any withholding tax obligations.

**8.11       Setoffs**

The Reorganized Debtors may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.

**8.12       De Minimis Distributions**

Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a Cash distribution with respect to any Claim if the amount of the distribution is less than $20.00.  The Claim of any holder whose distribution is in an amount less than $20.00 shall be discharged, and such holder shall be forever barred from asserting such Claim against the Reorganized Debtors, their respective property, or, if applicable, the Trade Account.  Any Cash not distributed by the Plan Disbursing Agent as a result of this provision shall be the property of the Reorganized Debtors, free of any restrictions, and any such Cash held by the Plan Disbursing Agent shall be returned to the Reorganized Debtors following the Distribution Date that would have applied to any such distribution.  If applicable, any Cash not distributed by the Trade Account Disbursing Agent as a result of this provision shall be retained in the Trade Account for disposition as provided for in Section 6.9 of the Plan.

**8.13    No Distributions in Excess of Allowed Claim Amount**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan).

**8.14    Allocation of Distributions**

All distributions received under the Plan by holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

**ARTICLE IX**

**CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN**

**9.1    Conditions to Confirmation**

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 9.3 of the Plan:

(a)    the Debtors shall have obtained a written commitment for the Exit Revolving Credit Facility on terms and conditions that (i) are reasonably acceptable to the Debtors and the First Lien Agent and (ii) support the Debtors' demonstration that the Plan is feasible;

(b)    the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, the Second Lien Agent, and the Exit Revolving Agent, and shall, among other things:

(i)    provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created under or in connection with the Plan;

(ii)    approve the Exit Revolving Credit Facility and the New Second Lien Term Loan Facility;

(iii)    authorize the issuance of the New Securities; and

(iv)    provide that, notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan; and

(c)    the Confirmation Order shall have been entered by the Bankruptcy Court.

**9.2    Conditions to Effective Date**

The following conditions precedent must be satisfied or waived on or prior to the Effective Date in accordance with Section 9.3 of the Plan:

(a)    the Confirmation Order shall not then be stayed, vacated, or reversed;

(b)    (i) the New Second Lien Term Loan Facility, the Stockholders Agreement, and the New Management Incentive Plan (including the founders equity plan, the management equity incentive plan, the annual incentive plan, and the employment agreements) shall be in form and substance reasonably satisfactory to the Debtors and the First Lien Agent and (ii) the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, the Registration Rights Agreement, and the New Warrants shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, and the Second Lien Agent, *provided that* the rights of the Second Lien Agent as to the Reorganized Parent Governing Documents and the Reorganized Subsidiary Governing Documents shall be limited to confirming that the final documents are not inconsistent with the parameters described in the Plan and any applicable exhibits to the Plan; and, to the extent any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the

31

effectiveness of each such document shall have been satisfied or waived in accordance with the respective provisions thereof, as applicable; *provided, however*, that in no event shall the effectiveness of any document that implements the treatment of the Existing First Lien Secured Claims or the Existing Second Lien Claims, including, without limitation, the New Second Lien Term Loan Facility, the Reorganized Parent Governing Documents, the Stockholders Agreement, the Registration Rights Agreement (except as required by the Plan to obtain the benefits thereof), or the New Warrants (except as required by the Plan to obtain the benefits thereof), be conditioned upon the execution of such document by any First Lien Lender or Second Lien Lender, as applicable, other than by JPMorgan Chase Bank, N.A. to the extent that it is party to such document in its capacity as First Lien Agent or New Term Loan Agent;

(c)  (i) the Exit Revolving Credit Facility shall be on terms and conditions reasonably acceptable to the Debtors, the First Lien Agent, and the Exit Revolving Agent, (ii) the Exit Revolving Credit Facility shall be in full force and effect upon closing and shall provide for the extension of credit thereunder to be available upon closing; (iii) the credit agreement and other documents evidencing the Exit Revolving Credit Facility shall have been executed and delivered by the respective parties thereto, and  (iv) all conditions precedent to the closing of the Exit Revolving Credit Facility shall have been satisfied or waived in accordance with the provisions thereof, as applicable;

(d)  all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained;

(e)  all employment agreements entered into by the Debtors before the Petition Date shall have been terminated or modified to the satisfaction of the First Lien Agent, consistent with the employment agreement provisions of the New Management Incentive Plan to the extent applicable; and

(f)  all material actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

## 9.3  Waiver of Conditions

Each of the conditions set forth in Sections 9.1 and 9.2, with the express exception of the conditions set forth in Sections 9.1(c) and 9.2(a), may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided*, *however*, that such waiver shall not be effective without the consent of (a) the First Lien Agent and the Exit Revolving Agent, which consents shall not be unreasonably withheld and (b) with respect to Sections 9.1(b) and 9.2(b)(ii) only, the First Lien Agent, the Exit Revolving Agent, and the Second Lien Agent, which consents shall not be unreasonably withheld.

## 9.4  Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

**ARTICLE X**

**RETENTION OF JURISDICTION**

## 10.1  Scope of Retention of Jurisdiction

Under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

(a)  allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan or by a Final Order (other than personal injury or wrongful death Claims, unless agreed by the holder), including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)  hear and determine all applications for Professional Fees and Substantial Contribution Claims; *provided*, *however*, that from and after the Effective Date, in respect to services rendered on and after the Effective Date, the payment of the fees and

32

expenses of any professionals retained by the Reorganized Debtors shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)        hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Rejection Damages Claims or Claims arising therefrom;

(d)        effectuate performance of and payments under the provisions of the Plan;

(e)        hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Litigation Rights;

(f)        enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents contained in the Plan Supplement or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

(g)        hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the New Securities, the Exit Revolving Credit Facility, the New Second Lien Term Loan Facility, the Reorganized Parent Governing Documents, the Reorganized Subsidiary Governing Documents, the New Management Incentive Plan, the Registration Rights Agreement, or the Stockholders Agreement shall be dealt with in accordance with the provisions of the applicable document;

(h)        consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)        enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)        hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

(l)        enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(m)        except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

(n)        hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(o)        hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

(p)        hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(q)        enter a final decree closing the Chapter 11 Case.

**10.2    Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1    Professional Fee Claims and Substantial Contribution Claims**

(a)    All final applications for allowance and payment of Professional Fee Claims and Substantial Contribution Claims must be filed and served on the Reorganized Debtors and their counsel, the First Lien Agent and its counsel, and other necessary parties in interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

(b)    Each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay reasonable professional fees and expenses in connection with professional services rendered to it after the Effective Date.

**11.2    Administrative Claims Bar Date**

All Requests for Payment of an Administrative Claim (other than as set forth in Sections 4.1(a) and 11.1 and this Section 11.2 of the Plan) must be filed with the Bankruptcy Court and served on counsel for the Debtors or Reorganized Debtors no later than forty-five (45) days after the Effective Date. Unless the Debtors or Reorganized Debtors object to an Administrative Claim by the applicable Claim Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, (a) no Request for Payment need be filed with respect to an Administrative Claim that is paid or payable by the Debtors in the ordinary course of business; (b) no Request for Payment need be filed with respect to Cure owing under an executory contract or unexpired lease if (i) the amount of Cure is fixed or proposed to be fixed by the Confirmation Order or other order of the Bankruptcy Court either pursuant to the Plan (including pursuant to the Contract/Lease Assumption Schedule) or pursuant to a motion to assume and fix the amount of Cure filed by the Debtors and (ii) a timely objection asserting an increased amount of Cure has been filed by the non-Debtor party to the subject contract or lease; and (c) no Request for Payment need be filed with respect to fees payable pursuant to Section 1930 of Title 28 of the United States Code.

**11.3    Dissolution of Statutory Committees**

On the Effective Date, any statutory committee appointed during the Chapter 11 Case shall be dissolved, the committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Case, the Plan, and its implementation, and the retention or employment of the committee's attorneys and other professionals shall terminate.

**11.4    Payment of Statutory Fees**

All fees payable pursuant to Section 1930 of Title 28 of the United States Code with respect to the period prior to the Effective Date shall be paid on the Effective Date or other required payment date. With respect to the period after the Effective Date, the obligation of each of the Reorganized Debtors to pay quarterly fees to the Office of the United States Trustee pursuant to Section 1930 of Title 28 of the United States Code shall continue until such time as a particular Chapter 11 case is closed, dismissed or converted.

**11.5    Compromises and Settlements of Claims and Litigation Rights**

From and after the Effective Date, the Reorganized Debtors may compromise and settle various Claims against them and/or Litigation Rights and other claims that they may have against other Persons without any further approval by the Bankruptcy Court. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle Claims against them and Litigation Rights or other claims that they may have against other Persons, subject to the approval of the Bankruptcy Court if, and to the extent, required.

**11.6    Satisfaction of Subordination Rights**

All Claims against the Debtors and all rights and claims between or among the holders of Claims relating in any manner whatsoever to any claimed subordination rights shall be deemed satisfied by the distributions under, described in, contemplated by, and/or implemented in Article IV of the Plan. Distributions under, described in, contemplated by, and/or implemented by the Plan to

34

the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**11.7    Releases by Debtors**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, willful misconduct, or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (a) any of the other Debtors and any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals and court-retained agents of the Debtors, (d) the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (e) the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (f) the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and (g) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (f); *provided*, *however*, that nothing in this Section 11.7 shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any of their employees (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; and *provided, further, however*, that nothing in this Section 11.7 shall operate as a release of intercompany obligations between any of the Debtors or between any of the Debtors and their non-Debtor subsidiaries unless otherwise provided for in the Plan.

**11.8    Releases by Holders of Claims and Interests**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each First Lien Lender and Second Lien Lender, each holder of an eligible Allowed Trade Unsecured Claim who receives payment from the Trade Account, if applicable, and to the extent permitted by applicable law and approved by the Confirmation Order each other holder of a Claim or Interest, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever, against (a) any of the Debtors' non-Debtor subsidiaries, (b) any of the directors, officers, and employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (c) any Professionals and court-retained agents of the Debtors, (d) the DIP Facility Agent, the DIP Facility Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (e) the First Lien Agent, the First Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, (f) the Second Lien Agent, the Second Lien Lenders, and the respective directors, officers, employees, counsel, and other advisors of each of the foregoing, but only in their capacities as such, and (g) any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (f), in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Estates, the conduct of the Debtors' business, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

**11.9    Discharge of the Debtors**

(a)    Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, (i) the Debtors,

and each of them, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, (D) the holder of a Claim based upon such debt is entitled to receive or retain any property under the Plan, or (E) the holder of a Claim based upon such debt accepted the Plan, and (ii) all RHI INC Interests shall be terminated.

(b)       As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all RHI INC Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**11.10    Injunction**

(a)       **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights:  (i) commencing or continuing, in any manner or in any place, any suit or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in any manner, in any place, or against any Person, that does not comply with or is inconsistent with the provisions of the Plan.**

(b)       **Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a claim, obligation, suit, judgment, demand, damages, debt, right, cause of action, or liability against a Person that is released or exculpated pursuant to Sections 11.7, 11.8, or 11.11 of the Plan are permanently enjoined from taking any of the following actions on account of such claim, obligation, suit, judgment, damages, demand, debt, right, cause of action, or liability: (i) commencing or continuing, in any manner or in any place, any suit or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment against any debt, liability, or obligation due to any released or exculpated Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person, that does not comply with or is inconsistent with the provisions of the Plan.**

(c)       **Without limiting the effect of the foregoing provisions of this Section 11.10 upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 11.10.**

**11.11    Exculpation and Limitation of Liability**

(a)       **To the extent permitted by applicable law and approved in the Confirmation Order, none of (i) the Debtors or any of the Debtors' non-Debtor subsidiaries, (ii) the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (iii) the Professionals or court-retained agents of the Debtors, (iv) the DIP Facility Agent, the DIP Facility Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (v) the First Lien Agent, the First Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vi) the Second Lien Agent, the Second Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vii) the members or Professionals of any statutory committee appointed during the Chapter 11 Case, but only in their capacities as such, or (viii) any of the successors or assigns of any of the parties identified in the foregoing clauses (i) through (vii), shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective present or former directors,**

**officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code, and in all respects all of the parties identified in the foregoing clauses (i) through (viii) shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**

(b)    **Notwithstanding any other provision of the Plan, to the extent permitted by applicable law and approved in the Confirmation Order, no holder of a Claim or an Interest, no other party in interest, and none of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, shall have any right of action against any of (i) the Debtors or any of the Debtors' non-Debtor subsidiaries, (ii) the directors, officers, or employees of any of the Debtors or any of the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case, (iii) the Professionals or court-retained agents of the Debtors, (iv) the DIP Facility Agent, the DIP Facility Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (v) the First Lien Agent, the First Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vi) the Second Lien Agent, the Second Lien Lenders, or the respective directors, officers, employees, counsel, or other advisors of each of the foregoing, but only in their capacities as such, (vii) the members or Professionals of any statutory committee appointed during the Chapter 11 Case, but only in their capacities as such, or (viii) any of the successors or assigns of any of the parties identified in the foregoing clauses (i) through (vii), and none of the parties identified in the foregoing clauses (i) through (viii) shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective present or former directors, officers, employees, members, participants, agents, representatives, partners, affiliates, counsel, other advisors, successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code.**

**11.12    Term of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**11.13    Successors and Assigns and Binding Effect**

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Case.

**11.14    Modifications and Amendments**

The Debtors may alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**11.15    Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect

and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.16    Revocation, Withdrawal, or Non-Consummation**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**11.17    Notices**

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor or a Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, and (d) addressed as follows:

> RHI ENTERTAINMENT, INC.
> 1325 Avenue of Americas, 21st Floor
> New York, New York 10019
> Attention:    Henry S. Hoberman, Esq.
>                       Executive Vice President, General Counsel and Secretary
> Telephone:    (212) 261-9272
> Facsimile:    (212) 977-3917
>
> with copies to:
>
> LATHAM & WATKINS LLP
> 885 Third Avenue
> New York, New York 10022-4834
> Attention:    D. J. Baker, Esq.
> Telephone:    (212) 906-1200
> Facsimile:    (212) 751-4864

**11.18    Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of New York shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of each Debtor shall govern corporate governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof.

**11.19    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

Dated: November 1, 2010

RHI Entertainment, Inc.
RHIE Holdings Inc.
RHI Entertainment Holdings II, LLC
RHI Entertainment, LLC
RHI Entertainment Productions, LLC
RHI Entertainment Distribution, LLC
RHI International Distribution Inc.
NGP Holding, Inc.
HEGOA Inc.
Independent Projects, Inc.
Don Quixote, Inc.
HE Pro Tunes, Inc.
HEP Music, Inc.
Metropolitan Productions, Inc.
Library Storage, Inc.
HEP SS Music Inc.
SLB Productions, Inc.

By: _____
Robert A. Halmi, Jr.
President and Chief Executive Officer
RHI Entertainment, Inc.

D. J. Baker
Rosalie Walker Gray
Keith A. Simon
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:          dj.baker@lw.com
                    rosalie.gray@lw.com
                    keith.simon@lw.com

Proposed Counsel for Debtors and Debtors in Possession

39

**EXHIBIT A**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT A**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**Exit Revolving Credit Facility Term Sheet**

| | |
|---|---|
| *Borrower:* | RHI Entertainment, LLC ("RHI LLC" or the "Borrower"). |
| *Guarantors:* | The obligations of the Borrower shall be guaranteed by RHI INC, RHIE Holdings Inc., RHI Entertainment Holdings II, and each subsidiary of the Borrower that guarantees the Existing First Lien Credit Agreement (each a "Guarantor," and collectively, the "Guarantors"; together with the Borrower, the "Credit Parties"). |
| *Sole Lead Arranger and Sole Bookrunner:* | J.P. Morgan Securities Inc. (the "Lead Arranger"). |
| *Administrative Agent:* | JPMorgan Chase Bank, N.A. ("JPMCB" or, in its capacity as administrative agent under the Exit Revolving Credit Facility, the "Exit Revolving Agent"). |
| *Lenders:* | A syndicate of banks, financial institutions and other entities (including JPMCB) satisfactory to the Lead Arranger and the Exit Revolving Agent, selected in consultation with the Borrower and arranged by the Lead Arranger (collectively, the "Exit Revolving Lenders"). The Exit Revolving Credit Facility will be offered to the First Lien Lenders on a pro rata basis. |
| *Facility:* | The revolving credit facility (the "Exit Revolving Credit Facility" or the "Revolving Facility") will consist of a total revolving commitment (the "Revolving Commitment") of up to U.S.$25 million (the principal amounts advanced under the Revolving Facility, the "Revolving Loans"). The Revolving Commitment shall be subject to the Exit Revolving Lenders (including JPMCB) agreeing to provide the full amount thereof. The Lead Arranger will use reasonable commercial efforts to arrange, but not underwrite, the Revolving Facility. |
| *Letters of Credit:* | A portion of the Revolving Facility not in excess of U.S.$5.0 million shall be available for the issuance of letters of credit ("Letters of Credit") by JPMCB (or any of its banking affiliates) (in such capacity, the "Issuing Bank"). |
| *Purpose:* | The Revolving Commitment shall be available for working capital and other general corporate purposes of the Borrower and its Subsidiaries and affiliates (including, subject to limitations to appear in the Revolving Facility, RHI INC, RHIE Holdings Inc. and RHI Entertainment Holdings II) in accordance with the final Facility documents. The proceeds of the Revolving Loans may not be used (a) to refinance or repay any obligations relating to any film projects previously identified as "spillover" projects, other than such payments as were reviewed and approved by the First Lien Agent prior to the Closing Date, in each case, without the prior written consent of the Exit Revolving Agent and the Required Lenders (as defined below) or (b) towards the production of any Picture (as defined below), but the foregoing shall not prevent the use of proceeds of Loans towards development expenses, subject to compliance with the |

A-1

| | development expense covenant described below. |
|---|---|
| ***Documentation for Revolving Facility:*** | The Revolving Facility will be documented by, among other things, a credit, guaranty and pledge agreement (the "Revolving Credit Agreement") to be negotiated and entered into in form and substance satisfactory to the Exit Revolving Agent and the Exit Revolving Lenders. |
| ***Term:*** | The Revolving Loans shall be repaid in full upon the earliest of (i) the Maturity Date (as defined below) or (ii) the acceleration of the Revolving Loans in accordance with the Revolving Credit Agreement (together with the Maturity Date, the "Termination Date"). "Maturity Date" shall mean December 31, 2013. Upon the occurrence of the Termination Date, the Revolving Loans and other obligations under the Revolving Facility shall be repaid in full. |
| ***Closing Date:*** | Closing to occur, subject to the satisfaction of the conditions precedent set forth below and in the Revolving Credit Agreement, upon the occurrence of the Effective Date of the Plan. The date of such closing is referred to as the "Closing Date"). |
| ***New Second Lien Term Loan Facility:*** | Simultaneously with the Closing Date, the First Lien Lenders will convert their Existing First Lien Claims into the New Second Lien Term Loan Facility (the "Term Facility"; the credit agreement to be negotiated and entered into to evidence same, the "New Second Lien Term Credit Agreement"; the administrative agent under the Term Facility, the "New Term Agent"; the Exit Revolving Lenders thereunder, the "New Term Lenders"; and the term loans which are to be extended thereunder on a non-cash basis on the Effective Date, the "Term Loans")). The Term Loans will be guaranteed by the Guarantors and will be secured by a second lien security interest in the same Collateral that secures the Revolving Facility. The New Second Lien Term Loans will have the same maturity date as the Revolving Facility and will contain representations and warranties, affirmative and negative covenants, financial covenants and events of default (but not necessarily mandatory prepayment, amortization or economic terms) substantially the same as those contained in the Revolving Facility. |
| ***Subordination of Liens Securing Term Facility:*** | The liens in favor of the Exit Revolving Agent (on behalf of the Exit Revolving Lenders) securing the Revolving Facility shall be senior to the liens securing the Borrower's obligations under the Term Facility. |
| ***Intercreditor Agreement:*** | As a condition to the Closing Date, the Exit Revolving Agent shall have negotiated and entered into a first lien/second lien intercreditor agreement with the New Term Agent (the "Exit Intercreditor Agreement") pursuant to which the Exit Revolving Agent and the New Term Agent shall agree that the security interests securing the Term Facility are subject and subordinate to the security interests in favor of the Exit Revolving Agent securing the Revolving Facility; *provided, however,* that the Exit Intercreditor Agreement shall contain, among other things, the following provisions: (a) the Exit Revolving Agent shall agree that the aggregate amount of the Revolving Commitments shall at no point exceed U.S.$25 million, (b) until such point as the Exit Revolving Agent or Exit Revolving Lenders have accelerated the Revolving Loans or commenced secured creditors' remedies with respect to any of the Collateral or any of the Credit Parties has become the subject of a bankruptcy, insolvency or receivership proceeding, the Borrower shall be entitled to pay, and the New Term Lenders shall be entitled to accept, (i) payments of interest on the Term Loans and of any scheduled amortization as set forth under the New Second Lien Term Credit Agreement as of the Closing Date, (ii) any mandatory prepayments set forth in the New Second Lien Term Credit Agreement as of the Closing Date |

|  | (e.g., mandatory prepayments with 100% of the proceeds of additional indebtedness and of certain asset dispositions, with 50% of the proceeds of post-Closing Date equity contributions, with 75% of Excess Cash Flow (as defined below) and with certain proceeds of insurance recoveries), (c) so long as no event of default exists under the Revolving Facility, the Borrower shall be entitled to pay, and the New Term Lenders shall be entitled to accept, any voluntary prepayments or other prepayments of the Term Loans under the Term Facility, (d) until the repayment in full of all Indebtedness under the Revolving Facility and the termination of any commitments to extend additional credit thereunder (the "Revolving Facility Repayment Date"), any proceeds of the common Collateral securing the Term Facility and the Revolving Facility that are realized in connection with any enforcement actions with respect to such Collateral, and any recovery in any bankruptcy, insolvency or receivership shall be paid to the Exit Revolving Lenders prior to payments to the New Term Lenders and (e) various commitments and agreements between the Exit Revolving Agent and the New Term Agent with respect to, among other things, the commonality of collateral, application of proceeds of common Collateral, actions which may or may not be taken in the context of an insolvency proceeding and amendments to the Revolving Facility documentation and the Term Facility documentation. |
|---|---|
| *Priority and Liens:* | The Revolving Loans and all other monetary obligations under the Revolving Facility (and all guaranties of the foregoing by the Guarantors), shall at all times be secured by a perfected first priority lien (subject solely to permitted liens to be specified, including liens in favor of talent guilds on terms and conditions to be established in the Revolving Credit Agreement) on all of the Borrower's and the Guarantors' respective property and assets, as well as by a pledge of 100% of the Equity Interests (to be defined in the Revolving Credit Agreement) in each Guarantor (but not the Equity Interests in the Borrower) and all of the other Equity Interests owned by the Borrower and each Guarantor (but limited to pledges of 65% of the Equity Interests owned by any Credit Party in any "controlled foreign corporation"). |
| *Depository Relationship:* | The Borrower's and Guarantors' cash management arrangements shall be reasonably acceptable to the Exit Revolving Agent and satisfactory deposit account control agreements in favor of the Exit Revolving Agent shall be executed as a condition precedent to the Closing Date. The cash management arrangements and the deposit account control agreements shall provide that, (a) from and after the date that the Borrower is not in compliance with the required Coverage Ratio as described below, any and all sums in each deposit account shall, on a daily basis, be swept into a collection account maintained with the Exit Revolving Agent under the Revolving Facility (and any amounts received in such collection account shall be automatically applied on a daily basis to repay revolving indebtedness under the Revolving Facility) and (b) from and after the date that the Borrower is not in compliance with the required Coverage Ratio or the occurrence of an Event of Default, the Exit Revolving Agent shall have full dominion and control over each of the Credit Parties' deposit accounts. |
| *Commitment Fee:* | 0.50% per annum on the unused amount of the Revolving Commitments (with the issuance of Letters of Credit being treated as usage of the Revolving Commitments) payable monthly in arrears during the term of the Revolving Facility and on the Termination Date. |
| *Letter of Credit Fees:* | The Exit Revolving Agent shall receive for the benefit of the Exit Revolving Lenders a fee computed at a rate per annum equal to the applicable margin for LIBOR loans (calculated in the same manner as interest) on the face amount of each issued but undrawn Letter of Credit under the Revolving Facility.<br><br>In addition, the Issuing Bank shall receive for its own account a fee of 0.25% per annum of the face amount for each Letter of Credit plus customary fees for fronting, issuance, amendments |

| | |
|---|---|
| | and processing, payable quarterly in arrears to the Issuing Bank for its own account. |
| *Upfront Fees:* | The following up-front fees payable to the Exit Revolving Agent for the benefit of the Exit Revolving Lenders in consideration of the Exit Revolving Lenders' extension of their respective Revolving Commitments:  (i) in the case of each First Lien Lender which provides a Revolving Commitment in an amount such that its pro rata portion of the total Revolving Commitments meets or exceeds such Lender's pro rata share of the total commitments (whether revolving or term loan) under the Existing First Lien Credit Agreement, 4.00% of such Lender's Revolving Commitments and (ii) in the case of all other Lenders, 3.00% of each such Lender's Revolving Commitments.<br><br>The up-front fees shall be fully-earned and payable as a condition to the Closing Date and non-refundable under all circumstances. |
| *Interest Rate:* | The Revolving Loans will accrue interest at a floating rate equal to, at the Borrower's option:  (i) the Alternate Base Rate plus 2.00%; or (ii) LIBOR plus 3.00% for interest periods to be determined.<br><br>The Alternate Base Rate is the highest of (a) the Exit Revolving Agent's Prime Rate, (b) the Federal Funds Effective Rate plus 0.50%, and (c) one-month LIBOR plus 1.00% for interest periods of one, two or three months.<br><br>LIBOR shall at all times be subject to a 2.00% floor and will include statutory reserves at all times when there are reserves.<br><br>All interest and fees will be calculated on the basis of a 360 or 365 day year, as applicable, and actual days elapsed. |
| *Default Interest:* | 2.00% above the then applicable interest rate which will be applied to the entire unpaid balance of the Revolving Loans. |
| *Interest Payment:* | Interest on the Revolving Loans shall be paid monthly in arrears, on the last Business Day (to be defined in the Revolving Credit Agreement) of each calendar month. |
| *Borrowing Base:* | The sum of the aggregate outstanding amount of direct borrowings under the Revolving Commitment plus the undrawn amount of outstanding Letters of Credit (including, without duplication, unreimbursed draws) issued for the account of the Borrower shall at no time exceed the Borrowing Base.  The Borrowing Base shall be defined in a manner satisfactory to the Exit Revolving Agent.  Borrowing Base eligibility standards may be fixed and revised from time to time by the Exit Revolving Agent, in its sole discretion with respect to downward adjustments and with respect to reversals of prior upward adjustments.  The definition of "Eligible Receivables" under the Borrowing Base shall exclude, among other things, (a) accounts receivable from non-U.S., non-U.K. and non-Canadian obligors; (b) accounts receivable past due more than 60 days or from obligors from whom 20% or more of receivables are 180 or more days overdue, (c) accounts receivable which are included in the Borrower's estimated bad debts; (d) accounts receivable with no readily determinable due date or which are otherwise subject to any material conditions to payment; (e) accounts receivable that have been assigned and accounts receivable for Pictures for which the Borrower either has not paid or does not in good faith project to pay the relevant minimum guaranty or buy-out payment (such amounts excluding Pictures for which the only remaining amounts due are associated with assigned accounts receivable so long as the obligor whose payment obligations were assigned does not hold any known setoffs or counterclaims which would disqualify the payment obligations from being an |

A-4

| | |
|---|---|
| | Eligible Receivable had they been payable to Borrower); (f) accounts receivable from uncompleted Pictures; (g) accounts receivable from Pictures financed by the MAT IV German film fund; (h) any receivables for which there is a bona fide request for a material adjustment, credit, offset, counterclaim or dispute (only the account in question shall be excluded); (i) any receivables for which Borrower has not delivered to the account debtor a notice of assignment and irrevocable instructions in the form to be attached to the Revolving Credit Agreement or for which the Exit Revolving Agent does not have a perfected security interest, and (j) the following reserves for long-term accounts receivable: for accounts receivable due (A) more than 365 days from the date of determination, a reserve of 25% of the amount thereof; (B) more than two years from the date of determination, a reserve of 50% of the amount thereof and (C) more than three years from the date of determination, a reserve of 75% of the amount thereof.  Eligible Receivables shall, where applicable, be translated at current foreign exchange rates.  In addition to Eligible Accounts Receivable, the Borrowing Base shall include a film library credit equal to 5% of the then-current Library Appraisal Amount (defined below), but which film library credit may not exceed U.S.$10.0 million at any time.  Borrowing Base reserves will specifically include (i) an advance rate reserve against Eligible Receivables of 85%, (ii) a reserve of $8.0 million with respect to historic amounts due to the guilds and (iii) a reserve for amounts due to be paid to guilds arising out of the future collection of currently contracted accounts receivable (estimated to be approximately U.S.$3.0 million). |
| ***Conditions Precedent to Occurrence of Closing Date:*** | The consummation of the Closing Date shall be subject to the satisfaction of conditions that are typical for a facility of this type, including but not limited to: (i) the substantial consummation of the Plan; (ii) negotiation and execution of the Revolving Credit Agreement and the other definitive documentation relating to the Revolving Facility in form and substance satisfactory to the Exit Revolving Lenders and the Exit Revolving Agent, including the Exit Intercreditor Agreement; (iii) perfection of security interests granted in favor of Agent, delivery of customary legal opinions and satisfactory lien searches; (iv) payment of the Upfront Fees and any other fees required to be paid under the Fee Letter; (v) the Exit Revolving Agent's satisfaction, in its sole discretion, with a business plan, containing forecasted financial statements consisting of balance sheets, cash flow statements and income statements, with supporting detail and underlying assumptions, together with management commentary on such assumptions (a "<u>Business Plan</u>") all covering a period commencing with the Effective Date and through at least the Maturity Date; (vi) delivery of 13-week cash flow projection satisfactory to the Exit Revolving Agent in its sole and absolute discretion; (vii) delivery of disclosure schedules, officer's certificates, company resolutions and other customary closing deliverables and (viii) except to the extent waived by the Exit Revolving Agent, for each guild that holds any security interest in any motion picture, which security interest pre-dates and survives the Closing Date, the Exit Revolving Agent shall have received an acknowledgment executed by such guild, which acknowledgment shall be in form and substance satisfactory to the Exit Revolving Agent and shall provide that the security interests in favor of the Exit Revolving Lenders and the New Term Loan Lenders, as a combined class, have at least the same priority vis-à-vis the surviving liens of such guild as existed between such guild and the Existing First Lien Credit Agreement. |
| ***Representations and Warranties:*** | Standard representations and warranties for a facility of this type, including but not limited to, due incorporation and good standing, absence of requirements for consents or approvals, absence of liens, accuracy of financial statements, absence of a material adverse change, and absence of litigation on terms at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement. |
| ***Affirmative Covenants:*** | Standard affirmative covenants for a facility of this type and at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement, including but not limited to delivery of financial statements, maintenance of properties and insurance, causing material subsidiaries to become Credit Parties (pursuant to the parameters set forth in the Existing First |

|  | Lien Credit Agreement) and payment of taxes and other material obligations. |
|  | In addition, the Borrower and the Guarantors shall be required to: |
|  | (a)  deliver, on an annual basis, (a) an updated Business Plan in form and substance satisfactory to Agent covering the three year period following the date of preparation and (b) an independent third party valuation of the Borrower's and its subsidiaries' unsold titles in the form generally provided under the Existing First Lien Credit Agreement (the amounts reflected therein, the "Library Appraisal Amount"); |
|  | (b)  deliver, on a monthly basis, rolling 13 week cash flow projections ("Cash Flow Projections") in form and substance satisfactory to the Exit Revolving Agent and its advisors in their sole discretion evidencing minimum cash on hand at all times during the projection period in amounts to be determined; |
|  | (c)  deliver, on a monthly basis, certifications as to compliance with each of the financial covenants in the Revolving Facility; |
|  | (d)  demonstrate, on a monthly basis, that the Coverage Ratio (as defined below) is greater than, on the last day of each month described below, the ratios set forth below: |
|  | Month:                                                             Minimum Coverage Ratio:<br><br>Each month through November 2011               1.10:1.0<br>December 2011 (only)                                    1.15:1.0<br>Thereafter, each month through December 2012    1.20:1.0<br>Thereafter, each month through December 2013    1.25:1.0 |
|  | From and after the date on which it is determined that the Coverage Ratio is not satisfied, the cash management provisions described in the section entitled "Depository Relationship" shall be implemented. |
| *Negative Covenants:* | In addition, the Borrower will not, and will not permit any of its Subsidiaries to: |
|  | (a) (i) produce any motion picture project in-house or otherwise incur any direct negative cost for any motion picture project, (ii) green-light any motion picture project to be produced in an off-balance-sheet manner without having achieved an aggregate amount of pre-sales for such project in an amount equal to at least the cost to the Credit Parties of acquiring rights in such project (including without limitation the purchase price, whether characterized as a purchase price, negative pick-up payment, minimum guarantee, buyout or otherwise) and without having satisfied the other parameters to be set forth in the Revolving Credit Agreement (which shall include among other things that (A) the Credit Parties shall in no event be obligated to make payments to the relevant producer or any other person prior to the delivery of the relevant film, (B) in the event that any of the Credit Parties assign to the producer or the producer's financier(s) any right to payment under any sub-licenses or sub-distribution agreements (or otherwise convey or direct any such payment to the producer or its financier), the payment obligations of the sub-distributor shall be non-recourse to the Credit Parties  and (C) the Exit Revolving Agent shall have had at least two (2) Business Days' opportunity to review any such documentation prior to execution (with such review to be limited to confirming compliance with the Revolving Facility documentation)), (iii) produce or arrange the production of any motion picture intended for theatrical exploitation, or (iv) produce or arrange the production of any episodic television program unless (A) each of the foregoing provisions of this clause (a) has been complied with and (B) the Credit Parties have no completion risk with respect to the season at issue and no obligation whatsoever (including any "tail" or economic risk) with respect to any subsequent season; |

A-6

(b) assign any of its accounts receivable or grant a security interest in any such accounts receivable to any third party producer or any financier of any third party producer other than pursuant to parameters to be set forth in the Revolving Credit Agreement (which shall include that the Exit Revolving Agent shall have had at least two (2) Business Days' opportunity to review any such documentation prior to execution);

(c) permit the Fixed Charge Coverage Ratio (as defined below), determined annually, commencing with the twelve month period ending December 31, 2011, to be less than the amounts set forth below:

| For the 12-Month Period Ending: | Minimum FCCR: |
|---|---|
| December 31, 2011 | 1.05:1.0 |
| December 31, 2012 | 1.1:1.0 |
| December 31, 2013 | 1.25:1.0 |

(d) permit their Consolidated Cash Flow (as defined below), determined for the periods ending on the dates set forth below, to be less than the minimum amounts set forth below:

| For the Period Ending: | Minimum Consolidated Cash Flow: |
|---|---|
| February 28, 2011 | $9.5 million |
| March 30, 2011 | $6.0 million |
| April 30, 2011 | $6.0 million |
| May 31, 2011 | $6.0 million |
| June 30, 2011 | $1.0 million |
| July 31, 2011 | $1.0 million |
| August 31, 2011 | $4.0 million |
| September 30, 2011 | $3.0 million |
| October 31, 2011 | $11.0 million |
| November 30, 2011 | $18.5 million |
| December 31, 2011 | $23.0 million |
| January 31, 2012 | $26.0 million |
| February 29, 2012 | $26.0 million |
| March 30, 2012 | $28.0 million |
| April 30, 2012 | $30.0 million |
| May 31, 2012 | $30.0 million |
| June 30, 2012 | $32.0 million |
| July 31, 2012 | $32.0 million |
| August 31, 2012 | $32.0 million |
| September 30, 2012 | $35.0 million |
| October 31, 2012 | $38.0 million |
| November 30, 2012 | $41.0 million |
| December 31, 2012 | $44.0 million |
| January 31, 2013 | $46.0 million |
| February 28, 2013 | $46.5 million |
| March 30, 2013 | $45.5 million |
| April 30, 2013 | $45.0 million |
| May 31, 2013 | $44.5 million |
| June 30, 2013 | $44.5 million |
| July 31, 2013 | $44.0 million |
| August 31, 2013 | $43.5 million |
| September 30, 2013 | $44.0 million |
| October 31, 2013 | $45.0 million |
| November 30, 2013 | $45.5 million |
| December 31, 2013 | $47.5 million |

(e) permit the aggregate outstanding principal of any borrowings under the Term Facility or the

A-7

| | |
|---|---|
| | maximum commitment amounts under the Term Facility to exceed U.S.$300 million, less any amortization theretofore paid or required to be paid and less any other repayments or prepayments made under the Term Facility, at any time;<br><br>(f) permit their Overhead Expenses (to be defined in the Revolving Credit Agreement) to exceed the annual limits (but with evidence of compliance with the annual limits to be provided quarterly) set forth below:<br><br>Year:                                    Maximum Overhead Expenses:<br>2011                                      $24.0 million<br>2012                                      $24.5 million<br>2013                                      $25.5 million<br><br>(g) permit their development costs and expenses (net of any cash recoveries or proceeds received from (a) the disposition of any development properties and (b) reimbursement by any third party such as a producer of development costs and expenses incurred by a Credit Party) to exceed $2.5 million in any calendar year (with evidence of compliance with the annual limits to be provided quarterly). |
| *Events of Default:* | Standard events of default for a facility of this type and at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement, including but not limited to, payment default (two (2) Business Day grace period for non-payment of interest and fees only), breach of negative covenant (no grace period), cross-defaults to other Indebtedness (including a cross-default to any event of default under the Term Facility and any default in the payment of any secured monetary obligations to any guilds), other breach under the loan documents (ten day grace period), false representation or warranty, a Change of Control (as defined below), a Change in Management (as defined below), judgments, certain ERISA/pension and environment-related defaults, customary events of default regarding an insolvency, receivership or bankruptcy event with respect to any of the Credit Parties' or any of their subsidiaries' failure to comply with any requirements of the Plan. |
| *Yield Protection and Increased Costs; Taxes:* | Customary provisions (a) protecting the Exit Revolving Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Exit Revolving Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR Loan on a day other than the last day of an interest period with respect thereto. |
| *Costs and Expenses; Indemnification:* | The Borrower shall pay or reimburse the Exit Revolving Agent for (a) all reasonable fees and expenses of the Exit Revolving Agent associated with the syndication of the facilities contemplated hereby and the preparation, execution, delivery and administration of the Revolving Facility documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of Morgan, Lewis & Bockius LLP and any other counsel retained by the Exit Revolving Agent (and any agents retained by such counsel) and financial advisors) (it being understood that reasonable efforts will be made to minimize unnecessary duplication of services) and (b) all reasonable fees and expenses of the Exit Revolving Agent and the Exit Revolving Lenders (including the reasonable fees, disbursement and other charges of counsel) in connection with the enforcement of and preservation of rights under the Revolving Facility documents (including by way of a refinancing or restructuring of the Revolving Facility that is in the nature of a "workout" thereof).<br><br>The Borrower shall also pay or reimburse the Exit Revolving Agent for reasonable fees and expenses of the Exit Revolving Agent's respective internal and third-party auditors, appraisers, |

| | |
|---|---|
| | advisors and consultants incurred in connection with the Revolving Facility, including asset evaluation expenses, syndication expenses, rating agency fees and other charges and disbursements. |
| | The Exit Revolving Agent and the Exit Revolving Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof or the exercise of remedies thereunder (except resulting from the bad faith, gross negligence or willful misconduct of the indemnified person). |
| *Assignments and Participations:* | Exit Revolving Lenders will be permitted to participate and assign all or a part of their Loans. Assignments of Loans shall be in a minimum principal amount of U.S.$1 million. |
| | Voting rights of participants will be limited to changes in amount, collateral provisions relating to release of all or substantially all of the Collateral, rate, fees and maturity date.  Participants will receive cost and yield protection (without duplication and limited to the cost and yield protection available to the Exit Revolving Lenders issuing the participation).  Any assignment will be by novation and will be subject to the approval of the Exit Revolving Agent and the Issuing Bank (but not the approval of the Borrower).  Assignees will assume all the rights and obligations of the assignor Lender.  Each assignment will be subject to the payment of a $3,500 service fee by the assigning Lender to the Exit Revolving Agent. |
| *Voting:* | Required Lenders (defined to mean Exit Revolving Lenders holding at least a majority of the then-outstanding Revolving Commitments) except for amendments and waivers customarily requiring the consent of each directly affected Lender, including that the consent of each Lender shall be required in order (i) for the Exit Revolving Agent to (a) release or subordinate its security interest in any Collateral valued in excess of $250,000 or (b) subordinate its security interest in any Collateral valued in excess of $250,000 other than in connection with subordination in favor of a producer-for-hire of a picture to be distributed by the Credit Parties, on a single-picture basis, pursuant to parameters to be set forth in the definitive documentation in any particular transaction, (ii) to decrease the non-default or default rate of interest or (iii) to alter the final scheduled maturity of any Loan or the principal amount of any Loan, decrease the rate at which the Commitment Fees accrue or delay the fixed scheduled maturity of any payment required to be made under the Revolving Facility.  The Revolving Facility documents will provide among other things that if the Borrower requests an amendment which requires unanimous consent and such amendment is consented to by a Super-Majority (66-2/3%) of the Exit Revolving Lenders, then with the consent of such Super-Majority, the Lender(s) which did not consent to the amendment requested by the Borrower may be replaced at par pursuant to parameters to be established in the Revolving Credit Agreement. |
| *Defaulting Lenders:* | The Revolving Facility shall contain certain provisions regarding "Defaulting Lenders" (to be defined in the Revolving Credit Agreement), including without limitation that:  (a) the unused Commitment Fees shall cease to accrue on the Revolving Commitments of Defaulting Lenders; (b) the Revolving Commitments of Defaulting Lenders shall not generally be counted in matters requiring Lender votes; (c) if any "L/C Exposure" (to be defined in the Revolving Credit Agreement) exists, (i) so long as the total revolving credit exposures of the non-Defaulting Lenders would not be exceeded as a result thereof, the L/C Exposures of the Defaulting Lenders shall be reallocated among non-Defaulting Lenders pro rata in accordance with their Revolving Commitments and (ii) solely to the extent that the reallocation described in clause (i) cannot, or can only partially, be effected, the Borrower shall be required to cash collateralize the remaining L/C Exposure (after the application of clause (i) above) of all Defaulting Lenders; (d) any payments which would otherwise be payable to any Defaulting Lenders will be adjusted as |

A-9

| | |
|---|---|
| | appropriate pursuant to mechanisms to be set forth in the Revolving Credit Agreement; (e) the Borrower shall have the right to replace a Defaulting Lender with an otherwise qualifying Lender pursuant to a customary lender replacement provision; and (f) in the event a Defaulting Lender fails to fund its share of any borrowing, the non-Defaulting Lenders shall fund their pro rata shares of the total requested borrowing (subject to availability of their Revolving Commitments). |
| *Agency:* | Usual and customary agency provisions satisfactory to the Exit Revolving Agent. |
| *Documentation:* | Reasonably satisfactory in form and substance to the Exit Revolving Agent, the Exit Revolving Lenders and the Borrower. |
| *Governing Law:* | New York. |
| *Certain Defined Terms:* | "Change of Control" shall mean the first day on which (i) a majority of the members of the Board of Directors of the Borrower are not Continuing Directors, (ii) any "person" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder as in effect from time to time), other than any persons which were on the Closing Date a New Term Lender and persons that are affiliates of such a Closing Date New Term Lender, shall own, directly or indirectly, beneficially or of record, shares of New Common Stock representing more than 50% of the voting Equity Interests of RHI INC (measured by voting power rather than number of shares or membership interests), (iii) RHI INC shall cease to have both beneficial ownership and control of 100% of the voting Equity Interests of the Borrower or (iv) the Borrower shall cease to have both beneficial ownership and control of 100% of the voting Equity Interests of each of RHI Entertainment Distribution, LLC, RHI Entertainment Productions, LLC and RHI International Distribution, Inc.  In addition, to the extent that the Management Incentive Plan includes any change of control concept in addition to the foregoing, the definitive documentation shall include a corresponding provision within the definition of "Change of Control". <br><br> "Change in Management" shall mean that the Borrower shall cease to employ an acceptable chief executive officer or shall cease to employ an acceptable executive vice president of finance (or chief financial officer if such position is utilized) or shall cease to employ an acceptable strategic planning officer, in each case to perform services substantially similar in scope to those provided for Borrower as of the Closing Date; provided, that (a) Robert Halmi, Jr., Michael Scarpelli and Robert Del Genio are pre-approved as an acceptable chief executive officer, executive vice president of finance, and strategic planning officer, respectively and (b) a Change in Management shall not be deemed to have occurred if, within ninety (90) days after the event (provided that such period shall only be thirty (30) days if the underlying event relates to the lack of employment of a strategic planning officer) which would otherwise have resulted in a Change in Management, a person acceptable to the Exit Revolving Agent and the Required Lenders replaces the prior relevant officer pursuant to terms and conditions (including with respect to scope of employment) satisfactory to the Exit Revolving Agent and the Required Lenders, and any proposed replacement shall be deemed "acceptable" unless the Exit Revolving Agent or the Required Lenders has determined the proposed replacement to not be acceptable within fifteen (15) Business Days notice to the Exit Revolving Agent of his or her candidacy; provided, that, solely in the context of the strategic planning officer, any determination that a replacement is "acceptable" by the New Term Agent shall be effective and controlling with respect to the Exit Revolving Agent and the Exit Revolving Lenders. <br><br> "Consolidated Cash Flow" shall mean for any period of determination, "Net cash provided by operating activities" of the Borrower and its Consolidated Subsidiaries as would be shown on a Consolidated Statement of Cash Flows prepared in accordance with GAAP plus (i) cash interest |

expense for the relevant period less permitted capital expenditures for such period plus (ii) cash paid in connection with restructuring activities (including without limitation amounts drawn under the pre-petition L/C issued in favor of RHI LLC's landlord to the extent the draw thereunder was included in "net cash provided by operating activities", severance, payments in connection with settlement of the "spillover" Pictures and any productivity bonuses paid to Robert Halmi Sr. with respect to spillover films that were released pre-petition) plus (iii) expenses that are accrued and paid to the strategic planning officer during such period.

For all month-end dates of determination, Consolidated Cash Flow is to be determined for the twelve month period ending on such date of determination.

"Continuing Director" shall mean, as of any date of determination, each member of the Board of Directors of the Borrower who (a) was a member of such Board of Directors on the Effective Date or (b) was endorsed for election or elected to such Board of Directors either (x) with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election or (y) by or with the consent of the Required Lenders.

"Coverage Ratio" shall mean the ratio of (i) the sum of the Library Appraisal Amount plus the amount of the Adjusted Receivables (to be determined in the manner set forth in the Revolving Credit Agreement) of the Borrower and the Guarantors to (ii) the aggregate amount of secured Indebtedness (to be determined in the Revolving Credit Agreement).  (Adjusted Receivables shall include book and non-book receivables, with exclusions of non-qualifying receivables similar to the exclusions applicable to Eligible Receivables, but without excluding foreign receivables, and applying a 10% present value discount on all receivables due more than 365 days from the date of determination in lieu of the Borrowing Base discount/reserves for long-term receivables.)

"Excess Cash Flow" shall mean, for any period for which it is to be determined, (x) the Consolidated "Net cash provided by operating activities" as would be shown on a Consolidated Statement of Cash Flows of the Borrower and its Consolidated Subsidiaries prepared in accordance with GAAP minus (y) the sum of (i) principal repayments by the Borrower or any of its Consolidated Subsidiaries on their Indebtedness,  including principal repayments on the Revolving Loans and the principal portion of payments under Capital Leases (to be determined in the Revolving Credit Agreement) (but exclusive of mandatory payments during the period based upon the amount of Excess Cash Flow during prior periods as well as payments on Indebtedness to guilds and any payments that can be reborrowed), (ii) permitted Capital Expenditures (to be determined in the Revolving Credit Agreement), to the extent paid in cash from sources other than the net proceeds of secured purchase money financing, (iii) dividends paid or payable to RHI INC during such period for the payment of taxes permitted hereunder for such period, to the extent not deducted in computing "Net cash provided by operating activities" and (iv) financing fees (including bank fees and professional fees) that are required to be classified in the "Net cash provided by financing activities" section of a Consolidated Statement of Cash Flows.

"Fixed Charge Coverage Ratio" shall mean for any period of determination, the ratio of (i) Consolidated Cash Flow for the relevant period to (ii) Fixed Charges for such period.  The Fixed Charge Coverage Ratio is to be determined for the twelve month period ending on any date of determination.

"Fixed Charges" shall mean, for any period for which it is to be determined, the sum of (a) cash total interest expense (including without limitation interest on the Term Loans and interest on the Revolving Facility), plus (b) scheduled payments on principal of Indebtedness (exclusive of repayments of revolving credit loans under the Revolving Facility and any mandatory prepayments under the Term Facility, but inclusive of any required amortization under the Term

| | Facility), in each case of the Borrower and its Consolidated Subsidiaries. "Library Appraisal Amount" shall have the meaning set forth in clause (a) of "Affirmative Covenants" in this term sheet. |
|---|---|

**EXHIBIT B**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**Final Term Sheet with Directors Guild of America, Inc., Screen Actors Guild, Inc., and
Writers Guild of America West, Inc. for itself and its affiliate Writers Guild of America East, Inc.**

**Final Term Sheet with Alliance of Canadian Cinema, Television and Radio Artists**

**Final Term Sheet with American Federation of Television and Radio Artists**

**Final Term Sheet with Media Entertainment and Arts Alliance**

**Final Term Sheet with Equity**

FINAL TERM SHEET

This Term Sheet ("Term Sheet"), when signed by the parties listed below ("the Parties"), shall constitute a binding agreement between the Parties and shall be in full force and effect until and unless it is replaced with a long form settlement agreement which the parties are in the process of negotiating and intend in good faith to conclude. The Parties to this Term Sheet are RHI Entertainment Distribution LLC, on behalf of itself, its parents, subsidiaries, production entities and related entities (collectively "RHI"), on the one hand, and the Directors Guild of America, Inc. ("DGA), the Screen Actors Guild, Inc. ("SAG") and the Writers Guild of America West, Inc. (on behalf of itself and the Writers Guild of America, East, Inc.)("WGA") (the DGA, SAG and the WGA are collectively referred to herein as "the Guilds"), on the other hand.

This Term Sheet resolves all issues relating to any claims for residuals allegedly due, as well as pension, health and welfare contributions and payroll taxes on such residual payments (collectively "residual obligations"), with respect to the films ("the RHI Films") listed on Exhibit A attached hereto as well as with respect to the residual obligations relating to rights exploited by RHI in the films ("the Crown Films") listed on Exhibit B attached hereto, it being understood that Crown Media Holdings, Inc.("Crown") is responsible for the residual obligations at issue relating to the Crown Films.

NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS AND PROMISES MADE HEREIN, THE PARTIES AGREE AS FOLLOWS:

1.      The Guilds agree to support a reorganization plan under which a new or reorganized entity (herein for convenience referred to as "RHI Newco") will be owned by RHI's lenders and emerge from the Chapter 11 bankruptcy proceedings. Additionally, under said reorganization plan, the existing RHI entities that are signatory to the Guilds' Basic Theatrical and Television Agreements ("the Collective Bargaining Agreements") and/or are obligated to make residual payments to the Guilds (collectively, "the RHI Signatories") will emerge from the Chapter 11 proceedings and will be the owner(s) of the RHI Films and the Crown Films. RHI Newco will be the owner of the assets of RHI, including its interests in the RHI Signatories.

2.      With respect to new motion pictures produced after they emerge from the Chapter 11 Bankruptcy Proceedings, the RHI Signatories will continue to be signatories to the Collective Bargaining Agreements with the Guilds in the same manner and to the same extent as prior to the filing of said Bankruptcy Proceedings and the RHI Signatories agree to pay and remain current on the residual obligations as they come due for such new motion pictures in accordance with the terms of the Collective Bargaining Agreements.

3.      With respect to the RHI Films and RHI's rights in the Crown Films, the RHI Signatories will assume all existing Guild collective bargaining agreements and/or assumption agreements, except that the obligations assumed will not include the obligations being settled under this Agreement.

4.      Payments to the Guilds will be as follows:

(i)      RHI Newco will cause the RHI Signatories to pay to the Guilds one hundred percent (100%) of the total residual obligations owed by RHI with respect to the RHI Films as of the filing of the Chapter 11 proceeding (the "RHI Pre-Petition Claim"). The parties agree that the total residual obligations which RHI owes as of the filing date of the Chapter 11 proceeding (the "Petition Filing Date") is deemed to be $ 15,337,980.[1]  In addition, RHI Newco will cause the RHI Signatories to pay an additional thirty percent (30%) of the RHI Pre-Petition Claim ($4,601,394) to cover all pension contributions, health and welfare contributions and all payroll taxes (including, but not limited to, the employer's share of FICA )(collectively these additional payments shall be referred to as "Fringes"). As provided below, to the extent said thirty percent (30%) Fringe payments exceed the amount needed to pay Fringes when payments to employees are calculated pursuant to paragraph 4(v), below, the excess shall be applied first to defray the costs of the payroll company services and any remaining excess will then be credited toward acceleration of the payment of the RHI Pre-Petition Claim, applied first to the oldest amount due.

(ii)      Said total of $19,939,374 shall be payable as follows:

$255,633.00 for residuals and $76,689.90 for Fringes (a total of $332,322.90) per month ratably over 60 months commencing with and due upon the first of the month following the month in which RHI Newco exits the Chapter 11 proceedings (each a "Basic Installment Payment"). Each Basic Installment Payment will be wired to an account maintained by the Guilds (the "Guild Payment Account"), which shall be an interest bearing account.

(iii)      In the event RHI Newco or its designated related entity or entities fails to make a Basic Installment Payment when due, the Guilds may declare an event of default by giving written notice to RHI Newco and the agent (the "Agent") for RHI Newco's lenders under the term loan credit facility contemplated by the plan of reorganization described in Section 1 above (the " Exit Term Loan Facility") of such failure. If the RHI Signatories or the Agent then fails to cure such default within five (5) calendar days of its receipt of such default notice, the remaining installments due under this Section 4 (but not the payment for the month in default) shall be accelerated to a 42 month payment schedule (each an "Accelerated Installment

---

[1] This amount and all related amounts will be re-calculated to reflect updated residual and Fringe amounts accrued or paid to the Guilds as of the Petition Filing Date.   The Guilds and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

2

2863189.7

Payment")[2], due upon the first of each applicable month. In the event that the RHI Signatories or the Agent fail to make the payment for the month in default within fifteen (15) calendar days after the Guilds give the original written notice of default, the Guilds may, by written notice to RHI Newco and the Agent, declare the remaining outstanding balance of the amount owed under this Section 4 to be immediately due and payable. In the event the RHI Signatories fail to make, when due, an Accelerated Installment Payment, the Guilds may declare an event of default by giving written notice to RHI Newco and the Agent of such failure and if the RHI Signatories or the Agent then fail to cure such default within fifteen (15) days of their receipt of such default notice, the Guilds by written notice to RHI Newco and the Agent may declare the remaining outstanding balance due the Guilds under this Section 4 to be immediately due and payable. In the event that the Agent or the required lenders declare an event of default under the Exit Term Loan Facility and accelerate RHI Newco's obligations under the Exit Term Loan Facility, the Agent shall provide immediate notice to the Guilds, and the Guilds may declare immediately due and payable the remaining balance of the amounts owed the Guilds under this Section 4. Concurrently with the Guilds giving any notice to RHI Newco pursuant to this provision, they shall give a copy of such notice to the Agent.

(iv)    All Basic Installment Payments and Accelerated Installment Payments paid to the Guilds under Sections 4(ii) and 4(iii) will be held in the Guild Payment Account until disbursed to employees represented by the Guilds pursuant to Section 4(v) below. All interest earned on such interest bearing account shall be used to help defray the cost of the payroll company services set forth in Section 4(v) below. RHI and the Lenders agree that all Basic Installment Payments and Accelerated Installment Payments are within the normal course of business and are indefeasibly transferred to the Guilds upon payment.

(v) At the end of each 6-month period following the Plan effective date, RHI Newco or the RHI Signatories and the Guilds will coordinate with Entertainment Partners or another payroll service acceptable to RHI Newco and the Guilds (the "Payroll Company"), so that the installment payments received by the Guilds over that 6-month period can be allocated and paid to the Guild-represented employees in the manner specified by each Guild collective bargaining agreement. The Guilds will fund such payments to Guild-represented employees, including Fringes, from such Section 4 installment payments to the Guilds. If the actual Fringes (including allowances for employer credits) are less than 30% of the ratable portion of the RHI Pre-Petition Claim then due, the excess shall be first applied to any fees and related costs then due and owing to the Payroll Company and then any remaining excess will be credited toward acceleration of the payment of the RHI Pre-Petition Claim, credited first to the last payment due. In the event the amount of any excess is insufficient to pay the fees and related costs due and owing to the Payroll Company for its services under this Section, the RHI Signatories will pay any additional amount then due and owing to the Payroll Company.

---

[2] References to moving to a 42 month schedule in this Agreement mean that subsequent monthly installment payments will be increased by the amount that a monthly payment under a 42 month amortization schedule exceeds the monthly payment under the 60 month monthly payment schedule specified herein.

2863189.7

(vi) If at the time there is a payoff/refinancing of the Exit Term Loan Facility for any reason the monthly amortization schedule is still on a sixty (60) month basis, the remaining monthly payments will be increased by the amount which the monthly amortization amount computed on a forty-two (42) month schedule exceeds the monthly amortization amount computed on a sixty (60) month schedule.[3] This increase in the amortization rate is independent of any event of default. Notwithstanding the foregoing, if, at the time of such payoff/refinancing, the amortization rate has been increased pursuant to Section 4(iii), it will not be subject to any additional increase as a result of an event contemplated by this Section 4(vi).

(vii) Commencing on the date that payment is due for the Basic Installment Payment for Month 43, interest on the unpaid balance of the RHI Pre-Petition Claim shall accrue from that date at the then existing rate for United States Treasury Bills with a maturity of one (1) year. Said interest shall be calculated and paid at the end of each six month period with the first such six month period commencing with Month 43.

5.      RHI will facilitate the resolution of all claims relating to the Crown Films. RHI and the Guilds agree that the total sum of residual obligations (exclusive of Fringes) based upon RHI's exploitation of the Crown Films as of the Petition Filing Date with respect to all exhibitions and/or distribution of the Crown Films through RHI in all media as of the Petition Filing Date (the "Crown Pre-Petition Claim") is deemed to be $8,014,369[4], which amount will be increased by the related Fringes as calculated by the Payroll Company. RHI will obtain Crown's agreement, which agreement will be in the form attached hereto as Exhibit C ( the "Crown Side Letter Agreement"), to pay said total liability as follows:

A.      Payment of $2,500,000 on the first of the month following the month in which the plan of reorganization for RHI is confirmed by the bankruptcy court in the Chapter 11 proceeding for RHI.

B.      Payment of the remaining amount of the Crown Pre-Petition Claim no later than January 5, 2011.

C.      Crown will use a payroll process essentially identical to Section 4(v) of this Proposal, including payment of all Fringes, for the distribution of the two payments specified above to the Guild-represented employees entitled thereto.

6.      With respect to pictures returned to producers or financiers ( the "Spillover Titles"), RHI will cause such producers or financiers to assume post-return residuals, and upon receipt of standard form assumption agreements regarding the Spillover Titles executed by such

---

[3] References to moving to a 42 month schedule in this Agreement mean that subsequent monthly installment payments will be increased by the amount that a monthly payment under a 42 month amortization schedule exceeds the monthly payment under the 60 month payment schedule specified herein.

[4] This amount and all related amounts will be re-calculated to reflect updated residual and Fringe amounts accrued or paid to the Guilds as of the Petition Filing Date. The Guilds and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

4

producers or financiers, RHI and RHI Newco will have no further obligations with respect to such post-return residuals.

7.     The RHI Signatories will pay (or cause to be paid) currently when due all residual obligations incurred with respect to any distribution of the RHI Films and Crown Films by them on or after the date RHI Newco exits the Chapter 11 proceedings. RHI will cause all residuals and Fringes which accrue between the Petition Filing Date and the date that RHI Newco exits the Chapter 11 proceedings, as payable by RHI or by Crown, to be paid in full when due.

8.     As of the Plan effective date, the RHI Signatories will own RHI's rights in all of the RHI and Crown Films and the Guilds' and RHI's Lenders' current lien priorities will be preserved. All existing Guild liens in connection with the RHI Films and the Crown Films shall remain in full force and effect.

9.     In consideration of the agreements and covenants of RHI set forth in this Agreement, the Guilds agree to provide a full release to RHI, Crown, their respective principals and production company partners with respect to which RHI or Crown has assumed residual obligations, as well as to any and all third parties, with respect to the claims being settled pursuant to this Agreement relating to exploitation by RHI of the RHI Films and Crown Films and arising prior to the filing date, including under the 2003 Settlement Agreements and including pension, health and welfare contributions and payroll taxes relating thereto as well as any claims for late fees, interest, liquidated damages or other penalties; provided, however, that such release will not apply to amounts due and owing under this Agreement in the event of any default by RHI under Paragraph 4 of this Agreement that is not timely cured and that results in the Guilds declaring the remaining outstanding balance due the Guilds under Section 4 to be immediately due and payable; and provided further, that this release does not extend to claims against Crown for payments due under Paragraph 5 in the event of a default by Crown in the payments required under Paragraph 5; and finally provided that this release does not extend to claims in connection with rights not exploited by RHI (i.e., rights in the Crown Films which are not owned or exploited by RHI). The Guilds and RHI will cooperate to obtain releases from the Guild pension and health plans of any claims those plans may have for contributions based upon any residuals allegedly due other than on residuals payable under the terms of this Agreement when and as such residual payments are due hereunder.

10.     This Agreement shall be effective with respect to any plan of reorganization for RHI that is supported by RHI and RHI's first lien lenders and which plan is consistent with and approves of all terms of this Agreement.

11.     This Agreement may be signed and delivered (including by facsimile transmission or pdf) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.     The Guilds' obligations under this Agreement are conditioned upon Crown executing the Crown Side Letter Agreement.

13.     This Agreement shall be governed by and construed under the laws of the state of New York without giving effect to that state's choice of law rules.

[The remainder of this Page is intentionally left blank.]

2863189.7

Executed this 27th day of August, 2010

Writers Guild of America, West, Inc.
on behalf of itself and Writers Guild
of America, East, Inc.

By _____

Title _____

Directors Guild of America, Inc.

By _____

Title _____

Screen Actors Guild, Inc.

By _____

Title _____

RHI Entertainment
Distribution LLC

By _____

Title _____

7

2863189.7

Executed this 27th day of August, 2010

Writers Guild of America, West, Inc.
on behalf of itself and Writers Guild
of America, East, Inc.

RHI Entertainment
Distribution LLC

By_____

By _____

Title _____

Title _____

Directors Guild of America, Inc.

By _____

Title _____

Screen Actors Guild, Inc.

By _____

Title _____

7

Executed this 27th day of August, 2010

Writers Guild of America, West, Inc.                    RHJ Entertainment
on behalf of itself and Writers Guild                  Distribution LLC
of America, East, Inc.

By_____                          By_____

Title_____                          Title_____

Directors Guild of America, Inc.

By_____

Title_____

Screen Actors Guild, Inc.

By _____

Title Deputy National Executive Director
     & General Counsel

7

2863189.7

Executed this 27th day of August, 2010

Writers Guild of America, West, Inc.
on behalf of itself and Writers Guild
of America, East, Inc.

By_____

Title_____

Directors Guild of America, Inc.

By_____

Title_____

Screen Actors Guild, Inc.

By_____

Title_____

RHI Entertainment
Distribution LLC

By_____
Henry S. Hoberman
Title _____ Exec. V.P., General Counsel
& Secretary

7

2863189.7

EXHIBIT A

## RHI TITLES

1    10 POINT 5
2    10 POINT 5 APOCALYPSE
3    5IVE DAYS TO MIDNIGHT
4    ABOVE AND BEYOND
5    ACCEPTANCE
6    ACCIDENTAL FRIENDSHIP
7    ACES N' EIGHTS
8    ALICE
9    ALL I WANT FOR CHRISTMAS
10    AMBULANCE GIRL
11    AN UNEXPECTED LOVE
12    ANGEL IN THE FAMILY
13    ANN RULE PRESENTS THE STRANGER BESIDE ME
14    ANNIE'S POINT
15    ANSWERED BY FIRE
16    ARCHANGEL
17    ARTHUR HAILEY'S DETECTIVE
18    ASSIGNMENT BERLIN
19    AUDREY'S RAIN
20    AVENGING ANGEL
21    AZTEC REX
22    BACK TO YOU AND ME a/k/a HOME AGAIN
23    BACKWOODS
24    BEYOND THE CALL
25    BITTEN
26    BLACK FRIDAY
27    BLACK SWARM
28    BLACKBEARD
29    BLOOD MONKEY
30    BLOODKNOT
31    BLUE RIVER
32    BOOK OF RUTH, THE
33    BOYFRIEND FOR CHRISTMAS
34    CARNY
35    CAROL CHRISTMAS, A
36    CASE OF THE WHITECHAPEL VAMPIRE, THE
37    CATEGORY 6: DAY OF DESTRUCTION
38    CATEGORY 7: THE END OF THE WORLD
39    CAVEDWELLER
40    CHARMS FOR THE EASY LIFE
41    CHRISTMAS CARD
42    CHRISTMAS CAROL, THE MUSICAL
43    CHRISTMAS IN CANAAN
44    CHRISTMAS VISITOR
45    CIRCUIT, THE
46    CLAIRE
47    CLOVER
48    COAST TO COAST

| 49 | COLOR OF JUSTICE |
| 50 | COLOUR OF MAGIC |
| 51 | COLT, THE |
| 52 | CONUNDRUM |
| 53 | COURTYARD, THE |
| 54 | CRASH AND BURN |
| 55 | CROC |
| 56 | CROOKED E: THE UNSHREDDED TRUTH ABOUT ENRON |
| 57 | CROWN HEIGHTS |
| 58 | CURSE OF KING TUT'S TOMB |
| 59 | D.C. 9/11: TIME OF CRISIS |
| 60 | DALVA |
| 61 | DARK BEAUTY |
| 62 | DEACONS FOR DEFENSE |
| 63 | DEADLY SUSPICION |
| 64 | DEFENDING OUR KIDS: THE JULIE POSEY STORY |
| 65 | DELIVERANCE OF ELAINE, THE |
| 66 | DEPTH CHARGE |
| 67 | DESOLATION CANYON |
| 68 | DETENTION |
| 69 | DEVIL'S MISTRESS |
| 70 | DINOTOPIA |
| 71 | DO YOU KNOW ME? |
| 72 | DOG BOYS |
| 73 | DR. JEKYLL AND MR. HYDE- 2007 MOVIE |
| 74 | DREAMKEEPER |
| 75 | DRIVE TIME MURDERS |
| 76 | DUE EAST |
| 77 | DYING TO BELONG |
| 78 | DYNASTY:MAKING OF A GUILTY PLEASURE |
| 79 | EARTHSEA |
| 80 | EDGE OF AMERICA - SHIPROCK |
| 81 | ELIZABETH SMART STORY |
| 82 | END OF SUMMER |
| 83 | EVERYTHING SHE EVER WANTED |
| 84 | EYE OF THE BEAST |
| 85 | FACE DOWN |
| 86 | FACE OF EVIL |
| 87 | FALLING IN LOVE WITH THE GIRL NEXT DOOR |
| 88 | FAMILY PLAN, THE |
| 89 | FARSCAPE IV [SERIES 22 EPS.] |
| 90 | FARSCAPE: THE PEACEKEEPER WARS |
| 91 | FIELDER'S CHOICE |
| 92 | FIGHTING FOR MY DAUGHTER |
| 93 | FINAL APPROACH |
| 94 | FINAL DAYS OF PLANET EARTH, THE |
| 95 | FINISH LINE |
| 96 | FIRST FAMILY |
| 97 | FIXER, THE |
| 98 | FLASH GORDON - THE SERIES (20 EPISODES) |
| 99 | FOR ONE NIGHT |
| 100 | FRANK HERBERT'S CHILDREN OF DUNE |

| | |
|---|---|
| 101 | FRANKENSTEIN |
| 102 | FULL BODY MASSAGE |
| 103 | GANG IN BLUE |
| 104 | GENTLE BEN 2: BLACK GOLD |
| 105 | GENTLE BEN: TERROR ON THE MOUNTAIN |
| 106 | GLEASON |
| 107 | GONE BUT NOT FORGOTTEN |
| 108 | GOOD FENCES |
| 109 | GRACE & GLORIE |
| 110 | GRACIE'S CHOICE |
| 111 | GRAND LARCENY |
| 112 | GRANDPA FOR CHRISTMAS, A |
| 113 | GRAVE MISCONDUCT |
| 114 | GRINDSTONE ROAD |
| 115 | GRIZZLY RAGE |
| 116 | GUNFIGHTER'S PLEDGE |
| 117 | HARD GROUND |
| 118 | HARD RIDE TO HELL |
| 119 | HARM'S WAY |
| 120 | HAUNTING SARAH |
| 121 | HEART OF A STRANGER |
| 122 | HEARTS ADRIFT |
| 123 | HEATSTROKE |
| 124 | HELLHOUNDS |
| 125 | HERCULES |
| 126 | HIDDEN PLACES |
| 127 | HIGH PLAINS INVADERS |
| 128 | HIVE, THE |
| 129 | HOGFATHER |
| 130 | HOLLYWOOD MOM'S MYSTERY, THE |
| 131 | HOME SONG |
| 132 | HOMELESS TO HARVARD |
| 133 | HUMAN TRAFFICKING |
| 134 | HUNGER POINT |
| 135 | HYBRID |
| 136 | I DO BUT I DON'T |
| 137 | I WAS A TEENAGE FAUST |
| 138 | ICON |
| 139 | IN THE LINE OF DUTY: FBI MURDERS, THE |
| 140 | IN THE SPIDER'S WEB |
| 141 | INFECTED |
| 142 | INSPECTORS |
| 143 | IVANA TRUMP'S: FOR LOVE ALONE |
| 144 | JACK |
| 145 | JANE DOE 1: VANISHING ACT |
| 146 | JANE DOE 2: NOW YOU SEE IT |
| 147 | JANE DOE 3: THE WRONG FACE |
| 148 | JANE DOE 4: TILL DEATH DO US PART |
| 149 | JANE DOE 5: THE HARDER THEY FALL |
| 150 | JANE DOE 6: YES, I REMEMBER IT WELL |
| 151 | JANE DOE 7: HOW TO FIRE YOUR BOSS |
| 152 | JANE DOE 8: TIES THAT BIND |

| | |
|---|---|
| 153 | JANE DOE 9: EYE OF THE BEHOLDER |
| 154 | JASPER, TEXAS |
| 155 | JOHNSON COUNTY WARS |
| 156 | JONATHAN STONE:THREAT OF INNOCENCE |
| 157 | JOURNEY TO THE CENTER OF THE EARTH-2007 REMAKE |
| 158 | JUST A DREAM |
| 159 | JUST DESSERTS |
| 160 | KILLER INSTINCT: THE FILES OF AGENT CANDICE DELONG |
| 161 | KILLER WAVE |
| 162 | KING & QUEEN OF MOONLIGHT BAY |
| 163 | KING OF TEXAS |
| 164 | KING SOLOMON'S MINES [4 HRS.] |
| 165 | KNIGHTS OF BLOODSTEEL |
| 166 | KUNG FU KILLER (PART 1 & 2) |
| 167 | LA FEMME MUSKETEER |
| 168 | LAST CALL |
| 169 | LAST COWBOY, THE |
| 170 | LAST TEMPLAR, THE |
| 171 | LIFE ON LIBERTY STREET |
| 172 | LION IN WINTER |
| 173 | LONE RIDER |
| 174 | LONG SHOT |
| 175 | LOSING CHASE |
| 176 | LOVE COMES SOFTLY |
| 177 | LOVE IS A FOUR LETTER WORD |
| 178 | LOVE'S ABIDING JOY |
| 179 | LOVE'S ENDURING PROMISE |
| 180 | LOVE'S LONG JOURNEY |
| 181 | LOVE'S UNENDING LEGACY |
| 182 | LOVE'S UNFOLDING DREAM |
| 183 | LYING TO BE PERFECT |
| 184 | MALDONADO MIRACLE, THE |
| 185 | MANEATER |
| 186 | MARCO POLO |
| 187 | MARK TWAIN'S ROUGHING IT |
| 188 | MASK OF THE NINJA |
| 189 | MCBRIDE 1: MURDER PAST MIDNIGHT |
| 190 | MCBRIDE 2: CHAMELEON MURDER, THE |
| 191 | MCBRIDE 3: ITS MURDER, MADAM |
| 192 | MCBRIDE 4: DOCTOR IS OUT... REALLY OUT |
| 193 | MCBRIDE 5: TUNE IN FOR MURDER |
| 194 | MCBRIDE 6: ANYBODY HERE MURDER MARTY? |
| 195 | MCBRIDE 7: FALLEN IDOL |
| 196 | MCBRIDE 8: DOGGED |
| 197 | MCBRIDE 9: SEMPER FI |
| 198 | MCBRIDE 10: REQUIEM |
| 199 | MEET THE SANTAS |
| 200 | MEMBER OF THE WEDDING |
| 201 | MENNO'S MIND |
| 202 | MERLIN'S APPRENTICE |
| 203 | METEOR |
| 204 | MIND GAMES - TRAUMA |

| 205 | MITCH ALBOM-5 PEOPLE YOU MEET IN HEAVEN |
| 206 | MOM AT SIXTEEN |
| 207 | MONEY PLAYS |
| 208 | MONSTER MAKERS |
| 209 | MONTE WALSH |
| 210 | MORE THAN MEETS THE EYE: JOAN BROCK STORY |
| 211 | MR. SAINT NICK |
| 212 | MR. STITCH |
| 213 | MURDER 101: COLLEGE CAN BE MURDER |
| 214 | MURDER 101: IF WISHES WERE HORSES |
| 215 | MURDER 101: LOCKED ROOM MYSTERY, THE |
| 216 | MURDER 101: THE PILOT #1 |
| 217 | MURDER AMONG FRIENDS - ISABELLA ROCKS |
| 218 | MURDER WITHOUT CONVICTION |
| 219 | MY SISTER'S KEEPER |
| 220 | MY SON IS INNOCENT |
| 221 | MYSTERIOUS ISLAND |
| 222 | MYSTERY OF NATALIE WOOD, THE |
| 223 | MYSTERY WOMAN 1: MYSTERY WEEKEND |
| 224 | MYSTERY WOMAN 2: SNAPSHOT OF MURDER |
| 225 | MYSTERY WOMAN 3: SING ME MURDER |
| 226 | MYSTERY WOMAN 4: VISION OF MURDER |
| 227 | MYSTERY WOMAN 5: REDEMPTION |
| 228 | MYSTERY WOMAN 6: GAME TIME |
| 229 | MYSTERY WOMAN 7: AT FIRST SIGHT |
| 230 | MYSTERY WOMAN 8: WILD WEST MURDER |
| 231 | MYSTERY WOMAN 9: OH BABY |
| 232 | MYSTERY WOMAN 10: IN THE SHADOWS |
| 233 | MYSTERY WOMAN MOVIE |
| 234 | NATIONAL LAMPOONS ATTACK OF THE 5 FT. 2 WOMAN |
| 235 | NATIONAL TREE |
| 236 | NAUGHTY OR NICE - GEORGE LOPEZ CHRISTMAS |
| 237 | NIAGARA MOTEL |
| 238 | NIGHT OF THE WOLF |
| 239 | NIGHTMARE AT THE END OF THE HALL |
| 240 | NIGHTMARE COME TRUE, A |
| 241 | NIGHTSCREAM |
| 242 | NO ONE WOULD TELL |
| 243 | NO ORDINARY BABY |
| 244 | NORTH SHORE FISH |
| 245 | OFF SEASON |
| 246 | OLD FASHIONED THANKSGIVING |
| 247 | ON THIN ICE/DEFENDING MY KIDS/MARY SMITH |
| 248 | ORDINARY MIRACLES |
| 249 | ORIGINAL SINS - ACTS OF CONTRITION |
| 250 | OUR HOUSE |
| 251 | OUT OF ORDER |
| 252 | OUT OF THE ASHES |
| 253 | OUT OF THE WOODS |
| 254 | OUTSIDER, THE |
| 255 | PANDEMIC |
| 256 | PANIC BUTTON |

257 PHANTOM RACER
258 PHANTOM, THE
259 PICKING UP AND DROPPING OFF
260 PIMPIN' PEE WEE
261 PLACE CALLED HOME, A
262 PLAINSONG
263 POSEIDON ADVENTURE
264 POWER & BEAUTY: JUDITH EXNER
265 PRAIRIE FEVER
266 PRAYERS FOR BOBBY
267 PRIMAL DOUBT
268 READING ROOM
269 REASONS OF THE HEART
270 RECIPE FOR MURDER - MURRAY MCGUIRE
271 REDEEMER
272 REPLACING DAD
273 RETURNING LILY
274 REVERSIBLE ERRORS
275 RIGHT TO REMAIN SILENT
276 RING OF DEATH
277 RIOT
278 RISE OF THE GARGOYLES
279 RIVERWORLD
280 ROMAN SPRING OF MRS. STONE, THE
281 SACRIFICES OF THE HEART
282 SAND SERPENTS
283 SANTA JUNIOR
284 SCARED SILENT
285 SEA BEAST
286 SEA WOLF
287 SEE JANE DATE
288 SEPARATED BY MURDER
289 SHADOW OF A DOUBT, A
290 SHADOWZONE: UNDEAD EXPRESS
291 SHARK SWARM
292 SHARPSHOOTER
293 SHE'S TOO YOUNG
294 SINGLE SANTA SEEKS MRS. CLAUSE
295 SITTER, THE
296 SNOW QUEEN
297 SOLDIER'S GIRL
298 SOMETHING BENEATH
299 SON OF THE DRAGON
300 SORORITY WARS
301 SPINNING BORIS
302 STATIC
303 STEALING SINATRA
304 STEVE MARTINI'S THE JUDGE
305 STICKS AND STONES
306 STORM, THE
307 STRAIGHT FROM THE HEART
308 STRANDED

| | |
|---|---|
| 309 | STRANGE RELATIONS |
| 310 | STRANGER BESIDE ME, THE/ENEMY WITHIN |
| 311 | STRANGER IN TOWN, A |
| 312 | STRANGER WITH MY FACE |
| 313 | STRANGER'S HEART, A |
| 314 | STREET WARRIOR |
| 315 | SUMMER OF FEAR |
| 316 | SUMMIT, THE |
| 317 | SUPERNOVA |
| 318 | SWAMP DEVIL |
| 319 | TALKING TO HEAVEN |
| 320 | TEN COMMANDMENTS |
| 321 | TERROR IN THE FAMILY |
| 322 | THEY SHOOT DIVAS, DON'T THEY? |
| 323 | THICKER THAN WATER |
| 324 | THOUGH NONE GO WITH ME |
| 325 | TIME TO REMEMBER, A |
| 326 | TIN MAN |
| 327 | TOO LATE TO SAY GOODBYE |
| 328 | TRAIL TO HOPE ROSE, THE |
| 329 | TRICKS |
| 330 | TRIPLE CROSS |
| 331 | TWILIGHT OF THE GOLDS, THE |
| 332 | TWO MOTHERS FOR ZACHARY |
| 333 | UNDUE INFLUENCE |
| 334 | UNFINISHED AFFAIR, AN |
| 335 | VICTOR DAVIS |
| 336 | VINEGAR HILL |
| 337 | VIPERS |
| 338 | W.E.I.R.D. WORLD |
| 339 | WALL, THE |
| 340 | WE WERE THE MULVANEYS |
| 341 | WEDDING DAZE |
| 342 | WHARF RAT, THE |
| 343 | WHAT I DID FOR LOVE |
| 344 | WHAT KIND OF MOTHER ARE YOU? |
| 345 | WHERE THERE'S A WILL |
| 346 | WHILE I WAS AWAY |
| 347 | WILD HEARTS |
| 348 | WITHIN THESE WALLS |
| 349 | WOMAN UNDONE |
| 350 | WORD OF HONOR |
| 351 | WYVERN |
| 352 | XTRA CREDIT |
| 353 | YOU'VE GOT A FRIEND - DERBY |
| 354 | ZOOMAN |

10-16536-smb    Doc 21-1    Filed 12/10/10    Entered 12/10/10 20:50:15    Appendix A -
Plan of Reorganization    Pg 78 of 145

EXHIBIT B

## CROWN TITLES

1 20,000 LEAGUES UNDER THE SEA
2 AFTERSHOCK: EARTHQUAKE IN NEW YORK
3 AGAINST HER WILL: AN INCIDENT IN BALTIMORE
4 ALICE IN WONDERLAND
5 ANASTASIA: MYSTERIES OF ANNA
6 ARABIAN NIGHTS
7 ATTIC: THE HIDING OF ANN FRANK, THE
8 BLIND FAITH
9 BRADY'S ESCAPE
10 BRIDESMAIDS
11 BRIDGE OF TIME
12 BROKEN VOWS
13 BY DAWN'S EARLY LIGHT
14 CALL OF THE WILD - REMAKE 1992
15 CANTERVILLE GHOST
16 CAPTAINS COURAGEOUS
17 CAPTIVE HEART:JAMES MINK STORY
18 CHOICES
19 CHRISTMAS MEMORY, A
20 CLEOPATRA
21 CLOVER
22 DEGREE OF GUILT-EYES OF A CHILD
23 DOOM RUNNERS
24 ELVIS MEETS NIXON
25 ENSLAVEMENT:THE TRUE LIFE STORY OF FANNY KEMBLE
26 ERICH SEGALS  ONLY LOVE
27 FATAL ERROR
28 FIRE NEXT TIME
29 GAMBLER 5: PLAYING FOR KEEPS
30 GLORY DAYS
31 GO TOWARDS THE LIGHT
32 GREAT ELEPHANT ESCAPE
33 GULLIVER'S TRAVELS
34 HARD TIME
35 HARD TIME: HOSTAGE HOTEL
36 HARD TIME: PREMONITION
37 HORTON FOOTE'S ALONE
38 IN COLD BLOOD
39 IN THE BEGINNING
40 INCIDENT 3: IN A SMALL TOWN
41 INCIDENT, THE
42 INSPECTORS II : A SHRED OF EVIDENCE
43 JACK AND THE BEANSTALK: THE REAL STORY
44 JACKIE, ETHEL & JOAN: THE WOMEN OF CAMELOT
45 JASON & THE ARGONAUTS
46 JESSE HAWKS
47 JOHNNY'S GIRL
48 JOURNEY TO THE CENTER OF THE EARTH

49 KIDNAPPED
50 LARRY MCMURTRY'S DEAD MAN'S WALK
51 LARRY MCMURTRY'S STREETS OF LAREDO
52 LONESOME DOVE I
53 LONG WAY HOME
54 LOST EMPIRE a/k/a MONKEY KING
55 MACSHAYNE II: FINAL ROLL OF THE DICE
56 MACSHAYNE I: WINNER TAKES ALL
57 MAGICAL LEGEND OF THE LEPRECHAUNS
58 MAN FROM LEFT FIELD, THE
59 MARIO AND THE MOB
60 MEMBER OF THE WEDDING
61 MERCY MISSION: THE RESCUE OF FLIGHT 771
62 MERLIN
63 MOTHER'S GIFT a/k/a LANTERN IN HER HAND, A
64 MY BROTHER'S KEEPER
   STANLEY & LIVINGSTON a/k/a NATIONAL GEOGRAPHIC
65 PRESENTS:FORBIDDEN TERRITORY..
66 NEIL SIMON'S: LONDON SUITE
67 NEIL SIMON'S: SUNSHINE BOYS
68 NIGHT THEY SAVED CHRISTMAS, THE
69 NOAH'S ARK
70 OLDEST LIVING CONFEDERATE WIDOW TELLS ALL
71 OUT OF TIME
72 PASSION OF AYN RAND
73 PATHFINDER
74 PRINCE AND THE PAUPER
75 RANGER, COOK & HOLE IN THE SKY
76 REAR WINDOW
77 REMEMBER ME
78 RETURN TO LONESOME DOVE
79 RIO DIABLO
80 ROBERT LUDLUM'S: APOCALYPSE WATCH
81 ROBIN COOK'S: LETHAL INVASION
82 ROBIN COOK'S TERMINAL
83 SAFE HOUSE
84 SALLY HEMINGS : AN AMERICAN SCANDAL
85 SCARLETT
86 SEA PEOPLE
87 SEARCH & RESCUE
88 SECRET, THE
89 SECRETS a/k/a OTHER ANNA, THE
90 SILENT PREDATORS
91 SONG OF HIAWATHA
92 STILL HOLDING ON: LEGEND OF CADILLAC JACK, THE
93 STORM IN SUMMER
94 SUMMER'S END
95 TAKING LIBERTY
96 TEMPTATIONS, THE
97 THIRD TWIN, THE
98 TENTH KINGDOM

 99 TIDAL WAVE: NO ESCAPE a/k/a CRASHER
100 TITANIC, THE
101 TO DANCE WITH OLIVIA
102 TOO RICH: THE SECRET LIFE OF DORIS DUKE
103 TORNADO!
104 TRUE WOMEN
105 VOYAGE OF THE UNICORN

FINAL TERM SHEET

This Term Sheet ("Term Sheet"), when signed by the parties listed below ("the Parties"), shall constitute a binding agreement between the Parties and shall be in full force and effect until and unless it is replaced with a long form settlement agreement which the parties are in the process of negotiating and intend in good faith to conclude. The Parties to this Term Sheet are RHI Entertainment Distribution, LLC, on behalf of itself, its parents, subsidiaries, production entities and related entities (collectively "RHI"), on the one hand, and Alliance of Canadian Cinema, Television and Radio Artists (the "Guild"), on the other hand.

This Term Sheet resolves all issues relating to any claims for residuals allegedly due, as well as related pension and health contributions and administrative expenses on such residual payments (collectively "residual obligations"), with respect to the films ("the RHI Films") listed on Exhibit A attached hereto as well as with respect to the residual obligations relating to rights exploited by RHI in the films ("the Crown Films") listed on Exhibit B attached hereto, it being understood that Crown Media Holdings, Inc.("Crown") is responsible for the residual obligations at issue relating to the Crown Films.

NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS AND PROMISES MADE HEREIN, THE PARTIES AGREE AS FOLLOWS:

1. The Guild agrees to support a reorganization plan under which a new or reorganized entity (herein for convenience referred to as "RHI Newco") will be owned by RHI's lenders and emerge from the Chapter 11 bankruptcy proceedings. Additionally, under said reorganization plan, the existing RHI entities that are signatory to the Guild's Independent Production Agreement with the Canadian Film and Television Production Association ("the Collective Bargaining Agreement") and/or are obligated to make residual payments to the Guild (collectively, "the RHI Signatories") will emerge from the Chapter 11 proceedings and will be the owner(s) of the RHI Films and the Crown Films. RHI Newco will be the owner of the assets of RHI, including its interests in the RHI Signatories.

2. With respect to new motion pictures produced after they emerge from the Chapter 11 Bankruptcy Proceedings, the RHI Signatories will continue to be signatories to the Collective Bargaining Agreement with the Guild in the same manner and to the same extent as prior to the filing of said Bankruptcy Proceedings and the RHI Signatories agree to pay and remain current on the residual obligations as they come due for such new motion pictures in accordance with the terms of the Collective Bargaining Agreement.

3.      With respect to the RHI Films and RHI's rights in the Crown Films, the RHI Signatories will assume all existing Guild collective bargaining agreements and/or assumption agreements, except that the obligations assumed will not include the obligations being settled under this Agreement.

4.      Payments to the Guild will be as follows:

(i)      RHI Newco will cause the RHI Signatories to pay to the Guild one hundred percent (100%) of the total residual obligations owed by RHI with respect to the RHI Films as of the filing of the Chapter 11 proceeding (the "RHI Pre-Petition Claim"). The parties agree that the total residual obligations which RHI owes as of the filing date of the Chapter 11 proceeding (the "Petition Filing Date") is deemed to be $ 591,296.[1] In addition, RHI Newco will cause the RHI Signatories to pay an additional aggregate amount of $64,716 to cover all related pension and health contributions and all administrative fees (collectively these additional payments shall be referred to as "Fringes"). If the Fringe payments made by the RHI Signatories exceed the amount needed to pay the actual amount of the Fringes due, the excess shall be credited toward acceleration of the payment of the RHI Pre-Petition Claim, applied first to the oldest amount due.

(ii)      Said total of $656,012 shall be payable as follows:

$7,039.24 for residuals and $770.43 for Fringes (a total of $7,809.67) per month ratably over 84 months commencing with and due upon the first of the month following the month in which RHI Newco exits the Chapter 11 proceedings (each a "Basic Installment Payment"). Each Basic Installment Payment will be wired to an account maintained by the Guild (the "Guild Payment Account"), which shall be an interest bearing account.

(iii)      In the event RHI Newco or its designated related entity or entities fails to make a Basic Installment Payment when due, the Guild may declare an event of default by giving written notice to RHI Newco and the agent (the "Agent") for RHI Newco's lenders under the term loan credit facility contemplated by the plan of reorganization described in Section 1 above (the " Exit Term Loan Facility") of such failure. If the RHI Signatories or the Agent then fails to cure such default within five (5) calendar days of its receipt of such default notice, the remaining installments due under this Section 4 (but not the payment for the month in default) shall be accelerated to a 60 month payment schedule (each an "Accelerated Installment Payment")[2], due upon the first of each applicable month. In the event that the RHI Signatories or

---

[1] This amount and all related amounts will be re-calculated to reflect updated residual and Fringe amounts accrued or paid to the Guild as of the Petition Filing Date. The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

[2] References to moving to a 60 month schedule in this Agreement mean that subsequent monthly installment payments will be increased by the amount that a monthly payment under a 60 month amortization schedule exceeds the monthly payment under the 84 month monthly payment schedule specified herein.

2889128.3

the Agent fail to make the payment for the month in default within fifteen (15) calendar days after the Guild gives the original written notice of default, the Guild may, by written notice to RHI Newco and the Agent, declare the remaining outstanding balance of the amount owed under this Section 4 to be immediately due and payable. In the event the RHI Signatories fail to make, when due, an Accelerated Installment Payment, the Guild may declare an event of default by giving written notice to RHI Newco and the Agent of such failure and if the RHI Signatories or the Agent then fail to cure such default within fifteen (15) days of their receipt of such default notice, the Guild by written notice to RHI Newco and the Agent may declare the remaining outstanding balance due the Guild under this Section 4 to be immediately due and payable. In the event that the Agent or the required lenders declare an event of default under the Exit Term Loan Facility and accelerate RHI Newco's obligations under the Exit Term Loan Facility, the Agent shall provide immediate notice to the Guild, and the Guild may declare immediately due and payable the remaining balance of the amounts owed the Guild under this Section 4. Concurrently with the Guild giving any notice to RHI Newco pursuant to this provision, they shall give a copy of such notice to the Agent.

(iv)    All Basic Installment Payments and Accelerated Installment Payments paid to the Guild under Sections 4(ii) and 4(iii) will be held in the Guild Payment Account until disbursed to employees represented by the Guild. All interest earned on such interest bearing account shall be credited toward acceleration of the payment of the RHI Pre-Petition Claim, applied first to the oldest amount due. RHI and the Lenders agree that all Basic Installment Payments and Accelerated Installment Payments are within the normal course of business and are indefeasibly transferred to the Guild upon payment.

5.     RHI will facilitate the resolution of all claims relating to the Crown Films. RHI and the Guild agree that the total sum of residual obligations (exclusive of Fringes) based upon RHI's exploitation of the Crown Films as of the Petition Filing Date with respect to all exhibitions and/or distribution of the Crown Films through RHI in all media as of the Petition Filing Date (the "Crown Pre-Petition Claim") is deemed to be $133,714[3], which amount will be increased by the related Fringes in the amount of $13,613. RHI will obtain Crown's agreement, which agreement will be in the form attached hereto as Exhibit C ( the "Crown Side Letter Agreement"), to pay said total liability as follows:

A.     Payment of $73,663.50 on the first of the month following the month in which the plan of reorganization for RHI is confirmed by the bankruptcy court in the Chapter 11 proceeding for RHI.

B.     Payment of $73,663.50 no later than January 5, 2011.

6.     With respect to pictures returned to producers or financiers (the "Spillover Titles"), RHI will cause such producers or financiers to assume post-return residuals, if any, and upon receipt of standard form assumption agreements regarding the Spillover Titles executed by

---

[3]  This amount and all related amounts will be re-calculated to reflect updated residual and Fringe amounts accrued or paid to the Guild as of the Petition Filing Date.  The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

2889128.3

such producers or financiers, RHI and RHI Newco will have no further obligations with respect to such post-return residuals.

7.     The RHI Signatories will pay (or cause to be paid) currently when due all residual obligations incurred with respect to any distribution of the RHI Films and Crown Films by them on or after the date RHI Newco exits the Chapter 11 proceedings. RHI will cause all residuals and Fringes which accrue between the Petition Filing Date and the date that RHI Newco exits the Chapter 11 proceedings, as payable by RHI or by Crown, to be paid in full when due.

8.     As of the Plan effective date, the RHI Signatories will own RHI's rights in all of the RHI and Crown Films and the Guild's and RHI's Lenders' current lien priorities will be preserved. All existing Guild liens, if any, in connection with the RHI Films and the Crown Films shall remain in full force and effect.

9.     In consideration of the agreements and covenants of RHI set forth in this Agreement, the Guild agrees to provide a full release to RHI, Crown, their respective principals and production company partners with respect to which RHI or Crown has assumed residual obligations, as well as to any and all third parties, with respect to the claims being settled pursuant to this Agreement relating to exploitation by RHI of the RHI Films and Crown Films and arising prior to the filing date, including pension and health contributions and administrative expenses relating thereto as well as any claims for late fees, interest, liquidated damages or other penalties; provided, however, that such release will not apply to amounts due and owing under this Agreement in the event of any default by RHI under Paragraph 4 of this Agreement that is not timely cured and that results in the Guild declaring the remaining outstanding balance due the Guild under Section 4 to be immediately due and payable; and provided further, that this release does not extend to claims against Crown for payments due under Paragraph 5 in the event of a default by Crown in the payments required under Paragraph 5; and finally provided that this release does not extend to claims in connection with rights not exploited by RHI (i.e., rights in the Crown Films which are not owned or exploited by RHI). The Guild and RHI will cooperate to obtain releases from the Guild pension and health plans of any claims those plans may have for contributions based upon any residuals allegedly due other than on residuals payable under the terms of this Agreement when and as such residual payments are due hereunder.

10.    This Agreement shall be effective with respect to any plan of reorganization for RHI that is supported by RHI's first lien lenders and which plan is consistent with and approves of all terms of this Agreement.

11.    This Agreement may be signed and delivered (including by facsimile transmission or pdf) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.    The Guild's obligations under this Agreement are conditioned upon Crown executing the Crown Side Letter Agreement.

4

2889128.3

13.    This Agreement shall be governed by and construed under the laws of the state of New York, U.S. without giving effect to that state's choice of law rules.

[The remainder of this Page is intentionally left blank.]

2889128.3

Executed this 28th day of September, 2010

Alliance of Canadian Cinema, Television and Radio Artists

By _____

Title _Brad Keener, Director_

RHI Entertainment Distribution, LLC

By _____

Title ___Henry S. Hoberman___
        Exec. V.P., General Counsel
        & Secretary

2889128.3

## EXHIBIT A

RHI FILMS:

1.  10.5 APOCALYPSE
2.  ABOVE AND BEYOND [4 HRS.]
3.  APRIL MORNING [HHOF]
4.  BEYOND THE CALL
5.  BLOODKNOT
6.  BOYS NEXT DOOR [HHOF]
7.  CALM AT SUNSET [HHOF]
8.  CASE OF THE WHITECHAPEL VAMPIRE, THE
9.  CATEGORY 6: DAY OF DESTRUCTION [4 HRS.] "S
10. CATEGORY 7: THE END OF THE WORLD
11. CAVEDWELLER
12. CHARMS FOR THE EASY LIFE
13. CHRISTMAS VISITOR
14. COAST TO COAST
15. COLOR OF JUSTICE
16. CONUNDRUM
17. CROOKED E: THE ENRON STORY
18. CROWN HEIGHTS
19. D.C. 9/11: TIME OF CRISIS
20. DEACONS FOR DEFENSE
21. DEFENDING OUR KIDS: THE JULIE POSEY STORY
22. DELIVERANCE OF ELAINE, THE a/k/a PENPALS
23. DOG BOYS
24. DREAMKEEPER [4 HRS.]
25. ELIZABETH SMART STORY
26. END OF SUMMER
27. FACE DOWN
28. FALLEN ANGEL [HHOF]
29. FIXER, THE
30. GANG IN BLUE
31. GLEASON
32. GOOD FENCES
33. GRACIE'S CHOICE
34. HAUNTING SARAH
35. HEART OF A STRANGER - LIFETIME
36. HOMELESS TO HARVARD
37. HUMAN TRAFFICKING [4 HRS.]
38. HUNGER POINT
39. I DO BUT I DON'T
40. IVANA TRUMP'S: FOR LOVE ALONE
41. JASPER, TEXAS
42. JOHNSON COUNTY WARS [4 HRS.]
43. JUDGE, THE a/k/a STEVE MARTINI'S: THE JUDGE

44. KILLER INSTINCT: THE FILES OF AGENT CANDICE
45. LAST CALL
46. LOSING CHASE
47. MAGIC OF ORDINARY DAYS [HHOF]
48. MIND GAMES - TRAUMA
49. MONTE WALSH
50. MORE THAN MEETS THE EYE: JOAN BROCK STORY
51. NAUGHTY OR NICE: GEORGE LOPEZ CHRISTMAS STORY
52. NO ORDINARY BABY a/k/a AFTER AMY
53. NORTH SHORE FISH
54. ON THIN ICE/DEFENDING MY KIDS/MARY SMITH
55. OUT OF THE ASHES
56. POWER & BEAUTY: JUDITH EXNER
57. RIDING THE BUS WITH MY SISTER [HHOF]
58. ROSE HILL [HHOF]
59. ROUGHING IT (MARK TWAIN'S) [4 HRS.]
60. SCARED SILENT a/k/a COMING FORWARD
61. SEE JANE DATE
62. SHADOWZONE: UNDEAD EXPRESS
63. SOLDIER'S GIRL
64. SPINNING BORIS a/k/a YELTSIN PROJECT, THE
65. TALES FROM THE NEVERENDING STORY
66. TRIPLE CROSS
67. UNDUE INFLUENCE [4 HRS.]
68. UNIVERSITY
69. VINEGAR HILL
70. WALL, THE
71. WE WERE THE MULVANEYS
72. WHARF RAT, THE
73. WHAT KIND OF MOTHER ARE YOU? a/k/a LESSONS IN LOVE
74. WHILE I WAS GONE a/k/a WHILE I WAS AWAY
75. WITHIN THESE WALLS

2889128.3

## EXHIBIT B

CROWN FILMS:

1. AND NEVER LET HER GO [4 HRS.]
2. ANNE RICE'S FEAST OF ALL SAINTS [4 HRS.]
3. ANNIE OJOS
4. BARNUM
5. BLACK FOX I
6. BLACK FOX II: PRICE OF PEACE
7. BLACK FOX III: GOOD MEN AND BAD
8. BLIND FAITH
9. BONANNO: A GODFATHER'S STORY [4 HRS.]
10. BONANNO: YOUNGEST GODFATHER [4 HRS.]
11. CAPTIVE HEART:THE JAMES MINK STORY
12. CHAMPAGNE CHARLIE [4 HRS.]
13. CHILDREN OF THE DUST [4 HRS.]
14. DEGREE OF GUILT-EYES OF A CHILD [4 HRS.]
15. DEVIL'S ARITHMETIC, THE
16. DOG OF THE YUKON/CALL OF THE WILD
17. DOWN IN THE DELTA
18. ELVIS MEETS NIXON
19. ENSLAVEMENT:THE TRUE LIFE STORY OF FANNY K
20. ESCAPE: HUMAN CARGO
21. FINDING BUCK MC HENRY
22. FREAK CITY
23. FREE OF EDEN
24. FURTHER TALES OF THE CITY [4 HRS.]
25. GIFT OF LOVE: THE DANIEL HUFFMAN STORY
26. GULF WAR [4 HRS.]
27. HALFBACK OF NOTRE DAME
28. HIDDEN IN AMERICA
29. HIROSHIMA [4 HRS.]
30. HOMECOMING, THE
31. HOSTAGE FOR A DAY
32. HOUND OF THE BASKERVILLES
33. IN COLD BLOOD [4 HRS.]
34. IN HIS FATHER'S SHOES
35. INSIDE THE OSMONDS
36. JACKIE, ETHEL & JOAN:THE WOMEN OF CAMELOT
37. JOE TORRE STORY: CURVEBALLS ALONG THE WAY
38. JOHNNY & CLYDE
39. LEGEND OF GATOR FACE, THE
40. LEGEND OF SLEEPY HOLLOW, THE
41. LET ME CALL YOU SWEETHEART (MARY HIGGINS CLARK'S)
42. LOCKED IN SILENCE
43. LONESOME DOVE SERIES [1-21 X 60]

2889128.3

44. LONESOME DOVE SERIES [22-43 X 60]
45. LOVE SONGS
46. MOONLIGHT BECOMES YOU (MARY HIGGINS CLARK'S)
47. MOONSHINE HIGHWAY
48. MORE TALES OF THE CITY [6 HRS.]
49. MR. & MRS. LOVING
50. MR. MUSIC
51. MR. ROCK 'N' ROLL : THE ALAN FREED STORY
52. MY LOUISIANA SKY
53. MY OWN COUNTRY
54. P.T. BARNUM [4 HRS.]
55. PASSION OF AYN RAND, THE
56. PATHFINDER
57. PRINCE CHARMING
58. RECKLESS DISREGARD
59. RED SNEAKERS, THE
60. RESTLESS SPIRITS
61. ROBIN COOK'S ACCEPTABLE RISKS
62. ROBIN OF LOCKSLEY
63. RUBY'S BUCKET OF BLOOD
64. RUN THE WILD FIELDS
65. SABRINA THE TEENAGE WITCH
66. SANDY BOTTOM ORCHESTRA
67. SEA PEOPLE
68. SECRET, THE
69. SEVENTEEN AGAIN
70. SIGN OF FOUR, THE
71. SNOW IN AUGUST
72. SONG OF HIAWATHA, THE
73. SPEARFIELD'S DAUGHTER [6 HRS.]
74. STRANGER IN TOWN, A
75. SUMMER'S END
76. SWEETEST GIFT, THE
77. THEY CALL ME SIRR
78. THIRD TWIN, THE [4 HRS.]
79. TIME AT THE TOP
80. TO DANCE WITH OLIVIA
81. TOO RICH: THE SECRET LIFE OF DORIS DUKE [4
82. VARIAN'S WAR
83. WALTER & HENRY
84. WHILE MY PRETTY ONE SLEEPS
85. WHISKERS
86. WHO KILLED ATLANTA'S CHILDREN?
87. WISHING TREE

2889128.3

FINAL TERM SHEET

This Term Sheet ("Term Sheet"), when signed by the parties listed below ("the Parties"), shall constitute a binding agreement between the Parties and shall be in full force and effect until and unless it is replaced with a long form settlement agreement which the parties are in the process of negotiating and intend in good faith to conclude. The Parties to this Term Sheet are RHI Entertainment Distribution LLC, on behalf of itself, its parents, subsidiaries, production entities and related entities (collectively "RHI"), on the one hand, and the American Federation of Television and Radio Artists (the "Union"), on the other hand.

This Term Sheet resolves all issues relating to the payment to the Union of residuals as well as pension, health and welfare contributions and payroll taxes on such residual payments (collectively, the "residual obligations") with respect to the products (the "RHI Products") listed on Exhibit A attached hereto, including during the contemplated bankruptcy proceedings of RHI under Chapter 11 of the U.S, Bankruptcy Code (the "Chapter 11 Bankruptcy Proceedings") and the satisfaction of residual obligations after a reorganized RHI or a new organization (herein for convenience referred to as "RHI Newco") emerges from the Chapter 11 Bankruptcy Proceedings.

NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS AND PROMISES MADE HEREIN, THE PARTIES AGREE AS FOLLOWS:

1. RHI will cause all residual obligations which accrue between the filing date of the Chapter 11 Bankruptcy Proceedings (the "Petition Filing Date") and the date that RHI Newco exits the Chapter 11 Bankruptcy Proceedings, as payable by RHI, to be paid in full when due.

2. The existing RHI entities that are signatory to the Union's Network Television Code ("the Collective Bargaining Agreement") and/or are obligated to make residual payments to the Union (the "RHI Signatories"), will pay (or cause to be paid) currently when due all residual obligations incurred with respect to any distribution of the RHI Products by them on or after the date RHI Newco exits the Chapter 11 Bankruptcy Proceedings.

3. With respect to new motion pictures produced after the RHI Signatories emerge from the Chapter 11 Bankruptcy Proceedings, they will continue to be signatories to the Collective Bargaining Agreement with the Union in the same manner and to the same extent as prior to the filing of the Chapter 11 Bankruptcy Proceedings and the RHI Signatories agree to pay and remain current on the residual obligations as they come due for such new motion pictures in accordance with the terms of the Collective Bargaining Agreement.

2965198.8

4. With respect to the RHI Products, the RHI Signatories will assume all existing Union collective bargaining agreements and/or assumption agreements.

5. As of June 30, 2010 RHI's residual obligations to the Union aggregated $148,356, which amount RHI will pay during October 2010. Exhibit A attached hereto sets forth the residual obligations as of June 30, 2010 for each RHI Product [1].

6. In consideration of the agreements and covenants of RHI set forth in this Agreement, the Union agrees to provide a full release to RHI, its principals and production company partners with respect to which RHI has assumed residual obligations, as well as to any and all third parties (collectively, the "RHI Released Parties"), with respect to claims of the Union relating to exploitation by RHI of the RHI Products and arising prior to the Petition Filing Date including pension, health and welfare contributions and payroll taxes relating thereto as well as any claims for late fees, interest, liquidated damages or other penalties; provided, however, that such release will not apply to amounts due and owing under Paragraph 5 of this Agreement (the "Settlement Payment"), and provided further that this release does not extend to claims in connection with rights not exploited by RHI. The Union and RHI will cooperate to obtain releases from the Union pension and health plans of any claims those plans may have for contributions based upon any residuals allegedly due other than on residuals payable under the terms of this Agreement when and as such residual payments are due hereunder. The Settlement Payment shall not be construed as a voidable transfer under the U.S. Bankruptcy Code or other applicable law, and RHI agrees not to assert that the Settlement Agreement is preferential or does not provide "new value" to RHI. Notwithstanding the foregoing, if the Settlement Payment is recovered in any bankruptcy proceeding, the Union's claims, and all Union rights and remedies in enforcement thereof, shall be reinstated in full, and RHI waives all time-based defenses thereto, through 180 days after the Settlement Payment is recovered. If any portion of the Settlement Payment is required to be repaid or returned to RHI or any trustee for RHI, pursuant to any bankruptcy law or any state or other federal law, the release given by the Union in favor of the RHI Releasees shall be void in its entirety without any required action by the Union.

7. This Agreement shall be effective with respect to any plan of reorganization for RHI that is supported by RHI and RHI's first lien lenders and which plan is consistent with and approves of all terms of this Agreement.

8. This Agreement may be signed and delivered (including by facsimile transmission or pdf) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

---

[1] This amount will be re-calculated to reflect updated residual obligations accrued or paid to the Union as of the Petition Filing Date. The Union and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Union arbitration if not achieved by mutual consent. After such re-calculation, any amount owed by the RHI Signatories through the Petition Filing Date will be paid on the first of the month following the later of (i) the month in which the plan of reorganization for RHI is confirmed by the bankruptcy court in the Chapter 11 Proceedings or (ii) the month in which such re-calculation is agreed to by the Union and RHI or the re-calculated amount is determined by arbitration.

2

9.    This Agreement shall be governed by and construed under the laws of the state of New York without giving effect to that state's choice of law rules.

[The remainder of this Page is intentionally left blank.]

2965198.8

Executed this 21st day of October, 2010

The American Federation of Television and Radio Artists

By _____

Title _____


RHI Entertainment Distribution LLC

By _____
　　Henry S. Hoberman
Title _____
　　Exec. V.P., General Counsel
　　& Secretary

4

**Exhibit A**

**RHI Products**

|  Product Title | Amount of Residual Obligations |
|---|---|
| Acceptance | $ 85 |
| Accidental Friendship | 8325 |
| Alice | 27,697 |
| Christmas in Canaan | 143 |
| Circuit, The | 25,097 |
| Do You Know Me a/k/a Have You Seen Me | 30,510 |
| Dragonsteel | 40,167 |
| Hard Ride to Hell | 447 |
| Lying To Be Perfect | 1,948 |
| National Tree | None |
| Riverworld | 12,197 |
| Sorority Wars | 1,190 |
| Stranger With My Face | 549 |
| Total | $148,356 |

2965198.8

FINAL TERM SHEET

This Term Sheet ("Term Sheet"), when signed by the parties listed below ("the Parties"), shall constitute a binding agreement between the Parties and shall be in full force and effect until and unless it is replaced with a long form settlement agreement which the parties are in the process of negotiating and intend in good faith to conclude. The Parties to this Term Sheet are RHI Entertainment Distribution, LLC, on behalf of itself, its parents, subsidiaries, production entities and related entities (collectively "RHI"), on the one hand, and Media Entertainment and Arts Alliance ( the "Guild"), on the other hand.

This Term Sheet resolves all issues relating to any claims for residuals allegedly due, as well as related administrative expenses on such residual payments (collectively "residual obligations"), with respect to the films ("the RHI Films") listed on Exhibit A attached hereto as well as with respect to the residual obligations relating to rights exploited by RHI in the films ("the Crown Films") listed on Exhibit B attached hereto, it being understood that Crown Media Holdings, Inc.("Crown") is responsible for the residual obligations at issue relating to the Crown Films.

NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS AND PROMISES MADE HEREIN, THE PARTIES AGREE AS FOLLOWS:

1. The Guild agrees to support a reorganization plan under which a new or reorganized entity (herein for convenience referred to as "RHI Newco") will be owned by RHI's lenders and emerge from the Chapter 11 bankruptcy proceedings. Additionally, under said reorganization plan, the existing RHI entities that are signatory to the Guild's collective bargaining agreement ("the Collective Bargaining Agreement") and/or are obligated to make residual payments to the Guild (collectively, "the RHI Signatories") will emerge from the Chapter 11 proceedings and will be the owner(s) of the RHI Films and the Crown Films. RHI Newco will be the owner of the assets of RHI, including its interests in the RHI Signatories.

2. With respect to new motion pictures produced after they emerge from the Chapter 11 Bankruptcy Proceedings, the RHI Signatories will continue to be signatories to the Collective Bargaining Agreement with the Guild in the same manner and to the same extent as prior to the filing of said Bankruptcy Proceedings and the RHI Signatories agree to pay and remain current on the residual obligations as they come due for such new motion pictures in accordance with the terms of the Collective Bargaining Agreement.

3.      With respect to the RHI Films and RHI's rights in the Crown Films, the RHI Signatories will assume all existing Guild collective bargaining agreements and/or assumption agreements, except that the obligations assumed will not include the obligations being settled under this Agreement.

4.      Payments to the Guild will be as follows:

(i)      RHI Newco will cause the RHI Signatories to pay to the Guild one hundred percent (100%) of the total residual obligations owed by RHI with respect to the RHI Films as of the filing of the Chapter 11 proceeding (the "RHI Pre-Petition Claim"). The parties agree that the total residual obligations which RHI owes as of the filing date of the Chapter 11 proceeding (the "Petition Filing Date") is deemed to be $550,321, which amount includes 1% for administrative expenses.[1]

(ii)      Said total of $550,321 shall be payable as follows:

$6,551.44 per month ratably over 84 months commencing with and due upon the first of the month following the month in which RHI Newco exits the Chapter 11 proceedings (each a "Basic Installment Payment"). Each Basic Installment Payment will be wired to an account maintained by the Guild (the "Guild Payment Account"), which shall be an interest bearing account.

(iii)      In the event RHI Newco or its designated related entity or entities fails to make a Basic Installment Payment when due, the Guild may declare an event of default by giving written notice to RHI Newco and the agent (the "Agent") for RHI Newco's lenders under the term loan credit facility contemplated by the plan of reorganization described in Section 1 above (the " Exit Term Loan Facility") of such failure. If the RHI Signatories or the Agent then fails to cure such default within five (5) calendar days of its receipt of such default notice, the remaining installments due under this Section 4 (but not the payment for the month in default) shall be accelerated to a 60 month payment schedule (each an "Accelerated Installment Payment")[2], due upon the first of each applicable month. In the event that the RHI Signatories or the Agent fail to make the payment for the month in default within fifteen (15) calendar days after the Guild gives the original written notice of default, the Guild may, by written notice to RHI Newco and the Agent, declare the remaining outstanding balance of the amount owed under this Section 4 to be immediately due and payable. In the event the RHI Signatories fail to make, when due, an Accelerated Installment Payment, the Guild may declare an event of default by

---

[1] This amount and all related amounts will be re-calculated to reflect updated residual amounts (plus the 1% for administrative expenses) accrued or paid to the Guild as of the Petition Filing Date. The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

[2] References to moving to a 60 month schedule in this Agreement mean that subsequent monthly installment payments will be increased by the amount that a monthly payment under a 60 month amortization schedule exceeds the monthly payment under the 84 month monthly payment schedule specified herein.

2

2895034.4

giving written notice to RHI Newco and the Agent of such failure and if the RHI Signatories or the Agent then fail to cure such default within fifteen (15) days of their receipt of such default notice, the Guild by written notice to RHI Newco and the Agent may declare the remaining outstanding balance due the Guild under this Section 4 to be immediately due and payable. In the event that the Agent or the required lenders declare an event of default under the Exit Term Loan Facility and accelerate RHI Newco's obligations under the Exit Term Loan Facility, the Agent shall provide immediate notice to the Guild, and the Guild may declare immediately due and payable the remaining balance of the amounts owed the Guild under this Section 4. Concurrently with the Guild giving any notice to RHI Newco pursuant to this provision, they shall give a copy of such notice to the Agent.

(iv)    All Basic Installment Payments and Accelerated Installment Payments paid to the Guild under Sections 4(ii) and 4(iii) will be held in the Guild Payment Account until disbursed to employees represented by the Guild. All interest earned on such interest bearing account shall be applied by the Guild to defray the cost of processing such disbursements to the employees. RHI and the Lenders agree that all Basic Installment Payments and Accelerated Installment Payments are within the normal course of business and are indefeasibly transferred to the Guild upon payment.

5.    RHI will facilitate the resolution of all claims relating to the Crown Films. RHI and the Guild agree that the total sum of residual obligations (inclusive of the 1% for administrative expenses) based upon RHI's exploitation of the Crown Films as of the Petition Filing Date with respect to all exhibitions and/or distribution of the Crown Films through RHI in all media as of the Petition Filing Date (the "Crown Pre-Petition Claim") is deemed to be $269,720[3]. RHI will obtain Crown's agreement, which agreement will be in the form attached hereto as Exhibit C ( the "Crown Side Letter Agreement"), to pay said total liability as follows:

A.    Payment of $134,860 on the first of the month following the month in which the plan of reorganization for RHI is confirmed by the bankruptcy court in the Chapter 11 proceeding for RHI.

B.    Payment of $134,860 no later than January 5, 2011.

6.    With respect to pictures returned to producers or financiers ( the "Spillover Titles"), RHI will cause such producers or financiers to assume post-return residuals, if any, and upon receipt of standard form assumption agreements regarding the Spillover Titles executed by such producers or financiers, RHI and RHI Newco will have no further obligations with respect to such post-return residuals.

7.    The RHI Signatories will pay (or cause to be paid) currently when due all residual obligations incurred with respect to any distribution of the RHI Films and Crown Films by them

---

[3] This amount and all related amounts will be re-calculated to reflect updated residual amounts (plus the 1% for administrative expenses) accrued or paid to the Guild as of the Petition Filing Date. The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

2895034.4

on or after the date RHI Newco exits the Chapter 11 proceedings. RHI will cause all residuals which accrue between the Petition Filing Date and the date that RHI Newco exits the Chapter 11 proceedings, as payable by RHI or by Crown, to be paid in full when due.

8.    As of the Plan effective date, the RHI Signatories will own RHI's rights in all of the RHI and Crown Films and the Guild's and RHI's Lenders' current lien priorities will be preserved. All existing Guild liens, if any, in connection with the RHI Films and the Crown Films shall remain in full force and effect.

9.    In consideration of the agreements and covenants of RHI set forth in this Agreement, the Guild agrees to provide a full release to RHI, Crown, their respective principals and production company partners with respect to which RHI or Crown has assumed residual obligations, as well as to any and all third parties, with respect to the claims being settled pursuant to this Agreement relating to exploitation by RHI of the RHI Films and Crown Films and arising prior to the filing date (including administrative expenses relating thereto as well as any claims for late fees, interest, liquidated damages or other penalties); provided, however, that such release will not apply to amounts due and owing under this Agreement in the event of any default by RHI under Paragraph 4 of this Agreement that is not timely cured and that results in the Guild declaring the remaining outstanding balance due the Guild under Section 4 to be immediately due and payable; and provided further, that this release does not extend to claims against Crown for payments due under Paragraph 5 in the event of a default by Crown in the payments required under Paragraph 5; and finally provided that this release does not extend to claims in connection with rights not exploited by RHI (i.e., rights in the Crown Films which are not owned or exploited by RHI).

10.    This Agreement shall be effective with respect to any plan of reorganization for RHI that is supported by RHI's first lien lenders and which plan is consistent with and approves of all terms of this Agreement.

11.    This Agreement may be signed and delivered (including by facsimile transmission or pdf) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.    The Guild's obligations under this Agreement are conditioned upon Crown executing the Crown Side Letter Agreement.

13.    This Agreement shall be governed by and construed under the laws of the state of New York, U.S. without giving effect to that state's choice of law rules.

[The remainder of this Page is intentionally left blank.]

4

2895034.4

Executed this 30th day of September, 2010

Media Entertainment and Arts Alliance

By _____ MARK RYAN_____

Title ASSISTANT FEDERAL SECRETARY


RHI Entertainment Distribution, LLC

By _____

Title _____

5

2895034.4

Executed this 30th day of September, 2010

Media Entertainment and Arts Alliance

By_____

Title _____

RHI Entertainment Distribution, LLC

By_____

Henry S. Hoberman

Title _____

Exec. V.P., General Counsel

& Secretary

5

2895034.4

**EXHIBIT A**

<u>RHI FILMS</u>

The Outsider

Echo of Thunder, a/k/a Thunderwith

Noah's Ark

Mercy Mission

Farscape:  The Peacekeeper Wars

Dynasty:  The Making of A Guilty Pleasure

The Mystery of Natalie Wood

2895034.4

**EXHIBIT B**

<u>CROWN FILMS</u>

Noah's Ark

Mercy Mission

Nowhere to Land

Silent Predators, a/k/a Diamond Back

Moby Dick

2895034.4

FINAL TERM SHEET

This Term Sheet ("Term Sheet"), when signed by the parties listed below ("the Parties"), shall constitute a binding agreement between the Parties and shall be in full force and effect until and unless it is replaced with a long form settlement agreement which the parties are in the process of negotiating and intend in good faith to conclude. The Parties to this Term Sheet are RHI Entertainment Distribution, LLC, on behalf of itself, its parents, subsidiaries, production entities and related entities (collectively "RHI"), on the one hand, and Equity (the "Guild"), on the other hand.

This Term Sheet resolves all issues relating to any claims for residuals allegedly due, as well the applicable United Kingdom value added taxes (the "VAT") on such residual payments (collectively "residual obligations"), with respect to the film, "Return of the Native" and "The Hidden City" ("the RHI Films")as well as with respect to the residual obligations relating to rights exploited by RHI in the films ("the Crown Films") listed on Exhibit A attached hereto, it being understood that Crown Media Holdings, Inc.("Crown") is responsible for the residual obligations at issue relating to the Crown Films.

NOW, THEREFORE, IN CONSIDERATION OF THE COVENANTS AND PROMISES MADE HEREIN, THE PARTIES AGREE AS FOLLOWS:

1.    The Guild agrees to support a reorganization plan under which a new or reorganized entity (herein for convenience referred to as "RHI Newco") will be owned by RHI's lenders and emerge from the Chapter 11 bankruptcy proceedings. Additionally, under said reorganization plan, the existing RHI entities that are signatory to the Television Production Agreement made between (1) British Equity, (2) British Film and Television Producers Association and (3) Independent Programme Producers Association and dated 1st January 1989, and all such successor agreements thereto, as applicable ("the Collective Bargaining Agreements") and/or are obligated to make residual payments to the Guild (collectively, "the RHI Signatories") will emerge from the Chapter 11 proceedings and will be the owner(s) of the RHI Films and the Crown Films. RHI Newco will be the owner of the assets of RHI, including its interests in the RHI Signatories.

2.    With respect to new motion pictures produced after they emerge from the Chapter 11 Bankruptcy Proceedings, the RHI Signatories will continue to be signatories to the Collective Bargaining Agreements with the Guild in the same manner and to the same extent as prior to the filing of said Bankruptcy Proceedings and the RHI Signatories agree to pay and remain current

2895063.4

on the residual obligations as they come due for such new motion pictures in accordance with the terms of the Collective Bargaining Agreements.

3.     With respect to the RHI Films and RHI's rights in the Crown Films, the RHI Signatories will assume all existing Guild collective bargaining agreements and/or assumption agreements, except that the obligations assumed will not include the obligations being settled under this Agreement.

4.     Payments to the Guild will be as follows:

(i)     RHI Newco will cause the RHI Signatories to pay to the Guild one hundred percent (100%) of the total residual obligations owed by RHI with respect to the RHI Films as of the filing of the Chapter 11 proceeding (the "RHI Pre-Petition Claim"). The parties agree that the total residual obligations which RHI owes as of the filing date of the Chapter 11 proceeding (the "Petition Filing Date") is deemed to be $351,618.[1] In addition, RHI Newco will cause the RHI Signatories to pay the VAT applicable to such residual obligations.

(ii)     Said total of $351,618 shall be payable as follows:

$4,185.93 per month ratably over 84 months commencing with and due upon the first of the month following the month in which RHI Newco exits the Chapter 11 proceedings (each a "Basic Installment Payment"). Each Basic Installment Payment will be wired to an account maintained by the Guild (the "Guild Payment Account"), which shall be an interest bearing account.

(iii)     In the event RHI Newco or its designated related entity or entities fails to make a Basic Installment Payment when due, the Guild may declare an event of default by giving written notice to RHI Newco and the agent (the "Agent") for RHI Newco's lenders under the term loan credit facility contemplated by the plan of reorganization described in Section 1 above (the " Exit Term Loan Facility") of such failure. If the RHI Signatories or the Agent then fails to cure such default within five (5) calendar days of its receipt of such default notice, the remaining installments due under this Section 4 (but not the payment for the month in default) shall be accelerated to a 60 month payment schedule (each an "Accelerated Installment Payment")[2], due upon the first of each applicable month. In the event that the RHI Signatories or the Agent fail to make the payment for the month in default within fifteen (15) calendar days after the Guild gives the original written notice of default, the Guild may, by written notice to RHI Newco and the Agent, declare the remaining outstanding balance of the amount owed under

---

[1] This amount and all related amounts will be re-calculated to reflect updated residual amounts accrued or paid to the Guild as of the Petition Filing Date. The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

[2] References to moving to a 60 month schedule in this Agreement mean that subsequent monthly installment payments will be increased by the amount that a monthly payment under a 60 month amortization schedule exceeds the monthly payment under the 84 month monthly payment schedule specified herein.

2

this Section 4 to be immediately due and payable. In the event the RHI Signatories fail to make, when due, an Accelerated Installment Payment, the Guild may declare an event of default by giving written notice to RHI Newco and the Agent of such failure and if the RHI Signatories or the Agent then fail to cure such default within fifteen (15) days of their receipt of such default notice, the Guild by written notice to RHI Newco and the Agent may declare the remaining outstanding balance due the Guild under this Section 4 to be immediately due and payable. In the event that the Agent or the required lenders declare an event of default under the Exit Term Loan Facility and accelerate RHI Newco's obligations under the Exit Term Loan Facility, the Agent shall provide immediate notice to the Guild, and the Guild may declare immediately due and payable the remaining balance of the amounts owed the Guild under this Section 4. Concurrently with the Guild giving any notice to RHI Newco pursuant to this provision, they shall give a copy of such notice to the Agent.

(iv)    All Basic Installment Payments and Accelerated Installment Payments paid to the Guild under Sections 4(ii) and 4(iii) will be held in the Guild Payment Account until disbursed to employees represented by the Guild. All interest earned on such interest bearing account shall be credited toward acceleration of the payment of the RHI Pre-Petition Claim, applied first to the oldest amount due. RHI and the Lenders agree that all Basic Installment Payments and Accelerated Installment Payments are within the normal course of business and are indefeasibly transferred to the Guild upon payment.

(v)    At the end of each 6-month period following the Plan effective date, RHI Newco or the RHI Signatories and the Guild will coordinate with Sargent-Disc or another payroll service acceptable to RHI Newco and the Guild (the "Payroll Company"), so that the installment payments received by the Guild over that 6-month period can be allocated and paid to the Guild-represented employees in the manner specified by the Collective Bargaining Agreements. The Guild will fund such payments to Guild-represented employees from such Section 4 installment payments to the Guild. The RHI Signatories shall pay all of the fees and costs of the Payroll Company with respect to the processing and payment of the Residuals contemplated by this Section 4. Also, to the extent practicable, the RHI Signatories will provide relevant information to the Payroll Company to enable it to credit the interest earned from the Guild Payment Account as described in Section 4(iv) above.

(vi)    Both parties are of the view that no VAT is chargeable on the residual payments because the place of supply for the purposes of VAT is the United States of America. If, however, the HMRC take the view that VAT is chargeable on the residual payments, then the residual payments will be treated as exclusive of VAT, in which event, in addition to paying the residuals as contemplated by this Paragraph 4, RHI Newco will cause the Guild Signatories to pay all applicable VAT resulting from the payment of such residuals which payment of the VAT shall be made as follows: No more frequently than once every calendar quarter the Guild shall deliver to RHI Newco a reasonably detailed statement showing the amount of VAT owed with respect to residuals previously paid pursuant to this Paragraph 4, which VAT has not already been paid by the Guild Signatories pursuant hereto, plus such other evidence of the amount of the VAT owed as RHI Newco has reasonably requested. Within ten days of RHI Newco's receipt of such statement and other requested information, RHI Newco shall cause the RHI Signatories to pay such VAT to the Guild. Notwithstanding anything in this Paragraph 4(vi) to the contrary, RHI acting in good faith shall have the right to challenge the

3

HMRC's determination that VAT is owed with respect to the payment of such residuals and while RHI is diligently pursuing any such challenges, it may suspend the payment to the Guild of any such VAT being challenged.

5.    RHI will facilitate the resolution of all claims relating to the Crown Films. RHI and the Guild agree that the total sum of residual obligations (exclusive of VAT) based upon RHI's exploitation of the Crown Films as of the Petition Filing Date with respect to all exhibitions and/or distribution of the Crown Films through RHI in all media as of the Petition Filing Date (the "Crown Pre-Petition Claim") is deemed to be $816,958[3]. RHI will obtain Crown's agreement, which agreement will be in the form attached hereto as Exhibit B (the "Crown Side Letter Agreement"), to pay said total liability as follows:

A.    Payment of $408,479 on the first of the month following the month in which the plan of reorganization for RHI is confirmed by the bankruptcy court in the Chapter 11 proceeding for RHI.

B.    Payment of $408,479 no later than January 5, 2011.

C.    Crown will use a payroll process essentially identical to Section 4(v) of this Proposal for the distribution of the two payments specified above to the Guild-represented employees entitled thereto.

In addition, Crown shall pay all applicable VAT on the residual payments referenced in this Paragraph 5 pursuant to a procedure substantially identical to the one regarding the VAT to be paid pursuant to Paragraph 4 hereof.

6.    With respect to pictures returned to producers or financiers (the "Spillover Titles"), RHI will cause such producers or financiers to assume post-return residuals, if any, and upon receipt of standard form assumption agreements regarding the Spillover Titles executed by such producers or financiers, RHI and RHI Newco will have no further obligations with respect to such post-return residuals.

7.    The RHI Signatories will pay (or cause to be paid) currently when due all residual obligations incurred with respect to any distribution of the RHI Films and Crown Films by them on or after the date RHI Newco exits the Chapter 11 proceedings. RHI will cause all residuals and VAT which accrue between the Petition Filing Date and the date that RHI Newco exits the Chapter 11 proceedings, as payable by RHI or by Crown, to be paid in full when due.

8.    As of the Plan effective date, the RHI Signatories will own RHI's rights in all of the RHI and Crown Films.

9.    In consideration of the agreements and covenants of RHI set forth in this Agreement, the Guild agrees to provide a full release to RHI, Crown, Hallmark Cards Inc.,

---

[3] This amount and all related amounts will be re-calculated to reflect updated residual amounts accrued or paid to the Guild as of the Petition Filing Date. The Guild and RHI will complete this process within 90 days after the Chapter 11 filing, subject to Guild arbitration if not achieved by mutual consent.

4

Crown Media Distribution, LLC and Crown Media United States, LLC, which are affiliates of Crown (collectively, the "Crown Affiliates"), their respective principals and production company partners with respect to which RHI or Crown has assumed residual obligations, as well as to any and all third parties, with respect to the claims being settled pursuant to this Agreement relating to exploitation by RHI of the RHI Films and Crown Films and arising prior to the filing date, including the VAT relating thereto, as well as any claims for late fees, interest, liquidated damages or other penalties; provided, however, that such release will not apply to amounts due and owing under this Agreement in the event of any default by RHI under Paragraph 4 of this Agreement that is not timely cured and that results in the Guild declaring the remaining outstanding balance due the Guild under Section 4 to be immediately due and payable; and provided further, that this release does not extend to claims against Crown or the Crown Affiliates for payments due under Paragraph 5 in the event of a default by Crown in the payments required under Paragraph 5; and finally provided that this release does not extend to claims in connection with rights not exploited by RHI (e.g., rights in the Crown Films which are not owned or exploited by RHI).

10.    This Agreement shall be effective with respect to any plan of reorganization for RHI that is supported by RHI's first lien lenders and which plan is consistent with and approves of all terms of this Agreement.

11.    This Agreement may be signed and delivered (including by facsimile transmission or pdf) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.    The Guild's obligations under this Agreement are conditioned upon Crown executing the Crown Side Letter Agreement.

13.    This Agreement shall be governed by and construed under the laws of the state of New York, U.S. without giving effect to that state's choice of law rules.

[The remainder of this Page is intentionally left blank.]

2895063.4

Executed this 21st day of October, 2010

Equity

By _____

Title _Assistant General Secretary_



RHI Entertainment Distribution, LLC

By _____

Title _____

2895063.4

Executed this 21st day of October, 2010

Equity

By_____

Title _____

RHI Entertainment Distribution, LLC

By _____
            Henry S. Hoberman
Title       Exec. V.P., General Counsel
            & Secretary

2895063.4

## EXHIBIT A

CROWN FILMS:

20,000 LEAGUES UNDER THE SEA

ALICE IN WONDERLAND [3 HRS.]

BRIDGE OF TIME

CANTERVILLE GHOST

CHRISTMAS CAROL, A

CLEOPATRA [4 HRS.]

ERICH SEGAL'S ONLY LOVE [4 HRS.]

GADGETMAN

GULLIVER'S TRAVELS [4 HRS.]

INFINITE WORLDS OF H.G. WELLS, THE [6 HRS.]

JACK AND THE BEANSTALK-THE REAL STORY [4 HRS.]

JASON AND THE ARGONAUTS

LITTLE RIDERS, THE

MAGICAL LEGEND OF THE LEPRECHAUNS, THE [4 HRS.]

MERLIN [4 HRS.]

NEIL SIMON'S LONDON SUITE

ODYSSEY, THE [4 HRS.]

OLD CURIOSITY SHOP [4 HRS.]

OUT OF DARKNESS a/k/a NATIONAL GEOGRAPHIC PRESENTS:
FORBIDDEN TERRITORY a/k/a STANLEY& LIVINGSTON

PRINCE AND THE PAUPER

PRINCESS STALLION

ROBERT LUDLUM'S: APOCALYPSE WATCH [4 HRS.]

RUBY RING, THE

SCARLETT [8 HRS.]

TENTH KINGDOM, THE [10 HRS.]

WITCH'S DAUGHTER, THE

2895063.4

**EXHIBIT C**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT C**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

<u>**New Common Stock Term Sheet**</u>

| | |
|---|---|
| *Bound Holders:* | Except as otherwise noted, the provisions of this term sheet shall apply to: (i) each holder of an Existing First Lien Claim (the "<u>Initial 1st Lien Holders</u>"), (ii) each holder of an Existing Second Lien Claim (the "<u>Initial 2nd Lien Holders</u>" and, together with the Initial 1st Lien Holders, the "<u>Initial Holders</u>") and (iii) any successor or transferee of any of the foregoing. |
| *Issue:* | Common Stock, $0.01 par value (the "<u>New Common Stock</u>"; any owner of same, whether an Initial Holder or a successor or transferee of same, is referred to as a "<u>Stockholder</u>"). |
| *Issuer:* | RHI Entertainment, Inc. |
| *Authorized Shares:* | 1,000,000 shares. |
| *Initial Issuance:* | To-be-determined amount mutually agreeable by the First Lien Agent and RHI INC. |
| *Classes:* | One class of shares. |
| *Voting Rights:* | One vote per share. |
| *Stockholders Agreement:* | Each Initial 1st Lien Holder shall be deemed to enter into the Stockholders Agreement on terms and conditions reasonably acceptable to the Debtors and the First Lien Agent, which, without limitation, shall provide for the transfer rights described below.  The Plan provides that, simultaneous with the effectiveness of the Plan, each Initial 1st Lien Holder shall be deemed to have entered into the Stockholders Agreement and that each Initial 1st Lien Holder shall be bound by the provisions of the Stockholders Agreement whether or not it has executed the Stockholders Agreement. |
| *Transfer Restrictions:* | During the 120 day period following emergence (the "<u>Initial Period</u>"), (i) pursuant to the Stockholders Agreement,  the equity and debt held by the Initial 1st Lien Holders will be "stapled" and the debt will only be able to be transferred if the equity is also transferred and the purchaser agrees in writing to be bound by the Stockholders Agreement and (ii) pursuant to the Second Amended and Restated Certificate of Incorporation of RHI INC, the Stockholders shall be subject to "drag along rights" with respect to an Extraordinary Transaction (as defined below) approved by Initial Holders holding at least 2/3 of the New Common Stock held by the Initial Holders.<br><br>Both during and after the Initial Period, (i) a Stockholder may only transfer New Common Stock to (a) a single purchaser who is in such transaction acquiring the entirety of the transferor's New Common Stock, (b) a single purchaser who is in such transaction |

| | |
|---|---|
| | acquiring at least three percent (3.0%) of the total New Common Stock or (c) a purchaser who is already a Stockholder and (ii) RHI INC shall have the right to require an opinion of counsel in the context of any transfer that the transfer will not violate the Securities Act of 1933 or applicable "blue sky" laws.  A Stockholder may not transfer Common Stock if, as a result of such transfer, RHI INC would be required to register a class of securities under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or any successor provision, or otherwise become subject to the reporting obligations of the Exchange Act or any successor statute. <br><br> Except as noted above, the New Common Stock will not otherwise be subject to any transfer restrictions (other than as imposed by applicable law). <br><br> "Extraordinary Transaction" shall mean (i) a sale that would result in one person, entity or group owning a majority of the equity interests in RHI INC (whether by merger, stock sale or otherwise), (ii) a sale of all, substantially all, or any substantial portion of, the assets of RHI INC or its subsidiaries or (iii) any "harvesting" or sublicensing or sub-distribution arrangement relating to RHI INC's or its subsidiaries' library of film rights or any substantial portion thereof. |
| *Registration Rights Agreement:* | On the Effective Date, RHI INC shall enter into a Registration Rights Agreement for the benefit of the Initial Holders which execute the agreement and the holders of the New Warrants which execute the agreement, which shall provide for "piggyback" registration rights for the New Common Stock (with customary exceptions, including RHI INC's initial public offering). <br><br> In connection with any exercise of registration rights granted pursuant to the Registration Rights Agreement, each beneficiary thereof shall provide RHI INC with customary and appropriate information relating to such beneficiaries, and shall be subject to customary indemnification obligations regarding the accuracy thereto.  The beneficiaries shall be subject to customary underwriter cutbacks, and shall be required (if requested by the underwriters) to refrain from transferring any shares of Common Stock or other securities during any registered offering.  The registration rights granted pursuant to the Registration Rights Agreement shall be transferrable along with the Common Stock or New Warrants, as applicable, subject to certain customary restrictions. |
| *Preemptive Rights:* | The beneficiaries of the Registration Rights Agreement will not have preemptive rights on future equity issuances. |
| *Board of Directors:* | Prior to emergence, the First Lien Agent shall designate the initial members of the New Board as provided for in the Plan.  Such New Board will have five directors (initially comprised of Robert A. Halmi, Jr. and four other directors chosen by the First Lien Agent).  The New Board will not include representatives from any Initial 1st Lien Holder or any Initial 2nd Lien Holder. <br><br> The directors will serve one year terms. <br><br> During the Initial Period, the majority in number of Initial 1st Lien Holders have the right to remove any or all of the directors, with or without cause.  Following the Initial Period, the Stockholders holding a majority of the New Common Stock will have the right to remove a director at any time, with or without cause. <br><br> During the Initial Period, Initial Holders holding at least 2/3 of the New Common Stock then held by the Initial Holders shall be entitled to appoint a replacement to fill any board vacancy.  After the Initial Period, the majority of the directors then in office or |

| | |
|---|---|
| | Stockholders representing a plurality of the New Common Stock shall be entitled to appoint a replacement to fill any board vacancy. |
| | During the Initial Period, only the Initial Holders shall be entitled to vote for the election of directors. After the Initial Period directors will be elected by a vote of the Stockholders (no cumulative voting); provided that the remaining directors shall appoint a replacement to fill any board vacancy until the next meeting of the shareholders. |
| | The directors will have customary fiduciary duties to Reorganized RHI INC (provided that the corporate opportunity doctrine shall be limited to only require directors to bring opportunities to Reorganized RHI INC if such opportunity was presented to such director in his or her capacity as a director of Reorganized RHI INC, with the foregoing proviso not applicable to any director who is also a full-time employee of Reorganized RHI INC or any of its subsidiaries). |
| | Directors will receive customary indemnification and insurance protection. |
| *Observer/Information Rights:* | Each Initial Holder that holds at least 3.5% of the outstanding New Common Stock will be entitled to appoint an observer to the New Board. Such observers will have the right to attend all board and participate in all board meetings and receive copies of all information provided to directors but will not be entitled to vote at board meetings (such observation rights shall be subject to customary conflict of interest or privilege restrictions). |
| | Each Stockholder that holds at least 1% of the outstanding New Common Stock will be entitled to receive copies of all financial statements provided to the Reorganized Debtors' lenders. In the event that the Reorganized Debtors are not required to provide any financial information to their lenders, such holders will be entitled to receive quarterly financial reports. |
| *Consent Rights:* | During the Initial Period, the following actions shall require the approval of (i) the New Board and (ii) Initial Holders holding at least 2/3 of the New Common Stock then held by the Initial Holders (but not any approval from any other shareholder unless otherwise required by applicable law): <ul><li>any amendment or modification to the articles of incorporation or bylaws or the adoption of any new bylaws of RHI INC</li><li>an Extraordinary Transaction</li><li>the issuance, redemption or repurchase of any equity securities of RHI INC or any of its subsidiaries</li><li>the dissolution, liquidation or winding up Reorganized RHI INC or its material subsidiaries</li><li>the declaration or payment of any dividend or other distribution by RHI INC or any of its subsidiaries</li><li>acquisitions in excess of a $5,000,000</li><li>engaging in any business other than (i) producing, acquiring and/or distributing motion pictures and miniseries that are intended to be initially exhibited on television and (ii) related activities that are ancillary thereto</li></ul> |

- appointment or replacement of  RHI INC's or any of its subsidiaries' independent auditors in the event of a dispute between the auditors and RHI INC

- expenditures in  one or a series of related transactions in excess of a $10,000,000

After the Initial Period and until such time as the original Initial 1st Lien Holders and their respective affiliates cease to collectively own at least 25% of the outstanding New Common Stock, the following actions shall require the approval of (i) the New Board and (ii) Stockholders holding at least a majority of the New Common Stock:

- the issuance of any senior equity

- any amendment or modification to the articles of incorporation or bylaws or the adoption of any new bylaws of RHI INC

- an Extraordinary Transaction

- engaging in any business other than (i) producing, acquiring and/or distributing motion pictures and miniseries that are intended to be initially exhibited on television and (ii) related activities that are ancillary thereto

- dissolution, liquidation or winding up Reorganized RHI INC or its material subsidiaries

- appointment or replacement of  RHI INC's or any of its subsidiaries' independent auditors in the event of a dispute between the auditors and RHI INC

The approval of the Board is required for:

- the hiring or firing of anyone in a position (or functional equivalent) of a Chief Executive Officer, a Chief Financial Officer, a Chief Operating Officer, a Chief Legal Officer, or a Chief Sales Officer of RHI INC or any of its material subsidiaries

- RHI INC or any or its subsidiaries entering into any Material Employment Agreement or entering into any amendment to or any extension of any  Material Employment Agreement

- changes in accounting practices or auditors

- appointment or replacement of RHI INC's or any of its subsidiaries' independent auditors in the event of a dispute between the auditors and RHI INC

"Material Employment Agreement" shall mean any employment agreement entered into by the Corporation or any of its subsidiaries that either (i) provides for cash compensation in excess of $250,000 in any year or (ii) that provides for potential severance payment (including any compensation to be paid during any notice period) in excess of $250,000 (or such lesser amount as set by the Board)

The approval of (i) the Board and (ii) the holders of a majority of the outstanding common stock (including the holders of the warrants issued pursuant to the plan on an as exercised basis) is required for:

- transactions between RHI INC or any of its subsidiaries and affiliates of RHI INC; provided, that the transactions with Affiliates (i) which involve monetary consideration of under $100,000 or (ii) which are entered into in the ordinary

C-4

|  | course of business of the Affiliate and on normal business terms, shall not require a shareholder vote. |
|---|---|
| *Other Rights:* | As of the Effective Date, no Stockholder will have any tag-along or other co-sale rights; put rights; call rights; anti-dilution protections; or preemptive, participation, or other similar rights to purchase a pro rata share of any offering by the Company of equity securities, or any securities convertible into equity securities. |

**EXHIBIT D**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT D**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

<u>**New Management Incentive Plan Term Sheet**</u>

| *Founders Equity Plan* | |
|---|---|
| *Participants:* | Robert Halmi, Jr. (CEO) and Peter von Gal (COO) (each, a "<u>Founder</u>"). |
| *Award Type:* | Restricted shares of New Common Stock ("<u>Restricted Stock</u>") or, as provided below, Restricted Stock Units ("<u>RSUs</u>"). |
| *Shares Subject to Awards:* | Pursuant to the Founders Equity Plan, awards with respect to 7.5% of the shares of New Common Stock of Reorganized RHI INC outstanding as of the Effective Date,  as determined on a fully diluted basis (but without giving effect to the Warrants, but taking into account the shares subject to the Founders Equity Plan and Management Equity Incentive Plan), may be issued to Founders.  It is anticipated that that initial awards shall be made as follows:<br><br>• 6.5% for Robert Halmi, Jr.<br><br>• 1.0% for Peter von Gal |
| *Expected Grant Date:* | Effective Date. |
| *Vesting:* | Founders Equity Plan Restricted Stock shall be immediately vested but shall not be transferable except as set forth herein; and such Restricted Stock will be subject to forfeiture in certain circumstances described herein. |
| *Forfeiture:* | Founders Equity Plan Restricted Stock will generally be forfeited upon termination of employment by the Company for cause or by the Founder without good reason. Founders Equity Plan Restricted Stock will not be forfeited upon a termination of employment (i) by the Company without cause or by the Founder for good reason (unless, within the 12-month period following such termination, the Founder breaches his restrictive covenants), or (ii) by reason of death or disability. |
| *Call Right:* | After termination of employment, any Founders Equity Plan Restricted Stock not forfeited as provided above may, at Company's option, be repurchased for the then-fair market value of the Company, which cash becomes payable at the time such shares of Restricted Stock otherwise would have become transferable; <u>provided</u>, that the call right must be exercised within 12 months from the termination of employment. |
| *Dividends; Shareholder Rights:* | Any cash dividends on the New Common Stock shall be held in escrow until the |

D-1

| | Founders Equity Plan Restricted Stock becomes transferable in connection with the Change in Control.  Except as otherwise set forth herein, holders of Founders Equity Plan Restricted Stock will have the rights and privileges of a stockholder of the Company, including voting rights (provided, that such voting rights may not be exercised during the "Initial Period" described in RHI INC's charter, and during such Initial Period, any votes based upon the number of New Common Stockholders or upon a percentage of New Common Stock shall be conducted as if the Restricted Stock had not been issued), with respect to such shares of Restricted Stock. |
|---|---|
| *Change in Control:* | "Change in Control" shall be defined in the definitive Founders Equity Plan document, which will be filed as part of a supplemental filing to the Plan of Reorganization, and may include a change in ownership or control and/or certain loan repayment events. |
| *Transferability:* | Founders Equity Plan Restricted Stock shall not be transferable, except in the case of (i) death, disability or to "permitted transferees" for estate planning purposes (and such transferee shall continue to be subject to the transfer restrictions); (ii) a Change in Control; or (iii) following a public offering of such New Common Stock (after any underwriter-imposed lock-up period). |
| *Section 409A:* | All Restricted Stock issued pursuant to the Founders Equity Plan shall be intended to be exempt from Section 409A of the Internal Revenue Code and may contain customary Section 409A-related provisions; provided, that the Company will have no liability for any adverse tax consequences to an executive under Section 409A. Awards under the Founders Equity Plan may be made in the form of RSUs, rather than Restricted Stock, to the extent determined appropriate by the parties. |

| *Management Equity Incentive Plan* | |
|---|---|
| *Eligibility:* | Employees, directors and consultants of the Company and its affiliates shall be eligible to participate in the Management Equity Incentive Plan (each, a "Participant"). Participants shall be recommended by the CEO and approved by the Compensation Committee of the New Board (the "Compensation Committee").  Participation by the CEO shall be recommended by the Compensation Committee and approved by the New Board. |
| *Award Types:* | Omnibus equity plan providing for various award types, including Restricted Stock awards, RSUs, non-qualified stock options , incentive stock options, stock appreciation rights and performance awards. |
| *Shares Subject to Awards:* | Pursuant to the Management Equity Incentive Plan, awards with respect to 7.5% of the shares of New Common Stock of Reorganized RHI INC outstanding as of the Effective Date, as determined on a fully diluted basis (but without giving effect to the Warrants, but taking into account the shares subject to the Founders Equity Plan and Management Equity Plan), may be issued to Participants. |

| | |
|---|---|
| *Expected Grant Date:* | As soon as practicable, and in any event within 90 days, after the Effective Date. |
| *Award Type on Expected Grant Date:* | All awards granted pursuant to the Management Equity Incentive Plan on the Grant Date to be Restricted Stock or, as provided below, RSUs. |
| *Vesting:* | Subject to the Participant's continuous employment with the Company through the applicable vesting date, the shares of Management Equity Incentive Plan Restricted Stock shall vest in equal annual installments over a three (3) year period, commencing on the first (1st) anniversary of the grant date and annually thereafter; provided that, notwithstanding the foregoing, all such shares of Restricted Stock shall become vested upon a Change in Control; and, provided, further that no such shares of Restricted Stock shall be transferable until a Change in Control occurs following the date of grant and such Restricted Stock will be subject to forfeiture in certain circumstances described herein. |
| *Forfeiture:* | Unvested Management Equity Incentive Plan Restricted Stock will generally be forfeited upon termination of employment, except if the Participant's employment is terminated without cause or for good reason and a Change in Control occurs within 12 months thereafter, the unvested Management Equity Plan Restricted Stock shall vest in the Participant upon such Change in Control; provided that, even vested Management Incentive Awards shall be forfeited in the case of (a) a termination for cause of the Participant, (b) in the case of any Founder who is a Participant, a resignation by such Founder without good reason.  Vested Management Equity Incentive Plan Restricted Stock will not be forfeited upon a termination of employment without cause or for good reason (unless the Participant breaches his/her restrictive covenants in accordance with their terms following termination of employment). |
| *Call Right:* | After termination of employment, any Management Equity Incentive Plan Restricted Stock not forfeited as provided above may, at Company's option, be repurchased for the then-fair market value of the Company; provided, that the call right must be exercised within 9 months (extended to 15 months if a 12-month non-competition commitment is applicable) from the termination of employment. |
| *Dividends; Shareholder Rights:* | Any cash dividends on the New Common Stock shall be held in escrow until the Management Equity Incentive Plan Restricted Stock becomes transferable in connection with the Change in Control.  Except as otherwise set forth herein, holders of Management Equity Incentive Plan Restricted Stock will have the rights and privileges of a stockholder of the Company, including voting rights (provided, that such voting rights may not be exercised during the "Initial Period" described in RHI INC's charter, and during such Initial Period, any votes based upon the number of New Common Stockholders or upon a percentage of New Common Stock shall be conducted as if the Restricted Stock had not been issued), with respect to such shares of Restricted Stock. |
| *Expected Participants:* | The following individuals are expected to receive Restricted Stock awards pursuant to the Management Equity Incentive Plan:<br><br>1.  Halmi, Jr., Robert (CEO)<br>2.  Von Gal, Peter (Head of Worldwide Sales)<br>3.  Hoberman, Henry (EVP, General Counsel & Secretary)<br>4.  Scarpelli, Michael (EVP – Finance) |

|  |  |
|---|---|
|  | 5. De Grazia, Martin (SVP – Contract Administration & Distribution)<br>6. Zapakin, Alan (SVP – Marketing)<br>7. Alexander, John (SVP – International Sales)<br>8. Erickson, Patricia (SVP – Human Resources & Distribution)<br>9. Sheppard, Susan (SVP – Business Affairs Attorney)<br>10. Ringler, Jeffrey L. (SVP – Business Affairs Attorney)<br>11. Oesterlin, Michael (SVP – International Sales)<br><br>See "Eligibility" above with respect to possible awards to additional individuals. |
| *Transferability:* | Management Equity Incentive Plan Restricted Stock shall not be transferable, except in the case of (i) death, disability or to "permitted transferees" for estate planning purposes (and such transferee shall continue to be subject to transfer restrictions); (ii) a Change in Control; or (iii) following a public offering of such New Common Stock (after any underwriter-imposed lock-up period). |
| *Section 409A:* | All Restricted Stock issued pursuant to the Management Equity Incentive Plan shall be intended to be exempt from Section 409A of the Internal Revenue Code and may contain customary Section 409A-related provisions; <u>provided</u>, that the Company will have no liability for any adverse tax consequences to an executive under Section 409A. Awards under the Management Equity Incentive Plan may be made in the form of RSUs, rather than Restricted Stock, to the extent determined appropriate by the parties. |

| Annual Incentive Plan (AIP) | |
|---|---|
| *AIP for 2011 and Subsequent Years:* | Annual Incentive Plan ("<u>AIP</u>") to be established at the sole discretion of the New Board in consultation with the Compensation Committee. |
| *Other Employees -- Discretionary Bonus Payments for fiscal years 2010 and 2011:* | *Employees who do not participate in AIP:*  With respect to each of fiscal years 2010 and 2011, the Company shall accrue a pool of $150,000 for discretionary annual bonuses for employees not eligible to participate in the AIP.  Includes new or promoted employees not eligible in the AIP Bonus Pool allocation at the beginning of the plan year.<br><br>The Compensation Committee shall be required to approve the release of the discretionary bonus pool after year-end, and the allocation of bonus pool payments shall be at the discretion of the CEO. |

| Employment Agreements | |
|---|---|
| *Eligible Participants:* | Senior Vice Presidents and above, including the Chief Executive Officer. |
| *Replace Existing Employment Agreements:* | The Employment Agreements shall supersede the existing employment agreements of |

|  | Senior Vice Presidents and above.  By entering into an Employment Agreement, the eligible individual shall acknowledge that his or her existing employment agreement shall terminate as of the Effective Date and that he or she shall waive all rights had under the existing employment agreement, including all monetary claims thereunder other than accruals of base salary accrued during the last payroll period in which the Effective Date occurs and any other accrued but unpaid non-salary benefits. |
|---|---|
| *Term of Agreements:* | Three-year initial term, automatically renews for successive one-year periods, unless either party provides notice of non-renewal at least 60 days prior to the expiration of the then-applicable term. |
| *Compensation and Benefits:* | Each employment agreement provides for each executive's (i) annual base salary, subject to increase (but not decrease) as determined by the New Board from time to time, (ii) participation in the Company's employee benefit plans, programs and arrangements, (iii) paid vacation, (iv) expense reimbursement, (v) equity awards, which terms shall include full vesting upon a Change in Control (as defined in the applicable equity plan) during the term or within one year following the executive's termination of employment without cause or for good reason, and (v) eligibility for bonus payments for calendar years subsequent to 2010. |
| *Payments and Benefits upon Certain Terminations of Employment:* | *Termination of Employment Without Cause, for Good Reason or upon Non-Renewal of Agreement by the Company*<br><br>Upon (a) a termination of employment by the Company without cause,  (b) a termination of employment by the executive for "good reason," (which shall include, in the case of Robert Halmi, Jr., Peter Von Gal, Henry Hoberman and Michael Scarpelli, a material diminution of duties, title or responsibility) or (c) non-renewal of the executive's agreement by the Company (with the date of termination being the expiration of the then-applicable term),[1] each executive is entitled to receive the following severance payments and benefits (the "Severance Benefits"), in addition to any earned but unpaid base salary and vacation pay and any amounts arising from the executive's participation in the Company's benefits plans:<br><br>(i) one year's continuation of the executive's annual base salary as in effect immediately prior to the date of termination of employment for Robert Halmi, Jr., Peter von Gal, Henry Hoberman and Michael Scarpelli or (2) six months' continuation of the executive's annual base salary as in effect immediately prior to the date of termination of employment for other executives;<br><br>(ii) for any year where a bonus opportunity pool has been established and accrued for, the pro rata amount of any bonus which would otherwise have been payable to the executive during the year the date of termination occurred, payable on at the same time such bonus is paid to other eligible executives;<br><br>(iii) continued coverage for the executive and any eligible dependents under all Company group health benefit plans in which the executive and any eligible depends are participating in immediately prior to the date of termination of employment, until the earlier of (A) the six-month anniversary of the date of termination of employment |

---

[1]  The benefits of this clause (c) shall be available only under the Employment Agreements (as being modified) for executives at a level higher than Senior Vice President ("Senior Executives").

D-5

| | (or, for Robert Halmi, Jr., Peter von Gal, Henry Hoberman and Michael Scarpelli, the first anniversary of the date of termination of employment) or (B) the date the executive first violates any of the restrictive covenants.<br><br>*Termination of Employment by Reason of Death or Disability*<br><br>Upon a termination of employment by the executive by reason of his (a) death or (b) disability, each executive (or his estate, as applicable) is entitled to receive the following payments and benefits, in addition to any earned but unpaid base salary and vacation pay and any amounts arising from the executive's participation in the Company's benefits plans:<br><br>(i) for any year where a bonus opportunity pool has been established and accrued for, the pro rata amount of any bonus which would otherwise have been payable to the executive during the year the date of termination occurred, payable at the same time such bonus is paid to other eligible executives; and<br><br>(ii) full vesting of any unvested equity awards as of the date of termination of employment. |
| --- | --- |
| *Release of Claims:* | All payments and benefits provided in connection with the executive's termination of employment will be subject to the executive's execution and non-revocation of waiver and release of claims agreement. |
| *Restrictive Covenants:* | In addition to customary confidentiality and non-disparagement covenants, the Employment Agreements shall contain a non-compete covenant and a non-solicitation covenant providing that such executive shall not (a) engage directly or indirectly with any competitive business or (b) solicit any employees (or customers, as applicable), each for the (i) 12 month period following the date of termination of employment for Robert Halmi, Jr., Peter von Gal, Henry Hoberman and Michael Scarpelli or (ii) 6 month period following the date of termination of employment for all other eligible participants; <u>provided</u>, that in the event of a termination of employment upon expiration of the employment term by reason of a non-renewal by the executive, the non-compete will apply only if the Company elects to provide the Severance Benefits.[2] |
| *Section 409A* | All payments and benefits provided to the executive pursuant to the Employment Agreement are intended to be exempt from or comply with Section 409A of the Internal Revenue Code and contain customary Section 409A-related provisions; <u>provided</u>, that the Company will have no liability for any adverse tax consequences to an executive under Section 409A. |

---

[2] The benefits of the foregoing proviso shall be available only to Senior Executives.

**EXHIBIT E**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT E**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**New Second Lien Term Loan Facility Term Sheet**

| | |
|---|---|
| *Borrower:* | RHI Entertainment, LLC ("RHI LLC" or the "Borrower"). |
| *Guarantors:* | The obligations of the Borrower shall be guaranteed by RHI INC, RHIE Holdings Inc., RHI Entertainment Holdings II, and each subsidiary of the Borrower that guarantees the Existing First Lien Credit Agreement referred to below (each a "Guarantor," and collectively, the "Guarantors"; together with the Borrower, the "Credit Parties"). |
| *Administrative Agent:* | JPMorgan Chase Bank, N.A. ("JPMCB" or, in its capacity as administrative agent under the New Second Lien Term Loan Facility, the "New Term Agent"). |
| *Lenders:* | The lenders (subject to assignments in accordance with the Term Loan Agreement described below, the "New Term Lenders") will be the First Lien Lenders, and each of which shall be deemed to be bound by the Term Loan Agreement without execution thereof. |
| *Facility:* | A credit facility (the "New Second Lien Term Loan Facility" or the "Term Facility") to be comprised of U.S.$300 million of term loans (the "Term Loans") which are to be extended on a non-cash basis on the Effective Date and allocated among the First Lien Lenders as provided in the Plan. |
| *Documentation for Term Facility:* | The Term Facility will be documented by, among other things, a credit, guaranty and pledge agreement (the "Term Loan Agreement") to be negotiated and entered into in form and substance satisfactory to the New Term Agent. The Term Loan Agreement will take the form of an amendment to or an amendment and restatement of the Existing First Lien Credit Agreement such that Lenders will retain the benefit of any perfection filings made by the First Lien Agent. |
| *Term:* | The Term Loans shall be repaid in full upon the earliest of (i) the Maturity Date (as defined below) or (ii) the acceleration of the loans in accordance with the Term Loan Agreement (together with the Maturity Date, the "Termination Date").<br><br>"Maturity Date" shall mean December 31, 2013.<br><br>Upon the occurrence of the Termination Date, the Term Loans and other obligations under the Term Facility shall be repaid in full. |
| *Closing Date:* | Closing to occur, subject to the satisfaction of the conditions precedent set forth below and in the Term Loan Agreement, upon the occurrence of the Effective Date of the Plan. The date of such closing is referred to as the "Closing Date". |

| | |
|---|---|
| *Use of Proceeds:* | No cash proceeds to the Borrower from the Term Loans; instead, the Term Loans are to be issued, along with the New Common Stock, in exchange for discharge of all Existing First Lien Claims on the Effective Date. |
| *Subordination of Liens to Exit Revolving Credit Facility Liens:* | The liens in favor of the New Term Agent (on behalf of the New Term Lenders) securing the Term Facility shall be subject and subordinate to the liens securing the Borrower's obligations under a revolving credit facility of up to U.S.$25 million (of which up to $5 million will be available in the form of letters of credit) to be extended to the Borrower (the "Exit Revolving Credit Facility" or the "Revolving Facility"; the credit agreement to be negotiated and entered into to evidence same, the "Revolving Credit Agreement"; the administrative agent under the Revolving Facility, the "Exit Revolving Agent"; the lenders thereunder, the "Exit Revolving Lenders"; and the revolving loans which may from time to time be extended thereunder, the "Revolving Loans")), and guaranteed by the Guarantors and secured by a first lien security interest in the same Collateral that secures the Term Facility.  The Revolving Credit Agreement initially will (i) have the same maturity date as the Term Facility, (ii) be governed by a borrowing base, and (iii) contain representations and warranties, affirmative and negative covenants, financial covenants and events of default (but not necessarily mandatory prepayment, amortization or economic terms) substantially the same as those contained in the Term Facility. |
| *Second Lien Intercreditor Agreement:* | As a condition to the Closing Date, the New Term Agent shall have negotiated and entered into first lien/second lien intercreditor agreement with the Exit Revolving Agent (the "Exit Intercreditor Agreement") pursuant to which the New Term Agent and the Exit Revolving Agent shall agree that the security interests securing the Term Facility are subject and subordinate to the security interests in favor of the Exit Revolving Agent securing the Revolving Facility; *provided, however,* that the Exit Intercreditor Agreement shall contain, among other things, the following provisions:  (a) the Exit Revolving Agent shall agree that the aggregate amount of the revolving credit commitments under the Revolving Facility shall at no point be permitted to exceed U.S.$25 million, (b) until such point as the Exit Revolving Agent or Exit Revolving Lenders have accelerated the Revolving Loans or commenced secured creditors' remedies with respect to any of the Collateral or any of the Credit Parties has become the subject of a bankruptcy, insolvency or receivership proceeding, the Borrower shall be entitled to pay, and the New Term Lenders shall be entitled to accept, (i) payments of interest on the Term Loans and of any scheduled amortization as set forth under the Term Loan Agreement as of  the Closing Date, (ii) any mandatory prepayments set forth in the Term Loan Agreement as of the Closing Date, (c) so long as no event of default exists under the Revolving Facility, the Borrower shall be entitled to pay, and the New Term Lenders shall be entitled to accept, any voluntary prepayments or other prepayments of the Loans under the Term Facility, (d) until the repayment in full of all Indebtedness under the Revolving Facility and the termination of any commitments to extend additional credit thereunder (the "Revolving Facility Repayment Date"), any proceeds of the common Collateral securing the Term Facility and the Revolving Facility that are realized in connection with any enforcement actions with respect to such Collateral, and any recovery in any bankruptcy, insolvency or receivership shall be paid to the Revolving Facility Lenders prior to payments to the New Term Lenders and (e) various commitments and agreements between the Exit Revolving Agent and the New Term Agent with respect to, among other things, the commonality of collateral, application of proceeds of common Collateral, actions which may or may not be taken in the context of an insolvency proceeding and amendments to the Revolving Facility documentation and the Term Facility documentation. |
| *Priority and Liens:* | The Term Loans and all other monetary obligations under the Term Facility (and all guaranties of the foregoing by the Guarantors), shall at all times, be secured by a perfected second priority lien (subject solely to permitted liens to be specified, including the first priority Liens in favor of the Exit Revolving Agent securing the Borrower's obligations under the Revolving Facility and |

| | liens in favor of talent guilds on terms and conditions to be established in the Term Loan Agreement) on all of the Borrower's and the Guarantors' respective property and assets, as well as by a pledge of 100% of the Equity Interests (to be defined in the Term Loan Agreement) in each Guarantor (but not the Equity Interests in the Borrower) and all of the other Equity Interests owned by the Borrower and each Guarantor (but limited to pledges of 65% of the Equity Interests owned by any Credit Party in any "controlled foreign corporation"). |
|---|---|
| ***Depository Relationship:*** | The Borrower's and Guarantors' cash management arrangements shall be reasonably acceptable to the New Term Agent and satisfactory deposit account control agreements in favor of the New Term Agent shall be executed as a condition precedent to the Closing Date.  The cash management arrangements and the deposit account control agreements shall provide that, (a) prior to the Revolving Facility Repayment Date, from and after the date that the Borrower is not in compliance with the required Coverage Ratio as described below, any and all sums in each deposit account shall, on a daily basis, be swept into a collection account maintained with the Exit Revolving Agent under the Revolving Facility (and any amounts received in such collection account shall be automatically applied on a daily basis to repay revolving indebtedness under the Revolving Facility) and (b) following the Revolving Facility Repayment Date, from and after the date that the Borrower is not in compliance with the required Coverage Ratio or the occurrence of an Event of Default, the New Term Agent shall have full dominion and control over each of the Credit Parties' deposit accounts. |
| ***Upfront Fees:*** | None. |
| ***Interest Rate:*** | The Term Loans will accrue interest at a floating rate equal to, at the Borrower's option:  (i) the Alternate Base Rate plus 2.00%; or (ii) LIBOR plus 3.00% for interest periods to be determined.<br><br>The Alternate Base Rate is the highest of (a) the New Term Agent's Prime Rate, (b) the Federal Funds Effective Rate plus ½ of 1.00%, and (c) one-month LIBOR plus 1.00% for interest periods of one, two or three months.<br><br>LIBOR shall at all times be subject to a 2.00% floor and will include statutory reserves at all times when there are reserves.<br><br>All interest and fees will be calculated on the basis of a 360 or 365 day year, as applicable, and actual days elapsed. |
| ***Default Interest:*** | 4.00% above the then applicable interest rate which will be applied to the entire unpaid balance of the Term Loans. |
| ***Interest Payment*** | Interest on the Term Loans shall be paid monthly in arrears, on the last Business Day of each calendar month. |
| ***Mandatory Amortization and Mandatory Prepayments:*** | The Borrower shall be required to prepay on the last Business Day of each month set forth in the below table principal on the Term Loans in the amount set forth opposite such month:<br><br>Month:  Required Amortization:<br><br>March 2011  $250,000<br>June 2011  $250,000<br>September 2011  $250,000<br>December 2011  $5,250,000 |

|  |  |
|---|---|
| March 2012 | $2,000,000 |
| June 2012 | $2,500,000 |
| September 2012 | $2,500,000 |
| December 2012 | $19,500,000 |
| March 2013 | $2,000,000 |
| June 2013 | $2,000,000 |
| September 2013 | $2,000,000 |
| December 2013 | $19,000,000 |

In addition, on an annual basis, the Borrower shall be required to repay the Term Loans with an amount equal to 75% of the Excess Cash Flow (as defined below) during the immediately preceding fiscal year.

In addition, subject to the provisions to be contained in the Exit Intercreditor Agreement, mandatory prepayments shall also be required with (x) 100% of the proceeds of certain asset sales and of additional indebtedness, (y) 50% of the proceeds of post-Closing Date equity contributions and (z) certain proceeds of insurance recoveries.

The Borrower may voluntarily prepay the Term Loans, without penalty, in amounts or on dates not described above, but any such voluntary prepayment shall not reduce the mandatory prepayments described above (e.g., such voluntary prepayments shall not reduce the required amortization, prepayments required from Excess Cash Flow or prepayments required with the proceeds of certain asset sales, indebtedness or equity contributions).

Once repaid, no portion of the Term Loans may be re-borrowed.

| | |
|---|---|
| ***Conditions Precedent to Occurrence of Closing Date:*** | The consummation of the Closing Date shall be subject to the satisfaction of conditions that are typical for a facility of this type, including but not limited to: (i) the substantial consummation of the Plan; (ii) negotiation and execution of the Term Loan Agreement and the other definitive documentation relating to the Term Facility in form and substance satisfactory the New Term Agent, including the Exit Intercreditor Agreement; (iii) perfection of security interests granted in favor of Agent, delivery of customary legal opinions and satisfactory lien searches; (iv) payment of any fees required to be paid under the Fee Letter; (v) the New Term Agent's satisfaction, in their sole discretion, with a business plan, containing forecasted financial statements consisting of balance sheets, cash flow statements and income statements, with supporting detail and underlying assumptions, together with management commentary on such assumptions (a "<u>Business Plan</u>") all covering a period commencing with the Effective Date and through at least the Maturity Date; (vi) delivery of 13-week cash flow projection satisfactory to the New Term Agent in its sole and absolute discretion; (vii) delivery of disclosure schedules, officer's certificates, company resolutions and other customary closing deliverables, (viii) except to the extent waived by the Term Loan Agent, for each guild that holds any security interest in any motion picture, which security interest pre-dates and survives the Closing Date, the New Term Agent shall have received an acknowledgment executed by such guild, which acknowledgment shall be in form and substance satisfactory to the New Term Agent and shall provide that the security interests in favor of the Exit Revolving Lenders and the New Term Loan Lenders, as a combined class, have at least the same priority vis-à-vis the surviving liens of such guild as existed between such guild and the Existing First Lien Credit Agreement and (ix) delivery of a Stockholders Agreement (a "<u>Stockholders Agreement</u>") among holders of Existing First Lien Claims (each, an "<u>Initial Holder</u>"), which Stockholders Agreement shall be binding on all Initial Holders regardless of whether they execute same and shall be in form and substance satisfactory to the New Term Agent, including that such Stockholders Agreement or the Reorganized Parent Governing Documents shall provide, among other things, that (a) through the 120th day following the Closing Date, in the context of any potential sale or disposition of all, substantially all, or any substantial portion of, of the Credit Parties' assets, or in the context of any potential "harvesting" or sublicensing or subdistribution arrangement relating to the Credit Parties' library |

| | |
|---|---|
| | of film rights or any substantial portion thereof (any such transaction, an "Extraordinary Transaction"), the determination of Initial Holders owning 66 2/3% of the New Common Stock then held by all Initial Holders shall be binding on all Initial Holders, (b) through the 120th day following the Closing Date, among other things, any director may be removed from office at any time with or without cause by the affirmative vote of a majority of the Initial Holders and any vacant director position in RHI INC shall be filled solely by a vote of 66 2/3% of the Initial Holders, and (c) through the 120th day following the Closing Date, no Initial Holder shall permit its New Common Stock (or any part thereof) to be sold, transferred or assigned to any Person unless such acquiring Person is also acquiring a proportionate amount of the Loans held by such selling Initial Holder (or its affiliates). |
| *Representations and Warranties:* | Standard representations and warranties for a facility of this type, including but not limited to, due incorporation and good standing, absence of requirements for consents or approvals, absence of liens, accuracy of financial statements, absence of a material adverse change, and absence of litigation on terms at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement. |
| *Affirmative Covenants:* | Standard affirmative covenants for a facility of this type and at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement, including but not limited to delivery of financial statements, maintenance of properties and insurance, causing material subsidiaries to become Credit Parties (pursuant to the parameters set forth in the Existing First Lien Credit Agreement) and payment of taxes and other material obligations. In addition, the Borrower and the Guarantors shall be required to: (a)  deliver, on an annual basis, (a) an updated Business Plan in form and substance satisfactory to Agent covering the three year period following the date of preparation and (b) an independent third party valuation of the Borrower's and its subsidiaries' unsold titles in the form generally provided under the Existing First Lien Credit Agreement (the amounts reflected therein, the "Library Appraisal Amount"); (b)  deliver, on a monthly basis, rolling 13 week cash flow projections ("Cash Flow Projections") in form and substance satisfactory to the New Term Agent and its advisors in their sole discretion evidencing minimum cash on hand at all times during the projection period in amounts to be determined; (c)  deliver, on an ongoing basis, copies of borrowing base certificates and any other reporting delivered to the Exit Revolving Agent and/or the Exit Revolving Lenders; (d) cause the strategic planning officer of the Borrower to conduct by no later than sixty (60) days after the Closing Date a strategic alternative review of potential Extraordinary Transactions; and (e)  demonstrate, on a monthly basis, that the Coverage Ratio (as defined below) is greater than, on the last day of each month described below, the ratios set forth below: |

| Month: | Minimum Coverage Ratio: |
|---|---|
| Each month through November 2011 | 1.10:1.0 |
| December 2011 (only) | 1.15:1.0 |
| Thereafter, each month through December 2012 | 1.20:1.0 |
| Thereafter, each month through December 2013 | 1.25:1.0 |

From and after the date on which it is determined that the Coverage Ratio is not satisfied, the cash management provisions described in the section entitled "Depository Relationship" shall be

| | implemented. |
|---|---|
| *Negative Covenants:* | Standard negative covenants for a facility of this type, and at least as favorable to a lending group as appearing in the Existing First Lien Credit Agreement (excluding any financial maintenance covenants), including but not limited to restrictions on mergers and consolidations, liens and encumbrances, indebtedness, dispositions of assets, investments, dividends and other restricted payments, capital expenditures and transactions with and payments to affiliates.<br><br>In addition, the Borrower will not, and will not permit any of its Subsidiaries to:<br><br>(a) (i) produce any motion picture project in-house or otherwise incur any direct negative cost for any motion picture project, (ii) green-light any motion picture project to be produced in an off-balance-sheet manner without having achieved an aggregate amount of pre-sales for such project in an amount equal to at least the cost to the Credit Parties of acquiring rights in such project (including without limitation the purchase price, whether characterized as a purchase price, negative pick-up payment, minimum guarantee, buyout or otherwise) and without having satisfied the other parameters to be set forth in the definitive documentation for the Term Facility (which shall include among other things that (A) the Credit Parties shall in no event be obligated to make payments to the relevant producer or any other person prior to the delivery of the relevant film, (B) in the event that any of the Credit Parties assign to the producer or the producer's financier(s) any right to payment under any sub-licenses or sub-distribution agreements (or otherwise convey or direct any such payment to the producer or its financier), the payment obligations of the sub-distributor shall be non-recourse to the Credit Parties and (C) the New Term Agent shall have had at least two (2) Business Days' opportunity to review any such documentation prior to execution (with such review to be limited to confirming compliance with the Term Facility documentation)), (iii) produce or arrange the production of any motion picture intended for theatrical exploitation, or (iv) produce or arrange the production of any episodic television program unless (A) each of the foregoing provisions of this clause (a) has been complied with and (B) the Credit Parties have no completion risk with respect to the season at issue and no obligation whatsoever (including any "tail" or economic risk) with respect to any subsequent season;<br><br>(b) assign any of its accounts receivable or grant a security interest in any such accounts receivable to any third party producer or any financier of any third party producer other than pursuant to parameters to be set forth in the Term Loan Agreement (which shall include that the New Term Agent shall have had at least two (2) Business Days' opportunity to review any such documentation prior to execution);<br><br>(c) permit the Fixed Charge Coverage Ratio (as defined below), determined annually, commencing with the twelve-month period ending December 31, 2011, to be less than the amounts set forth below:<br><br>For the 12-Month Period Ending:   Minimum FCCR:<br>December 31, 2011    1.05:1.0<br>December 31, 2012    1.1:1.0<br>December 31, 2013    1.25:1.0<br><br>(d) permit their Consolidated Cash Flow (as defined below), determined for the periods ending on the dates set forth below, to be less than the minimum amounts set forth below:<br><br>For the Period Ending:   Minimum Consolidated Cash Flow:<br>February 28, 2011    $9.5 million<br>March 30, 2011    $6.0 million<br>April 30, 2011    $6.0 million |

| | |
|---|---|
| | May 31, 2011 ... $6.0 million<br>June 30, 2011 ... $1.0 million<br>July 31, 2011 ... $1.0 million<br>August 31, 2011 ... $4.0 million<br>September 30, 2011 ... $3.0 million<br>October 31, 2011 ... $11.0 million<br>November 30, 2011 ... $18.5 million<br>December 31, 2011 ... $23.0 million<br>January 31, 2012 ... $26.0 million<br>February 29, 2012 ... $26.0 million<br>March 30, 2012 ... $28.0 million<br>April 30, 2012 ... $30.0 million<br>May 31, 2012 ... $30.0 million<br>June 30, 2012 ... $32.0 million<br>July 31, 2012 ... $32.0 million<br>August 31, 2012 ... $32.0 million<br>September 30, 2012 ... $35.0 million<br>October 31, 2012 ... $38.0 million<br>November 30, 2012 ... $41.0 million<br>December 31, 2012 ... $44.0 million<br>January 31, 2013 ... $46.0 million<br>February 28, 2013 ... $46.5 million<br>March 30, 2013 ... $45.5 million<br>April 30, 2013 ... $45.0 million<br>May 31, 2013 ... $44.5 million<br>June 30, 2013 ... $44.5 million<br>July 31, 2013 ... $44.0 million<br>August 31, 2013 ... $43.5 million<br>September 30, 2013 ... $44.0 million<br>October 31, 2013 ... $45.0 million<br>November 30, 2013 ... $45.5 million<br>December 31, 2013 ... $47.5 million<br><br>(e) permit the aggregate outstanding principal of any borrowings under the Revolving Facility or the maximum commitment amounts under the Revolving Facility to exceed U.S.$25 million at any time;<br><br>(f) permit their Overhead Expenses (to be defined in the Term Loan Agreement) to exceed the annual limits (but with evidence of compliance with the annual limits to be provided quarterly) set forth below:<br><br>Year: ... Maximum Overhead Expenses:<br>2011 ... $24.0 million<br>2012 ... $24.5 million<br>2013 ... $25.5 million<br><br>(g) permit their development costs and expenses (net of any cash recoveries or proceeds received from (a) the disposition of any development properties and (b) reimbursement by any third party such as a producer of development costs and expenses incurred by a Credit Party) to exceed $2.5 million in any calendar year (but with evidence of compliance with the annual limits to be provided quarterly). |
| *Events of Default:* | Standard events of default for a facility of this type and at least as favorable to a lending group as those contained in the Existing First Lien Credit Agreement, including but not limited to, payment default (two Business Day grace period for non-payment of interest and fees only), |

| | |
|---|---|
| | breach of negative covenant (no grace period), cross-defaults to other Indebtedness (including a cross-default to any event of default under the Revolving Facility and any default in the payment of any secured monetary obligations to any guilds), other breach under the loan documents (ten day grace period), false representation or warranty, a Change of Control (as defined below), a Change in Management (as defined below), judgments, certain ERISA/pension and environment-related defaults, customary events of default regarding an insolvency, receivership or bankruptcy event with respect to any of the Credit Parties' or any of their subsidiaries' failure to comply with any requirements of the Plan. |
| *Yield Protection and Increased Costs; Taxes:* | Customary provisions (a) protecting the New Term Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the New Term Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR Loan on a day other than the last day of an interest period with respect thereto. |
| *Costs and Expenses; Indemnification:* | The Borrower shall pay or reimburse the New Term Agent for (a) all reasonable fees and expenses of the New Term Agent associated with the preparation, execution, delivery and administration of the Term Facility documents and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of Morgan, Lewis & Bockius LLP and any other counsel retained by the New Term Agent (and any agents retained by such counsel) and financial advisors) (it being understood that reasonable efforts will be made to minimize unnecessary duplication of services) and (b) all reasonable fees and expenses of the New Term Agent and the New Term Lenders (including the reasonable fees, disbursement and other charges of counsel) in connection with the enforcement of and preservation of rights under the Term Facility documents (including by way of a refinancing or restructuring of the Term Facility that is in the nature of a "workout" thereof). |
| | The Borrower shall also pay or reimburse the New Term Agent for reasonable fees and expenses of the New Term Agent's respective internal and third-party auditors, appraisers, advisors and consultants incurred in connection with the Term Facility, including asset evaluation expenses, syndication expenses, rating agency fees and other charges and disbursements. |
| | The New Term Agent and the New Term Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof or the exercise of remedies thereunder (except resulting from the bad faith, gross negligence or willful misconduct of the indemnified person). |
| *Assignments and Participations:* | Lenders will be permitted to participate and assign all or a part of their Term Loans. Assignments of Term Loans shall be in a minimum principal amount of U.S.$1 million. |
| | Voting rights of participants will be limited to changes in amount, collateral provisions relating to release of all or substantially all of the Collateral, rate, fees and maturity date. Participants will receive cost and yield protection (without duplication and limited to the cost and yield protection available to the New Term Lenders issuing the participation). Any assignment will be by novation and will be subject to the approval of the New Term Agent, not to be unreasonably withheld (but not the approval of the Borrower). Assignees will assume all the rights and obligations of the assignor Lender. Each assignment will be subject to the payment of a $3,500 service fee by the assigning Lender to the New Term Agent. |

| | |
|---|---|
| *Voting:* | Required Lenders (defined to mean Lenders holding at least a majority of the then-outstanding Term Loans) except for amendments and waivers customarily requiring the consent of each directly affected Lender, including that the consent of each Lender shall be required in order (i) for the New Term Agent to (a) release or subordinate its security interest in any Collateral valued in excess of $1,000,000 or (b) subordinate its security interest in any Collateral valued in excess of $1,000,000 other than in connection with subordination in favor of a producer-for-hire of a Picture to be distributed by the Credit Parties, on a single-picture basis, pursuant to parameters to be set forth in the definitive documentation in any particular transaction, (ii) to decrease the non-default or default rate of interest or (c) to alter the scheduled maturity (or scheduled amortization of) any Term Loan or the principal amount of any Term Loan, or delay the fixed scheduled maturity of any payment required to be made under the Term Facility.  The Term Facility documents will provide among other things that (a) if the Borrower requests an amendment which requires unanimous consent and such amendment is consented to by a Super-Majority (66-2/3%) of the New Term Lenders, then with the consent of such Super-Majority, the New Term Lender(s) which did not consent to the amendment requested by the Borrower may be replaced at par pursuant to parameters to be established in the Term Loan Agreement, (b) if the Required Lenders desire to consent to any Extraordinary Transaction, the determination of the Required Lenders shall be binding on the Lender group. |
| *Agency:* | Usual and customary agency provisions satisfactory to the New Term Agent. |
| *Documentation:* | Reasonably satisfactory in form and substance to the New Term Agent, the New Term Lenders and the Borrower. |
| *Governing Law:* | New York. |
| *Certain Defined Terms:* | "Change of Control" shall mean the first day on which (i) a majority of the members of the Board of Directors of the Borrower are not Continuing Directors, (ii) any "person" (as that term is used in Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder as in effect from time to time), other than any persons which were on the Closing Date a New Term Lender and persons that are affiliates of such a Closing Date New Term Lender, shall own, directly or indirectly, beneficially or of record, shares of Parent Equity representing more than 50% of the voting Equity Interests of RHI INC (measured by voting power rather than number of shares or membership interests), (iii) RHI INC shall cease to have both beneficial ownership and control of 100% of the voting Equity Interests of the Borrower or (iv) the Borrower shall cease to have both beneficial ownership and control of 100% of the voting Equity Interests of each of RHI Entertainment Distribution, LLC, RHI Entertainment Productions, LLC and RHI International Distribution, Inc.  In addition, to the extent that the Management Incentive Plan includes any change of control concept in addition to the foregoing, the definitive documentation shall include a corresponding provision within the definition of "Change of Control". <br><br> "Change in Management" shall mean that the Borrower shall cease to employ an acceptable chief executive officer or shall cease to employ an acceptable executive vice president of finance or shall cease to employ an acceptable strategic planning officer, in each case to perform services substantially similar in scope to those provided for Borrower as of the Closing Date; provided, that (a) Robert Halmi, Jr., Michael Scarpelli and Robert Del Genio are pre-approved as an acceptable chief executive officer, executive vice president of finance (or chief financial officer if such position is utilized) and strategic planning officer, respectively and (b) a Change in Management shall not be deemed to have occurred if, within ninety (90) days after the event (provided that such period shall only be thirty (30) days if the underlying event relates to the lack of employment of a strategic planning officer) which would otherwise have resulted in a Change |

in Management, a person acceptable to the New Term Agent and the Required Lenders replaces the relevant officer pursuant to terms and conditions (including with respect to scope of employment) satisfactory to the New Term Agent and the Required Lenders, and any proposed replacement shall be deemed "acceptable" unless the New Term Agent or the Required Lenders has determined the proposed replacement to not be acceptable within fifteen (15) Business Days notice to the New Term Agent of his or her candidacy.

"Consolidated Cash Flow" shall mean for any period of determination, "Net cash provided by operating activities" of the Borrower and its Consolidated Subsidiaries as would be shown on a Consolidated Statement of Cash Flows prepared in accordance with GAAP plus (i) cash interest expense for the relevant period less permitted capital expenditures for such period plus (ii) cash paid in connection with restructuring activities (including without limitation amounts drawn under the pre-petition L/C issued in favor of RHI LLC's landlord to the extent the draw thereunder was included in "net cash provided by operating activities", severance, payments in connection with settlement of the "spillover" Pictures and any productivity bonuses paid to Robert Halmi Sr. with respect to spillover films that were released pre-petition) plus (iii) expenses that are accrued and paid to the strategic planning officer during such period.

For all month-end dates of determination, Consolidated Cash Flow is to be determined for the twelve month period ending on such date of determination.

"Continuing Director" shall mean, as of any date of determination, each member of the Board of Directors of the Borrower who (a) was a member of such Board of Directors on the Effective Date or (b) was endorsed for election or elected to such Board of Directors either (x) with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election or (y) by or with the consent of the Required Lenders.

"Coverage Ratio" shall mean the ratio of (i) the sum of the Library Appraisal Amount plus the amount of the Adjusted Receivables (to be determined in the manner set forth in the Exit Agreement) of the Borrower and the Guarantors to (ii) the aggregate amount of secured Indebtedness (to be determined in the Term Loan Agreement). (Adjusted Receivables shall include book and non-book receivables, with exclusions of non-qualifying receivables similar to the exclusions applicable to Eligible Receivables under the term sheet for the Exit Revolving Credit Facility, but without excluding foreign receivables, and applying a 10% present value discount on all receivables due more than 365 days from the date of determination in lieu of the Borrowing Base discount/reserves for long-term receivables.)

"Excess Cash Flow" shall mean, for any period for which it is to be determined, (x) the Consolidated "Net cash provided by operating activities" as would be shown on a Consolidated Statement of Cash Flows of the Borrower and its Consolidated Subsidiaries prepared in accordance with GAAP minus (y) the sum of (i) principal repayments by the Borrower or any of its Consolidated Subsidiaries on their Indebtedness, including principal repayments on the Loans and the principal portion of payments under Capital Leases (to be determined in the Term Loan Agreement) (but exclusive of mandatory payments during the period based upon the amount of Excess Cash Flow during prior periods as well as payments on Indebtedness to guilds and any payments that can be reborrowed), (ii) permitted Capital Expenditures (to be determined in the Term Loan Agreement), to the extent paid in cash from sources other than the net proceeds of secured purchase money financing, (iii) dividends paid or payable to RHI INC during such period for the payment of taxes permitted hereunder for such period, to the extent not deducted in computing "Net cash provided by operating activities" and (iv) financing fees (including bank fees and professional fees) that are required to be classified in the "Net cash provided by financing activities" section of a Consolidated Statement of Cash Flows.

"Fixed Charge Coverage Ratio" shall mean for any period of determination, the ratio of (i) Consolidated Cash Flow for the relevant period to (ii) Fixed Charges for such period. The Fixed

| | |
|---|---|
| | Charge Coverage Ratio is to be determined for the twelve-month period ending on any date of determination.<br><br>"Fixed Charges" shall mean, for any period for which it is to be determined, the sum of (a) cash total interest expense (including without limitation interest on the Term Loans and interest on the Revolving Facility), plus (b) scheduled payments on principal of Indebtedness (exclusive of repayments of revolving credit loans under the Revolving Facility and any mandatory prepayments under the Term Facility, but inclusive of any required amortization under the Term Facility), in each case of the Borrower and its Consolidated Subsidiaries.<br><br>"Library Appraisal Amount" shall have the meaning set forth in clause (a) of "Affirmative Covenants" in this term sheet. |

**EXHIBIT F**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT F**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**New Warrants Term Sheet**

| | |
|---|---|
| *Issuer:* | RHI Entertainment, Inc. (the "Company"). |
| *Holders:* | Second Lien Lenders (each, a "Holder"). |
| *Ownership Percentage:* | New Warrants (the "Warrants") collectively representing 15% ownership of the Company on a fully-diluted basis, as of the Effective Date, determined after taking into account the full dilution attributable to New Management Incentive Plan and the exercise of the Warrants. |
| *Closing:* | Effective Date. |
| *Exercise Period of Warrants:* | Exercisable at any time, in whole or in part, prior to the earlier of (1) the 7th anniversary of the Effective Date and (2) the time of closing of a sale of all or substantially all of the equity securities of the Company (other than equity securities issued to management under the New Management Incentive Plan) to a third party purchaser (provided that the Holders shall be provided reasonable advance notice of such sale and shall have the right to either (i) exercise the Warrants (including in the cashless exercise described below) prior to the consummation of such sale or (ii) sell the Warrants in such sale for the "in the money" value of such Warrants (with such "in the money" value determined in accordance with the valuation procedures described for a cashless exercise below). |
| *Exercise Price of Warrants:* | The exercise price of the Warrants shall be based upon an equity value of the common stock of the Company that is issued to the First Lien Lenders on the Effective Date being equal to 100% of the full amount of the allowed claim in respect of the Existing First Lien Claims. Equity value shall be determined after taking into account all new debt issued to the holders of Existing First Lien Claims in connection with the Effective Date. |
| | The Warrants will include a "cashless exercise" option. For purposes of a cashless exercise or a sale of the Warrant (as discussed above), the value of the underlying shares shall be determined as follows: (a) in connection with a sale of the Company where the purchase price for the Company's securities is payable in cash or in securities that are publicly traded, the value of the underlying shares shall equal the value of the consideration payable for each share, (b) if the Company's securities are publicly traded, the five-day average of the closing price for such shares prior to the applicable date of determination, or (c) in all other events the value shall be determined in good faith by (or in a manner determined by) the New Board; provided that if the Holders of a majority of shares of common equity of the Company issued or issuable upon exercise of the Warrants (the "Required Holders") disagree with New Board's valuation, the value shall be determined by an independent arbitrator mutually selected by the Company and the Required Holders (with the Holders paying for the costs of such independent arbitrator unless the value determined by such independent arbitrator is at least 110% of the value |

| | |
|---|---|
| | determined by the Company). |
| *Put Rights:* | None. |
| *Special Consent Rights:* | Consent of the Required Holders shall be required for the following actions by the Company or any of its subsidiaries:<br><br>(i) Amend the Certificate of Incorporation or By-Laws of the Company or any of its subsidiaries in a manner materially adverse to the Holders disproportionately to the holders of the Company's common stock;<br><br>(ii) Adversely alter any of the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Holders;<br><br>(iii) Agree or commit to do any of the foregoing.<br><br>Consent of the Required Holders would be required to amend, modify or terminate any of the foregoing protective provisions.<br><br>In addition, entry into or modification of any transaction with an Affiliate (defined below) of the Company will require the approval of the holders of a majority of the outstanding common stock of the Company (including the Holders voting on an as exercised basis); provided, that the transactions with Affiliates (i) involving monetary consideration of under $100,000 or (ii) which are entered into in the ordinary course of business of the Affiliate (e.g., in the case of any Affiliate which is a financial institution, depository or other banking arrangements, interest rate swap or other hedging arrangements, transactions involving performance under, amendments to or refinancings of the financing facilities being implemented on the Effective Date or any refinancing or restructuring thereof, and in the case of any Affiliate which is a film distributor or channel operator, the ordering of film product or other customary license arrangements) and on normal business terms, shall in each case not require a shareholder/Holder vote.<br><br>"Affiliate" means, with respect to any specified Person at any time means, (a) each Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person at such time, with "control" defined as the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, (b) each Person who is at such time a direct or indirect beneficial holder of at least 15% of the voting equity interests such specified Person (excluding the Warrants) on a fully-diluted basis, (c) each Person that is managed by a majority of the executive officers and/or a majority of the directors that manage such specified Person, (d) the members of the immediate family of each holder described in clause (b), and (e) each Person of which such specified Person or an Affiliate (as defined in clauses (a) through (d)) thereof will, directly or indirectly, beneficially own at least 15% of the voting equity interests of, such Person (excluding the Warrants) on a fully- diluted basis.  For purposes hereof, so long as they shall hold any equity interests of the Company, JPMorgan Chase Bank, N.A. and JPM Mezzanine Capital, LLC shall not be considered to be under "common control" or under common management. |
| *Future Grants of Rights to Stockholders:* | In the event that the Company provides all of the holders of the common stock of the Company:  (a) a preemptive right, a participation right, or other similar right to purchase a pro rata share of any offering by the Company of equity securities, or any securities convertible into or exercisable for equity securities, (b) a tag-along or co-sale right or similar right with respect to the sale or transfer of any equity securities or any securities |

|  | convertible into or exercisable for equity securities, (c) a put or call right with respect to the purchase of any equity securities, or any securities convertible into or exercisable for equity securities or (d) anti-dilution protection, then in each case the Company shall be required to provide contemporaneously to the Holders the same rights on the same terms with respect to both (i) the Warrants and (ii) the common stock that is being issued to the holders of Existing Second Lien Claims on the Effective Date. |
|---|---|
| *Registration Rights:* | *Demand Registrations.*  None.<br><br>*Piggyback Registration Rights.*  The Holders will be entitled to piggyback registration rights with respect to the shares of common stock underlying the warrants.<br><br>*Expenses.*  Expenses of piggyback registrations will be paid by the Company (other than underwriting discounts and selling commissions), including without limitation for one legal counsel for all selling holders. |
| *Anti-Dilution:* | The exercise price of the Warrants and/or number of common equity securities issuable upon exercise of the Warrants will be subject to adjustment to account for any stock splits, stock dividends and similar events.<br><br>In the event that the Company provides anti-dilution protection to all of the holders of at least 2.5% of the outstanding shares of common stock of the Company, the Company shall be required to provide contemporaneously to the Holders the same protections on the same terms. |
| *Dividends:* | Upon any declaration or payment of cash dividends on common equity, the holders shall not be entitled to any payment in connection therewith, and the exercise price of the Warrants shall be unaffected. |
| *Tag Along Rights:* | None. |
| *Transfer Rights:* | Freely transferable subject to applicable securities laws; provided that no transfer will be permitted unless either (a) a single transferee is receiving the entirety of the Warrant and any other Warrants held by the transferring Holder, (b) a single transferee is receiving an entitlement to purchase at least a number of shares of common stock equal to 20% of the number of shares of common stock into which all Warrants issued pursuant to the Plan are convertible (after giving effect to all applicable anti-dilution provisions and assuming that no Warrants have been exercised or terminated as a result of their acquisition by the Company) or (c) the transferee is already a holder of common stock of the Company or Warrants.  Transfers that are not in accordance with the foregoing shall be null and void *ab initio*. |
| *Information Rights:* | The financial information and reasonable inspection rights provided to lenders under the senior credit facility post-Reorganization will be available for each Holder so long as any Warrant or underlying common equity is outstanding.  In the event that RHI Entertainment and its affiliates are not required to provide any financial information to their lenders, such holders will be entitled to receive quarterly financial reports. |
| *Governing Law:* | New York. |

**EXHIBIT G**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF**
**RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**EXHIBIT G**

**TO**

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
RHI ENTERTAINMENT, INC. AND AFFILIATED DEBTORS**

**Films Subject to Film Obligation Settlements**

| | TITLE | PRODUCER/CUSTOMER/LICENSOR PARTY | LENDER PARTIES |
|---|---|---|---|
| 1. | ACCEPTANCE | Frank & Bob Films II VZS Productions, Inc. von Zerneck/Sertner Films Frank von Zerneck Robert M. Sertner (collectively, "VZS") | |
| 2. | ALICE | Alice Productions Inc. Studio Eight (Alice) Limited Reunion Pictures Inc. | Royal Bank of Canada |
| 3. | AMBULANCE GIRL | VZS | |
| 4. | ARABIAN NIGHTS | American Broadcasting Companies, Inc. ("ABC") | |
| 5. | CATEGORY 6: DAY OF DESTRUCTION | VZS | |
| 6. | CATEGORY 7: THE END OF THE WORLD | VZS | |
| 7. | CHRISTMAS IN CANAAN | XMAS Films Inc. | |
| 8. | DEADLY INVASION | VZS | |
| 9. | DEFENDING OUR KIDS: THE JULIE POSEY STORY | VZS | |
| 10. | DOUBLE WEDDING | Jaffe Braunstein Entertainment, LLC | |
| 11. | DREAMKEEPER | ABC | |
| 12. | DYING TO BELONG | VZS | |
| 13. | DYNASTY: MAKING OF A GUILTY PLEASURE | VZS | |
| 14. | ELIZABETH SMART STORY | VZS | |
| 15. | FAIRFIELD ROAD | Cypress Point Films, Inc. ("CPF") | |
| 16. | FAMILY GATHERING | Tertius Productions, Inc. | |
| 17. | FATAL ERROR | VZS | |
| 18. | FERGIE & ANDREW | VZS | |
| 19. | FOR ONE NIGHT ONLY | VZS | |
| 20. | GOBLIN | Gobi Productions Inc. | City National Bank ("CNB") |

| | | Reel One Entertainment, Inc. | |
|---|---|---|---|
| 21. | GRACIE'S CHOICE | VZS | |
| 22. | HAUNTING SARAH | VZS | |
| 23. | HEART OF A STRANGER - LIFETIME | VZS | |
| 24. | HOLIDAY IN YOUR HEART | VZS | |
| 25. | I DO BUT I DON'T | VZS | |
| 26. | INSIDE THE OSMONDS | VZS | |
| 27. | KILLER INSTINCT: THE FILES OF AGENT CANDICE DELONG | VZS | |
| 28. | MITCH ALBOM'S THE FIVE PEOPLE YOU MEET IN HEAVEN | ABC | |
| 29. | MOM AT SIXTEEN | VZS | |
| 30. | MONGOLIAN DEATH WORM | Sweet Tater, LLC<br>Black Chrome, Inc. ("BCI") | CNB<br>Bank Leumi USA ("Bank Leumi") |
| 31. | MORE THAN MEETS THE EYE: JOAN BROCK STORY | VZS | |
| 32. | MOTHER KNOWS BEST | VZS | |
| 33. | MOTHMAN | BRK Distribution LLC ("BRKD") | OJK Investments, LLC ("OJK") |
| 34. | MR. ROCK 'N' ROLL : THE ALAN FREED STORY | VZS | |
| 35. | MY SON IS INNOCENT | VZS | |
| 36. | MYSTERY OF NATALIE WOOD, THE | VZS | |
| 37. | NATIONAL TREE | CPF | |
| 38. | NAUGHTY OR NICE - GEORGE LOPEZ CHRISTMAS | VZS | |
| 39. | NIGHTSCREAM | VZS | |
| 40. | NO ONE WOULD TELL | VZS | |
| 41. | NO ORDINARY BABY | VZS | |
| 42. | NOWHERE TO LAND | VZS | |
| 43. | PHANTOM RACER | Phantom Racer Productions, Inc. | National Bank of Canada ("NBC") |
| 44. | RETURNING LILY | VZS | |
| 45. | REVERSIBLE ERRORS | VZS | |
| 46. | RIVERWORLD | Riverworld Productions Inc. | NBC |
| 47. | ROBIN COOK'S ACCEPTABLE RISKS | VZS | |
| 48. | ROBIN COOK'S INVASION | VZS | |
| 49. | ROBIN COOK'S TERMINAL | VZS | |

| 50. | SCARED SILENT | VZS | |
|---|---|---|---|
| 51. | SEE JANE DATE | VZS | |
| 52. | SEVEN DEADLY SINS | Abbey Films Limited | |
| 53. | SILENT PREDATORS | VZS | |
| 54. | SORORITY WARS | VZS | |
| 55. | STILL HOLDING ON: LEGEND OF CADILLAC JACK, THE | VZS | |
| 56. | SURVIVE THE SAVAGE SEA | VZS | |
| 57. | TEN COMMANDMENTS, THE | ABC | |
| 58. | TERROR IN THE FAMILY | VZS | |
| 59. | THE CIRCUIT | VZS | |
| 60. | THEY SHOOT DIVAS, DON'T THEY? | VZS | |
| 61. | TOO RICH: THE SECRET LIFE OF DORIS DUKE | VZS | |
| 62. | TORNADO! | VZS | |
| 63. | TWO CAME BACK | VZS | |
| 64. | UNEARTHED (AKA MANDRAKE) | Mandrake Botanical, LLC BCI | CNB Bank Leumi |
| 65. | VINEGAR HILL | VZS | |
| 66. | VIRTUAL OBSESSION AKA HOST | VZS | |
| 67. | WE WERE THE MULVANEYS | VZS | |
| 68. | WES CRAVEN PRESENTS HOUSE OF FEAR DON'T LOOK DOWN | VZS | |
| 69. | WHILE I WAS AWAY | VZS | |
| 70. | WITCHVILLE | BRKD | OJK |
| 71. | WITHIN THESE WALLS | VZS | |